REDACTED – PUBLIC VERSION

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HUMANA INC.<br><br>                                    Plaintiff,<br><br>         v.<br><br>ACTAVIS ELIZABETH, LLC,<br>ACTAVIS HOLDCO US, INC.,<br>ACTAVIS PHARMA, INC.,<br>AMNEAL PHARMACEUTICALS, INC.,<br>APOTEX CORP.,<br>ASCEND LABORATORIES, LLC,<br>AUROBINDO PHARMA USA, INC.,<br>BRECKENRIDGE PHARMACEUTICAL, INC.,<br>CAMBER PHARMACEUTICALS, INC.<br>CITRON PHARMA, LLC<br>DR. REDDY'S LABORATORIES INC.,<br>ENDO INTERNATIONAL PLC,<br>G&W LABORATORIES, INC.<br>GENERICS BIDCO I, LLC,<br>GLENMARK PHARMACEUTICALS INC., USA,<br>HERITAGE PHARMACEUTICALS INC.,<br>IMPAX LABORATORIES, LLC<br>LANNETT COMPANY, INC.,<br>LUPIN PHARMACEUTICALS, INC.,<br>MORTON GROVE PHARMACEUTICALS, INC.<br>MYLAN, INC.<br>MYLAN, N.V.<br>MYLAN PHARMACEUTICALS, INC.,<br>OCEANSIDE PHARMACEUTICALS, INC.,<br>PAR PHARMACEUTICAL, INC.<br>PAR PHARMACEUTICAL COMPANIES, INC.,<br>SANDOZ, INC.,<br>SUN PHARMACEUTICAL INDUSTRIES, INC.<br>TARO PHARMACEUTICALS INDUSTRIES LTD.<br>TARO PHARMACEUTICALS USA, INC.,<br>TEVA PHARMACEUTICALS USA, INC.,<br>UPSHER-SMITH LABORATORIES, LLC,<br>VALEANT PHARMACEUTICALS INTERNATIONAL,<br>VALEANT PHARMACEUTICALS NORTH AMERICA LLC<br>VERSAPHARM, INC.<br>WOCKHARDT USA LLC,<br>ZYDUS PHARMACEUTICALS (USA) INC.,<br><br>                                    Defendants. | Civil Action No.<br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br><br><br>**Redacted Version** |

**REDACTED – PUBLIC VERSION**

## TABLE OF CONTENTS

I.      NATURE OF THE CASE ................................................................................................ 1

II.     THE DRUGS SUBJECT TO THE CONSPIRACY ...................................................... 5

III.    JURISDICTION AND VENUE ................................................................................... 17

IV.     THE PARTIES ............................................................................................................. 18

      A.      Plaintiff ............................................................................................................. 18

      B.      Defendants ........................................................................................................ 20

      C.      Co-Conspirators ............................................................................................... 29

V.      REGULATORY AND ECONOMIC BACKGROUND .............................................. 29

      A.      Generic Drugs Should Provide Lower-Priced Options for Purchasers ......... 29

      B.      The Prescription Drug Market ........................................................................ 31

      C.      The Prescription Drug Distribution System ................................................... 32

      D.      The Market for Generic Drugs is Highly Susceptible to Collusion ............... 34

VI.     GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY ............................. 37

      A.      Congress Launched an Investigation into Generic Price Hikes ..................... 37

      B.      The DOJ Investigates Criminal Generic Drug Collusion .............................. 39

      C.      State Attorneys General Launch Their Own Investigation ............................ 41

VII.    THE GENERIC DRUG MARKET ............................................................................. 45

      A.      The Cozy Nature of the Industry and Opportunities for Collusion .............. 45

            1.      Trade Association Meetings and Conferences ..................................... 46

                 a.      National Association of Chain Drug Stores ............................ 47

                 b.      Generic Pharmaceutical Association ........................................ 48

                 c.      Healthcare Distribution Management Association ................. 51

                 d.      Efficient Collaborative Retail Marketing ................................. 52

                 e.      Minnesota Multistate Contracting Pharmacy Alliance .......... 52

REDACTED – PUBLIC VERSION

|  |  | f. | Healthcare Supply Chain Association | 53 |

**2.** Industry Dinners and Private Meetings .................................. 54

**3.** Personal Telephone Calls, E-Mails, and Text Message Communications ................................................................. 56

B. The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox ................................................ 57

C. Generic Drug Price Spikes Since 2013 ................................. 73

VIII. THE CONSPIRACY ................................................................ 74

A. Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors ........................................................................ 76

**1.** April 2013: Teva Hires Nisha Patel ........................................ 76

**2.** Ranking "Quality of Competition" to Identify Price Increase Candidates ............................................................................ 80

a. The "High Quality" Competitor Relationships ........................ 81

b. Mylan (+3) ............................................................................. 82

c. Watson/Actavis (+3) .............................................................. 83

d. Sandoz (+3) ........................................................................... 84

e. Glenmark (+3) ....................................................................... 84

f. Taro (+3) ................................................................................ 85

g. Lupin (+2) .............................................................................. 85

B. Price Increase Hiatus .............................................................. 86

C. New Relationships Emerge .................................................... 87

D. Competitors Become "High Quality" After Successfully Colluding With Teva ............................................................................... 87

E. Quality Competitors Collude With Each Other, Sandoz/Mylan .... 87

F. Commitment to the Overarching Conspiracy ......................... 88

G. Low Quality Competitors Comply with the Overarching Conspiracy .......... 90

H. Individual Relationships ......................................................... 90

**1.** Ara Aprahamian ...................................................................................90

**2.** David Berthold .................................................................................91

**3.** Jim Brown.........................................................................................93

**4.** Maureen Cavanaugh.........................................................................94

**5.** Marc Falkin ......................................................................................94

**6.** Jim Grauso .......................................................................................96

**7.** Kevin Green......................................................................................99

**8.** Armando Kellum............................................................................ 101

**9.** Jill Nailor ....................................................................................... 102

**10.** James Nesta ................................................................................... 104

**11.** Konstantin Ostaficiuk.................................................................... 105

**12.** Nisha Patel .................................................................................... 106

**13.** David Rekenthaler......................................................................... 108

**14.** Rick Rogerson............................................................................... 110

**15.** Tracy Sullivan ............................................................................... 110

I.  Teva Profitability Increases Dramatically...................................................... 111

J.  Teva and its Executives Knowingly Violated the Antitrust Laws ................ 112

K.  Price Increases Slow Dramatically After Government Investigations Commence ...................................................................................................... 115

L.  Consciousness of Guilt .................................................................................. 116

M.  Spoliation of Evidence .................................................................................. 117

N.  Obstruction of Justice ................................................................................... 118

IX.  THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS ................................................................................119

A.  Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion .......................................................................... 119

**1.**   Teva/Mylan ......................................................................... 119

   a.    Fenofibrate ................................................................. 119

   b.    Clonidine TTS ............................................................ 123

   c.    Tolterodine ER .......................................................... 127

   d.    Capecitabine ............................................................. 132

**2.**   Teva/Sandoz ...................................................................... 135

   a.    Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa). 135

   b.    Temozolomide ........................................................... 136

   c.    Tobramycin ................................................................ 140

   d.    Dexmethylphenidate HCL ER ................................... 142

**3.**   Teva/Lupin ........................................................................ 144

   a.    Lamivudine/Zidovudine (Combivir) ...................... 144

   b.    Irbesartan .................................................................. 147

   c.    Drospirenone and Ethinyl Estradiol (Ocella) ...................... 148

   d.    Norethindrone/Ethinyl Estradiol ......................... 151

**4.**   Teva/Greenstone .............................................................. 152

   a.    Oxaprozin .................................................................. 152

   b.    Tolterodine Tartrate ................................................ 155

   c.    Piroxicam ................................................................... 157

   d.    Cabergoline ............................................................... 159

**5.**   Teva/Actavis ...................................................................... 160

   a.    Amphetamine/Dextroamphetamine ER ................. 160

   b.    Amphetamine/Dextroamphetamine IR .................. 162

   c.    Dextroamphetamine Sulfate ER .............................. 162

   d.    Clonidine TTS ............................................................ 163

e.      Budesonide inhalation ................................................... 165

f.      Celecoxib ........................................................................ 165

**6.**    Teva/Par ....................................................................................... 167

a.      Omega-3-Acid Ethyl Esters .......................................... 167

b.      Entecavir ....................................................................... 169

c.      Budesonide DR .............................................................. 171

**7.**    Teva/Taro ..................................................................................... 172

a.      Enalapril Maleate .......................................................... 172

b.      Nortriptyline HCL ......................................................... 176

**8.**    Teva/Zydus ................................................................................... 179

a.      Fenofibrate .................................................................... 180

b.      Paricalcitol .................................................................... 184

c.      Niacin ER ...................................................................... 186

d.      Etodolac ER ................................................................... 189

**9.**    Teva/Glenmark ............................................................................ 191

a.      Moexipril HCL .............................................................. 191

b.      Desogestrel/Ethinyl Estradiol (Kariva) ................................. 193

c.      Gabapentin .................................................................... 194

**10.**   Teva/Amneal ................................................................................ 195

a.      Norethindrone Acetate .................................................. 195

**11.**   Teva/ Dr. Reddy's ........................................................................ 195

a.      Oxaprozin ...................................................................... 195

b.      Paricalcitol .................................................................... 197

**12.**   Mylan / Sandoz ............................................................................ 202

a.      Valsartan HCTZ ............................................................ 202

**REDACTED – PUBLIC VERSION**

B.     Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015) .................................................................................................... 205

    1.     July 31, 2012 Price Increase ................................................................ 205

         a.     Nadolol.................................................................................. 206

         b.     Labetalol HCL..................................................................... 208

         c.     Nitrofurantoin MAC ........................................................... 209

    2.     February – April 2013: Increasing Prices Before a New Competitor Enters the Market: Budesonide Inhalation Suspension.................... 210

    3.     May 13, 2013 Price Increase – Tizanidine ......................................... 211

    4.     May 24, 2013 First List of Price Increases......................................... 213

         a.     Glenmark .............................................................................. 215

         b.     Sandoz .................................................................................. 218

         c.     Taro...................................................................................... 221

    5.     July 3, 2013 Price Increases ................................................................ 222

         a.     Upsher-Smith ....................................................................... 224

         b.     Mylan ................................................................................... 225

         c.     Sandoz .................................................................................. 229

    6.     Impact of July 3, 2013 Price Increases on Teva................................. 230

    7.     July 19, 2013 Price Increase – Enalapril Maleate.............................. 231

    8.     August 9, 2013 Price Increases........................................................... 236

         a.     Mylan ................................................................................... 240

         b.     Etodolac ............................................................................... 243

         c.     Niacin ER ............................................................................. 247

    9.     July 2013 – January 2014: Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL ............................. 250

    10.     April 4, 2014 Price Increases .............................................................. 254

a.      Cephalexin ..................................................................... 260

b.      Azithromycin and Medroxyprogesterone ........................... 262

c.      Clarithromycin ER........................................................... 265

d.      Ketoconazole.................................................................. 268

e.      Estradiol/Norethindrone Acetate and Cyproheptadine HCL
        ....................................................................................... 271

f.      Diflunisal ........................................................................ 273

g.      Ethosuximide .................................................................. 274

11.     Impact of April 4, 2014 Price Increases to Teva ............................. 275

12.     August 28, 2014 Price Increases.......................................... 276

a.      Enalapril Maleate ............................................................ 278

b.      Prochlorperazine............................................................. 278

c.      Mylan ............................................................................. 279

d.      Taro ............................................................................... 282

e.      Zydus ............................................................................. 286

13.     January 28, 2015 Price Increases.......................................... 287

a.      Ciprofloxacin HCL and Glimepiride ................................. 289

b.      Griseofulvin.................................................................... 291

C.      COMPETITORS BECOME "HIGH QUALITY" AFTER
        SUCCESSFULLY COLLUDING WITH TEVA........................................ 291

1.      Apotex............................................................................ 291

2.      Zydus.............................................................................. 293

3.      Heritage.......................................................................... 294

4.      Lupin .............................................................................. 319

5.      Par.................................................................................. 320

6.      Greenstone...................................................................... 322

**REDACTED – PUBLIC VERSION**

| | | | |
|---|---|---|---|
| **7.** | Amneal | | 323 |
| **8.** | Rising | | 324 |
| **9.** | Breckenridge | | 326 |
| **10.** | Glenmark | | 327 |
| **11.** | Camber | | 328 |

X.     HUMANA'S PURCHASES AND ANTITRUST INJURY ....................................333

XI.    INTERSTATE TRADE AND COMMERCE ............................................................336

XII.   TOLLING AND FRAUDULENT CONCEALMENT ...........................................337

XIII.  DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY ....................................................................................................................................338

XIV.   CAUSES OF ACTION............................................................................................338

XV.    DEMAND FOR JUDGMENT.................................................................................574

XVI.   JURY DEMAND......................................................................................................574

**REDACTED – PUBLIC VERSION**

Plaintiff Humana Inc. ("Humana") files this Complaint against Defendants Actavis Elizabeth, LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories Inc., Emcure Pharmaceuticals, Ltd., Endo International, plc, G&W Laboratories, Ltd., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, Heritage Pharmaceuticals Inc., Impax Laboratories, LLC, Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Morton Grove Pharmaceuticals, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals, Inc., Oceanside Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Par Pharmaceutical, Inc., Sun Pharmaceutical Industries, Inc. Sandoz, Inc., Taro Pharmaceutical Industries, Ltd., Taro Pharmaceuticals USA, Inc., Teva Pharmaceuticals USA, Inc., Upsher-Smith Laboratories, LLC, Valeant Pharmaceuticals International, Valeant Pharmaceuticals North America LLC, VersaPharm, Inc. Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc. (collectively "Defendants") and alleges based on personal knowledge as to the facts pertaining to it and information made public during ongoing government investigations of Defendants and other generic drug companies, and upon information and belief as to all other matters, as follows:

## I.     NATURE OF THE CASE

1.     Humana brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the Defendants' profits, and that of others working with them, at the expense of Humana, a private health benefit provider, as well as consumers and the government.

2.     In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers,

and third-party payers ("TPPs") like Humana. Defendants here, however, along with other generic

drug manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst

themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or

maintain the price of the drugs identified in Section II below (the "Subject Drugs"). The

Defendants' scheme continues to affect the generic drug markets for the Subject Drugs. While this

Complaint alleges facts as to the Subject Drugs, this scheme and conspiracy extends to other generic

drugs, including those that are the subject of Humana's Second Amended Complaint, as may be

further amended, in *Humana Inc. v. Actavis Elizabeth, LLC*, No. 2:18-cv-03299-CMR.

3.      Defendants orchestrated their conspiracy through secret communications and

meetings, both at private and public events, like trade association meetings held by the Generic

Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare

Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the

Efficient Collaborative Retail Marketing organization ("ECRM"), the Minnesota Multistate

Contracting Alliance for Pharmacy ("MMCAP"), and the Healthcare Supply Chain Association

("HSCA"), among others.

4.      The conspiracy, which infected the entire generic marketplace, was designed to evade

detection. Pursuant to a "fair share" scheme, Defendants predetermined market share, fixed prices,

and rigged bids on the Subject Drugs listed below, as well as additional drugs. This fair share

understanding was often referred to by Defendants as the "rules of engagement" for the generic

drug industry and permeated every segment of the industry. The *modus operandi* was to avoid

competition among generic manufacturers that would normally result in significant price erosion and

significant savings for purchasers, particularly insurers – like Humana – responsible for paying the

bulk of the prescription drug costs in the United States. This overarching conspiracy, effectuated by

a series of drug-specific conspiracies, thwarted competition across the generic drug industry:

5.      Predictably, the results of the conspiracy were severe. The prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%, like for example, Doxazosin Mesylate (1053%), Fluconazole (1,570%), Nadolol (2,762%), and Oxybutynin Chloride (between 1,100 and 1,500%).

6.      These price increases are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs, specifically Amiloride HCL/HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clotrimazole, Dextroamphetamine Sulfate, Diltiazem HCL, Doxazosin Mesylate, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Methotrexate, Nadolol, Nitrofurantoin MAC, Oxaprozin, Oxybutynin Chloride, Piroxicam, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Tobramycin, and Trifluoperazine HCL.[1]

7.      By 2012, Teva Pharmaceuticals USA. Inc. ("Teva") and its co-conspirators embarked on one of the most egregious and massive price-fixing conspiracies in the history of the United States. They leveraged the culture of cronyism in the generic drug industry to avoid price erosion, increase prices for targeted products, and maintain artificially inflated prices across their respective product portfolios without triggering a "fight to the bottom" among competitors. While Teva spearheaded the particular overarching conspiracy that is the subject of this Complaint, it is part of an even larger overarching conspiracy and understanding of how the generic manufacturers fix prices and allocate markets to suppress competition.

8.      Defendants routinely and systematically communicated with one another to determine and agree on how much market share, and which customers, each conspirator was

---

[1] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

entitled to. They effectuated their market allocation by either refusing to bid for particular customers or providing outrageously high cover bids. This created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

9.     Defendants understood and acted upon an underlying code of conduct widespread in the generic drug industry: any time a competitor enters a particular drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. While different drugs may involve different competitors, this understanding remains constant and is the backbone of the industry wide conspiracy.

10.    As one example of this conspiracy, Teva selected a core group of "High Quality" conspirators that it had existing conspiratorial relationships with, and targeted drugs that Teva and High Quality competitors overlapped on for price increases. Teva and the High Quality competitors understood that they would lead and follow each other's price increases, and did so frequently and successfully.

11.    The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

12.    This industry-wide data is consistent with the substantial price increases Humana suffered for the Subject Drugs.

13.    At the peak of the collusive activity involving Teva, during a 19-month period from July 2013 through January 2015, Teva significantly raised prices on dozens of different generic drugs. Teva colluded with High Quality conspirators on most of them.

14.     Defendants knew their conduct was unlawful. They limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct. When communications were reduced to writing or text messages, Defendants often destroyed the evidence of those communications.

15.     Executives and others at the highest levels in many of Defendant companies and other companies not named as Defendants, including among others, Ara Aprahamian, David Berthold, James (Jim) Brown, Maureen Cavanaugh, Tracy Sullivan DiValerio, Marc Falkin, James (Jim) Grauso, Kevin Green, Armando Kellum, Jill Nailor, James (Jim) Nesta, Konstantin (Kon) Ostaficiuk, Nisha Patel, David Rekenthaler, and Richard (Rick) Rogerson, among others, conceived, directed, and ultimately benefitted from these schemes.

16.     This scheme to fix and maintain prices, allocate markets, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein. As a result of the conspiracy, Humana paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

17.     Humana seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

## II.     THE DRUGS SUBJECT TO THE CONSPIRACY

18.     <u>Adapalene</u>. Adapalene is a topical retinoid used to treat acne and other skin conditions. Adapalene comes in different forms including gels and creams.

19.     <u>Albuterol Sulfate</u>. Albuterol sulfate is a bronchodilator that targets the β-2 receptor of the lungs to relax muscles in the airways to increase pulmonary airflow. It is used to treat shortness of breath caused by asthma and chronic obstructive pulmonary disease. It was first

discovered in the 1960s and is included on the World Health Organization's ("WHO's") list of Essential Medicines.

20.     <u>Amiloride HCL/HCTZ</u>. Amiloride hydrochloride ("HCL") and amiloride hydrochlorothiazide ("HCTZ") are diuretics typically used in combination to treat hypertension, heart failure or extra fluid in the body (edema). They also help to treat or prevent low potassium levels. Both medications are included on the WHO's list of Essential Medicines.

21.     <u>Amoxicillin/Clavulanate</u>. Amoxicillin/clavulanate is an antibiotic consisting of amoxicillin and clavulanate potassium. Amoxicillin is an antibiotic used to treat bacterial infections such as middle ear infections, strep throat, pneumonia, skin infections, urinary tract infections, and others. Clavulanate potassium is an inhibitor to bacterial resistance. Amoxicillin/clavulanate is included on the WHO's list of Essential Medicines.

22.     <u>Amphetamine/Dextroamphetamine</u>. Amphetamine/dextroamphetamine is a combination stimulant used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. The medication comes in both extended release (ER) and instant release (IR) forms.

23.     <u>Azithromycin</u>. Azithromycin is an antibiotic used to treat bacterial infections, sexually-transmitted infections, and malaria. It is included on the WHO's list of Essential Medicines.

24.     <u>Bethanechol Chloride</u>. Bethanechol chloride is used to treat dry mouth and bladder problems such as the inability to urinate or empty the bladder completely.

25.     <u>Budesonide</u>. Budesonide is a corticosteroid. The inhaled form is used for long-term management of asthma and chronic obstructive pulmonary disease. It can also be used to treat allergic rhinitis and nasal polyps. The pill form is delayed release (DR) and is used to treat inflammatory bowel diseases including Crohn's disease, ulcerative colitis, and microscopic colitis. Budesonide is included on the WHO's list of Essential Medicines.

26.     <u>Bumetanide</u>. Bumetanide is a diuretic used to treat swelling as a result of heart failure, liver failure, or kidney problems. It is also used to treat high blood pressure.

27.     <u>Buspirone HCL</u>. Buspirone hydrochloride is used for the short-term treatment of anxiety disorders, particularly generalized anxiety disorders.

28.     <u>Cabergoline</u>. Cabergoline is a dopamine receptor agonist used in the management of prolactinomas. It is also used as an antidepressant and lactation suppressor.

29.     <u>Capecitabine</u>. Capecitabine is a chemotherapy medication used to treat breast cancer, gastric cancer, and colorectal cancer. It is included on the WHO's list of Essential Medicines.

30.     <u>Carbamazepine</u>. Carbamazepine is an anticonvulsant medication used to treat epilepsy and neuropathic pain. It is also used to treat schizophrenia and bipolar disorder. It is included on the WHO's list of Essential Medicines.

31.     <u>Cefdinir</u>. Cefdinir is an antibiotic used to treat pneumonia, otitis media, strep throat, and cellulitis.

32.     <u>Cefprozil</u>. Cefprozil is a cephalosporin antibiotic used to treat ear infections, skin infections, and other bacterial infections.

33.     <u>Celecoxib</u>. Celecoxib is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain and inflammation from osteoarthritis, acute pain in adults, rheumatoid arthritis, ankylosing spondylitis, painful menstruation, juvenile rheumatoid arthritis, and to reduce the number of colon and rectal polyps in people with familial adenomatous polyposis.

34.     <u>Cephalexin</u>. Cephalexin is a cephalosporin antibiotic used to treat bacterial infections including otitis media, streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

35.     <u>Cimetidine</u>. Cimetidine is a histamine receptor antagonist that inhibits stomach acid production and is used to treat heartburn and peptic ulcers.

36.     <u>Ciprofloxacin HCL</u>. Ciprofloxacin hydrochloride is an antibiotic used to treat bacterial infections including bone and joint infections, intra-abdominal infections, infectious diarrhea, respiratory tract infections, skin infections, typhoid fever, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

37.     <u>Clarithromycin ER</u>. Clarithromycin is an antibiotic used to treat bacterial infections including strep throat, pneumonia, skin infections, h. pylori infection, and Lyme disease, among others. It can be taken in extended release form. It is included on the WHO's list of Essential Medicines.

38.     <u>Clemastine Fumarate</u>. Clemastine fumarate is an antihistaminic compound used to treat hay fever and allergy symptoms including sneezing, runny nose, red itchy tearing eyes, and to relieve the itching and swelling of hives.

39.     <u>Clonidine TTS</u>. Clonidine transdermal therapeutic system ("TTS") is used to treat high blood pressure, ADHD, drug withdrawal (alcohol, opioids, or tobacco), menopausal flushing, diarrhea, and certain pain conditions. Clonidine TTS is sold in transdermal patches.

40.     <u>Clotrimazole</u>. Clotrimazole is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and types of ringworm including athlete's foot and jock itch. Clotrimazole is sold as a topical solution applied as a cream at various doses. It is included on the WHO's list of Essential Medicines.

41.     <u>Cyproheptadine HCL</u>. Cyproheptadine hydrochloride is an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes and nose, sneezing, hives, and itching.

42.     <u>Desmopressin Acetate</u>. Desmopressin acetate is used to treat diabetes insipidus, bedwetting, hemophilia a., von Willebrand disease, and high blood urea levels. It is included on the WHO's list of Essential Medicines.

43.    <u>Desogestrel/Ethinyl Estradiol (Kariva)</u>. Desogestrel/ethinyl estradiol, brand name Kariva, is a progestin medication which is used in birth control pills for women and also for treatment of menopausal symptoms in women.

44.    <u>Dexmethylphenidate HCL ER</u>. Dexmethylphenidate hydrochloride is a central nervous system ("CNS") stimulant used to treat ADHD. It can be taken in extended release form.

45.    <u>Dextroamphetamine Sulfate ER</u>. Dextroamphetamine sulfate is a CNS stimulant and amphetamine enantiomer used to treat ADHD and narcolepsy. It can be taken in extended release form.

46.    <u>Diclofenac Potassium</u>. Diclofenac potassium is an NSAID used to treat pain, inflammatory disorders, and dysmenorrhea.

47.    <u>Dicloxacillin Sodium</u>. Dicloxacillin sodium is an antibiotic of the penicillin class used to treat mild-to-moderate staphylococcal infections.

48.    <u>Diflunisal</u>. Diflunisal is an NSAID used to treat mild to moderate pain, osteoarthritis, and rheumatoid arthritis.

49.    <u>Diltiazem HCL</u>. Diltiazem hydrochloride is a calcium channel blocker used to treat hypertension, angina, and heart arrhythmias.

50.    <u>Disopyramide Phosphate</u>. Disopyramide phosphate is an antiarrhythmic medication used to treat ventricular tachycardia.

51.    <u>Doxazosin Mesylate</u>. Doxazosin mesylate is used to treat symptoms of an enlarged prostate and hypertension.

52.    <u>Drospirenone and Ethinyl Estradiol (Ocella)</u>. Drospirenone and ethinyl estradiol, brand name Ocella, is a progestin medication used in birth control pills and menopausal hormone therapy.

53.     <u>Enalapril Maleate</u>. Enalapril maleate is used to treat hypertension, symptomatic heart failure, asymptomatic left ventricular dysfunction, and diabetic kidney disease.

54.     <u>Entecavir</u>. Entecavir is an antiviral medication used to treat hepatitis B virus infection. It is included on the WHO's list of Essential Medicines.

55.     <u>Epitol</u>. Epitol is a branded generic form of Carbamazepine, described above.

56.     <u>Estazolam</u>. Estazolam is a benzodiazepine used to treat sleep disorders.

57.     <u>Estradiol</u>. Estradiol is used in menopausal hormone therapy to prevent and treat moderate to severe menopausal symptoms such as hot flashes, vaginal dryness, and atrophy. It is also used to treat osteoporosis.

58.     <u>Estradiol/Norethindrone Acetate (Mimvey)</u>.  Estradiol/norethindrone acetate, brand name Mimvey, is a combination estradiol and norethisterone acetate used to treat vasomotor symptoms, vulvar and vaginal atrophy, and osteoporosis associated with menopause.

59.     <u>Ethinyl Estradiol / Levonorgestrel (Portia and Jolessa)</u>. Ethinyl estradiol and levonorgestrel, brand names Portia and Jolessa, is a combined birth control pill comprised of ethinyl estradiol, an estrogen, and levonorgestrel, a progestin. It is also used for symptoms of menstruation, endometriosis, and emergency contraception. It is included on the WHO's list of Essential Medicines.

60.     <u>Ethinyl Estradiol/Norethindrone (Balziva)</u>. Norethindrone/ethinyl estradiol, brand name Balziva, is a combination of ethinyl estradiol, an estrogen, and norethisterone, a progestin. It is used for birth control, and to treat menstruation symptoms, endometriosis, and menopausal symptoms. It is included on the WHO's list of Essential Medicines.

61.     <u>Ethosuximide</u>. Ethosuximide is used for absence seizures. It is included on the WHO's list of Essential Medicines.

62.     Etodolac. Etodolac is an NSAID used for the management of mild to moderate pain, fever, and inflammation.

63.     Fenofibrate. Fenofibrate is used to treat abnormal blood lipid levels. It also used to treat high cholesterol to reduce the risk of cardiovascular disease and diabetic retinopathy in those with diabetes mellitus.

64.     Fluconazole. Fluconazole is an antifungal medication used to treat fungal infections including candidiasis, blastomycosis, coccidioidomycosis, cryptococcosis, histoplasmosis, dermatophytosis, and pityriasis versicolor. It is included on the WHO's list of Essential Medicines.

65.     Fluoxetine HCL. Fluoxetine hydrochloride is an antidepressant of the selective serotonin reuptake inhibitor (SSRI) class used for treatment of major depressive disorder, obsessive-compulsive disorder, bulimia nervosa, panic disorder, and premenstrual dysphoric disorder. It is included on the WHO's list of Essential Medicines.

66.     Flurbiprofen. Flurbiprofen is an NSAID primarily used as a pre-operative antibiotic as well as for arthritis or dental pain.

67.     Flutamide. Flutamide is a nonsteroidal antiandrogen used to treat prostate cancer. It is also used to treat androgen-dependent conditions such as acne, excessive hair growth, and high androgen levels in women.

68.     Fluvastatin Sodium. Fluvastatin sodium is a statin used to treat high cholesterol and to prevent cardiovascular disease.

69.     Fosinopril HCTZ. Fosinopril hydrochlorothiazide is a combination of an ACE drug with a diuretic used to treat hypertension and heart failure.

70.     Gabapentin. Gabapentin is an anticonvulsant medication to treat seizures, neuropathic pain, hot flashes, and restless pain syndrome. Some doctors also prescribe it to treat anxiety disorders, insomnia, and bipolar disorder.

71.     <u>Glimepiride</u>. Glimepiride is used to treat diabetes mellitus type 2 by controlling high blood sugar.

72.     <u>Glipizide-Metformin</u>. Glipizide-Metformin is a combination of glipizide (a sulfonylurea that stimulates the body's natural insulin production) with metformin (a biguanide that reduces the body's absorption of sugar) that works to control blood sugar in patients with type-2 diabetes.

73.     <u>Glyburide</u>. Glyburide is an oral medication used to control blood sugar in patients with type-2 diabetes.

74.     <u>Glyburide-Metformin</u>. Glyburide-Metformin is a combination medication taken orally to control blood sugar in patients with type-2 diabetes.

75.     <u>Griseofulvin</u>. Griseofulvin is an antifungal medication used to treat dermatophytosis (ringworm). It is included on the WHO's list of Essential Medicines.

76.     <u>Haloperidol</u>. Haloperidol is an antipsychotic used to treat schizophrenia, tics in Tourette syndrome, mania in bipolar disorder, nausea and vomiting, delirium, agitation, acute psychosis, and hallucinations caused by alcohol withdrawal.  It is included on the WHO's list of Essential Medicines.

77.     <u>Hydralazine HCL</u>. Hydralazine hydrochloride is a vasodilator used to treat hypertension and heart failure.

78.     <u>Hydroxyurea</u>. Hydroxyurea is used to treat sickle-cell disease, chronic myelogenous leukemia, cervical cancer, polycythemia vera, and psoriasis. It is included on the WHO's list of Essential Medicines.

79.     <u>Hydroxyzine Pamoate</u>. Hydroxyzine pamoate is an antihistamine used to treat itchiness, anxiety, and nausea due to motion sickness.

80.     <u>Irbesartan</u>. Irbesartan is used to treat hypertension, heart failure, and diabetic kidney disease.

81.     <u>Isoniazid</u>. Isoniazid is an antibiotic used to treat tuberculosis and atypical mycobacterial infections. It is included on the WHO's list of Essential Medicines.

82.     <u>Ketoconazole</u>. Ketoconazole is an antifungal medication used to treat fungal infections such as tinea, cutaneous candidiasis, pityriasis versicolor, dandruff, and seborrheic dermatitis. It is also used to treat excessive hair growth and Cushing's syndrome.

83.     <u>Ketoprofen</u>. Ketoprofen is a propionic NSAID that has analgesic and antipyretic effects. It is used to treat arthritis-related inflammatory pains, severe toothaches, musculoskeletal pain, and nerve pain.

84.     <u>Ketorolac Tromethamine</u>. Ketorolac tromethamine is an NSAID used for the management of moderate to severe pain.

85.     <u>Labetalol HCL</u>. Labetalol hydrochloride is used to treat hypertension and for the long-term management of angina.

86.     <u>Lamivudine/Zidovudine (Combivir)</u>. Lamivudine/zidovudine, brand name Combivir, is a combination antiretroviral medication used to treat human immunodeficiency virus (HIV) / acquired immunodeficiency syndrome (AIDS). It is included in the WHO's list of Essential Medicines.

87.     <u>Loperamide HCL</u>. Loperamide hydrochloride is used to treat diarrhea caused by gastroenteritis, inflammatory bowel disease, or short bowel syndrome. It is included on the WHO's list of Essential Medicines.

88.     <u>Medroxyprogesterone</u>. Medroxyprogesterone is a progestin used to treat conditions such as absent or irregular menstrual periods and abnormal uterine bleeding. It is also used with estrogens to decrease the risk of endometrial hyperplasia. A derivative, medroxyprogesterone

**REDACTED – PUBLIC VERSION**

acetate, is a progestin used as a method of birth control and in menopausal hormone therapy. It is also used to treat endometriosis, abnormal uterine bleeding, abnormal sexuality in males, and certain types of cancer. It is included on the WHO's list of Essential Medicines.

89.    <u>Meprobamate</u>. Meprobamate is an oral tranquilizer used to treat short term anxiety, tension, and insomnia.

90.    <u>Methimazole</u>. Methimazole is an oral medication used to treat hyperthyroidism.

91.    <u>Methotrexate</u>. Methotrexate is a chemotherapy agent and immune system suppressant used to treat cancer, autoimmune diseases, ectopic pregnancy, and for medical abortions. It is used to treat cancers such as breast cancer, leukemia, lung cancer, lymphoma, and osteosarcoma, and autoimmune diseases such as psoriasis, rheumatoid arthritis, and Crohn's disease. It is included on the WHO's list of Essential Medicines.

92.    <u>Metronidazole</u>. Metronidazole is an antibiotic available in cream, jelly, and lotion form. It is used to treat vaginal infections, among other infections.

93.    <u>Moexipril HCL</u>. Moexipril hydrochloride is an ACE inhibitor used to treat hypertension and congestive heart failure.

94.    <u>Moexipril HCL/HCTZ</u>. Moexipril HCTZ is a combination of moexipril HCL, as described above, and hydrochlorothiazide, a diuretic.

95.    <u>Nabumetone</u>. Nabumetone is an NSAID used to treat pain and inflammation.

96.    <u>Nadolol</u>. Nadolol is used to treat hypertension and for long-term treatment of angina pectoris. It is also used for heart rate control in people with atrial fibrillation, prevention of migraine headaches, prevention of bleeding veins in people with cirrhosis, and to treat people with high levels of thyroid hormone.

97.     Niacin ER. Niacin is an organic compound that is a form of vitamin B3. It is an essential human nutrient and the extended release form is used to treat high blood cholesterol and niacin deficiency.

98.     Nimodipine. Nimodipine is a dihydropyridine calcium channel blocker used to manage and reduce problems caused by bleeding blood vessels in the brain.

99.     Nitrofurantoin MAC. Nitrofurantoin microcrystal ("MAC") is an antibiotic used to treat bladder infections. It is included on the WHO's list of Essential Medicines.

100.    Norethindrone Acetate. Norethindrone acetate is a progestin used in birth control pills, menopausal hormone therapy, and for treatment of gynecological disorders such as abnormal uterine bleeding.

101.    Nortriptyline HCL. Nortriptyline hydrochloride is used to treat depression, neuropathic pain, ADHD, and anxiety and is also used for smoking cessation.

102.    Omega-3-Acid Ethyl Esters. Omega-3 acid ethyl esters are the omega-3 fatty acids eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA) found in fish oil. The combination is used to reduce triglyceride levels in adults with severe hypertriglyceridemia.

103.    Oxaprozin. Oxaprozin is an NSAID used to relieve inflammation, swelling, stiffness, and joint pain associated with osteoarthritis and rheumatoid arthritis.

104.    Oxybutynin Chloride. Oxybutynin chloride is used to treat an overactive bladder. It is also used to treat bed wetting in children and excessive sweating.

105.    Paricalcitol. Paricalcitol is used for the prevention and treatment of secondary hyperparathyroidism associated with chronic kidney disease.

106.    Paromomycin. Paromomycin is a broad-spectrum oral antibiotic. It is used to treat parasitic infections in the intestines and complications of liver disease. It is included on the WHO's list of Essential Medicines.

107.   <u>Penicillin VK.</u> Penicillin VK potassium ("VK") is an antibiotic used to treat bacterial infections including strep throat, otitis media, and cellulitis. It is also used to treat rheumatic fever and to prevent infections following removal of the spleen. It is included on the WHO's list of Essential Medicines.

108.   <u>Pentoxifylline.</u> Pentoxifylline is a xanthine derivative used to treat muscle pain, cramping, numbness, or weakness in people with peripheral artery disease. It is also used for the treatment of chronic venous leg ulcers and alcoholic hepatitis.

109.   <u>Piroxicam.</u> Piroxicam is an NSAID used to treat rheumatoid arthritis and osteoarthritis, primary dysmenorrhea, and post-operative pain, and is also used as an analgesic in the treatment of inflammatory conditions.

110.   <u>Prazosin HCL.</u> Prazosin hydrochloride is used to treat hypertension, symptoms of an enlarged prostate, and post-traumatic stress disorder.

111.   <u>Prochlorperazine.</u> Prochlorperazine is used to treat nausea, schizophrenia, migraines, and anxiety.

112.   <u>Raloxifene HCL.</u> Raloxifene hydrochloride is used to prevent and treat osteoporosis in postmenopausal women and those on glucocorticoids. It is also used for reduction of risk and treatment of invasive breast cancer and to reduce breast density.

113.   <u>Ranitidine HCL.</u> Ranitidine hydrochloride is used to treat peptic ulcer disease, gastroesophageal reflux disease, Zollinger-Ellison syndrome, and hives. It is included on the WHO's list of Essential Medicines.

114.   <u>Tamoxifen Citrate.</u> Tamoxifen citrate is used to prevent and treat breast cancer. It is included on the WHO's list of Essential Medicines.

115.   <u>Temozolomide.</u> Temozolomide is an oral chemotherapy drug used to treat some brain cancers, astrocytoma, and glioblastoma multiforme.

116.     <u>Tizanidine</u>. Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

117.     <u>Tobramycin</u>. Tobramycin is an antibiotic used to treat various bacterial infections, particularly gram-negative infections.

118.     <u>Tolmetin Sodium</u>. Tolmetin sodium is an NSAID used to reduce hormones that cause pain, swelling, tenderness, and stiffness in conditions such as osteoarthritis, rheumatoid arthritis, and juvenile rheumatoid arthritis.

119.     <u>Tolterodine</u>. Tolterodine is used to treat frequent urination, urinary incontinence, and urinary urgency. It is sold in extended release form and as tolterodine tartrate.

120.     <u>Topiramate Sprinkle</u>. Topiramate sprinkle is used to treat epilepsy and alcohol dependence and to prevent migraines.

121.     <u>Trifluoperazine HCL</u>. Trifluoperazine hydrochloride is an antipsychotic used to treat schizophrenia and for the short-term treatment of generalized anxiety disorder.

122.     <u>Valsartan HCTZ</u>. Valsartan hydrochlorothiazide is used to treat hypertension, heart failure, and diabetic kidney disease.

123.     <u>Warfarin Sodium</u>. Warfarin sodium is an anticoagulant used to treat blood clots such as deep vein thrombosis and pulmonary embolism. It is also used to prevent stroke in people who have atrial fibrillation, valvular heart disease, or artificial heart valves. It is included on the WHO's list of Essential Medicines.

124.     <u>Zoledronic Acid</u>. Zoledronic acid is a biphosphate used to prevent bone fractures in cancer patients. It is included on the WHO's list of Essential Medicines.

## III.     JURISDICTION AND VENUE

125.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Humana asserts claims for relief under Section 1 of the Sherman Act,

15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

126.    This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

127.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(b)-(d). Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

128.    Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States (including in this District).

## IV.    THE PARTIES

### A.    Plaintiff

129.    Humana Inc. is incorporated in Delaware and headquartered at 500 West Main Street, Louisville, Kentucky. Humana is publicly traded under the NYSE symbol "HUM."

130.    Humana is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide, *inter alia:* (1) Medicare benefits, through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans offered under Part C of Medicare, or prescription drug benefits under Part D of Medicare; and (2) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. Humana's subsidiaries provide these benefits to beneficiaries in all 50 states, the District of Columbia, and Puerto Rico. Humana is the second largest Medicare Advantage Organization in the United States. These assignor subsidiaries and/or affiliates include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc., dba ChoiceCare Network, Humana AdvantageCare Plan, Inc., Humana Behavioral Health, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health Organization Insurance Corporation and M.D. Care, Inc. Humana's subsidiaries and affiliates expressly have assigned the claims pleaded herein to Humana.

131.    Humana is also the parent and assignee of claims of its subsidiary Humana Pharmacy, Inc. f/k/a Rightsource ("HPI"). HPI buys prescription drugs directly from

manufacturers and wholesalers and dispenses them to Humana's benefits plan members on a mail-order and retail pharmacy basis, pursuant to members' doctors' prescriptions. HPI has purchased the numerous of the Subject Drugs directly from Defendants pursuant to various contractual agreements.

132.     In addition, Humana is the parent and assignee of claims of its subsidiary Humana Pharmacy Solutions, Inc. ("HPS"). HPS is a pharmacy benefit manager ("PBM") that provides Humana's benefits plan members with benefits and services including processing and pricing prescription drug claims.

133.     Humana, either directly or through its health plan subsidiaries, insures and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by Defendants were submitted and paid. Humana is pursuing recovery related to those claims.

**B.     Defendants**

134.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva Pharmaceuticals USA, Inc., purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco. Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

135.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Defendant Actavis Holdco and is a research and development and manufacturing entity for the Actavis generics operations.

136.     Defendant Actavis Pharma, Inc., is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

137.     Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

138.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with a principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey. At all times relevant to the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

139.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of business at 2400 North Commerce Parkway, Weston, Florida. At all times relevant to the Complaint, Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

140.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation with its principal place of business in Parsippany, New Jersey. At all times relevant to the Complaint, Ascend marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

141.     Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with its principal place of business at 6 Wheeling Road Dayton, New Jersey. At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

142.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Avenue, Fairfield, New Jersey. At all times relevant to the Complaint, Breckenridge marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

143.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business at 1031 Centennial Avenue, Piscataway, New Jersey. At all times relevant to the Complaint, Camber marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

144.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. At all times relevant to the Complaint, Citron marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

145.     Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business at 107 College Road East, Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. At all times relevant to the Complaint, Dr. Reddy's marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

146.     Defendant Emcure Pharmaceuticals, Ltd., ("Emcure") is an Indian corporation with its principal place of business in Pune, India. Emcure is the parent company of Defendant Heritage

Pharmaceuticals, Inc. and Emcure Pharmaceuticals USA, Inc., both of which have their principal

place of business in East Brunswick, New Jersey. Emcure participated in and at times directed the

business activities of Defendant Heritage Pharmaceuticals, Inc. At all times relevant to the

Complaint, Emcure participated in the alleged conspiracy, and marketed and sold one or more of

the Subject Drugs in this District and throughout the United States.

147.    Defendant Endo International plc ("Endo") is an Irish company with global

headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. Endo is the parent

company of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. In

August 2014, Endo's subsidiary, Generics International (US), Inc. d/b/a Qualitest Pharmaceuticals,

acquired co-conspirator, DAVA Pharmaceuticals, Inc. ("DAVA"). In September 2015, Endo

completed the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including

Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's

business with Endo's subsidiary co-conspirator Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming

the segment Par Pharmaceutical, Inc. Par is thus the successor in interest to both DAVA and

Qualitest. At all times relevant to the Complaint, Endo marketed and sold generic pharmaceuticals

in this District and throughout the United States, and also participated in and directed the business

activities of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc.

148.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its

principal place of business in South Plainfield, New Jersey. At all times relevant to the Complaint,

G&W marketed and sold one or more of the Subject Drugs in this District and throughout the

United States.

149.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with

its principal place of business in Huntsville, Alabama, and formerly conducted business as Qualitest.

Generics Bidco is a wholly owned subsidiary of Defendant Endo, and affiliate of Defendant Par

23

(defined below). At all times relevant to the Complaint, Generics Bidco marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

150.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey. At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

151.    Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Defendant Emcure. At all times relevant to the Complaint, Heritage marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

152.    Defendant Impax Laboratories, LLC, formerly known as Impax Laboratories, Inc., ("Impax") is a Delaware limited liability company with its principal place of business in Hayward, California. At all times relevant to the Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

153.    Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

154.    Defendant Lupin Pharmaceuticals, Inc., ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. At all times relevant to this Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

155.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly-owned subsidiary of Defendant Wockhardt, Ltd. At all times relevant to this Complaint, Morton Grove marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

156.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc. and Defendant UDL Laboratories Inc.

157.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.

158.    Defendant Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendants Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc.

159.    Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan." At all times relevant to this Complaint, Mylan marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

160.    Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York.

161.    Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a direct subsidiary of Defendant Par Pharmaceutical Companies, Inc.

162.    Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are each wholly-owned subsidiaries of Defendant Endo and collectively referred to as "Par." At all times relevant to

the Complaint, Par has marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

163.     Defendant Sandoz, Inc., ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business at 100 College Road West, Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

164.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." At all times relevant to the Complaint, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

165.     Defendant Taro Pharmaceuticals Industries Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Taro Israel. At all times relevant to the Complaint, participated in and directed the business activities of Defendant Taro Pharmaceuticals USA, Inc.

166.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business at 3 Skyline Drive, Hawthorne, New York.

167.     Taro Pharmaceuticals Industries Ltd. and Taro Pharmaceuticals USA, Inc. are collectively referred to herein as "Taro." At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

168.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva Israel. At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

169.     Defendant Upsher-Smith Laboratories, LLC, ("Upsher-Smith") is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN. Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan. At all times relevant to the Complaint, Upsher-Smith marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

170.     Defendant Valeant Pharmaceuticals International is a Canadian company with its principal place of business in Bridgewater, New Jersey. Valeant was a California company until September 2010 when it merged with Biovail Corporation, a Canadian company.

171.     Defendant Valeant Pharmaceuticals North America, LLC is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly-owned subsidiary of Valeant Pharmaceuticals International.

172.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California. Oceanside is a wholly owned subsidiary of Valeant Pharmaceuticals North America, LLC.

173.     Valeant Pharmaceuticals International, Valeant Pharmaceuticals North America, LLC, and Oceanside will collectively be referred to herein as "Valeant." At all times relevant to the Complaint, Valeant marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

174.     Defendant VersaPharm, Inc. ("VersaPharm") is a Georgia corporation with its principal place of business at 1775 West Oak Parkway, Suite 800, Marietta, Georgia. On August 12, 2014, Akorn, Inc. acquired VPI Holdings Corp., the parent company of VersaPharm. At all times relevant to the Complaint, VersaPharm marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

175.     Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey. At all times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

176.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business at 73 Route 31 North, Pennington, New Jersey. At all times relevant to the Complaint, Zydus marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

177.     When any allegation of the Complaint refers to any representation, act or transaction of Defendants, or any agent, employee or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants acted within the scope of their actual or apparent authority, and performed such representations, acts or transactions on behalf of Defendants.

### C.      Co-Conspirators

178.      Various other persons, firms, entities, and corporations not named as Defendants in this Complaint, including the individuals named below, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy, including but not limited to those defendants named in Humana's Second Amended Complaint, as may be further amended, in *Humana Inc. v. Actavis Elizabeth, LLC*, No. 2:18-cv-03299-CMR, but who are not named in this Complaint.

179.      The true names of additional co-conspirators are presently unknown to Humana. Humana may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

180.      The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.      REGULATORY AND ECONOMIC BACKGROUND

### A.  Generic Drugs Should Provide Lower-Priced Options for Purchasers

181.      Generic drugs provide a lower-cost but therapeutically equivalent substitute for brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[2]

---

[2] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

182.    To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research's ("CDER"), Office of Generic Drugs ("OGD").

183.    When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA. This signifies the generic drug is therapeutically equivalent to a reference listed drug ("RLD"). RLD can either be a brand-name drug or a generic drug if the brand is not currently marketed. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the RLD.

184.    Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. The only material difference between a generic and its brand name counterparts is price. When multiple generic manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases. An FDA study recently noted that "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction." Because of this, AB-rated generic drugs gain market share rapidly. As more generic drugs enter the market, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like Humana. These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

185.    Because each generic of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the only differentiating feature, and the basis for competition.[3] Generic competition, therefore, when functioning in a market undisturbed by

---

[3] *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at*

anticompetitive forces, reduces drug costs by driving prices down for AB-rated generic versions of brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices will become, ever nearing closer to a manufacturer's marginal costs.

186.    In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug. The prescription may only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor (unless the prescribing physician indicated "dispense as written" on the prescription).

187.    Generic competition enables purchasers like Humana to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[4]

### B.    The Prescription Drug Market

188.    The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and filled.

189.    For most consumer products, the person responsible for paying for the product selects the product. When the payer is also the user of the product, the price of the product plays an appropriate role in the person's choice. This incentivizes manufacturers to lower the price of their product. The pharmaceutical marketplace departs from this norm.

---

https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

[4]  GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

190.    In most instances, a pharmacist dispenses a prescription pursuant to a doctor's prescription, and the patient and his/her health insurer pay for the prescription drug. The pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

191.    Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

192.    Brand pharmaceutical sellers exploit this departure from consumer norms by employing "detailing" teams that persuade doctors to prescribe the branded product without advising the doctor on the cost of the product. The most important tool that insurers, like Humana, who bear the overwhelming majority of the cost of these prescription drugs, have is the availability of generic drugs in a competitive market. When drug manufacturers begin selling AB-rated generic drugs, insurers, along with others in the distribution chain, are able to substantially drive down the prices paid for those drugs.

193.    For example, TPP health insurers, like Humana, have complex formulary structures that incentivize doctors, pharmacists and insureds to prescribe, dispense, and fill AB-rated generic drugs when available.

## C.    The Prescription Drug Distribution System

194.    Drug manufacturers supply drug products. Rather than develop new drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels. A manufacturer seeking to sell a drug in the United States must obtain FDA approval. The FDA typically evaluates whether the drug is safe and efficacious, the manufacturing process, labelling and quality control.

195.    Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health insurance plans. Competition among generic drug manufacturers is dictated by price and supply; as such generic manufacturers do not differentiate their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

196.    Drug suppliers include the manufacturers or other companies that contract with a manufacturer to sell a drug product made by the manufacturer. Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers, distributors, pharmacy benefit managers, mail-order or specialty pharmacies.

197.    Generic manufacturers report list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"). The WAC represents the manufacturers' list price, and typically does not represent discounts that may be provided. Manufacturers may supply the same generic drug at several different prices depending on the customer or type of customer.

198.    Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

199.    Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers. Wholesalers and distributors pay lower prices to acquire generics than the corresponding branded drug.

200.     Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies, or mail-order pharmacies. Pharmacies also pay lower prices to acquire generic drugs than to acquire the corresponding branded drug.

201.     Finally, insurers and insureds purchase the prescribed drug, typically in some type of cost sharing arrangement, depending on an insurer's formulary placement, among other things.

202.     To combat rising costs, some third-party payers and PBMs have implemented Maximum Allowable Costs ("MACs") that set the upper limit on what they will pay for a generic drug. TPPs and PBMs set MACs based on a variety of factors, including the lowest acquisition cost in the market for that generic drug. MAC pricing effectively requires pharmacies, retailers, and PBMs to purchase the lowest-price version of a generic drug on the market, regardless of WAC. As a result, a manufacturer should not, in a properly functioning market, be able to significantly increase its price without incurring the loss of a significant volume of sales. A manufacturer can only raise its price in the presence of MAC pricing if it knows it is conspiring with competitors to raise their prices too.

**D.     The Market for Generic Drugs is Highly Susceptible to Collusion**

203.     Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Humana is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases.

204.     Factors showing that a market is susceptible to collusion include:

    a.     High level of industry concentration: A small number of competitors control roughly 100% of the market for each of the Subject Drugs. Beginning in 2005, the

generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the Subject Drugs, there were between two and four manufacturers providing that drug for sale in the United States during the relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.      Sufficient numbers to drive competition: While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough that prices should have remained at their historical, near marginal cost levels absent collusion.

c.      High barriers to entry: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d.      High inelasticity of demand and lack of substitutes: Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, the particular Subject Drug they are prescribed is the only effective treatment.

e.      Commoditized market: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one

for another. The only differentiating feature, and therefore the only way a Defendant can gain market share, is by competing on price.

      f.     Absence of departures from the market: There were no departures from the market during the relevant period that could explain the drastic price increases.

      g.     Absence of non-conspiring competitors: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

      h.     Opportunities for contact and communication among competitors: Defendants participate in the committees and events of the GPhA, HDMA, ECRM, MMCAP, HSCA, and other industry groups, as set forth below, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

      i.     Size of Price Increases: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists testing price boundaries must take a measured approach. But, the increases are not 5% or even 10% jumps— they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

      j.     Reimbursement of Generic Drugs: The generic market has institutional features that inhibit non-collusive, parallel price increases. These features include MAC pricing, insurers' formulary placements, and required substitution at the pharmacy level. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## VI.   GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

205.    Defendants' and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the United States Department of Justice Antitrust Division, the United States Senate, the United States House of Representatives, and the Attorneys General of 46 states, the District of Columbia, and Puerto Rico ("the State AGs").

206.    The DOJ's and State AG's investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.   Congress Launched an Investigation into Generic Price Hikes

207.    In January 2014, the NCPA urged the Senate Help Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

208.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Apotex, Dr. Reddy's, Lannett, Mylan, Par, Sun, Teva, and Zydus, requesting information about the escalating prices of generic drugs.[5] More recently on August 13, 2019, Senator Sanders and Rep. Cummings sent letters to

---

[5] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

executives of Mylan and Teva – companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

209.    Senator Sanders and Rep. Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[6]

210.    On February 24, 2015, Senator Sanders and Rep. Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[7] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[8]

211.    In August 2016, the GAO issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs

---

[6] *Id.*

[7] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[8] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

REDACTED – PUBLIC VERSION

with extraordinary price increases were 31 of the Subject Drugs: Amiloride HCL/HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clotrimazole, Dextroamphetamine Sulfate ER, Diltiazem HCL, Doxazosin Mesylate, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Methotrexate, Nadolol, Nitrofurantoin MAC, Oxaprozin, Oxybutynin Chloride, Piroxicam, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Tobramycin, and Trifluoperazine HCL.[9]

B.     The DOJ Investigates Criminal Generic Drug Collusion

212.     The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry in 2014 that initially focused on just two drugs.[10] Most of the Defendants here have come under DOJ scrutiny.

213.     The DOJ first charged Heritage Pharmaceuticals, Inc. ("Heritage") executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for generic doxycycline hyclate and glyburide. The two pleaded guilty to violating Section 1 of the Sherman Act.

214.     Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett, Mylan, Par, Sandoz, Taro, and Teva admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search

---

[9] GAO Report at Appx. III.

[10] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

warrant on Mylan in the fall of 2016. In 2017, Perrigo Company disclosed that its offices were searched as well.[11]

215.    Upon information and belief, the DOJ has granted conditional amnesty to one generic manufacturer not named in this Complaint, but who is a Defendant in *Humana Inc. v. Actavis Elizabeth, LLC, et al.*, No. 2:18-cv-03299-CMR, Dkt No. 109.

216.    Information disclosed by some Defendants evidence the broad scope of the conspiracy.

217.    In Lannett's November 3, 2014 quarterly report filed with the Securities and Exchange Commission ("SEC"), it disclosed that its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[12] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[13]

218.    Mylan has also disclosed that it received DOJ subpoenas relating to various generic drugs, and that DOJ executed search warrants in connection thereto.[14] Defendants Actavis, Sandoz, Par, Taro, and Teva also received DOJ subpoenas relating to their marketing and pricing of generic pharmaceuticals, and communications with competitors.[15]

---

[11] A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan.

[12] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).

[13] *Id.*

[14] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016); Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).

[15] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf; Par

219.     A DOJ grand jury subpoena is significant; it indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[16]

220.     The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

221.     On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry.

## C.     State Attorneys General Launch Their Own Investigation

222.     In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Based on evidence procured through their own subpoena-power, the State AGs filed a civil action alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas

---

Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015); Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016); Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).

[16] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

are going out, and the investigation is growing beyond the companies named in the suit."[17] Then-CTAG George Jepsen called the evidence obtained in that investigation "mind-boggling."[18]

223.     Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[19]

224.     In their consolidated amended complaint filed on June 18, 2018, the State AGs broadened their case to include fifteen drugs, many of which are Subject Drugs in this Complaint. At the time, CTAG Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[20] According to a recent interview with Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these

---

[17] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. Id.

[18] *Id.*

[19] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[20] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

consolidated MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[21]

225.     On May 10, 2019 the State AGs filed a new complaint focusing on a conspiratorial web Teva constructed with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("State AG Complaint No. 2").[22] The allegations in the State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged…"[23] Many of the drugs identified in that complaint are the subject of this Complaint.

226.     During the course of their investigation, the States AGs obtained cooperation from a number of individuals. The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout the State AG Complaint No. 2 and this Complaint. Some of those cooperating witnesses include:

---

[21] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

[22] *Connecticut, et al v. Teva Pharmaceuticals USA, Inc.,* 2:19-cv-02407 (E.D. Pa.).

[23] State AG Complaint No. 2 at ¶4. The State AGs detail their extensive investigatory efforts in State AG Complaint No. 2. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.* ¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

a.      A former pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

b.      A former sales and marketing executive at non-defendant Rising Pharmaceuticals, Inc. ("Rising") and Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

c.      A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

d.      A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

e.      A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

f.      Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage.

227.    In addition, Teva has, at all times relevant to the Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions. Although the State AGs do not have full access to that database, they have obtained static images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports. Through its review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision. A number of those instances are detailed throughout this Complaint.

## VII.   THE GENERIC DRUG MARKET

### A.  The Cozy Nature of the Industry and Opportunities for Collusion

228.     The collusion alleged herein infested the generic drug industry.

229.     At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Humana to pay artificially inflated prices at supracompetitive rates.

230.     In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

  a.     Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

  b.     Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

  c.     Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

  d.     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

     e.     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

     f.     Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

     g.     Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

231.    The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

### 1.    Trade Association Meetings and Conferences

232.    Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences wherein generic manufacturers are invited to attend. Further, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA")(now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association of Accessible Medicine), Efficient Collaborative Retail Marketing ("ECRM"), the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"). Between February 20, 2013 and December 20, 2014, there were at least forty-four different tradeshows or customer conferences where Defendants had the opportunity to, and actually did, meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

233.    At the various trade shows and conferences, Defendants' employees interacted with one another and discussed their respective businesses. Many of these events included social and recreational outings such as golf, lunch, cocktail parties, and dinners that provided additional opportunities to meet with competitors. Defendants used these opportunities to share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, and in turn to implement schemes that unreasonably restrain competition in the United States' market for generic drugs.

234.    In fact, in the Association for Accessible Medicine's Antitrust Compliance Policy Manual updated in January 2018 (well after litigation and investigation surrounding generic drug pricing conspiracies began), the trade association explicitly stated, "Meetings, communications and contacts that touch on antitrust matters present special challenges. A simple example will illustrate this. Suppose that competitors were to discuss their prices at a meeting or in a document, and that their prices increased shortly afterward. A jury might view this as evidence that their discussions led to an agreement on pricing, and thus violated the antitrust laws." It went on to warn "Do not discuss any subjects that might raise antitrust concerns (including prices, market allocations, refusals to deal, and the like) unless you have received specific clearance from counsel in advance." The Association also warns members to avoid creating written records, and "avoid language that might be misinterpreted to suggest that the Association condones or is involved in anticompetitive behavior."

*a.    National Association of Chain Drug Stores*

235.    NACDS "advances a pro-patient and pro-pharmacy agenda. For the ultimate benefit of the customers served by NACDS members, the mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

236.     NACDS hosts an Annual Meeting, attended only by member companies' executives, that it claims is "the industry's most prestigious gathering of its most influential leaders. It is the classic 'Top-to-Top' business conference, attended by industry decision makers." It boasts that it will give companies "a unique opportunity to gain new insights into today's changing marketplace and set your course for the future," and the "opportunity to meet and discuss strategic issues with key trading partners" to "set [] the stage for profitable business."

237.     NACDS also hosts a Total Store Expo annually, which similarly boasts that is it "the industry's largest gathering of its most influential leaders. It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

238.     NACDS members include Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

           b.   *Generic Pharmaceutical Association*

239.     GPhA is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[24] GPhA was created in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[25]

---

[24] GPhA, Membership, available at
http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.

[25] *Id.*

240.    GPhA's website offers members the opportunity to "participate in shaping the policies that govern the generic industry." GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[26]

241.    Actavis, Amneal, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Sandoz, Teva, Wockhardt, and Zydus are regular members of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA meetings and events.

242.    Executives from Actavis, Amneal, Apotex, Impax, Lupin, Mylan, Par, Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013, including:

      a.    2011 Board of Directors: Debra Barrett, Senior Vice President Global Affairs and Public Policy, Teva; Douglas S. Boothe, CEO, Actavis; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America, as Vice-Chair; Pat LePore, CEO, Par; and Joe Renner, CEO, US Division, Zydus.

      b.    2012 Board of Directors: Charlie Mayr, Senior Vice President Watson Pharmaceuticals, now a division of Teva; Joe Renner, CEO, US Division, Zydus; Douglas S. Boothe, CEO, Actavis; Debra Barrett, Senior Vice President Global Affairs and Public Policy, Teva; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America as Chair; and Chirag Patel, President, Amneal.

---

[26] *Id.*

49

c.   2013 Board of Directors[27]: Tony Mauro, President, Mylan North America, as

Chair; Don DeGolyer, President and CEO, Sandoz, as Vice Chair; Debra

Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva

Pharmaceuticals; Carole Ben-Maimon, President, Global Pharmaceuticals (div.)

of Impax[28]; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.;

Jeffrey Glazer, President and CEO, Heritage; Joseph Renner, President & CEO,

Zydus; Chirag Patel, President, Amneal; and Jeff Watson, President, Apotex.

d.   2014 Board of Directors[29]: Carole Ben-Maimon, President, Global

Pharmaceuticals (div.) of Impax; Peter Goldschmidt, President, Sandoz US;

Jeffrey Glazer, President and CEO, Heritage; Tony Mauro, President, Mylan

Inc.; Allan Oberman, CEO and President, Teva Americas Generics; Joseph

Renner, President & CEO, Zydus; Jeff Watson, President, Apotex; and Paul

McGarty, President, Lupin, as at-large director.

e.   2015 Board of Directors[30]: Debra Barrett, Senior Vice President, Global

Government Affairs & Public Policy, Teva Americas; Peter Goldschmidt,

President, Sandoz US; Marcie McClintic Coates, Head of Global Regulatory

Affairs, Mylan Inc.; Marcy Macdonald, Vice President of Regulatory Affairs,

Impax; Paul McGarty, President, Lupin; Jeffrey Glazer, President and CEO,

---

[27] GPhA Announces 2013 Board of Directors, Ass'n for Accessible Meds.,
https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.

[28] In 2016, Ben-Maimon joined Teligent's Board of Directors. She also previously held positions at
Qualitest and Teva. While at Global Pharmaceuticals at Impax, she worked with Teligent's Grenfell-
Gardner on a development, supply, and marketing agreement for another generic topical drug.
[29] GPhA Announces 2014 Board of Directors, Ass'n for Accessible Meds.,
https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

[30] GPhA Announces 2015 Board of Directors, Ass'n for Accessible Meds.,
https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

Heritage; Tony Pera, President, Par Pharmaceuticals; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex.

f.   2016 Board of Directors: Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Jim Kedrowski, Executive Vice President, Sun; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals as Secretary-Treasurer; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex as Vice Chair.

*c.   Healthcare Distribution Management Association*

243.    HDMA, now called HDA, is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[31] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

244.    Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Amneal, Apotex, Breckenridge, Dr. Reddy's, Heritage, Lannett, Lupin, Mylan, Par, Sandoz, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as Allergan, now a division of Actavis.[32] As of March 2016, HDMA's manufacturer membership list included Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, Lupin, Mylan, Par, Sandoz, Teva, Upsher-Smith, Wockhardt, and Zydus, as

---

[31] *About*, HAD, https://healthcaredistribution.org/about.

[32] *Manufacturer Members*, HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/ membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

well as Allergan, now a division of Actavis.[33] At various times relevant to this Complaint, Citron and

Sun were also HDMA members.

### d.   *Efficient Collaborative Retail Marketing*

245.     ECRM hosts strategic events and offers innovative technology solutions to help

buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more

efficiently.[34] It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug

manufacturers, purchasers, and other industry professionals meet "to discuss new business

opportunities, review contracting strategies, and future business planning activities."[35] Sessions

include one-on-one strategic meetings meant to maximize time, grow sales, and uncover trends.

246.     At annual meetings organized by ECRM, generic drug manufacturers schedule

meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers,

distributors, and buy groups for independent pharmacies.

### e.   *Minnesota Multistate Contracting Pharmacy Alliance*

247.     MMCAP hosts various meetings and conferences throughout the year that are

regularly attended by Defendants' representatives with price setting capabilities. According to its

website, MMCAP is a "free, voluntary group purchasing organization [("GPO")] for government

facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare

---

[33] *Manufacturer Members,* HDMA,
https://web.archive.org/web/20160329122456/http://www.healthcaredistribution.org:80/about/
membership/manufacturer/manufacturer-members

[34] *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg ,
https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also
Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline
Water Co., http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-
participation-national-retail-marketing-trade-show/.

[35] ECRM, Health System/Institutional Pharmacy EPPS,
https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

value to members since 1985. MMCAP's membership extends across nearly every state in the

nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals

and other healthcare products and service; such as medical supplies, influenza vaccine, dental

supplies, drug testing, wholesaler invoice auditing and returned goods processing."

*f.   Healthcare Supply Chain Association*

248.    HSCA is a trade association that represents leading healthcare GPOs, including for-

profit and not-for-profit corporations, purchasing groups, associations, multi-hospital systems and

healthcare provider alliances. According to its website, "HSCA and its member GPOs are

committed to delivering the best products at the best value to healthcare providers, to increasing

competition and innovation in the market, and to being supply chain leaders in transparency and

accountability."  HSCA's annual event, the National Pharmacy Forum, connects supply chain

professionals, pharmaceutical industry representatives, including generic drug manufacturers and

suppliers, and others to provide "top-level educational opportunities coupled with one-to-one

networking and business-building opportunities."

249.    GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events

between 2012 and the present, and high-level representatives and corporate officers from

Defendants, including employees with price-setting authority, attended these meetings. A list of

those meetings and attendees is attached as Exhibit A.

250.    At these various conferences and trade shows, Defendants' employees and

representatives, as well as representatives of other generic drug manufacturers, discussed their

respective businesses and customers, and discussed the conspiratorial price increases alleged in this

Complaint. In many of the conferences described above, attendees for each conspirator Defendant

include individuals with generic drug pricing authority. Their discussions also occurred at lunches,

cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants'

representatives used these opportunities to discuss and share upcoming bids, generic drug markets, pricing strategies, and contractual pricing terms specific to certain customers. [36]

### 2.    Industry Dinners and Private Meetings

251.    Senior executives and sales representatives also frequently gathered in small groups, providing inconspicuous facetime with their competitors where they could discuss sensitive information.

252.    Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another. At least forty-one (41) different generic drug manufacturers are located between New York City and Pennsylvania, including, among others, Actavis, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Sandoz, Sun, Taro, Teva, Wockhardt, and Zydus.

253.    Defendants' high-level executives frequently gathered for "industry dinners." In January 2014, while generic drug prices were soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufactures, met at a steakhouse in Bridgewater, New Jersey. Executives (including Berthold, Falkin, and Ostaficiuk) from Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, and Sun among others, attended this particular dinner.

254.    At these dinners, one company is typically responsible for paying the bill for all attendees. For example, in December 2013 a Dr. Reddy's executive joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [another company] picked up the last

---

[36] *See, e.g.,* AG Compl. at ¶ 79.

bill.…PS.…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

255.     Other groups of competitors routinely gathered for golf outings. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, high-level executives from Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus, and others attended the event at a country club in Bowling Green, Kentucky. Rekenthaler was in attendance. Rekenthaler and Apotex' Vice President of Commercial Operations, US and Latin America, Jeffrey Hampton, actually stayed together in the home of the owner of the packaging company. By the end of the outing, Ostaficiuk sent an email to the other attendees, stating "This is a crazy biz but I am grateful to have friends like all of you!!!! Happy and honored to have you all as 'fraternity brothers.'"

256.     Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information. Upon information and belief, several of these events occurred in May 2015 in Baltimore, Maryland, and in August 2015 in Denver, Colorado.

257.     Many "Women in the Industry" dinners were organized by Anne Sather, a salesperson from Heritage. Other participants in these meetings were employees of other generic pharmaceutical manufacturers located in Minnesota or salespeople residing or traveling to the area. In November 2014, Sullivan of Lannett sent Sather (Heritage) a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" Sather responded: "There is an Xmas [sic] party at Tanya' house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."

258.     Dinners were also planned around visits of certain out-of-town competitors. When organizing one of these such dinners, Sather commented "Sorry if the meeting/dinner invite is a

little short notice, but Kate Neely of Dr. Reddy's will be in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the Industry too – we can recap all our findings from NACDS over a martini or glass of wine! 😊 Plus the food is super yummy!"

259.     Several different GNOs were held in 2015, including (1) at the ECRM conference in February (involving Citron, Dr. Reddy's, Heritage, Lannett, Teva, Upsher-Smith, and Zydus, among others); (2) in Baltimore in May (involving Citron, Dr. Reddy's, Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference on August 24, 2015 (involving Citron, Dr. Reddy's, and Heritage, among others). The Baltimore GNO in May 2015 consisted of a professional baseball game, drinks, and a spa day on May 13, wherein the competitors could discreetly and privately discuss competitively-sensitive information.

### 3.     Personal Telephone Calls, E-Mails, and Text Message Communications

260.     Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

261.     Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Humana.

262.     Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors. For example, executives at Teva had at least 1,501 contacts with competitors, including from Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus. Further, executives at Heritage had at least 513 contacts with executives from would-be competitors including from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, Sun, Teva, and Zydus.

263.     For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel moved to Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As detailed below, Malek and Patel orchestrated a number of price increases between 2013-present—some led by Teva, others by Heritage.

264.     Malek and Patel's relationship was valued and accepted by Malek's supervisors. For example, in April 2014, Malek and Glazer (Heritage) met with Mehta and President Vikas Thapar of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek told Mehta and Thapar about Patel. Malek, who had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

**B.     The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox**

265.     As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

266.     The overarching conspiracy among generic manufacturers – which ties together all of the agreements on the Subject Drugs identified in this Complaint – is an agreed- upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. That term is generally understood as an approximation of how much market share each competitor is entitled to. Fair share is based on the number of competitors in the market, with a potential adjustment based on the timing of entry or the

anticompetitive allocation of buyers amongst similar or the same competitors in another generic

drug market. Once a manufacturer has achieved its "fair share," it is generally understood that it will

no longer compete for additional business. The common goal or purpose of this overarching

agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-

competitive price increases.

267.     This overarching agreement is widespread across the generic drug industry and is

broader than the Defendant manufacturers named in this Complaint. Humana focuses here on the

role of these named Defendants and their participation in, and agreement with, this overarching

conspiracy as applied to the sale of the Subject Drugs, as well as how these specific conspiracies are

also part of the larger overarching conspiracy.

268.     The exact contours of this "fair share" understanding, which has been in place for

many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during

the numerous in-person meetings, telephonic communications, and other interactions between

generic manufacturers about specific drugs. These business and social events occur with such great

frequency that there is an almost constant ability for Defendants to meet in person and discuss their

business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period),

there were at least forty-four (44) different tradeshows or customer conferences where the

Defendants had the opportunity to meet in person, some of which are described above. These in-

person meetings gave the Defendants the opportunity and cover to have these conversations, and

reach these agreements, without fear of detection.

269.     As described in more detail below, when necessary, this larger understanding was

reinforced through phone calls and text messages between the Defendants to discuss "fair share"

and the desire to maintain or raise prices with respect to specific drugs. These types of

communications occur with great frequency across the industry, including among Defendants.

270.    For example, from January 1, 2013 through December 31, 2013, senior sales

executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at

Teva spoke to representatives of every significant competitor by phone and/or text on multiple

occasions. Phone calls and text messages with several of those key competitors during the 2013

calendar year are set forth below. The following Table, which is conservative because it is based on

phone and text message records from only some of the executives and salespeople at issue and

therefore shows only some of the phone calls and text messages between the Defendants during that

period, illustrates the frequency with which Defendants communicated with each other throughout

2013.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

Source: State AG Complaint No. 2 (Table 1).

271.    Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel

and Rekenthaler of Teva speaking with competitors. Many – though not all – of those

communications involve matters that are addressed throughout this Complaint.

272.    Similarly, from January 1, 2014 through December 31, 2014, senior sales executives

and other individuals responsible for the pricing, marketing and sales of generic drugs at Teva

continued to speak to representatives of every significant competitor by phone and/or text on

multiple occasions. Phone calls and text messages with several of those key competitors during the

2014 calendar year are set forth below. The following Table, which is conservative because it is

based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

Source: State AG Complaint No. 2 (Table 2).

273.    Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva). Many – though not all – of those communications involve the Subject Drugs that are addressed throughout this Complaint. It was not just Teva personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy, as illustrated in the graphic on page 37 of the State AG Complaint No. 2.

274.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationship between Teva and another conspirator. However, this convenience should not imply that the Complaint is solely concerned with bilateral relationships involving Teva.

275.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by

Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR capsules. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

276.    Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

277.    When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example, when Dr. Reddy's was about to enter the market for a drug in January 2013, the Vice President of Sales and Marketing explained during negotiations with his competitor that "he views it this way. If they [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

278.    Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive. Patel (Teva) and Berthold (Lupin) spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014. That same day, Rekenthaler

(Teva) sent an internal e-mail to Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

279.    Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



[TARO_000224150.]

280.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

281.    This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." Ironically, it was this exact greed that

inspired this conspiracy. As demonstrated throughout the Complaint, Aprahamian's idea of

"responsibility" meant constantly reaching out to competitors in order to coordinate giving up share

to reach a "fair" allocation and keep prices high.

282.    This scheme to strangle competition and allocate "fair share" is typically

implemented as follows. First, Defendants allocate the market for an individual drug based on the

number of competitors and the timing of their entry so that each competitor obtains an acceptable

share of the market. Then, the competitors agree on ways to avoid competing on price and, at times,

significantly raise price. This pattern is frequently followed even in the absence of direct

communication between the competitors, demonstrating the universal code of conduct Defendants

agreed to.

283.    The "fair share" understanding has been particularly effective when a new

competitor enters the market – a time when, in a free-functioning, competitive market for generic

drugs, prices would be expected to go down. In today's generic drug markets, a new competitor will

either approach or be approached by existing competitors. Existing competitors will agree to "walk

away" from a specific customer or customers by either refusing to bid or submitting a cover bid.

The new competitor's transition into the market is seamless; the new entrant is ceded market share

and immediately charges a supra-competitive price. The competitors then continue this process of

dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a

"stable" market.

284.    "Fair share" principles also dictate how generic drug manufacturers respond when a

competitor experiences supply issues. If the disruption is temporary, the existing competitors will

refrain from taking any action that might upset the market balance. By contrast, if the disruption is

for a longer term, the competitors will divide up customers until each player achieves a revised "fair

share" based on the number of players remaining in the market. For example, in July 2013, a retail

pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

285.    These rules about "fair share" apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

286.    For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:

Do you think the  Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

287.    Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

288.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014, Teva was approached by a large retail customer on behalf of non-defendant generic

drug manufacturer Greenstone LLC ("Greenstone"). The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

289.    Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation."

290.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

291.    Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As explored more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants, which affected nearly every overlapping drug they sold. As just one example, Patel (Teva) exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian (Taro) on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive, stating "[w]e should probably discuss

how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

292.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors. For example, in March 2015, Upsher-Smith learned that Sandoz had submitted a bid on a product not identified in this Complaint at one of Upsher-Smith's GPO customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

293.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as well as allocation spanning across numerous drugs. For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

294.     The concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers. For example, in June 2013, Dr. Reddy's was entering the market on a product not identified in the Complaint where Par had previously been exclusive. K.N., a senior account executive at Dr. Reddy's, sent an internal e-mail reporting that "[a GPO customer] has indicated that Par will walk away, so we have put together a proposal based on that information."

295.     Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Teva, asking them to submit a "Priority Wishlist of items to gain increased volume in the market." The customer reported to Teva that "7 of the global suppliers have created and submitted wishlists and that [the customer] will be reviewing next week and taking a look at how they can move things around. He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

296.     Further, in January 2015, Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL/HCTZ tablets. The customer stated "Yes, I would like a OTB [One Time Buy]. Can you provide pricing? And yes, we should discuss an ongoing offer as well. I think you are way under your 'fair share' on this one if I remember correctly."

297.     Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising prices. For example, in November 2013, S.G., a senior account executive at

Sandoz, sent an internal e-mail stating "[a large wholesale customer] is indicating that Glenmark and Caraco had taken a price increase on [a drug not identified in the Complaint] in June. [The customer] is asking if Sandoz will be rationalizing the market. . . . Please advise on next steps. Our [lower] pricing is disrupting the market."

298.    The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. "Fair share" decisions consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Or a putative competitor may decline to complete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug. Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

299.    Indeed, Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price.

300.    There are many examples of Defendants conspiring across drug markets. As set forth below, Teva implemented collusive price increases on several drugs at a time in a series of price increases detailed below and communicated with certain putative competitors as to multiple drugs as part of each such wave of price increases.

301.     Defendants also conspired across drug markets to maintain their market allocation scheme. For example, in November 2013, Dr. Reddy's won the "B" slot[37] business at a large wholesale customer on a product not identified in the Complaint. Dr. Reddy's had previously won the "A" slot business at that customer because Mylan had "walked away" from the business. J.A., a senior account executive at Dr. Reddy's, sent an internal e-mail stating "My concern here is that [Mylan] will retaliate somewhere else. I'm unsure of the $ volume, but this would pull somewhere around 4% share from Mylan, and I don't think they would take that lying down."

302.     Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on two drugs not identified in the Complaint at a large retail customer. CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox." And in June 2014, Sandoz again chose not to bid at a customer on a product not identified in this Complaint out of concern that Mylan would retaliate. As CW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers." As discussed more fully below, these decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol.

303.     A similar scenario occurred in August 2015, when Taro declined to bid on Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent. Taro voiced concerns

---

[37] Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium tablets. As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus "could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac." As discussed more fully below, both Etodolac ER and Warfarin Sodium were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014. Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

304.     As these and other examples alleged below make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap and any future markets where they might eventually compete.

305.     In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped. For example, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases. Patel explained that she had been hired by Teva to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price. CW-1 reiterated his conversation to Kellum, who understood and approved.

306.     As set forth above, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time. For example, in July 2013, Teva increased pricing on a list of 21 different products. There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, (Teva), to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal e-mail

address before then forwarding it to CW-2's personal e-mail address. Upon receiving the list, CW-2

read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a number of

products that Sandoz did not even sell.

307.    It was not uncommon for generic manufacturers to communicate with each other

about products that they did not sell. As another example, Teva, Wockhardt, and Mylan collusively

raised pricing on Enalapril Maleate in July 2013 (discussed more fully below). After a lengthy

conversation with Patel in the midst of the price increases, Aprahamian (Taro) (not in the market for

Enalapril Maleate at that time) sent an internal e-mail, including to M.P., a senior Taro executive,

stating "[t]here has been some significant changes in the market landscape with this product and I'd

like to get product back in Taro label (and fast)." And Taro did move fast. By December 2013,

Aprahamian spoke again with Patel, M.A., an account manager at Mylan, and M.C., a senior sales

and marketing executive at Wockhardt. Taro then re-entered the Enalapril Maleate market and

matched competitor pricing.

308.    As another example, on January 1, 2013 – the day before a substantial Mylan price

increase on a number of items –Green (Teva) spoke five (5) times with Nesta (Mylan). The next day,

Green spoke with Kellum (Sandoz). Kellum then sent an internal e-mail to the Sandoz team stating

"[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels

and Mylan took a significant price increase on Levothyroxine. Let's please be cautious on both these

products." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz

that Mylan raised price on that product.

309.    Unlike their branded counterparts, generic drugs are commodities and generic

manufacturers are constantly making decisions to enter new markets and leave existing markets.

Often these decisions are made, at least in part, based on who the competitors are and how strong

the relationship is between the two companies. For example, in July 2013, Sandoz was looking to

implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped

on with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out

of the market, and then Sandoz could re-enter later at the higher price.

310.    This interdependence between generic manufacturers is further demonstrated by the

countless examples of companies sharing sensitive information with competitors as a matter of

course. The State AGs have gathered evidence going back more than a decade of generic companies

routinely communicating and sharing information with each other about bids and pricing strategy.

This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or

"RFP") to a competitor, either on their own initiative, or at the request of a competitor.

311.    Defendants and other generic drug manufacturers also share information among

themselves regarding the terms of their contracts with customers, including pricing terms, price

protection, and rebates. Defendants use this information to negotiate prices or terms that are more

favorable to them, often to the ultimate detriment of payors and consumers. For example, in

December 2013, Teva was negotiating new price increase language in its customer contracts and

wanted some comfort that its competitors had similar language. On December 23, 2013,

Rekenthaler spoke with Nesta (Mylan) three times, including a 13-minute call. Immediately after

hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

| From: | Dave Rekenthaler |
|---|---|
| Sent: | Mon 12/23/2013 10:41 AM (GMT-05:00) |
| To: | ███████; Maureen Cavanaugh |
| Cc: | Nisha Patel02 |
| Bcc: | |
| Subject: | RE: Proposed Price Increase Language |

Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

312.    Defendants were well aware that what they were doing was illegal and took steps to

cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of

Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded "explain FS, (Fair Share)?" Aprahamian replied:



313.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

314.     To avoid creating a potentially incriminating paper trail, Kellum (Sandoz) routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

315.     The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described. Indeed, to date, many of the Defendants have made no document productions in connection with the State AGs' investigation, including Amneal, Apotex, Breckenridge, Glenmark, Lupin, and Zydus, and several other Defendants have made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt. Even Teva, the central figure in this Complaint, has to date only produced documents from two custodians to the State AGs.

### C.    Generic Drug Price Spikes Since 2013

316.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. As Senator Sanders noted, the prices of more than 1,200 generic medications increased an average of 448 percent between July

**REDACTED – PUBLIC VERSION**

2013 and July 2014.[38] An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

317.     These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|          | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|----------|------|---------------------------|------------------------------|-----------------------------|
|          | 2010 | 3820 | 125 | 260 |
|          | 2011 | 4265 | 255 | 409 |
|          | 2012 | 4071 | 223 | 433 |
|          | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

318.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

319.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## VIII.  THE CONSPIRACY

320.     When entering a generic drug market, Teva and the other Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of

---

[38] Why are Some Generic Drugs Skyrocketing in Price?: Hearing on S. 113-859 Before the S. Comm. on Health, Education, Labor, and Pensions, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcommittee on Primary Health and Aging).

artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

321.    Illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to many of the Subject Drugs.

322.    By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

323.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices – there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

324.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

325.     Generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

326.     Examples of specific collusive price increases on many of the Subject Drugs are set forth below.

## A.  Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors

327.     Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability. On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things: (1) net income was down 26% compared to the prior year; (2) total net sales were down 4%; and (3) generic sales declined by 7%.

328.     By this time, Teva had already started to consider new options to increase its profitability, including more product price increases. Over the next several years, Teva embarked on an aggressive plan to conspire with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

### 1.     April 2013: Teva Hires Nisha Patel

329.     In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing. In that position, her job responsibilities included, among other things: (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing

pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

330.    Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases. This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

331.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

332.    Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

333.    Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013 - nearly three weeks before Patel started at Teva - Aprahamian (Taro) sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva - Hush Hush for now...." The COO responded by saying "[m]aybe the industry will be better for it. Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva. Patel had also worked with Aprahamian several years earlier at ABC.

334.     Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013.

Patel began communicating with competitors, by phone and text, the day after she left ABC, before

she even started at Teva. For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

335.     Once Patel began her employment at Teva, her communications with certain

competitors became much more systematic and frequent - and focused around market events such

as price increases, market entry, customer challenges and loss of exclusivity.

336.     When she joined Teva, Patel's highest priority was identifying drugs where Teva

could effectively raise price without competition. On May 1, 2013, Patel began creating an initial

spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying

candidates for price increases, Patel started to look very closely at Teva's relationships with its

competitors, and also her own relationships with individuals at those competitors. In a separate tab

of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of

Competition" by assigning companies into several categories, including "Strong Leader/Follower,"

"Lag Follower," "Borderline" and "Stallers."

337.     Patel understood – and stressed internally at Teva – that "price increases tend to

stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very

important for Patel to identify those competitors who were willing to share information about their

price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

338.     As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

339.     Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications. Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

340.     Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

341.    After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. As discussed more fully below, these are all drugs that Glenmark increased prices on two weeks later, on May 16, 2013. Teva followed with its own price increases shortly thereafter.

### 2.    Ranking "Quality of Competition" to Identify Price Increase Candidates

342.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

343.    The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

344.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

345.    Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

    a.    The "High Quality" Competitor Relationships

346.    The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's' price increases. The agreements and understandings regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

b. *Mylan (+3)*

347.     Mylan was Teva's highest-ranked "quality" competitor. The relationship between these two competitors was longstanding and deeply engrained. It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

348.     Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012. From that time until the time Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least three-hundred and ninety-two (392) times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

349.     Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes. Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often. Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

350.     When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Rekenthaler promptly took over the role of communicating with Nesta. Starting in December 2013, through the time that Rekenthaler left Teva in April, 2015, Rekenthaler spoke to Nesta one hundred (100) times. Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

351.     The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C., a senior

executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least one hundred and thirty-five (135) times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued as needed through communications between Rekenthaler and R.P. at Mylan.

c.  *Watson/Actavis (+3)*

352.    Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis. Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

353.    Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis. From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

354.    In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler. From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least four hundred and thirty-three (433) times.

355.    Cavanaugh also had a very strong relationship with Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other four hundred and ten (410) times.

> d. *Sandoz (+3)*

356.     Teva also considered Sandoz a top-quality competitor. Patel had a very strong relationship with CW-1 at Sandoz.

357.     Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke one hundred and eighty-five (185) times by phone, including at or around every significant price increase taken by either company. As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases. Patel explained that she had been hired at Teva to identify products where Teva could increase prices. CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

358.     Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive. These relationships pre-dated Patel joining Teva.

> e. *Glenmark (+3)*

359.     Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and J.C., a sales and marketing executive at Glenmark.

360.     As stated above, Patel began communicating with CW-5 even before she began her employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

361.     Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months.

After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

### f.  Taro (+3)

362.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian. Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

363.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva. From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least one hundred (100) times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

### g.  Lupin (+2)

364.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel. Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold. Several of those examples are discussed below. Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone one hundred and twenty-five (125) times.

365.    From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

366.    Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave. For example, as discussed more fully below, in October 2013

Lupin was preparing to increase its pricing on the drug Cephalexin oral suspension. Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

### B.      Price Increase Hiatus

367.      Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

368.      This slowed down Teva's plans for its next round of price increases. During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work. Patel began to return to the office on a part-time basis beginning in November 2013.

369.      During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

370.      As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they communicated through different channels. These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

371.      By early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

### C.   New Relationships Emerge

372.   By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

373.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

### D.   Competitors Become "High Quality" After Successfully Colluding With Teva

374.   A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva's conspiratorial relationships.

375.   Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period. These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

### E.   Quality Competitors Collude With Each Other, Sandoz/Mylan

376.   In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market. Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate

agreements regarding drugs where they overlapped. The relationship highlighted in this section is the relationship between executives at Sandoz and Mylan. However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

377.    In September 2012, CW-4, concerned about her job security at Sandoz, sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

378.    In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

###    F.    Commitment to the Overarching Conspiracy

379.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party

that took the price increase. Often, the competitor would then follow with its own comparable price increase.

380.     There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

381.     The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian (Taro) often spoke with CW-3 (Sandoz) about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

382.     Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with its own comparable price increase.

### G.      Low Quality Competitors Comply with the Overarching Conspiracy

383.      As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox." Several examples of this with respect to some of the Subject Drugs are alleged below.

### H.      Individual Relationships

384.      The relationship between CW-4 and Nesta discussed above is just one example of two competitors capitalizing on their relationship to fix prices and allocate markets on drugs that both companies manufactured. Each of the individuals identified below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlapping drugs. Many of these relationships are discussed throughout this Complaint.

385.      The following sections profile each of these individuals and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them. The charts that follow are limited to communications with employees at other Defendants and do not include communications these individuals may have had with executives at competitor companies that are not named in this Complaint.

#### 1.      Ara Aprahamian

386.      Aprahamian is the Vice President of Sales at Taro and has held that position since he moved to Taro from Actavis in March 2013. Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the Defendants and other pharmaceutical companies. For example, between March 2013 and October 2018, Aprahamian exchanged at least seven hundred and six (706) phone calls and text messages with his contacts at Actavis, Amneal, non-defendant Greenstone,

Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mylan, Sandoz, Teva, and Wockhardt. These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R. (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2013 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| R.H. (Greenstone) | 4 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

## 2.      David Berthold

387.     Berthold is the Vice President of Sales at Lupin and has held that position since June

2006. During his tenure at Lupin, Berthold has been the primary person at the company

communicating with competitors. Indeed, Berthold has relationships with individuals at many of the

Defendants and other pharmaceutical companies and is one of the most prolific communicators of

all the individual Defendants. For example, between March 2011 and October 2018, Berthold

exchanged at least four thousand one hundred and eighty-five (4,185) phone calls and text messages

with his contacts at Actavis, Amneal, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark,

Greenstone, Lannett, Mylan, Sandoz, Teva, Wockhardt, and Zydus. These communications are

detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| R.H. (Greenstone) | 791 | 3/9/2011 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2013 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2013 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2014 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2014 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

### 3.    Jim Brown

388.    Brown is the Vice President of Sales at Glenmark and has held that position since November 2012. Brown was one of several Glenmark executives that conspired with competitors. Although not as prolific in his communications with competitors as some of the other individual Defendants, he did communicate when necessary to further the agreements. For example, between June 2012 and August 2018, Brown exchanged at least three hundred and ninety-five (395) calls and text messages with his contacts at Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Lannett, Lupin, Par, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 16 | 12/18/2013 | 2/22/2018 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

### 4.    Maureen Cavanaugh

389.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Teva until April 2018. She is currently the Senior Vice President and Chief Commercial Officer at Lannett. During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation. In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the agreements. For example, between January 2011 and August 2017, Cavanaugh exchanged at least six hundred and twelve (612) phone calls and text messages with her contacts at Actavis, Amneal, Glenmark, Greenstone, Sandoz, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| S.R.(1) (Amneal) | 45 | 1/18/2011 | 11/14/2012 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

### 5.    Marc Falkin

390.    Falkin was the Vice President of Marketing, Pricing and Contracts at Actavis until Actavis was acquired by Teva in August 2016. For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva. During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants and other pharmaceutical companies. For example, between August 2013 and July 2016, Falkin exchanged at least two thousand five hundred and sixty-two (2,562) phone

calls and text messages with his contacts at Amneal, Apotex, Aurobindo, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

REDACTED – PUBLIC VERSION

### 6.   Jim Grauso

391.    Grauso was employed as a Senior Vice President of Commercial Operations at Aurobindo until Janua1y 2014. In February 2014, Grauso moved to Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations. Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark. For example, between December 2011 and January 2014, Grauso exchanged at least one thousand seven hundred and sixty-three (1,763) phone calls and text messages with his contacts at Actavis, Amneal, Breckenridge, Glenmark, Greenstone, Lupin, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

392.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo. For example, between February 2014 and October 2018, he exchanged at least two thousand and eighteen (2,018) phone calls and text messages with his contacts at Amneal, Aurobindo,

**REDACTED – PUBLIC VERSION**

Breckenridge, Dr. Reddy's, Greenstone, Lupin, Mylan, Par, Rising, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2018 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 10/4/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

### 7.    Kevin Green

393.    Green worked at Teva as a Director of National Accounts until November 2013 when he took a position with Zydus, where he is still employed as the Vice President of Sales. Green developed a number of relationships with individuals at many of the Defendants and other pharmaceutical companies. He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Green exchanged at least one thousand four hundred and ten (1,410) phone calls and text messages with his contacts at Aurobindo, Breckenridge, Dr. Reddy's, Greenstone, Lannett, Lupin, Mylan, Sandoz, Wockhardt, and Zydus. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

394.     Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Green exchanged at least nine hundred and sixty-nine (969) phone calls and text messages with his contacts at Amneal, Aurobindo, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Rising, Sandoz, and Teva. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2013 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2013 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| R.H. (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

**8.    Armando Kellum**

395.    Kellum was the Director of Pricing and Contracts at Sandoz until July 2015. While at

Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into

price fixing and market allocation agreements with competitors. In addition, Kellum had his own

relationships with certain competitors and communicated with those contacts directly when

necessary to further the agreements. For example, between May 2011 and April 2015, Kellum

exchanged at least one hundred and eighty-two (182) phone calls and text messages with his contacts

at Actavis, Amneal, Dr. Reddy's, Greenstone, Lupin, Rising, Teva, Upsher-Smith, and Zydus. These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

### 9.  Jill Nailor

396.    Nailor has worked at Greenstone since August 2010 and is currently the Senior

Director of Sales and National Accounts. Nailor directed her subordinate R.H., a national account

executive, and others at Greenstone to fix prices and allocate customers with competitors on

overlapping drugs, including with several of the corporate Defendants. She also instructed them to

avoid putting any evidence of such communications into writing.

397.    In addition, Nailor regularly communicated directly with competitors herself. For

example, between August 2010 and May 2017, Nailor exchanged at least four thousand four

hundred and thirty-nine (4,439) phone calls and text messages with her contacts at Actavis, Amneal,

Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lupin, Lannett, Mylan, Par, Sandoz, Taro, Teva,

Upsher-Smith, Wockhardt, and Zydus. These communications are detailed in the table below:

**REDACTED – PUBLIC VERSION**

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 3769 | 8/26/2010 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2014 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

### 10.   James Nesta

398.     Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan. Nesta communicates regularly with his counterparts at many of the Defendants and other pharmaceutical companies. For example, between January 2011 and February 2016, Nesta exchanged at least five thousand two hundred and ninety-three (5,293) phone calls and text messages with his contacts at Actavis, Amneal, Aurobindo, Greenstone, Dr. Reddy's, Lannett, Lupin, Par, Sandoz, Taro, Teva, and Zydus. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| S.R.(1) (Amneal) | 1079 | 1/3/2011 | 12/17/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

### 11.   Konstantin Ostaficiuk

399.    Ostaficiuk is the President of Camber and has held that position since 2009. During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors. Indeed, Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the Defendants. For

example, between March 2011 and August 2017, Ostaficiuk exchanged at least four hundred and

sixty-four (464) phone calls with his contacts at Actavis, Amneal, Aurobindo, Breckenridge, Dr.

Reddy's, Glenmark, Lannett, Lupin, Rising, Sandoz, Taro, Teva, Wockhardt, and Zydus. These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2013 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| S.R.(1) (Amneal) | 12 | 3/12/2012 | 10/25/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2015 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2011 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2013 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

### 12.    Nisha Patel

400.    Patel worked at Teva from April 2013 to December 2016, first as a Director of

Strategic Customer Marketing and then as a Director of National Accounts. As discussed in great

detail throughout this Complaint, Patel was in frequent communication with her counterparts at the

**REDACTED – PUBLIC VERSION**

Defendants and other pharmaceutical companies to fix prices and allocate markets. For example, during her time at Teva, Patel exchanged at least one thousand two hundred and forty (1,240) phone calls and text messages with her contacts at Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Upsher-Smith, and Zydus. As discussed in this Complaint, Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp. The communications detailed in the table below include only telephone calls and text messages:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| R.H. (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2014 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2016 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2016 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

### 13.   David Rekenthaler

401.    Rekenthaler was the Vice President of Sales, US Generics at Teva until April 2015. Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the Defendants and other pharmaceutical companies. For example, between January 2011 and March 2015, Rekenthaler exchanged at least one thousand and forty-four (1,044) phone calls and text messages with his contacts at Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Rising, Sandoz, Taro, Wockhardt, and Zydus. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2012 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| S.R.(1) (Amneal) | 1 | 8/6/2012 | 8/6/2012 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

### 14.  Rick Rogerson

402.    Rogerson was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several Defendants. For example, between February 2010 and July 2016, Rogerson exchanged at least six hundred and thirty-five (635) phone calls and text messages with his contacts at Dr. Reddy's, Glenmark, Lannett, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

### 15.  Tracy Sullivan

403.    Tracy Sullivan has been employed at Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the Defendants and other pharmaceutical companies. For example, between March 2011 and August 2016, Sullivan exchanged at least four hundred and ninety-five (495) phone calls and text messages with her contacts at Amneal, Aurobindo,

Breckenridge, Dr. Reddy's, Greenstone, Mylan, Par, Teva, Wockhardt, and Zydus. These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2011 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| R.H. (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

## I.     Teva Profitability Increases Dramatically

404.    As discussed more fully below, from July 3, 2013 through January 28, 2015, Teva

conspired with its competitors to raise prices on dozens of different drugs. The impact of these

price increases on Teva's profitability was dramatic.

405.    After these price increases – on July 30, 2015 – Teva reported strong results and

raised its guidance for the full year 2015. Among other things: (1) net income was up 15% compared

to the prior year; (2) operating income was up 16% compared to the prior year; and (3) cash flow

from operations was up 41% compared to the prior year. Teva reported a gross profit margin of

62.8%, which was up from 58.1% the prior year. Teva's stock prices also soared. By July 2015,

Teva's stock price was trading at an all-time high. These significant results were obtained largely as a result of the anticompetitive conduct detailed herein.

### J.    Teva and its Executives Knowingly Violated the Antitrust Laws

406.    Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of Conduct. For example, Teva's Code of Conduct from the summer of 2013 states specifically:



407.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva reached with its competitors.

408.    For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." It was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on

conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

409.    As Patel was starting to create her ranking of quality competitors and identify price increase candidates, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

410.    With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

411.    K.G. immediately forwarded that information to Cavanaugh (Teva), who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

412.    Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where

Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

413.    Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013. In the "Reasons for Increase" column, Patel again included specific information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

414.    This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

> Under reasons, I would change to the following:
>
> 1. Etodolac ER : Follow Taro
> 2. Etodolac : Follow Sandoz; Taro increase anticipated.
> 3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

415.    As discussed more fully below, Teva increased prices on those three drugs two days later. Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

416.    Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors. Patel was aware that both Rekenthaler and Green were

communicating with competitors, sometimes at her direction. Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

417.    Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 (Sandoz) called Rekenthaler (Teva) and left a message. Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

### K.    Price Increases Slow Dramatically After Government Investigations Commence

418.    As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014. This was not a coincidence. Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

419.    In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015. In its report, Sandoz found that "[g]eneric drug price increases in 2013 and 2014 were very common." Specifically, the report stated:

"For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%."

420.    The report went on to state that "[t]he number and level of price increases declined noticeably in 4Q 2014." The following graphic, which was included in the Sandoz report, demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



421.    The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down. To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

## L.    Consciousness of Guilt

422.    The Defendants were aware that their conduct was illegal. They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic

communications after they were made. There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally. This was part of a consistent effort by these individuals, as well as individuals at other corporate Defendants, to avoid putting incriminating information in writing, in order to evade detection.

423.    For example, when Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "call me." Again, this was done to avoid putting any potentially incriminating communications in writing. Patel learned this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

424.    Kellum (Sandoz) was also aware that what he and others at Sandoz were doing was illegal. Kellum had received antitrust training and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws. Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability. As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

**M.    Spoliation of Evidence**

425.    Many of the individuals named above, and other employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

426.    For example, Patel produced text messages – in response to the States' subpoena – going back as far as early 2014. Prior to producing those text messages, however, Patel had deleted

all of her text communications with competitors from the same time period, including many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan; and many other text messages with employees of Dr. Reddy's, Glenmark (including CW-5), Greenstone (including R.H.), Par, Sandoz, Upsher-Smith and Zydus.

427.    Patel deleted these text messages after a conversation with Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was aware of the government investigations that had been commenced and told Patel that the government was showing up on people's doorsteps. Sometime after that, Patel deleted her text messages with competitors.

428.    Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the States requested it through an investigatory subpoena in July 2017. As discussed below, B.H. was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings. After the States' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

**N.    Obstruction of Justice**

429.    Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response. This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

430.    When the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex. Rekenthaler then immediately called Cavanaugh and C.B., another

senior Teva executive. Rekenthaler spoke several times to Cavanaugh before then calling his own

attorney and speaking twice. Later that day, Patel called Rekenthaler two more times to coordinate

her response to the government.

431.    Other Defendants took similar action in response to events in the States'

investigation. Several were speaking frequently at or around the time a subpoena was issued, or

when the States were engaging in substantive discussions with their counsel. As just one example, on

July 17, 2018 the States sent a subpoena to Grauso, through his counsel. That same day, Grauso

spoke to Aprahamian for more than twelve (12) minutes. The States then set up a conference call

with Grauso's counsel for July 25, 2018. The day before that call – July 24, 2018 –Aprahamian spoke

to his lawyer, and then shortly thereafter called Grauso. The next day, shortly after a conversation

between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for

nearly seven (7) minutes.

## IX.    THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS

### A. Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

#### 1.    Teva/Mylan

##### a.  Fenofibrate

432.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic

Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin

having approximately 35% market share.

433.    On February 27, 2013, K.G.(Teva) e-mailed multiple Teva colleagues asking them to

provide "any noise you may be hearing in the market relative to additional competition on

Fenofibrate 48mg and 145mg." Specifically, K.G. was seeking "Competitive Intelligence" on

Mylan's potential entry to the market. In order to get this information, Green called Mylan's Vice

President of National Accounts, Nesta. Over the course of that day, Green and Nesta spoke at least four (4) different times. That same day, Green reported back to K.G. and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

434.    A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate. On May 8, 2013, Green e-mailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate". This request for information was reiterated – and its purpose made clear – the following day when K G. sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

435.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone. These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

436.    In one striking example of the coordination between the three companies, Nesta called Green at 2:42 pm on May 7, 2013 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 pm – Nesta called Berthold and spoke for nearly three (3) minutes.

437.    On May 10, 2013, K.G. received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic was to allocate a customer of

REDACTED – PUBLIC VERSION

sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

438.    Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

439.    Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48 mg and 145 mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed: "this is the customer we should concede on Fenofibrate."

440.    Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

### b.   *Clonidine TTS*

441.     As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine TTS. Mylan had approximately 48.4% market share and Teva had approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

442.     In November 2011, Teva took over Mylan's business for Clonidine TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine TTS. Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine TTS.

443.    On February 10, 2012, Cardinal's move to Teva prompted K.G. (Teva) to order his colleagues to gather intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes. Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine TTS.

444.    To gain back some market share, Mylan challenged Teva's Clonidine TTS business at McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

445.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal. Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva. Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

446.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e- mail to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine

Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least

two calls between Green and Nesta on July 17 and the morning of July 18, 2012. Those calls lasted

three (3) minutes and five (5) minutes, respectively.

447.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least

twice, once for four (4) minutes and once for fourteen (14) minutes. On those calls, Nesta informed

Green of Mylan's impending temporary exit from the Clonidine TTS market. As expected, later in

the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as

Wal-Mart and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a

temporary discontinuation notice.

448.    Mylan's exit from the Clonidine TTS market presented an opportunity to raise prices

and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.

For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS,

Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine TTS was $22.13, $37.81,

and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below

$10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market,

however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a

direct invoice price of $33.28, $56.08, and $80.76, respectively.

449.    Mylan and Teva maintained regular contact as former Mylan customers came to

Teva because of Mylan's supply issues with Clonidine TTS. For example, Teva submitted bids to

CVS and Wal-Mart—which were ultimately accepted by those companies—on October 4, 2012 and

October 5, 2012, respectively. In the days leading up to those bids, Teva and Mylan representatives

had at least the following phone calls:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

450.     Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine TTS market, it could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Green (Teva) and Nesta (Mylan) spoke for ten (10) minutes. That same day, E.G. (Teva) sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

451.     In or about February 2013, Mylan relaunched Clonidine TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine TTS business at Econdisc. Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

452.     Rekenthaler (Teva) acknowledged in an internal e-mail dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems." For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan refused. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior

pricing. Nonetheless, because Mylan's bid to CVS was not competitive—but rather an effort to allocate the market without eroding price—Teva was able to maintain artificially higher prices at CVS.

453.    To carry out their scheme to allocate the Clonidine TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least thirty-three (33) different times and spoke for nearly 2 hours and 45 minutes.

454.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



> **From:** ▮▮▮▮▮
> **Sent:** Tuesday, April 09, 2013 2:24 PM
> **To:** ▮▮▮▮; Dave Rekenthaler
> **Cc:** ▮▮▮▮▮▮▮▮
> **Subject:** Clonidine - Mylan Challenges
> **Importance:** High
>
>
> Kevin / Dave,
>
>
> Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?
>
>
> We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%. We received the Omnicare challenge yesterday.
>
>
> Based on a discussion with Kevin Green, Mylan would follow a price increase.

*c.   Tolterodine ER*

455.    Tolterodine Extended Release ("Tolterodine ER") is the generic of the brand name medication Detrol LA..

456.     Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler (Teva), K.G. (Teva), and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

457.     Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected that on January 1, 2014, the price of Detrol LA was going to increase. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

458.     At the end of the day on Friday, December 20, 2013, T.C. (Teva) learned from D.H. (Cardinal) that Mylan intended to launch its Tolterodine ER on January 2, 2014. D.H. (Cardinal) further provided T.C. (Teva) with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

459.     T.C. (Teva) informed her Teva colleagues of Mylan's plans. K.G. (Teva) then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively

for all accounts, K.G. (Teva) noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

460.    On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15am, which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22am, Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds. During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

461.    For example, at 10:33am – while Rekenthaler was still on the phone with Nesta, K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:



From:      Dave Rekenthaler
Sent:      Mon 12/23/2013 10:41 AM (GMT-05:00)
To:        ██████████, Maureen Cavanaugh
Cc:        Nisha Patel02
Bcc:
Subject:   RE: Proposed Price Increase Language

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

462.  Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

463.  At 12:12 pm on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to reach its desired 60% market share while Mylan would get its desired 40% share:

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

[TUS000654798.]

464.  In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser. The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with Nesta on December 23, 2013:

| Dosages | Initial Pricing Plan | | Price after Dave Rekenthaler Speaks with Jim Nesta | |
|---|---|---|---|---|
| | **WALGREEN** | | **WALGREEN** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| | **CIGNA** | | **CIGNA** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| | **HUMANA** | | **HUMANA** | |
| Product Description | Direct Invoice | | Direct Invoice | |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 88.05 | | 108.00 | |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 264.15 | | 324.00 | |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,467.50 | | 1,800.00 | |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 88.05 | | 108.00 | |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 264.15 | | 324.00 | |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,467.50 | | 1,800.00 | |
| | **OPTUM RX** | | **OPTUM RX** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

465.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

466.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

          *d.   Capecitabine*

467.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

468.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

469.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

470.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

471.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

472.    For example, at 12:46pm that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

From: Dave Rekenthaler
Sent: Mon 8/04/2014 12:51 PM (GMT-05:00)
To:                                    Nisha Patel02
Cc:     Maureen Cavanaugh
Bcc:
Subject: Capcetibine


Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

473.     Cavanaugh (Teva) responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

474.     Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

475.     On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an e-mail to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead C.B. told Patel she "wi[ll] call" to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

476.     The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva. The same day that Mylan put a bid in to McKesson – August 7, 2014 –Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes. On that

call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

477.    This market allocation "plan" was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan. C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm. Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

478.    The next morning, at 8:30 am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02am, Rekenthaler e-mailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

479.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

480.    Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

### 2.     Teva/Sandoz

#### a.   *Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa)*

481.     During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

482.     In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

483.     On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

484.     After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, Green (Teva) spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz . . .."

485.     Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had

received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 (Sandoz) called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16pm, Rekenthaler forwarded an e-mail to Patel and posed the question, "Who's over at Sandoz now?" Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

486.     Rekenthaler then called CW-2 (Sandoz) at 1:26pm that same day and they spoke for two (2) minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48pm, for seven (7) minutes. Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

*b.   Temozolomide*

487.     The patent on Temodar, the branded version of Temozolomide, was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

488.     On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid. That same day, CW-1 received a telephone call from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide. Nothing was agreed to on that call.

489.     On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out

Teva's plans with regard to The Pharmacy: "Please find out if Teva is submitting an offer to them."

The next morning, S.G., a national accounts executive at Sandoz, spoke with The Pharmacy and

asked The Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his

team: "I just spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet

received an offer from Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to

understand their supply and launch status. [The Pharmacy] will be circling back and I will share the

feedback we receive with everyone on this email trail."

490.     At the same time, CW-1 was reaching out to Teva directly to get more information.

CW-1 called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they

spoke for over fourteen (14) minutes that same afternoon.

491.     Also on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically

delivered Teva's message regarding its plans for Temozolomide:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, July 23, 2013 3:26 PM
**To:** Greenstein, Steven
**Subject:**

8/11 launch

Looking to play nice in 2 player market

Have supply for that share.

What are your plans?

492.     By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz

(a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete

aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to

sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide.

Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

493.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. T.C. (Teva), discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: "We'll send offers out to everyone. My instincts tell me Sandoz will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll send them out an offer same time as everyone else and respond from there." Rekenthaler most likely got his information from Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 (Sandoz) and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

494.    Teva and Sandoz were also coordinating through other channels. After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013. After those calls, S.G. (Sandoz) suggested in an internal e-mail on July 31 that Sandoz cede the business and instead submit a cover bid: "[The Pharmacy] has received an offer from Teva on Temozolomide. They are asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that we submit an offer."

495.    Similarly, on July 29, 2013, Green (Teva) spoke to CW-2 (Sandoz) two (2) times. The two spoke again on July 31, 2013 for six (6) minutes. During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted the The Pharmacy's business. The next day, August 1, 2013, D.P., another Sandoz executive, e-mailed Kellum, conveying the message from Green:

REDACTED – PUBLIC VERSION

| From: | ████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=████ ████B108848C-2032-4369-BDD7-5742A8329215] |
|---|---|
| Sent: | 8/1/2013 11:52:29 AM |
| To: | Kellum, Armando [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellum, Armando3a1dd060-78e9-4d1c-904b-da70bd48a7c5] |
| CC: | ████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=████ 554612fa-c83d-4cef-8dde-6baf08aeaa0f] |
| Subject: | Teva temzol |

AK:

██████ just got some intel from a reputable source:

Teva plans to launch on Monday (Aug 12)
Teva sending offers to all customers today
Teva wants ████

Regards,

████

496.     Teva and Sandoz communicated their future plans with each other for other accounts in addition to The Pharmacy and CVS. On July 31, 2013, D.P. (Sandoz) e-mailed an update on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and is planning to send to Econdisc tomorrow[.]"

497.     Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

498.     Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength. In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

499.     CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

c.   *Tobramycin*

500.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

501.    As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of this information in an internal Teva e-mail the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn. Hearing they are ready to ship once they secure business, and we have been challenged." The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

502.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that that each would maintain or concede to the other. Patel then memorialized the agreement in an e-mail two days later. The result:  Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare. Teva also planned to concede the Cardinal business to Sandoz.

503.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

504.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

505.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

506.    CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

507.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal e-mail, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursue this opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after

she had called CW-1 (Sandoz) twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four (4) minutes.

### d. *Dexmethylphenidate HCL ER*

508.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmethylphenidate HCL ER in February 2014, Patel (Teva) spoke frequently with CW-1 (Sandoz) about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmethylphenidate HCL ER 40mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

509.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmethylphenidate HCL ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Wed 2/12/2014 6:34 PM (GMT-05:00) |
| To: | █████████████ |
| Cc: | |
| Bcc: | |
| Subject: | Re: ABC Dexmethylphenidate 40mg - Challenge |

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone

510.    One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

511.     On February 14, 2014, Teva also refused to lower its price for Dexmethylphenidate HCL ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

512.     Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmethylphenidate HCL ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one (21) minutes. The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: "[t]he competitor (Sandoz) has not yet shipped. The new price will become effective on and the price protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14."

513.     Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmethylphenidate HCL ER.

514.     Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva. In February 2014, Sandoz's target market share for varying strengths of Dexmethylphenidate HCL ER varied by how many manufacturers were in the market. Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmethylphenidate HCL ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from them. In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmethylphenidate HCL ER, Par "gave up the business to keep the market share even." As Sandoz was entering the market, Rekenthaler (Teva) was speaking to M.B., a senior

national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

515.    The market allocation scheme between Teva and Sandoz on Dexmethylphenidate HCL ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmethylphenidate HCL ER 5mg on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmethylphenidate HCL ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva. When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

### 3.    Teva/Lupin

#### a.    *Lamivudine/Zidovudine (Combivir)*

516.    Teva launched Lamivudine / Zidovudine (brand name Combivir) in December 2011.

517.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

518.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

519.    For example, on April 24, 2012, T.C. (Teva) asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her

understanding of how quickly the FDA typically approved new product applications, Rekenthaler

assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ▮▮▮▮▮▮▮▮
> **Subject:** RE: what r you guys hearing on generic combivir?
>
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate.

520.     That "good friend" was Aurobindo's R.C., who had previously worked with both

T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would

evidence conspiratorial communications between the two competitors. To confirm this information,

Green also called and spoke to Grauso (Aurobindo) that same day for twelve (12) minutes and

Berthold (Lupin) for four (4) minutes.

521.     After speaking with Berthold, Green responded separately to T.C., providing specific

information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin'

s anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25,

2012, for seven (7) minutes.

522.     In early May, with the Lupin and Aurobindo launches just days away,

communications among all three competitors accelerated noticeably. Over the four-day period from

May 7 to May 10, for example, the three companies spoke at least thirty-two (32) times, as set forth

in the table below:

**REDACTED – PUBLIC VERSION**

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

523.     During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

*b.   Irbesartan*

524.    Teva received approval to manufacture generic Irbesartan in March 2012.

525.    On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

526.    At 11:27am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

```
From:     Kevin Green
Sent:     Tue 3/06/2012 12:26 PM (GMT-05:00)
To:                                        ; Dave Rekenthaler;
Cc:                          ; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan


Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG
```

527.    That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

```
From:
Sent:     Tue 3/06/2012 3:08 PM (GMT-05:00)
To:       Dave Rekenthaler;                          ; Kevin Green;
Cc:                         , Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan


Then work harder….
```

528.    At 10:54am the next day, Green called Berthold again. They spoke for nearly seven (7) minutes. At 12:20pm, K.G. (Teva) shared with the sales team the competitively sensitive

information Green had obtained. Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the customers that received offers. K.G. stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan on March 30, 2012.

c.   *Drospirenone and Ethinyl Estradiol (Ocella)*

529.   Barr Pharmaceuticals received approval to market Drospirenone and Ethinyl Estradiol (brand name Ocella) in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

530.   In late 2012, Lupin received approval to market a generic Ocella product.

531.   By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves. On April 24, 2013, Berthold of Lupin called Green at Teva. The two spoke for over three (3) minutes. Berthold called Green two more times the following day.

532.   The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis. In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

533.   The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

534.   The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

535.     Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

536.     The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes. Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

537.     On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "Agreed."

538.     On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes). After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

---

**From:** Kevin Green
**Sent:** Wednesday, July 10, 2013 9:46 AM
**To:** ██████
**Cc:** ████████; Nisha Patel02
**Subject:** Ocella


Tom,


Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

---

539.     Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold. During that call, the two decided that Patel would

call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly

after and the two spoke for more than four (4) minutes. They spoke again first thing the next

morning, for nearly one (1) minute.

540.    The next day, Patel e-mailed Green, saying: "BTW, Ocella. Check!" Green, confused

by the e-mail, responded: "Huh... you are calling....correct?" Patel confirmed that she had indeed

called her counterpart at Lupin: "Yes. I was saying it's all done."

541.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between

Green and Berthold that lasted twenty (20) minutes.

542.    On July 29, 2013, Green announced to his colleagues: "Lupin has entered and we

need to evaluate."

543.    The lines of communication between competitors Teva and Lupin remained open

and active over the next few months as they worked on the details of which company would take

which generic Ocella accounts. On September 5, 2013, for example, Rekenthaler conveyed to a

colleague the importance of retaining a particular customer's account, along with his understanding

of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold

by phone twice the following day to confirm the understanding between the two companies.

544.    On September 9, 2013, K.G. (Teva) sent an internal e-mail to his colleagues

conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella

business. He informed them that because Teva had secured two other significant customers, "we

will likely need to give up some of our formulary position to this new market entrant."

545.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts

between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the

furtive arrangement. He told her to be careful before conceding large customers on a "bucket basis"

rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

### d.  *Norethindrone/Ethinyl Estradiol*

546.    Teva markets its generic version of Norethindrone/Ethinyl Estradiol under the name Balziva®.

547.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol

548.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

549.    The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Patel spoke to Berthold (Lupin) twice by phone.

550.    Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

551.    On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4. Teva/Greenstone

*a. Oxaprozin*

552.     Non-defendant Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the days and weeks leading up to Greenstone's entry into the market, Green (Teva) and R.H., an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

553.     During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

554.     Part of the understanding between the companies was that Teva would concede at least two large customers - CVS and Cardinal - to Greenstone, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

555.     On March 27, 2013, T.C. (Teva) forwarded an e-mail that T.C. had received from Walmart to Green and Rekenthaler. The e-mail from Walmart, sent the same day, requested that

REDACTED – PUBLIC VERSION

Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a

new bid from a competitor (Greenstone).

556.     Rekenthaler's immediate reaction to T.C.'s e-mail was "Great. More idiots in the

market…" In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that,

pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal . . . remember[?]"

Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal and CVS to Greenstone.

Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor strategy on their part for

sure." In her reply, T.C. made it clear that there was an understanding between Teva and

Greenstone:

From: ███████████
Sent:     Wed 3/27/2013 4:36 PM (GMT-05:00)
To:       Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject: RE: Oxaprozin 600mg Tab


I thought they said they were done after cardainl.. I am pissed.

557.     Teva took immediate steps to address the situation. That same day – March 27, 2013

– Green called R.H. at Greenstone at 5:25pm but she did not answer. The next morning, at 8:06am,

T.C. sent an e-mail to Walmart stating: "Addressing this morning…" Less than a half hour later,

T.C. sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

558.     After Green spoke to T.C., he immediately called R.H. at Greenstone. R.H. relayed

the information from Green to her boss, Nailor, in a series of conversations and text messages over

the course of that morning, and later in the day, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

559.    During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

560.    At 1:22 pm that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI - I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the e-mail to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

561.    Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

b. *Tolterodine Tartrate*

562.    Greenstone entered the market for Tolterodine 1mg and 2mg Tablets on January 23,

2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to

Greenstone's entry, R.H. and Nailor of Greenstone were speaking frequently to Patel and

Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text

messages include at least those set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

563.    During these calls and text messages, Teva and Greenstone agreed that Teva would

concede business to Greenstone in order to avoid significant price erosion in the market.

564.    The day after Greenstone's entry – January 24, 2014 - in a message to Teva national

account managers about how important it was for them to determine and document which

competitor was challenging Teva for business in a particular situation (because it would help Teva

determine whether to concede or not), Patel stated: "As we've heard, Greenstone is entering the

market for Tolterodine. I'm sure we will have to concede somewhere. . . ."

REDACTED – PUBLIC VERSION

565.     On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:

From:     Dave Rekenthaler
Sent:     Tue 1/28/2014 4:02 PM (GMT-05:00)
To:       ████████████████
Cc:       Maureen Cavanaugh; Nisha Patel02
Bcc:
Subject: RE: price challenge delphi 10707 cvs tolterdine

It's Greenstone, new to market.  We can discuss.

566.     The next day, Patel and R.H. (Greenstone) tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

567.     On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. (Teva), who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded – again not wanting to put the details into writing:

On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:

████ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

568.     The next day, Patel called R.H. (Greenstone) and the two spoke for nearly sixteen (16) minutes.

569.     After some internal discussions at Teva regarding the CVS business, Teva confirmed

its decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on

Tolterodine.

<em>c.   Piroxicam</em>

570.     On March 3, 2014, Greenstone received FDA approval to market Piroxicam

capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and

20mg capsules.

571.     Greenstone immediately began seeking potential customers. At 10:07am on March 5,

2014, J.L. (Teva) sent an e-mail to Patel informing her that Greenstone had just received Piroxicam

approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy

in place for Piroxicam?"

572.     Before responding to that e-mail, Patel sought to negotiate strategy with Greenstone.

Patel called R.H. (Greenstone) at 10:55am and they spoke briefly. Shortly after that call, Patel also

called R.H.'s boss, Nailor. At 2:14pm that afternoon, Patel and Nailor spoke briefly. Immediately

after hanging up with Nailor, Patel responded to J.L.'s e-mail:



573.     Teva immediately began preparing a strategy to deal with Greenstone's entry into the

Piroxicam market. On March 6, 2014, Patel requested a customer profitability and share analysis.

During these negotiations with competitors regarding market entry, it was typical for Teva

157

employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

574.    That same day, Patel had multiple calls with Nailor and R.H. at Greenstone to discuss their plans for dividing the Piroxicam market. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

575.    The next day - March 7, 2014 - after the flurry of phone calls detailed above, Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: "I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

576.    Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account.

The same day, after hearing that Teva was not going to back down on the CVS challenge, R.H. (Greenstone) called Patel at 1:41pm and they spoke briefly.

577.     Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel and R.H. spoke briefly early in the day. R.H. also called Patel at 11:35pm that same day and they spoke for fifteen (15) minutes. Immediately after speaking to Patel, R.H. called Nailor and they spoke for ten (10) minutes. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

578.     For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would be prudent to concede the Anda business to Greenstone on Piroxicam, in order to alleviate any future challenges from Greenstone. Patel agreed with the decision to concede on April 1, 2014.

### d.  Cabergoline

579.     In December 2014, as Greenstone was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. (Teva) on Greenstone's behalf. In a December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between Greenstone and Teva: "I need to talk to you about Cabergoline. Greenstone is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains. [The Wholesaler] owes Greenstone a favor and would be ok if you walked away from their business. Greenstone has promised to play nice in the sandbox. Let me know if you are available to discuss."

580.     The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

581.     T.C. (Teva) did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded: "Of course. I will let G[reen]stone know not to do anything crazy."

582.     The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation: "Tell Greenstone we are playing nice in the sandbox and we will let them have [The Wholesaler]."

583.     Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

### 5.     Teva/Actavis

#### a.   *Amphetamine/Dextroamphetamine ER*

584.     Teva began marketing Amphetamine/Dextroamphetamine ER (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-XR"), after the expiration of the brand manufacturer's patent on Adderall XR®.

585.     On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

586.     Teva deferred its decision on pricing until Actavis was in a position to ship the product.

587.     Actavis obtained FDA approval to manufacture various formulations of Amphetamine/Dextroamphetamine ER on June 22, 2012. At 9:58pm that same evening, Rekenthaler instructed Teva employees to find out Actavis' plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32am the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

**From:** ▮▮▮▮▮
**Sent:** Saturday, June 23, 2012 8:32 AM
**To:** Dave Rekenthaler; ▮▮▮▮▮▮▮▮  Kevin Green
**Subject:** Re: Actavis Adderall XR

Spoke to ▮▮▮. Going after approx 15 share.
1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

588.     The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

589.     Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

590.     One year later, Teva's customer renewed its request for a price reduction on Amphetamine/Dextroamphetamine ER, citing Actavis' desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: " . . . we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

### b.  *Amphetamine/Dextroamphetamine IR*

591.     In March 2014, Aurobindo was making plans to enter the market with

Amphetamine/Dextroamphetamine IR (sometimes referred to as "Mixed Amphetamine Salts" or

"MAS-IR"). On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market

share target for the impending launch was 10%. Teva's senior marketing operations executive, K.G.,

indicated that Teva was aware that both Aurobindo and Actavis were launching.

592.     A flurry of telephone communications between Teva and these two competitors

took place on the days surrounding the foregoing e-mail. The day before, on March 17, 2014, Patel

had spoken to Actavis' Director of Pricing, Rick Rogerson, three (3) times. Rekenthaler and Falkin

of Actavis also spoke once on that day. On March 18, 2014, the day of the e-mail, Rekenthaler and

R.C. (Aurobindo) had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke

again seven (7) times on March 20, 2014.

593.     On April 16, 2014, Teva received word from a customer that a new competitor in

the market had offered a lower price than Teva's current price for

Amphetamine/Dextroamphetamine IR. Patel informed K.G. that the challenge was coming from

Actavis and recommended that Teva concede that customer's account. At 1:43pm, she

communicated to another colleague that the decision had been made to concede. Apparently closing

the loop, she called Rogerson at Actavis at 1:55pm. They spoke for just over four (4) minutes.

### c.  *Dextroamphetamine Sulfate ER*

594.     On June 19, 2014, as Actavis was entering the market for Dextroamphetamine

Sulfate ER, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of

the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis'

market share goals because he and Falkin (Actavis) had spoken twice by phone that morning – once

for more than eleven (11) minutes and again for more than nine (9) minutes.

595.     Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dextroamphetamine Sulfate ER. She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis. Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

### d.   Clonidine TTS

596.     Teva began marketing Clonidine TTS in 2010 after the expiration of the brand manufacturer's patent on Catapres-TTS®.

597.     On May 6, 2014, Actavis was granted approval to market Clonidine TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day: for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

598.     The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. (Teva) responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis' "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

599.     On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine TTS to more acceptable levels with an even more intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54am. At 10:02am, she informed her colleagues of the results of the negotiations, instructing them: "Please concede Ahold and HEB."

600.     The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10%-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis' pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

601.     Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box …. If history repeats itself activist [sic] is going to be responsible in the market…."

602.     The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine TTS. On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

603.     When L.R., Teva's analytics manager, recommended giving up yet another Clonidine TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson

the prior day, K.G. (Teva) reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

### e. Budesonide inhalation

604.    Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

605.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis' plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

606.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis. She explained that Actavis' sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis' entry into the market.

### f. Celecoxib

607.    Teva received approval to market Celecoxib in May 2014.

608.    On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

609.    Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

610.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain ("The Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. Actavis reportedly sought 25% of The Pharmacy's Celecoxib business. A representative of The Pharmacy told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

611.    Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything . . . . We're at 32% and I think that's reasonable."

612.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute. Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

### 6.    Teva/Par

#### a.    *Omega-3-Acid Ethyl Esters*

613.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

614.    On the morning of June 26, 2014, Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had not heard anything yet but promised to "snoop around."

615.    Patel had indeed already started "snooping around." At 9:46am, she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



616.    T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening

of June. That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more . . .."

617.    The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two according to the phone records. That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler. At 11:27am that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> "You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this . . . ."

618.    Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

619.    After the discussions between Patel and T.P. (Par), Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

620.    As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

621.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five (5) text messages.

On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

622.     By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

623.     By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Rekenthaler was speaking frequently with J.H. (Apotex) to coordinate during the time period of Apotex's entry in the market.

b.     *Entecavir*

624.     As Teva was preparing to enter the market for Entecavir in August 2014, T.C. (Teva), informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C. further noted: "We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

625.     On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized

generic].” Rekenthaler also noted that Teva would be pricing as if they were “exclusive” in the market and expressed concern that customers might react negatively to the launch of this drug “because of our recent price increase [on other drugs].”

626.     The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par. The two spoke two (2) more times the next day, August 29, 2014.

627.     On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Rekenthaler, after speaking with M.B. (Par) several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was “doubtful PAR will be much lower.” Despite Teva’s refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

628.     Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir. T.C. replied that she had not and followed up later saying that ABC had indicated that it would sign Teva’s offer letter. Rekenthaler replied: “Great, that helps. We may end up conceding our friends up north [CVS] if they make too much fuss.” T.C. dismissed that concern: “I think they will work with us really…We need them they need us so we just have to make it work.”

629.     Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

630.     Within a few weeks, however, Teva’s share of the market was much more in line with “fair share” principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

631.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. (Par) twice on October 2, 2014.

632.    The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

*c.   Budesonide DR*

633.    Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

634.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B. (Par) called Rekenthaler (Teva). The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

635.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par…they are the two players in the mkt…as well as usage."

636.    Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

637.    On April 4, 2014, Rekenthaler informed members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was

not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

638.     Although Teva did not launch Budesonide DR until approximately June 2016, company executives attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 7.     Teva/Taro

#### a.     *Enalapril Maleate*

639.     In 2009, Taro discontinued its sales of Enalapril Maleate under its own label and effectively exited the market. It continued supplying Enalapril Maleate thereafter only to certain government purchasers under the "TPLI" label.

640.     By mid-2013, the Enalapril Maleate market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant anticompetitive price increase for Enalapril Maleate in July 2013.

641.     Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril Maleate for its national contract (for government purchasers), which was slated to expire in September 2013.

642.     In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril Maleate. As a result of those conversations, Taro's plans changed.

643.     On July 17, 2013 – the same day that Teva was taking steps to implement the price increase –Patel called Aprahamian and left a message. He returned the call and the two spoke for almost fourteen (14) minutes. Then, on July 19, 2013 – the day that both Teva and Wockhardt's

price increases for Enalapril Maleate became effective –Aprahamian called M.C. at Wockhardt on

his office phone and left a message. He then immediately called M.C.'s cell phone, which M.C.

answered. They spoke for nearly eleven (11) minutes.

644.    On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues

signaling a change in plans:



645.    Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould

only look for 10-15% MS [market share] but with recent market changes and units on this product,

it would be incremental."

646.    In the coming months, both Teva and Taro engaged in intensive analyses of how the

market should look after Taro's re-launch so that each competitor would have its desired, or "fair,"

share of the market.

647.    On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should

bid on in response to a request for bids from a major customer, which was largely based on whether

Teva had reached its "fair share" targets. Enalapril Maleate was one of the drugs where, according to

Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that e-

mail, Patel had spoken to Aprahamian on July 30 (11 minute call) and July 31, 2013 (4 minute call).

Based on the agreement between the two companies, and in accordance with the industry's "fair

share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

648.     Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . .."

649.     In early December 2013, Taro was fully ready to re-enter the Enalapril Maleate market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

650.     On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

651.     Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

652.     Taro's fact sheet for the Enalapril Maleate re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

653.     Taro began submitting offers on Enalapril Maleate the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

654.     Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril Maleate market. Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

655.     Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril Maleate market share goal of 15% had been raised to 20%.

656.     Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. (Wockhardt) to call Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, S.K. (Wockhardt) conveyed the details to his colleagues:

| | |
|---|---|
| **From:** | ████████████ |
| **Sent:** | Thursday, January 2, 2014 10:20 AM |
| **To:** | ████████████████████ |
| **Subject:** | RE: Competitive Offer for Enalapril |

████,

I spoke to ████ on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick.  Call to discuss.

657.     By May 2014 the market was stable, and market share for Enalapril Maleate was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril Maleate: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

658.     By June 2014, Taro had obtained 25% market share for Enalapril Maleate in a 4-player market. Mylan and Teva each had approximately 28% market share.

*b.   Nortriptyline HCL*

659.     While Taro was approved in May 2000 to market generic Nortriptyline HCL, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

660.     By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "…Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

661.     In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline HCL of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

662.     On November 6, 2013, Aprahamian pressed his team to "…get some offers on Nortrip[tyline] out . . .." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

663.     Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

664.     Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler (Teva) and Falkin (Actavis) spoke twice by phone on November 10, 2013.

665.     Then, on November 12, 2013, Taro's Aprahamian called Patel (Teva). Their conversation lasted almost eleven (11) minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will

pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

666.    The discussions of how to accommodate Taro into the Nortriptyline HCL market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two text messages with Cavanaugh (Teva) on November 17, and one on November 18, 2014.

667.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis.. [sic] We have outstanding Teva offers out .. [sic]".

668.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no time in seeking Actavis' permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

669.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

670.    The competitors continued consulting with each other over the coming months on Nortriptyline HCL. On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline HCL SKUs, and that HEB was interested in moving the business to Taro.

671.    Having already cleared the move with Actavis during his December 6th call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

672.    Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

673.    Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

674.    Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

675.    At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline HCL. Prior to this time - particularly in early 2014 – Nortriptyline HCL had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline HCL from contention in order to accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline HCL price increase, it stated: "Delay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline HCL on January 28, 2015 – in coordination with both Taro and Actavis.

### 8.    Teva/Zydus

676.    Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

677.     In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

*a.   Fenofibrate*

678.     Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013. To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

679.     In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share for his new employer, Zydus.

680.     On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus' anticipated entry into the Fenofibrate market. Notably, Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

681.     In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

682.     On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched Teva, Mylan, and Lupin. In the days leading up to the launch, individuals from all four competitors were in regular contact with each other to discuss pricing and allocating market share to

180

Zydus. Indeed, between March 3 and March 7, these competitors exchanged at least twenty-six (26)

calls with each other. These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

683.    During the morning of March 17, 2014, Patel and Green had two more phone calls,

lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing

how to divide the market for several products Zydus was entering the market for. A half an hour

after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for

several products on which Teva overlapped with Zydus - including Fenofibrate. With respect to

Fenofibrate, Patel recommended "Defend all large customers." Later that same day, Patel called

Green again and they spoke for more than eleven (11) minutes.

684.    In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

685.    For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

686.    That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

687.    The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

688.    In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel e-mailed Rekenthaler stating "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight (8) minutes. Patel also called Berthold of Lupin and they spoke for five (5) minutes.

689.    On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and explained "if we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva?

This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

690.     K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award. The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

691.     On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

692.     On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management." T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business." Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

693.     The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight (8) minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen (15) minutes.

b. *Paricalcitol*

694.     Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

695.     In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Zydus and another generic manufacturer not named as a defendant in this case planned to enter the market on day 181, which was March 29, 2014.

696.     In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

697.     On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER. After receiving that e-mail, Rekenthaler called Green. The call lasted less than one (1) minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes. Later that afternoon, Patel also called Green. The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes. On March 4, Patel called Green again and left a voicemail.

698.     On March 12, 2014, T.S. e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

699.     On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus

pricing. The next day, on March 14, 2014, Patel called Green. A few minutes later, Green returned

the call and they spoke for nineteen (19) minutes. Rekenthaler then called Patel and they spoke for

eleven (11) minutes.

700.     During the morning of March 17, 2014, Patel and Green had two more phone calls,

lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing

how to divvy up the market for several products where Zydus was entering the market. A half an

hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep"

for several products on which Teva overlapped with Zydus – including Paricalcitol. With respect to

Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid,

Omnicare." Later that same day, Patel called Green again and they spoke for more than eleven (11)

minutes.

701.     Over the next several weeks, Teva would "strategically" concede several customers

to the new entrant Zydus.

702.     For example, on March 27, 2014, Green called Patel. Patel returned the call and they

spoke for nearly nine (9) minutes. The next day, on March 28, 2014, OptiSource, one of Teva's

GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a

competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource e-mail to

Patel. Within minutes, Patel responded "[w]e should concede."

703.     That same day, Teva was notified by another customer, Publix, that Zydus had

submitted a proposal for its Paricalcitol business. On April 1, 2014, Teva conceded the customer to

Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

704.     Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another

Teva customer. That same day, Patel called Green and left a 22-second voicemail. The next day, on

April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes. Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

705.    On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business. Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call and they spoke for nearly twelve (12) minutes. Later that day, after her discussion with Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a defendant in this case]." On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

*c.    Niacin ER*

706.    Teva entered the Niacin ER market on September 20, 2013 as the first- to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

707.    Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Zydus planned to enter on June 28, 2014.

708.    Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price

REDACTED – PUBLIC VERSION

increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green (Zydus), Patel and Rekenthaler (Teva), and Berthold (Lupin) are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

709.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER. The communications between Green, Rekenthaler, Patel, and Berthold are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

710.    In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer. The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes. Less than an hour later, Green called Patel and they spoke for eight (8) minutes. A few minutes later, Green called Patel again and left a

twelve-second voicemail. Later that evening, Patel e-mailed K G. reporting what Teva had learned on those calls:

711.    K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

712.    Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Berthold (Lupin). These calls are listed below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

713.    Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

714.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating: "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the e-mail, Rekenthaler called Green. The call lasted two (2) minutes. Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes. Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

715.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail stating "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well." Patel replied, "Please be sure to consult with [K.G.] on this one. Thanks." Later that morning,

Green called Rekenthaler. The call lasted two (2) minutes. Green then called Patel and they spoke for nearly six (6) minutes.

716.    On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P. also entered the loss in Teva's internal database – Delphi – and noted that the reason for the concession was "Strategic New Market Entrant."

717.    On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

### d.   Etodolac ER

718.    Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only generic suppliers of the product. As described below, Teva and Taro -through Patel and Aprahamian- colluded to significantly raise the price of Etodolac ER in August 2013.

719.    On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian. During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

**REDACTED – PUBLIC VERSION**

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

720.    On May 14, 2014, Anda- a wholesaler customer of Teva- notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text messages and had a four (4)-minute call with Aprahamian. The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

721.    On May 20, 2014, Green called Patel and they spoke for four (4) minutes. That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a brief call with Cavanaugh (Teva). The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight (28) minutes. That same day, K.R. (Zydus) and Cavanaugh (Teva) exchanged four (4) text messages.

722.    The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

723.     Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian at Taro for fourteen (14) minutes.

724.     On July 2, 2014, Patel called Green and left a voicemail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

725.     When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "Did we choose not to match this?" Patel responded, "Yes. New market entrant – Zydus." K.G. replied, "Okay good. Thank you."

### 9.     Teva/Glenmark

#### a.     *Moexipril HCL*

726.     Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril HCL between May and July 2013. When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril HCL, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

727.     On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler (Teva) forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business:

REDACTED – PUBLIC VERSION

**From:** Dave Rekenthaler
**Sent:** Monday, August 05, 2013 7:05 PM
**To:** Nisha Patel02
**Subject:** Fwd: ABC - Loss business on Moexipril


???

Sent from my iPhone

728.     Rekenthaler forwarded the e-mail only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

729.     Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Mon 8/05/2013 7:10 PM (GMT-05:00) |
| To: | Dave Rekenthaler |
| Cc: | |
| Bcc: | |
| Subject: | RE: ABC - Loss business on Moexipril |

I know…made the call already

730.     The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

731.     Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Brown, the Vice President of Sales at Glenmark, called Patel at 9:45am but did not reach her. Patel returned Brown's call at 10:08am and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

732.     As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril HCL. Later that same day – August 6, 2013 – T.S. (Teva) informed colleagues that "[t]oday is a new day and today…. ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

        b.    *Desogestrel/Ethinyl Estradiol (Kariva)*

733.     Glenmark entered the market for Desogestrel/Ethinyl Estradiol (brand name Kariva) 0.15mg/0.02mg tablets on April 4, 2012 under its own brand name of Viorele.

734.     During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva. The chart included a suggested re-bid price for generic Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

735.     This sparked a flurry of communications that same day between Patel and three different Glenmark representatives - Brown and Grauso, and J.C., a sales and marketing executive at Glenmark - as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

736.     After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 - virtually guaranteeing that the business would be awarded to Glenmark.

                       *c.   Gabapentin*

737.     Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

738.     On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors. The PCMA described its Annual Meeting as "the . . . ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

739.     Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors. At around the time she sent the e-mail, Patel exchanged two (2) text messages with Brown (Glenmark).

740.     Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share. Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned internally that it did not "want to disrupt Glenmark's business too much."

### 10.   Teva/Amneal

#### a.  *Norethindrone Acetate*

741.     On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for Norethindrone Acetate was Amneal. The same day, Patel received phone calls from two different Amneal employees – the first, a three-minute call from S.R.(2), a senior sales executive, and the second from S.R.(1), a senior sales and finance executive for almost twenty-five (25) minutes. These were the first calls Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013. That same day, S.R.(1) also spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

742.     After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market. At that time, market share was almost evenly split between the three competitors. When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

### 11.   Teva/ Dr. Reddy's

#### a.  *Oxaprozin*

743.     In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

744.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

745.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

746.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

747.    Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Green, Walgreens did not "want to move but obviously want[s] the price."

748.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green. That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

749.    Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

750.     While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's. Eager to avoid any further price erosion from the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

751.     At 12:33pm that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor. At 2:20pm, that colleague provided the information to Patel, copying Rekenthaler and K.G. With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two (2) minutes and was their only telephone conversation in 2013.

752.     After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on August 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

753.     By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

*b.   Paricalcitol*

754.     518.     Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file generic and had 180 days of generic exclusivity.

755.     Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC. All others are not an automatic concede, but we expect to concede." During March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol. By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

756.     By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market. On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

757.     At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

758.     On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("The Pharmacy") –Patel spoke with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50am, Patel called V.B. and left a voicemail. V.B. returned the call at 9:18am, and the two spoke for more than ten (10) minutes. Later that day, at 2:46pm, Dr. Reddy's provided The Pharmacy with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. A representative of The Pharmacy responded that it "[l]ooks like Teva is the right target." Shortly after this e-mail exchange, at 3:21pm, V.B. called Patel again and the two spoke for nearly nine (9) minutes.

759.     By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The Pharmacy. The internal plan was that if The Pharmacy declined, then Dr. Reddy's would make an offer to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

760.     Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4mcg portion of the business. Patel recommended to her boss, K.G., that Teva concede the business: "We have ~70 share and it is ideal to concede here because of the incomplete family." K.G. agreed. Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade Relations: "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well." T.C. relayed this statement, word-for-word, to Cardinal.

761.     Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity. ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014. In internal e-mails discussing this price challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug. When asked for his thoughts on this, Rekenthaler remarked:



762.     Despite the pricing challenge, Teva retained the ABC Paricalcitol business. As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

763.     Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks. On June 26, 2014, Teva's K.G. told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

764.     Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

765.     Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014. That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more than twelve (12) minutes. Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitol. Patel directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher" on Paricalcitol.

766.     The next day, Teva conceded the Giant Eagle business to Dr. Reddy's. S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

767.     After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

REDACTED – PUBLIC VERSION

From: Nisha Patel02
Sent: Thu 7/17/2014 11:36 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)

Sorry! Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff pricing.
Can't win!

768.     Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

769.     On July 16, 2014, McKesson informed Teva that it had received a competing bid for

Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva

initially decided to concede the One Stop portion of McKesson's business only, while retaining the

RiteAid portion. Patel wrote internally to her team that "[t]his decision is based on the number of

competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be

done with challenging our business on this product.)" Patel further added that Teva had been

"looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is

concede some share to DRL but not all."

770.     On July 18, 2014 – a Friday –Patel called V.B. at Dr. Reddy's at 4:20pm and left a

message. V.B. returned the call on Monday morning, and the two spoke for more than four (4)

minutes. They spoke again the next morning, July 22, 2014, for more than six minutes. During these

calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and

driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid)

to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be done

after this" – meaning it would not compete for additional business because it had attained its fair

share. McKesson passed this information along to Teva on July 22.

771.     The next day, July 23, 2014, Teva conceded its entire McKesson business – both

RiteAid and One Stop – to Dr. Reddy's. In its Delphi database, Teva noted that the McKesson

Paricalcitol business had been conceded to a "Strategic New Market Entrant." After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

772.    By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 12.    Mylan / Sandoz

#### a.    *Valsartan HCTZ*

773.    The first drug that CW-4 (Sandoz) and Nesta (Mylan) coordinated about was Valsartan HCTZ (brand name Diovan HCT).

774.    Mylan was the first to file an ANDA to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic for six months.

775.    Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012. In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product. These calls are detailed in the table below:

**REDACTED – PUBLIC VERSION**

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

776.     During these phone calls, Sandoz and Mylan- through CW-4 and Nesta - agreed to divide up the market so that each competitor obtained roughly a 50% market share.

777.     Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

778.     On September 21, 2012 - the date of the Valsartan HCTZ launch - R T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs. a formidable competitor like Mylan. . . . you should be very proud!"

779.     That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, "…sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied:

> I guess this is what they call "co-opetition".

780.     Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

781.     On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction. Kellum replied, "[n]o price change."

782.     On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal e-mail in advance of the meeting asking "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

B.   **Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015)**

1.   **July 31, 2012 Price Increase**

783.   Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following[39]:

| Drug | Competitors |
| --- | --- |
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

784.   Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors. For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase. For example:

a.   Mylan: Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls: 6, 2, 4, 7 and 2 minutes);

---

[39] Watson Phannaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012. The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name. [See https://www.allergen.com/news/news/thomson-reuters/Watson-pharmaceuticals-inc-is-now-actavis-inc.]

    b.   Watson: Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls: 1 and 9 minutes);

    c.   Sandoz: Green spoke to CW-2 (Sandoz) on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes).

    d.   Breckenridge: Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

    e.   Alvogen: Green had several calls with Nesta (Mylan) (noted above) on July 31, 2012. After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

           *a.   Nadolol*

785.    As early as 2012, Teva was speaking to competitors about the drug Nadolol.

786.    In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

787.    By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly entrenched.

788.    Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase, Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

789.     Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta (Mylan) twice, with one call lasting fourteen (14) minutes.

790.     Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013. The day before the Mylan increase Nesta spoke to Green four (4) times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase, Green called Kellum twice in the morning, including a six (6) minute call at 9:43am. Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

---

**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:** ███████████████████████████████████████████████████████

**Subject:** Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

---

791.     Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

792.     Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50am the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

793.     Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

794.     To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years. In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol. Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

795.     Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

b.  *Labetalol HCL*

796.     After Teva increased its pricing on Labetalol HCL on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug. For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand). In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

797.     That same day, Green spoke to CW-2 of Sandoz two (2) times. After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

798.     T.C. (Teva) agreed: "We need to stay the TEVA course."

799.     Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

> c.     Nitrofurantoin MAC

800.     Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

801.     For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors). At 9:49am on October 10, 2012, K.G. (Teva) sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

802.     Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen. At 10:01am, Green called Nesta and the two spoke for ten

REDACTED – PUBLIC VERSION

(10) minutes. After hanging up – at 10:11am – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes. To close the loop, Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

### 2. February – April 2013: Increasing Prices Before a New Competitor Enters the Market: Budesonide Inhalation Suspension

803.    As of February 2013, Teva was the only company in the market for generic Budesonide inhalation suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. Before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide inhalation suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

804.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, Rekenthaler called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes. This was the first-ever phone call between them based on the phone records produced.

805.    The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes. Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm

Actavis' pricing, Teva was informed by the customer that Actavis' pricing was "in line with [Teva's] current wholesale pricing."

806.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market. In the interim, though, Teva was able to continue to charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

### 3.    May 13, 2013 Price Increase – Tizanidine

807.    As of May 2013, Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold. At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

808.    Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the large volumes we currently service."

809.    Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4 mg 150 ct went from $4.50 to $45.00. . . . We should secure confirmation but if this is true it would be very positive …." Kellum responded, "Wow! Thank

you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team – no new offers."

810.     On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "Tizanidine" stating "[l]et's discuss."

811.     On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC increases were significant - ranging from 248% to 344%, depending on the formulation. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

812.     Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

813.     On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are[sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes. Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e

will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

814.    On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. (Dr. Reddy's) asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

815.    On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid." A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "[w]e cannot supply unfortunately."

### 4.    May 24, 2013 First List of Price Increases

816.    When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013. She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File." The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

817.    For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs – including the four different formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

818.    The graphic on page 170 of AG Complaint No. 2 summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013.

819.    The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor, K.G., to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

820.    The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013. Some illustrative examples of that coordination are set forth below.

a. *Glenmark*

821.     A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

a.   CW-5: four (4) calls on May 2, 2013 (5:02; 0:06; 7:18 and 11:39), two (2) calls on May 3, 2013 (1:53 and 0:06); one (1) text message on May 3, 2013;

b.   J.C.: three (3) calls on May 6, 2013 (6:45; 20:44; 8:39); two (2) calls on May 7, 2013 (7:59 and 1:03). For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:



From:       Nisha Patel02
Sent:       Thu 5/02/2013 6:49 AM (GMT-05:00)
To:         ▮▮▮▮▮▮▮▮▮▮
Cc:
Bcc:
Subject: RE: Price Increases — will you be scheduling time next week to discuss?

When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

822.     Less than fifteen minutes later, Patel received a call from CW-5 (Glenmark) and the two spoke for just over five (5) minutes. Shortly after that call, at 7:44am, Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

823.     As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:



824.     In accordance with the fair share understanding outlined above Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

825.     Patel also spoke to CW-5 (Glenmark) for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene gel; Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ; Pravastatin; and Ondansetron. Patel also spoke to CW-5 and J.C. (Glenmark) multiple times on May 17, 2013.

826.     After the Glenmark price increase implementation on May 16, 2013, and before Teva had the opportunity to follow those increases, several customers approached Teva looking for a lower price. Teva refused to bid on most of these solicitations so to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark drugs: "IF we bid, we need to bid high, or we will disturb the market."

827.     Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved non high "quality" competitors. For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

828.     For example, the market for Fluconazole tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor. In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called R.H., a national account manager at Greenstone but was unable to connect. Patel was ultimately not able to communicate with R.H. by phone until May 28, 2013 when the two had a twenty-one (21) minute call. The next day after speaking to R.H. – May 29, 2013 –Patel promptly added Fluconazole to the Teva price increase list.

829.     Teva followed the Glenmark price increase for Fluconazole tablets on July 3, 2013. That same day, Patel spoke to R.H. for nearly sixteen (16) minutes and also spoke to CW-5 (Glenmark) for almost five (5) minutes. The Teva price increases were a staggering 875% - 1,570%,

depending on the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Patel coordinated those increases with both Glenmark and Greenstone.

> b.  *Sandoz*

830.    In her May 24 "Immediate PI File," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

831.    At the same time, Sandoz was internally discussing its "bidding high" strategy for Nabumetone. Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz pricing analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

| From: | ███████████ |
|---|---|
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; ███████████ |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

832.    Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15am on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for

Ranitidine HCL). She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

833.    After these conversations with Patel, at 10:02am, CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

> **From:** ▇▇▇▇▇▇
> **Sent:** Thursday, May 30, 2013 10:02 AM
> **To:** Kellum, Armando
> **Cc:** ▇▇▇▇▇
> **Subject:** Ranitidine tabs
>
> I think there might be some price increases in the pipeline.
>
> Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16. I wonder if Teva and Amneal will follow? They are the two dominant players on this molecule
>
> We just bid and I think we are getting the award at a contract price of $1.77. This contract is negative gross margins but 15% above variable costs. RAD was at $0.95. Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.
>
> RAD is also buying up a lot of our short dated product.
>
> Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well. I'm thinking we can go from $1.77 to $5 maybe

834.    The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

835.    The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1 at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

836.     At 8:27am, after the first two of the phone calls listed above, Patel sent the following

e-mail clarifying some of the information that L.R. had provided, reflecting some of the

conversations about market share she was having with CW-1:



From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To:
Cc:
Subject: RE: Isoniazid market pricing

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply…which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

837.     Later that day, at 3:21pm, Patel passed along additional information with specific

price points she had received from CW-1 at Sandoz:

From:     Nisha Patel02
Sent:     Wed 6/12/2013 3:21 PM (GMT-05:00)
To:       ▮▮▮
Cc:       ▮▮▮
Bcc:
Subject:  RE: Isoniazid market pricing

▮▮.

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me
know if you need anything else.

838.　　As discussed more fully below, Teva ultimately increased price on Isoniazid on

January 28, 2015 – in coordination with Sandoz. Patel spoke to CW-1 for more than sixteen (16)

minutes shortly before the increase, on January 22, 2015.

c.　Taro

839.　　Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene

Gel, she was confident in following the Glenmark price increase because there were also "[r]umors

of a Taro increase" on that drug. In addition to Teva and Glenmark, Taro was the only other

competitor in the market for Adapalene gel at that time. Patel had heard the "rumors" about a Taro

increase directly from Aprahamian, the Vice President of Sales and Marketing at Taro. During a

nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors

agreed to follow the Glenmark increase. This was the first call between Patel and Aprahamian since

Patel joined Teva.

840.　　Shortly after the phone call with Patel, Aprahamian made an internal request for a

report with specific information about Adapalene gel in order to evaluate a potential Taro increase

on the drug, including volume and pricing. Aprahamian indicated that the reason for his request was

that the "[r]umor mill has some price changes in the market."

841.　　The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a

price increase on Adapalene gel:

221

842.    Exactly one week after the call between Patel and Aprahamian, on May 29, 2013,
Taro increased its price on Adapalene gel. As discussed below, Teva followed with its own price
increase on July 3, 2013, which coordinated with both Glenmark and Taro.

### 5.    July 3, 2013 Price Increases

843.    Teva implemented its first formal set of price increases using Patel's high-quality
competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the
drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others
had been added in the interim. Patel scheduled a conference call for the day before the price
increases to discuss those increases with members of Teva's sales and pricing departments:

REDACTED – PUBLIC VERSION

| | Price Increase -- Agenda |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1)  Price increase effective Wednesday, 7/3/2013

2)  List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

844.  Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

845.  The graphic on page 180 of the State AG Complaint No. 2 details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase.

846.     The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – i.e., had no competitors.

847.     Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

*a.   Upsher-Smith*

848.     On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

849.     On June 13, 2013, K.G. (Teva) sent an e-mail to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

850.     On June 15, 2013 Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

851.     Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these

initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

852.     On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a defendant in this Complaint, also increased its price for that drug. As a result, a national account executive at Teva sent an e-mail to Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

853.     On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% increase on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

### b.   Mylan

854.     Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an e- mail with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs: Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets; Diltiazem HCL tablets; Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol tablets.

855.    The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes. Green also called Patel twice that day to report on what he had learned. Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

856.    On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting over eleven (11), two (2), four (4), and sixteen (16) minutes.

857.    On May 29, 2013, after a discussion with Cavanaugh Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin HCL, and Methotrexate.

858.    Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

859.     On June 26, 2013, in the midst of this flurry of communications between Teva and

Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues

sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

860.     In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a

high likelihood of success." Patel also responded favorably with regard to some of the drugs,

alluding to the fact that she had inside information about at least Ketoprofen:

From: Nisha Patel02
Sent: Wednesday, June 26, 2013 1:41 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: RE: India Transfer Review - Price Increase List Question

▮▮▮▮▮

I definitely agree on Ketoprofen since there are rumors of activity on this one…From a "quality of competitor" standpoint, I definitely think all, but Nystatin, are strong candidates. We'll gather intel on the rest and factor into the potential items for later. Is there a time constraint and a need for actual numbers, or is this just an inquiry to see if they would be possible in the near future? Sorry for the basic questions. I'm just trying to understand how to look at possible deletions v. any other candidate item.

861.     Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac

Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2,

2013. Teva then quickly followed with its own price increase for both drugs (and others) on August

9, 2013. As discussed more fully below, those price increases were closely coordinated and agreed to

by Teva and Mylan.

862.    At the end of the flurry of phone communications between Teva and Mylan

described above – on June 28, 2013 –Green and Nesta had a four (4) minute call starting at 10:59am.

Within minutes after that call, Patel sent the following e-mail internally at Teva:

From:      Nisha Patel02
Sent:      Fri 6/28/2013 11:22 AM (GMT-05:00)
To:        ███████████████████████
Cc:        ███████████████████████
Bcc:
Subject: Competitor Increase Items


All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective
date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and
determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply,
etc).


███████,

Hearing that Ketoprofen is on the list.

863.    Patel obtained this information directly from Green but got one significant point

wrong (which confirms that she had advance notice of the Mylan increase). In fact, Mylan did not

announce the price increases until the following Monday, July 1, 2013 – with an effective date of July

2, 2013.

864.    Patel consistently used the term "rumors" in e-mails to camouflage that  Teva was

communicating with competitors about future price increases. She used the term when discussing

Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before

Taro raised its price on Adapalene gel. She used it again on June 26, 2013 – after Green and Nesta

spoke several times in advance of Mylan's price increase on Ketoprofen.

865.    Similarly, on July 2, 2013 – the day before Teva's price increases (including for the

drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing

compared with regard to Methotrexate. Patel responded that Mylan's pricing was a little low on that

drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable

increasing the price of that drug on July 3, 2013. These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

> ### c.   Sandoz

866.     After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Sandoz ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

867.     On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

868.     Pursuant to that direction, on July 15, 2013 CW-2 (Sandoz) called Rekenthaler (Teva) and left a message. Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's personal e-mail account:

REDACTED – PUBLIC VERSION

| From: | David Rekenthaler [daverek@verizon.net] |
|---|---|
| Sent: | Monday, July 15, 2013 5:02 PM |
| To: | ████████@icloud.com |
| Subject: | Fwd: |

Sent from my iPhone

Begin forwarded message:

**From:** Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
**Date:** July 15, 2013, 4:59:27 PM EDT
**To:** "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase [not actual inc] |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLET | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

869.     CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

870.     One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only other competitor in that market. Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

**6.     Impact of July 3, 2013 Price Increases on Teva**

871.     As she was preparing to implement Teva's August 9, 2013 price increases described below, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent

**REDACTED – PUBLIC VERSION**

Pravastatin increase (as alleged in Humana's Second Amended Complaint). The results were staggering.

872. According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

873. Teva handsomely rewarded Patel for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

### 7.    July 19, 2013 Price Increase – Enalapril Maleate

874. Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

875. Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

876. Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate. Interestingly, the customer indicated that the

request was due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of

Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week. They

took a ~75% increase to WAC."

877.    The comment from the customer sparked some confusion at Teva, which Teva

quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting

almost sixteen (16) minutes. The next day, July 11, 2013, Green and Nesta spoke two more times.

During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the

Mylan price increase on Enalapril Maleate. This information sparked the following e-mail exchange

between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase.
> They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
>> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their
>> supply issue plus Mylan increase.
>>
>> Nisha Patel
>>
>> Teva Pharmaceuticals USA
>>
>> Director, Strategic Customer Marketing
>>
>> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>>
>>> This is all a result of a wockhardt price increase following a Mylan increase
>>>
>>> Sent from my iPhone

878.    As it turned out, there must have been a miscommunication between Green and

Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet

had the opportunity to do so as of July 11, 2013.

879.     On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was planning on increasing its price for Enalapril. Patel responded: "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

880.     That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate. Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

881.     On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes. During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

882.     First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase. Internally, Wockhardt employees

REDACTED – PUBLIC VERSION

understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one (1) minute call; shortly thereafter, Green returned the call and they spoke for two (2) more minutes. At 9:57am that morning, K.K. reported internally the specific price ranges that he had obtained from Green.

883.    Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using the term "rumors" to obfuscate the true source of her information:

> From:    Nisha Patel02
> Sent:    Tue 7/16/2013 11:08 AM (GMT-05:00)
> To:      ▇▇▇▇▇▇▇▇
> Cc:
> Bcc:
> Subject: Enalapril Increase Overview
>
> ▇▇▇▇
>
> As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.
>
> This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:
>
> 1. Mylan: 44%
> 2. Wockhardt: 43%
> 3. Teva: 13%
>
> At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

884.    That same day, Nesta called Patel and left a voice mail.

885.     Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase. That same day, July 16, 2013, Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams, and sent the following agenda:

| Subject | Price Increase Discussion |
|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ████████████████████████████; Dave Rekenthaler ████████████████████████████████████████; Kevin Green; ████ |
| Message | Sorry for the re-schedules!<br><br>We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

886.     Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Patel

nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same day:



887.    Within a few days after the increases, a customer complained to K.K. (Wockhardt), asking: "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct: "Mylan took up first we are just following." Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

### 8.    August 9, 2013 Price Increases

888.    On August 9, 2013, Teva raised prices on twelve (12) different drugs. These increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

889.    Patel began planning for the increase shortly after the July 3 increases were implemented. On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

890.    The list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz. In the days leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

891.    Patel was also communicating indirectly with Mylan through Green. For example, on July 10, 2013 - the day before Patel sent the preliminary "Round 2" increase list - Green and Nesta spoke twice. Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes. The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

REDACTED – PUBLIC VERSION

892.     Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

893.     By August 7, 2013, Patel had finalized the list. That day she sent an e-mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Cavanaugh, summarizing the increases. As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 96.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 101% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.26 - Dava, 0.4% |
| ETODOLAC ER TABLETS | 138% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 20.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 268% | Follow Mylan | Mylan, 81.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex; Lupin waiting on Teva. | Glenmark, 21.2% - Apotex, 7.1% - Zydus, 5.8% - Lupin, 4.3% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

894.     K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the e-mail, K.G. politely asked Patel to remove some of the incriminating information:

From: ███████
Sent:  Wed 8/07/2013 11:00 AM (GMT-05:00)
To:    Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

895.    In accordance with the executive's request, Patel deleted the information.

896.    Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The graphic on page 197 of State AG Complaint No. 2 details some of the calls with competitors in the days and weeks leading up to the increases.

897.    The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors. That drug was slated for the lowest increase of all drugs on the list (7%).

898.    The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

899.    As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

                                        *a.   Mylan*

900.    Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs. But at times Patel communicated directly with Nesta.

901.    For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

A large majority were Mylan drugs.

902. The next day – July 23, 2013 – at 4:30pm, Green and Nesta spoke for more than six (6) minutes. Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan. The call lasted more than three (3) minutes.

903. On July 29, 2013, Green (Teva) was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July. Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:



From: Kevin Green
Sent: Monday, July 29, 2013 9:49 AM
To: ▮▮▮▮▮▮▮
Cc: ▮
Subject: Walgreens: Items for discussion

▮▮▮▮,

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

904. The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel

asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

905.    Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

906.    In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel sent the following e-mail with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:

From:    Nisha Patel02
Sent:    Wed 7/31/2013 3:23 PM (GMT-05:00)
To:      Kevin Green;                                            Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion

My initial commentary…

If we can take on the supply, we can bid on items we have already taken our increase on (bold).

**Enalapril:** seeking share

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list

There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

907.     Based on all of these communications between Teva and Mylan (and at times other

competitors), Teva was able to successfully increase price on seven different drugs that it overlapped

with Mylan, on August 9, 2013, as set forth above.

*b.   Etodolac*

908.     As of July 13, 2013, Teva sold both Etodolac and Etodolac ER. Teva's competitors

for the standard version of Etodolac were Taro and Sandoz. For Etodolac ER, Teva had only one

competitor – Taro.

909.     When Patel first began planning for "Round 2" of Teva's price increases, Etodolac

and Etodolac ER were not slated for increases. For example, when she circulated a long list of

potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

910.    Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

911.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian (Taro) and they spoke for sixteen (16) minutes. Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Patel called CW-1 (Sandoz) and the two spoke for more than ten (10) minutes.

912.    During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

913.    On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
| Etodolac ER | Could follow IR (Shared with Taro) |

914.    Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

915.    That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases,

including for Etodolac. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 (Sandoz) called Aprahamian (Taro) that same day and the two spoke for more than three (3) minutes.

916.    The Sandoz price increase for Etodolac was effective July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut."

917.    When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

918.    Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

919.    Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 (Sandoz) and Aprahamian (Taro):

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

920.    Aprahamian was also speaking to his contact at Sandoz- CW-3 - during this time,
including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

921.    On August 1, 2013 - shortly after speaking with Patel - Aprahamian instructed a
colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER.
Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in
writing, Aprahamian concluded: "Will come over and discuss with you."

922.    By August 5, 2013, it was well known internally at Teva that Taro would soon be
raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops"
meeting on August 5, 2013 - which Patel attended - reflect the following:



4.  Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

923.     When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

924.     Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

c.    *Niacin ER*

925.     On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

926.     Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20.

927.     The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price. On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G. immediately forwarded the e-mail to Patel with the instruction: "Please see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

928.     Within a week, Teva was ready to implement the price increase. On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

929.     Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

930.     During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

931.     When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

932.     In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing - so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

933.     Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the e-mail to several people internally at Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:



934.     That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

935.    Patel responded:

> From:      Nisha Patel02
> Sent:      Mon 3/24/2014 1:13 PM (GMT-05:00)
> To:        ██████████
> Cc:        Maureen Cavanaugh; ████████████████████ Dave Rekenthaler
> Bcc:
> Subject: RE: Niacin ER
>
> Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

936.    The next day – March 25, 2014 – K.G. (Teva) summarized the status of Teva's LOE

Plan and the company's agreement with Lupin on Niacin ER: "With the four concessions (CVS,

Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I

calculated 39%) . . . . We need to keep everybody else."

### 9.    July 2013 – January 2014: Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL

937.    As detailed above, after Mylan and Teva implemented significant price increases in

early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan

price increases. Sandoz sought this information because it did not want to accidentally compete for

market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

938.    To that end, on July 15, 2013, Sandoz executives held an internal meeting during

which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to

investigate [the] list of Mylan and Teva increase items."

939.    That same day, as detailed above, CW-2 contacted his counterpart at Teva,

Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the

percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta.

The call lasted two-and-a-half (2.5) minutes. A half hour later, Nesta returned the call and they

spoke for nearly nineteen (19) minutes.

940.    During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased

prices on so that Sandoz could follow with its own price increase. Nesta provided CW-4 with a list

of drugs, highlighting that the Nadolol price increase would be large. Nesta also emphasized that

Mylan did not appreciate having its prices challenged and that prices should be kept high. After the

phone call ended, CW-4 sent the following e-mail to her superiors (the "July 2013 E-mail"):

**From:** ▮▮▮▮▮▮
**Sent:** Tuesday, July 16, 2013 6:31 PM
**To:** ▮▮▮▮▮▮▮ Kellum, Armando; ▮▮▮▮▮▮▮▮▮
**Subject:** Price increases

Here are some of the pricing increases from Mylan I was able to garner. These are reportedly to be BIG
increases,
Bupropion HCL
Diltiazem HCL
Haloperidol
Clomipramine
Sotalol
Tizanidine
Peprhenazine
Levothyroxine (Lanette followed)
Nadolol

There were others but ones we don't have. There may be others we have, but this is all I was able to get.
Pretty well anything we get from a customer that isn't supply obviously is due to pricing increase.

If a specific product is questionable, let me know and I'll find out about it.

▮▮▮▮▮

1

941.    For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the

time of the July 2013 E-mail. Indeed, Mylan would not raise price on this product until August 9,

2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also

increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list –

Trifluoperazine HCL and Benazepril HCTZ.

942.    Over the next several months, and consistent with their understanding, Sandoz

declined to bid and take business from Mylan customers (except in one instance where Mylan had

more than its fair share) and raised prices to match Mylan on a number of products. On August 6,

2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long. Three

days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250% on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

943.    On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL and that Sandoz needed to "rationalize the market."

944.    On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz. F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

945.    On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

946.    On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal e-mail explaining that "Mylan took a price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

947.    On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:

REDACTED – PUBLIC VERSION

From: ▮▮▮▮▮▮
Sent:      Wednesday, October 02, 2013 6:45 PM
To:        ▮▮▮▮▮▮
Cc:        Kellum, Armando
Subject:   Haloperidol and Trifluoperazine - WAGS

Steve,

We discussed internally and decided not to pursue WAGS on these at this point.  We have been running up against Mylan a lot lately(Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

▮▮▮▮▮▮

948.    Over the next several days, CW-4 and Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

949.    On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price

REDACTED – PUBLIC VERSION

protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

950.    Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

### 10.    April 4, 2014 Price Increases

951.    On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge, Heritage, VersaPharm and non-defendant Rising Pharmaceuticals, Inc. ("Rising") – as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

952.    Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
    - Exclusive items
    - Number of competitors; Target 2-4 total players, where quality of competitor is high
    - Teva has majority share and quality of competitors is high - lead
    - Competitors with long term supply issues
    - Competitors exiting market
    - Low or limited financial exposure
    - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
    - Delayed reactions erode pricing
    - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

953.    Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014." She stated: "Attached is my list of potential items. Note that they still need to go through the review process."

954.    The initial list contained drugs sold by Actavis, Lupin, and Greenstone, among others. Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

955.    On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

956.     Those efforts were successful. By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review. That list included the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|--------|--------------|---------------|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

957.     Patel continued to refine the list over the next several weeks.

REDACTED – PUBLIC VERSION

958.     On March 17, 2014, Patel sent a near final version of the "PI Candidates"

spreadsheet to K.G. with the statement: "Once you verify these are acceptable, we can finalize for

the increase." Patel and Rekenthaler both were communicating frequently with competitors- in this

case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising - to coordinate the price

increases in the week before Patel sent the price increase list to K.G. At least some of those

communications are reflected in the table below:

**REDACTED – PUBLIC VERSION**

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

959.    Rekenthaler had also previously spoken with his contact at VersaPharm – J.J., a

senior national accounts executive – on January 22, 2014 for five (5) minutes and March 7, 2014 for

three (3) minutes to secure VersaPharm's agreement to follow the Teva increase on two drugs.

**REDACTED – PUBLIC VERSION**

Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, VersaPharm followed with its own price increase shortly after the Teva increase.

960.    In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

961.    Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

962.    These price increases were all coordinated and agreed to between Teva and its competitors. Patel and/or Rekenthaler communicated directly with all of their key competitors in

the days and weeks leading up to the increase. Many of those communications are set forth in the graphic at page 221 of the State AG Complaint No. 2.

963.    Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

*a. Cephalexin*

964.    Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva: Patel and Green. As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

965.    As of late October 2013, however, neither of those options was available to Berthold. Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

966.    This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where Teva was the only other competitor in the market –Berthold already knew that Teva would follow the increase.

967.    On October 14, 2013, Berthold called Rekenthaler at Teva. They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

968.    On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension –Berthold also called T.S., a national account executive at Teva, to notify

REDACTED – PUBLIC VERSION

Teva of the price increase. He called T.S. at 9:18am that morning and left a message. T.S. returned

the call at 9:57am, and the two spoke for nearly five (5) minutes.

969.    Within minutes after hanging up the phone with Berthold, T.S. notified others

internally at Teva about the substantial increase Lupin was about to take:



970.    The Lupin increase on Cephalexin oral suspension actually became effective the next

day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly

thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging

for Cephalexin.

971.    K.G. (Teva) responded later that day, asking: "Did Lupin increase the Caps as well?"

Rekenthaler answered immediately, with information he had learned from Berthold in mid-October:

"Lupin did not increase the caps, only the susp[ension]."

972.    On November 22, 2013, a large customer requested a bid from Teva on Cephalexin

due to the Lupin price increase. T.S. forwarded the e-mail from the customer to Rekenthaler and

others with the suggestion that, because Teva already had the majority share, it should not bid for

the business. K.G. agreed, and simultaneously forwarded the e-mail to Patel stating: "Nisha, let's add

this to our list to discuss." Patel called Berthold the same day and left a message.

973.    When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

974.    On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

### b.  *Azithromycin and Medroxyprogesterone*

975.    In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets. Patel and R.H., a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

976.    On November 18, 2013 – only two days after Patel and R.H. exchanged six (6) text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager seeking approval to implement the price increases. The General Manager approved of the price increases the next day. Then, on November 23, 2013 Patel spoke to R.H. (Greenstone) for nearly one (1) minute.

977.    On December 2, 2013 - the same day that Greenstone was slated to send out notices of the price increases to its customers - Patel spoke to R.H. (Greenstone) three times within a span of twenty (20) minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

978.     After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase - one that would not be effective for another month:

From:     Nisha Patel02
Sent:     Mon 12/02/2013 2:23 PM (GMT-05:00)
To:       ████████████████
Cc:       ████████████████  ; Dave Rekenthaler
Bcc:
Subject:  Azithro OS Price Increase

FYI, I'm hearing that Greenstone just announced an increase on Azithromycin Oral Suspensions, effective January 1st. Please take this into consideration for bid requests we may receive.

979.     On December 5, 2013, Patel continued to communicate with R.H. about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails. The next day, Patel sent another e-mail to K.G. about Azithromycin suspension:

REDACTED – PUBLIC VERSION

From:      Nisha Patel02
Sent:      Fri 12/06/2013 11:33 AM (GMT-05:00)
To:        ▉▉▉▉▉▉▉▉▉
Cc:
Bcc:
Subject: Azithro Susp Question

▉▉▉▉

I mentioned earlier in the week that Greenstone took an increase that is effective January 1st. (As a reminder, I intend to add these items to my list of potential price increases for Q1 2014.)

Since the new pricing requires a WAC increase, I am inclined to decline to bid at this time. Further, in a 2 player market, we have 54% share and this includes a gain of ~4% in June.

Do you agree with the "decline to bid at this time" approach?

980.    K.G. agreed with Patel's recommendation. Later that day, J.L. of Teva sent the following notice to several Teva colleagues:

From: ▉▉▉▉▉▉▉▉
Sent: Friday, December 06, 2013 2:27 PM
To: ▉▉▉▉▉▉▉
Cc: ▉▉▉▉▉▉▉▉▉▉▉▉▉ Nisha Patel02
Subject: RE: Giant Eagle Cephalexin Offer

We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.

As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time.  Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.

The request was left open to see if we could supply for internal purposes only.

Please inform the customer that we are unable to provide an offer at this time.

981.    That same day, Teva declined to bid on Azithromycin at multiple customers.

982.    Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's

market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with R.H. (Greenstone) for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

983.    Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension. A national account executive at Teva asked Patel: "Can we provide any better pricing than Greenstone? . . . I know we have picked up our target share." Patel had spoken with R.H. (Greenstone) twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was: "Let's talk tomorrow."

984.    Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets on April 4, 2014. Patel spoke twice with R.H. (Greenstone) that same day.

c.    *Clarithromycin ER*

985.    Teva and Actavis were coordinating on several drugs Teva price-fixed on April 4, 2014. One of them was Clarithromycin ER tablets. As of December 2013, Teva, Actavis and Zydus were the only generic manufacturers actively selling Clarithromycin ER.

986.    On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

987.    The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

988.    Immediately after receiving that e-mail, at 9:40am, Patel called Rogerson at Actavis and the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with Rogerson, at 10:12am, Patel responded to the e-mail, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

989.    On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price. At 9:19am, Patel called Rogerson at Actavis and they spoke for more than six (6) minutes. Shortly after that call, at 9:45am, Patel sent an e-mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

990.    When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

991.    Similarly, in March 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

992.    At 9:54 am on March 14, 2014, Rogerson called Patel and left a message. Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

**From:** Nisha Patel02
**Sent:** Friday, March 14, 2014 10:47 AM
**To:** ███████████████████████████████
**Cc:** Dave Rekenthaler; ████████████████████
**Subject:** Market Increases

NAMs,

I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):

Tamoxifen

Mirtazipine

Estazolam

In fact, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

993.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can."

994.   Less than two hours later, at 12:37pm, Patel called Rogerson again. They spoke for more than five (5) minutes. Shortly after hanging up the phone, at 12:51pm, Patel wrote another e-mail to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

995.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "PI Candidates" list to K.G. (Teva). The list included both Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes. Rekenthaler (Teva) and Falkin (Actavis) also exchanged four (4) text messages that day and had one call lasting more than six (6) minutes.

996.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. Patel and Rogerson spoke twice by phone that day.

267

Rekenthaler and Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

997.    After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

998.    Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

### d.    Ketoconazole

999.    Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

1000.    Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole cream, Teva's competitors were Taro and Sandoz. For Ketoconazole tablets, Teva's competitors were Taro, Mylan and Apotex.

1001.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian (Taro) and CW-1 (Sandoz). During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta (Mylan); he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

1002.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:

> **From:** ██████████
> **Sent:** Friday, April 04, 2014 3:01 PM
> **To:** ████████; Kellum, Armando; ████████████████████
> ██████████████
> **Subject:** Ketoconazole Cream Price Increase
>
> As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled). Taro will more than likely follow shortly. We should determine if Teva had additional increases yesterday as well.

1003.   CW-1 (Sandoz) immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

1004.   That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

1005.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate

Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

1006.    Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1007.    Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1008.    In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Patel, who responded immediately:

From:    Nisha Patel02
Sent:    Wed 5/14/2014 10:05 AM (GMT-05:00)
To:      ██████████
Cc:      ████████████████████████
Bcc:
Subject: RE: Cardinal Ketoconazole CR NBO # 11796


Unable to bid at this time. For internal purposes, it is for strategic reasons.

1009.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian (Taro). She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1010.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, for internal purposes)."

1011.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and CW-1 (Sandoz) spoke for more than three (3) minutes.

1012.   The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

*e.   Estradiol/Norethindrone Acetate and Cyproheptadine HCL*

1013.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. One of those new co-conspirators was Breckenridge. Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1014.   On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets. Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label. For Cyproheptadine HCL, Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing

even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1015.   In the weeks leading up to those increases – when Patel was still out on maternity leave –Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

1016.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1017.   With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine HCL. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking to S.C., Patel sent the following e-mail regarding the customer's request:



> From:    Nisha Patel02
> Sent:     Fri 2/07/2014 2:46 PM (GMT-05:00)
> To:
> Cc:
> Bcc:
> Subject: RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72
>
> Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

1018.   With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two- player market. For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1019.    On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and Cyproheptadine HCL tablets (contract increases of as much as 526%). In addition, Teva increased the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

*f.  Diflunisal*

1020.    Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1021.    Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal. For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1022.    Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes. When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1023.    Teva and Rising continued to coordinate the increase over the next several months. For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
|---|---|

1024.    That same day, Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting

the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1025.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1026.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re- entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

### g.   Ethosuximide

1027.   On the April 4, 2014 Teva price increase list, VersaPharm was a competitor on two different drugs: Ethosuximide capsules and Ethosuximide oral solution.

1028.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

1029.   VersaPharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, VersaPharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at VersaPharm, and speaking for five (5) minutes on January 22, 2014. When Patel sent the next "PI Candidate" list

**REDACTED – PUBLIC VERSION**

to a colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list, with the following notation:

| Ethosuximide Liquid | Shared only with Versa; test quality of competitor |
|---|---|
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

1030.   Rekenthaler called again and spoke with J.J. at VersaPharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

1031.   On April 9, 2014 – only five days after the Teva increase – VersaPharm increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

1032.   Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of VersaPharm never spoke by phone again.

### 11.   Impact of April 4, 2014 Price Increases to Teva

1033.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

1034.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1035.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/ Clavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets. Patel of Teva spoke to CW-1 (Sandoz) on the day of the Sandoz price increases for more than three (3) minutes.

275

1036.    Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

1037.    Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Patel's initial response to the customer was "[w]e believe the market is still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Patel wrote: "I can't quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs recently."

1038.    Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium tablets. Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

### 12.    August 28, 2014 Price Increases

1039.    On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

**REDACTED – PUBLIC VERSION**

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (5.9%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (5.4%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (63%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (5.7%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

1040.   In the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance. At least some of those communications are set forth in the graphic at page 250 of the State AG Complaint No. 2.

1041.   The day before the increase became effective – August 27, 2014 –Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

1042.    In addition to those phone communications noted above, representatives from Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

### a.    Enalapril Maleate

1043.    With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as shown above. Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

### b.    Prochlorperazine

1044.    Similarly, with regard to Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above. Nesta, in turn, communicated with M.D., a senior sales executive at non-defendant Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

1045.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

c.   *Mylan*

1046.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1047.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

1048.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ tablets; Cimetidine tablets; Enalapril Maleate tablets; Fluvastatin Sodium capsules; Loperamide HCL capsules; Prazosin HCL capsules; and Sotalol HCL tablets.

1049.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. Previously, Patel had relied on Green to obtain specific Mylan customer price points (referred to as "intel") through his

communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a

follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies

would not have been appropriate for this situation, and concluded that: "Plus, we really need some

intel" about the Mylan contract price points.

1050.    Patel continued to push for specific contract price points from Mylan. On April 28,

2014, Patel sent an e-mail to the Teva sales team, stating: "To date, we have no intel on Mylan's

recent increases. I realize there is a lot of travel going on, but whatever you can gather and share

would be greatly appreciated."

1051.    On May 9, 2014, Patel sent another e-mail:



1052.    Shortly after receiving that e-mail – at 11:15am that morning –Rekenthaler called

Nesta (Mylan) and left a message. Nesta returned the call at 11:23am, and the two spoke for nearly

eight (8) minutes.

1053.    Separately, and before Rekenthaler was able to convey any information he had

obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items)

directly to T.S. (Teva), lamenting the absence of Green to obtain the Mylan intel:

REDACTED – PUBLIC VERSION

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? . . . At some point, I know I'll have to find another source of magic :))

1054.   The next day, T.S. sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

| | |
|---|---|
| From: | ████████████ |
| Sent: | Tue 5/13/2014 1:34 PM (GMT-05:00) |
| To: | Nisha Patel02 |
| Cc: | |
| Bcc: | |
| Subject: | FW: Dirt |
| Attachments: | Mylan-Price List A.xlsx |

FYI

1055.   The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

1056.   Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market. That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1057.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

REDACTED – PUBLIC VERSION

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

1058.   Also on the list were three additional Mylan drugs for which Teva would be leading

the price increase: Diclofenac Potassium tablets; Flurbiprofen tablets; and Prochlorperazine tablets.

*d.   Taro*

1059.   Taro also significantly raised its prices on the following drugs which overlapped with

Teva: Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and

Warfarin Sodium tablets.

1060.    Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian. It was understood that Teva would follow the Taro price increases based on these and prior conversations. In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1061.    Specifically, on May 28, 2014, T.S. (Teva) sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet. That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 10D | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 10O0 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

1062.    Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

1063.    On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin Sodium and other drugs –Patel and Aprahamian exchanged five (5) text messages. After exchanging those text messages, Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)" At 5:08pm that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

1064.    First thing the next morning, Patel and Aprahamian exchanged two (2) text messages. Then, at 9:56am, the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had

obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

1065.    On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. K.G. – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

1066.    One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

1067.    As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva, Taro and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014. In the days between the Taro and Zydus price increases for Warfarin Sodium, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1068.    On June 13, 2014 - the date of the Zydus increase on Warfarin Sodium – Teva was presented with an offer from a customer for a one-time buy on that drug. Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of

drugs on which Teva planned to raise prices. A number of them - including Carbamazepine

chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream,

emollient cream, gel and ointment, and Warfarin Sodium tablets - included the notation

"Follow/Urgent - Taro" as the reason for the increase. For that list of drugs, Patel directed that "we

should not provide any decreases on these products." Patel's directive meant that Teva would not

seek to compete for market share against Taro or Zydus when approached by customers due to

those competitors' price increases.

1069.    On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing

them of the status of Teva's next price increase. She noted that Teva had already been "receiving

multiple requests on several items that are prioritized as increase candidates." Patel continued:

"While we do not have an exact date of increase, we are taking our increase plans into consideration

and are bidding on new business at the planned increase price where our WAC allows." Finally,

Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

1070.    Some of the "intelligence" referred to by Patel was gathered during a phone

conversation she had with Aprahamian (Taro) the day before, on June 17, 2014, which lasted more

than fifteen (15) minutes.

1071.    The next day, Patel continued to gather "intelligence" and made concerted efforts to

simultaneously coordinate with both Aprahamian (Taro) and Green (Zydus). The timing and

duration of those phone calls is set forth below:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

1072.    On August 28, 2014, Teva followed the Taro price increases on Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets. As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

> *e.    Zydus*

1073.    In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle capsules.

1074.    As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate Sprinkle, while Actavis had just 3% of the market.

1075.    In April 2014, Zydus raised its price for Topiramate Sprinkle capsules. Patel was in frequent communication with Green at the time of the Zydus price increase.

1076.    In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1077.    Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 - the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above - Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that - the same day that Green had extensive phone calls with both Rekenthaler and Patel - Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

1078.    Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### 13.    January 28, 2015 Price Increases

1079.    Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1080.    When Patel left the pricing department at Teva her position was not re- filled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1081.   On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor- DRL | Dr. Reddy's (54%); Accord (17%); INT labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor- Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi -Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

1082.   Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015. The relevant phone communications between Teva and several of its competitors related to these drugs are set forth in the chart at page 264 of the State AG Complaint No. 2.

1083.   Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

1084.   Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

REDACTED – PUBLIC VERSION

### a.   *Ciprofloxacin HCL and Glimepiride*

1085.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increases to the Ciprofloxacin HCL WAC were 201% - 533% depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

1086.   In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases. At least some of those phone communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

1087.   V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four (4) text messages on August 25, 2014 - only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

1088.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how T.W. obtained this information, the subject line of the e-mail clearly identified the information as

"Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated that Teva initiated price increases, but did not include glimepiride:

On Aug 28, 2014, at 4:11 PM, ███████████████ > wrote:

Hi All,
Teva had price increases today.  No glimepiride though!
See products below.
Thanks,
████

1089.   J.M., a senior marketing executive at Dr. Reddy's, replied: "Thanks for sending. This was shown in the pricing compendium today. I was a little disappointed. However, some of the price increase[s] were led by other companies more than a month ago. So I am still hopeful they may follow." Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between V.B. and Patel during their various conversations.

1090.   In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015. In the interim, V.B. and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

1091.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Rekenthaler (Teva) spoke to Falkin (Actavis) several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

1092.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

    *b.* *Griseofulvin*

1093.  On September 9, 2014, Actavis notified its customers of a price increase on

Griseofulvin microsize oral suspension. In the days leading up to September 9, 2014, Patel and

Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase.

Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

1094.  The Actavis price increase for Griseofulvin became effective on October 6, 2014.

1095.  Teva promptly added Griseofulvin to its own price increase list, with the notation

"Follow Competitor- Actavis" as the reason for the price increase.

1096.  Teva followed the Actavis increase for Griseofulvin during its next price increase

event on January 28, 2015. As discussed above, in the days leading up to that price increase

Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for

Griseofulvin microsize oral suspension matched Actavis' WAC pricing exactly.

## C.    COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCESSFULLY COLLUDING WITH TEVA

### 1.    Apotex

1097.  Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a

ranking of -3. When Patel updated her Quality Competitor rankings in May 2014, however, Apotex

was rated +2 – an increase in five points over that twelve-month period.

1098.    Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, the latter of which is discussed above.

1099.    Teva increased its pricing on Doxazosin Mesylate in August 2013. Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1100.    Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Rekenthaler (Teva) and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

1101.    That relationship continued through 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler (Teva) engaged in numerous communications with J.H. (Apotex). The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1102.    As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

### 2.    Zydus

1103.    Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus' increase was more personnel-oriented: Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

1104.    Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus' entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above.

1105.    Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1106.    In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices –Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

1107.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

1108.   Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1109.   Even before Green joined Zydus in November 2013, Teva did have success in coordinating price increases with Zydus with respect to Pravastatin.

### 3.   Heritage

1110.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013. Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1111.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least thirty-seven (37) times.

1112.   Heritage's successful effort to coordinate price increases with Teva and other conspirators on four drugs – Acetazolamide, Leflunomide, Nystatin, and Theophylline – is described in Humana's Second Amended Complaint dated April 1, 2019, No. 2:18-cv-03299-CMR (E.D. Pa.). Heritage's efforts to coordinate price increases with Teva and other conspirators on Albuterol

Sulfate, Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Meprobamate,

Metronidazole, Nimodipine, Paromomycin, and Zoledronic Acid are described more fully, below.

1113.    In early 2014, Malek (Heritage) held a meeting with Heritage pricing executives,

Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's

Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous

planned price increases.

1114.    On April 15, 2014, Malek (Heritage) called Patel to discuss price increases on

Glipizide-Metformin, Glyburide, Glyburide-Metformin, and others. On their 17-minute

conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either

follow or not challenge Heritage's price increases by underbidding.

1115.    Because Teva was already planning a price increase on Nystatin and Theophylline

ER, Malek (Heritage) and Patel agreed Teva would take the lead on those increases. In subsequent

months, Malek (Heritage) and Patel spoke several more times on the price increases and timing.

1116.    On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in

which Malek (Heritage) identified 18 drugs that Heritage would target for increase. Prior to the call,

Malek (Heritage) circulated to his sales team a spreadsheet ("the Heritage list") which listed each

drug, the competitors, and their respective market share. The Heritage list included Fosinopril

HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Meprobamate, Methimazole,

Nimodipine, and Paromomycin, among others. Malek (Heritage) instructed members of the team to

immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach

agreement on price increases. Different Heritage employees were identified as being primarily

responsible for communication with different competitors.

1117.    The Heritage sales team promptly began to contact their competitors. For example,

Sather (Heritage) communicated with three counterparts at different competitors, reaching

agreements with all of them to increase prices. First, she spoke with Sun Senior Sales Manager, Susan Knoblauch for forty-five (45) minutes and agreed to increase prices for Paromomycin. Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for nine (9) minutes, which led to an agreement to increase prices for Glipizide-Metformin.

1118.   Neal O'Mara (Heritage) also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the price of Glipizide-Metformin, among others. O'Mara (Heritage) summarized in an e-mail to Malek (Heritage) and Sather (Heritage) titled "Mylan": "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products." O'Mara was also responsible for communicating with Heritage's Methimazole competitor Par on pricing.

1119.   A few days later, Malek (Heritage) sent an e-mail to Lukasiewicz (Heritage), titled "bindo" referring to Aurobindo stating: "Let me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]" On the Heritage list, Lukasiewicz (Heritage) was charged with responsibility for communication on Fosinopril–HCTZ, on which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin. Lukasiewicz (Heritage) exchanged numerous voice-mails with McMahon (Aurobindo) on April 28 and 29, 2014.

1120.   In addition to Teva, Malek (Heritage) took responsibility for reaching out to Ascend regarding Nimodipine. Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

1121.   On May 8, 2014, Malek (Heritage) sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with the plan asap.

1122.   Heritage's Matt Edelson, Senior Director of Sales, and directly responsible for Heritage's Humana business, responded immediately "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." Malek (Heritage) tasked Edelson (Heritage) with communication with Dr. Reddy's on Meprobamate. He exchanged six text messages with Austin (Dr. Reddy's) on April 24, 2014, and then spoke with Austin (Dr. Reddy's) on May 6, 2014.

1123.   Sather (Heritage) responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." Sather (Heritage) had been tasked with communicating with Actavis on Glyburide-Metformin and Sun on Paromomycin, among others.

1124.   Also on May 8, 2014, Lukasiewicz (Heritage) and McMahon (Aurobindo) held a sixteen (16) minute phone call and then an eighteen (18) minute phone call on June 25, 2014. They spoke again for over three (3) minutes on July 7, 2014.

1125.   On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

1126.   On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Paromomycin (100% increase); Glyburide (200% increase); and Nimodipine (48% increase).

1127.    Two days later, on June 25, 2014, Malek (Heritage) spoke with Patel and informed her that Heritage would be increasing prices for a number of drugs that Teva was a competitor for.

1128.    On June 26, 2014, Sather (Heritage) sent a text message to a large wholesaler customer stating:

> "As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters."

1129.    On July 1, 2014, Malek (Heritage) e-mailed Heritages sales team:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

1130.    In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, and Nimodipine, as well as others.

1131.    Sather (Heritage) quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER…150%."

1132.    Additional allegations as to other Subject Drugs, most of which involve Heritage, are set forth below.

a.      *Albuterol Sulfate*

1133.   At all relevant times, Mylan and Sun dominated the market for Albuterol Sulfate.

Specifically, Mylan sold Albuterol Sulfate directly to Humana.

1134.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

1135.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose

dramatically.

1136.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased price by over 4,300%

from $.13 to $5.88 on March 6, 2013. Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $.13

to $4.70 on April 15, 2013, as illustrated by WAC data. These price increases effected multiple doses

of Albuterol Sulfate.

| Product 2MG | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

b.      *Fosinopril HCTZ*

1137.   At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated

and continue to dominate the market for Fosinopril HCTZ. By April 2014, Heritage had a 47%

market share for Fosinopril HCTZ.

1138.   On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales,

Jim Brown via LinkedIn. Lukasiewicz (Heritage) spoke with McMahon (Aurobindo) on May 8, 2014

via phone. That same day, McMahon (Aurobindo) called Glenmark's Executive Vice President of

Generics, James Grauso, and they spoke on the phone. On May 9, 2014, Aurobindo's Tim

Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson. All of these calls were regarding price increases for Fosinopril HCTZ.

1139.   That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda. Within one month, Sather (Heritage) spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

1140.   After in-person meetings with Gustafson (Aurobindo) and Christopher Bihari (a Sandoz Director of National Accounts) on May 14, Sather (Heritage) confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed." The next day, representatives of Aurobindo and Sandoz spoke numerous times.

1141.   On June 3, 2014, Sather (Heritage) texted Bihari (Sandoz) and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix. This initiated a series of communications during the summer of 2014 that included three calls between Gustafson (Aurobindo) and Bihari (Sandoz) and five calls, and multiple texts, between Gustafson (Aurobindo) and Johnson (Glenmark). Gustafson (Aurobindo) would have one final call with Johnson (Glenmark) on August 26, 2014, before going radio silent until April 8, 2015.

1142.   Lukasiewicz (Heritage) and McMahon (Aurobindo) spoke on June 25, 2014 via phone, and again on July 7, 2014.

1143.   On June 25, 2014, Sather (Heritage) texted Citron's Kaitlin Alexander to find out if Citron was entering the market for Glyburide but found out that Citron was actually entering the market for both Glyburide and Fosinopril HCTZ. Sather (Heritage) informed Alexander (Citron) of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz (Heritage), informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via e-mail. Strelau (Citron)

also told Lukasiewicz (Heritage) that Sather (Heritage) should communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosi – HCTZ or other price increases. The following day, Short (Citron) and Sather (Heritage) spoke for over 20 minutes. Their conversations continued through July and August 2014.

1144.   Lukasiewicz (Heritage) also spoke directly with Grauso (Glenmark) on July 18, 2014 and July 30, 2014. On July 28, 2014, Short (Citron) called and texted McMahon (Aurobindo) to discuss Fosinopril HCTZ.

1145.   On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers. On June 27, McMahon (Aurobindo) and Grauso (Glenmark) spoke twice.

1146.   By July 9, 2014, Heritage successfully raised prices on 18 different customers for Fosinopril HCTZ. That same day, Citron confirmed that it was trying to match Heritage's price increases. On July 14, 2014, Strelau (Citron) and Grauso (Glenmark) spoke. The next day, Citron matched Heritage's supracompetitive prices.

1147.   Sandoz also increased its pricing for Fosinopril HCTZ. By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

     *c.*     *Glipizide-Metformin*

1148.   At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

1149.   On April 15, 2014, Malek (Heritage) discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

1150.   O'Mara (Heritage) spoke to Aigner (Mylan) on April 23, 2014 and reached an agreement to raise prices.

1151.    To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.

1152.    Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call. Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin.

1153.    By July 9, 2014, Heritage increased the price nationwide to 27 different customers for Glipizide-Metformin. Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases. By November 2014, a Heritage employee reported to Malek that most of Heritage's price increases "had stuck."

*d.      Glyburide*

1154.    Aurobindo, Heritage, and Teva dominated the Glyburide market at all relevant times.

1155.    On April 15, 2014, Malek (Heritage) spoke with Patel and discussed Heritage's intention to raise prices on Glyburide. Patel agreed that if Heritage raised the price, Teva would follow suit.

1156.    Heritage also brought Aurobindo into the scheme. On May 8, 2014, Lukasiewicz (Heritage) contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

1157.    On May 9, 2014, Heritage held an internal call on price increases, and included Glyburide on the list of drugs set for an increase.

1158.    One week later, Heritage and Aurobindo representatives spoke to one another at the MMCAP conference in Minnesota. The Heritage representative reported to Malek (Heritage) that the Aurobindo representative expressed "similar like minding on the pricing strategies we discussed."

1159.   On June 23, 2014, Heritage held a "Price Change Call" where it listed Glyburide for a 200% increase.

1160.   In June 2014, Heritage learned of a potential new competitor in the Glyburide market. Sather (Heritage) texted Alexander (Citron) inquiring into whether Citron would be entering the Glyburide market.

Sather (Heritage): "Work question: is Citron launching Glyburide anytime soon?"

Alexander (Citron): "Yes we currently have the product in our warehouse."

Sather (Heritage): "We are raising the price right now – just letting you know. Teva says they will follow."

Sather (Heritage): "Aurobindo agrees too."

Alexander (Citron): "?"

Alexander (Citron): "You have micronaise brand equivalent."

Alexander (Citron): "And are you also raising your wacs?"

Sather (Heritage): "Sorry – was on conference call. Ours is Micronaise? Is yours Micro or Diabeta?"

Alexander (Citron): "Micro"

Sather (Heritage): "I don't think we are changing WAC – verifying now"

Alexander (Citron): "Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing…are doing this immediately, i know she was mentioning teva can take a while to raise prices"

Sather (Heritage): Teva is slow but conversations have been good."

Sather (Heritage): "No change to WAC for us"

Sather (Heritage): "We are raising our customers 200% over current market price."

Alexander (Citron): "Okay ill make sure the appropriate people find out"

<u>Sather (Heritage)</u>: "Teva has 66% of mkt – great target for share! By [sic] [t]hey should play fair. Aurobindo and us each have about 18% share. Good luck!"

<u>Alexander (Citron)</u>: "Thanks! Is this something you will be doing like this week?"

<u>Sather (Heritage)</u>: "Letters going out this week! A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days"

<u>Alexander (Citron)</u>: "Perfect makes sense…Your not going anything with glyb/met pricing right?

<u>Sather (Heritage)</u>: "Not yet – but is on a short list!"

<u>Sather (Heritage)</u>: "Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too"

<u>Alexander (Citron)</u>: "Okay yeah we have that too…Thanks for the info!"

1161.  Sather (Heritage) quickly reported to the Heritage sales team. Then, on July 2, 2014, Strelau (Citron) called Lukasiewicz (Heritage) confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan. On July 2, a different Citron representative spoke to Sather (Heritage). They continued to communicate throughout the summer of 2014.

1162.  By the end of June, Heritage had cemented its price raising agreements with Aurobindo, Citron, and Teva and notified its customers of the hikes. By July 9, Heritage increased the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we will not be bidding. Thanks."

1163.  Teva also increased its WAC pricing on Glyburide by July 9, 2014. Not even one week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's levels.

1164.    Teva and Aurobindo both declined to provide bids when a Heritage customer, outraged with the price increases, requested bids from both companies. Teva and Aurobindo acted at the direction of Malek (Heritage).

*e.    Glyburide-Metformin*

1165.    Actavis, Aurobindo, Heritage, and Teva dominated the Glyburide-Metformin market at all relevant times. As of April 2014, Heritage had 5% market share and was eager to raise prices.

1166.    On April 15, 2014, Malek (Heritage) contacted Patel and discussed Heritage's price increase goals. Patel agreed that if Heritage raised the price on Glyburide-Metformin, as well as other drugs, Teva would follow with its own price increases. Their communications continued over the next several months.

1167.    Sather (Heritage) called Dorsey (Actavis). They reached an agreement to increase the price of Glyburide-Metformin and Verapamil.

1168.    Shortly thereafter, Dorsey (Actavis) informed the sales and pricing team at Actavis of Heritage's intention to raise prices on these two drugs. In an internal April 28 email, an Actavis pricing manager stated, "[Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

1169.    On May 1, 2014, Falkin (Actavis), who was a recipient of the email described above, called a Teva counterpart regarding the scheme. Their communications continued over the next several months.

1170.    On May 12, Falkin (Actavis) spoke twice with Aurobindo's CEO regarding price increases. Falkin (Actavis) also exchanged thirty (30) text messages with a Teva representative between May 19 and May 22, 2014.

1171.    Around this same time, several Heritage employees communicated with their counterparts at Aurobindo about the Glyburide-Metformin price increase.

1172.   For example, Lukasiewicz (Heritage) made contact with Aurobindo by phone on May 8, 2014, and then in person on May 14. He reported that he had "found similar like minding on the pricing strategies we discussed."

1173.   On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call. Heritage continued to plan price increase through the next month.

1174.   On June 25, 2014, Sather (Heritage) exchanged text messages with a Citron representative about raising prices for Glyburide-Metformin wherein Citron agreed to raise prices, and then inquired "Your [Heritage] [sic] not doing anything with glyb/met pricing right?" Sather (Heritage) responded "Not yet- but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug.

1175.   Heritage increased its WAC prices for Glyburide-Metformin in July 2014.

1176.   In an August 20, 2014 text message exchange, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil.

Sun representative: "Have you heard anything about an Actavis price increase?"

Heritage representative: "I heard they were on board with it. What item specifically?"

Sun representative: "I don't know. I am just hearing about an increase but no details. What product have you heard about"

Heritage representative: "We were communicating on Glyburide/Metformin and Verapamil"

Sun representative: "We haven't touched verapamil yet"

1177.   Heritage and Teva both increased their WAC prices for Glyburide-Metformin, while Citron also agreed to "match their price increases."

1178.    This agreement between Heritage, Teva, Aurobindo, and Actavis was part of an overarching conspiracy of the Defendants to unreasonably restrain trade in the generic pharmaceutical market.

### f.    *Hydralazine HCL*

1179.    Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.

### g.    *Meprobamate*

1180.    In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

1181.    On March 21, 2013, Malek (Heritage) e-mailed members of his team that he is "Looking **to** take a price increase on [mepro]. Only other competition is DRL. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL [Dr. Reddy's] and communicate to feel out?" His team confirmed that they will touch base with counterparts at Dr. Reddy's.

1182.    On a call on March 22, the two companies agreed to set and increase prices on Meprobamate. The agreement was confirmed in an e-mail later that day from a Heritage representative: "DRL is on board with price increase. I will fill you in later."

1183.    On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer. The Heritage employee reported to Malek (Heritage) that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going." Malek (Heritage) replied "Unless

[the national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

1184.    In April 2013, Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain. Heritage then e-mailed the large pharmacy chain that it was increasing Meprobamate prices. The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

1185.    The following month, Malek (Heritage) told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago. This makes the playing field for market share more even and I assume since you were looking for one more customers that you are good now. Tell him you don't think the team is going to walk from anymore share at this point."

1186.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board, nearly simultaneously, as a result of their agreement, in late April 2013 and early May 2013, respectively.

1187.    Over the next several years, the market remained highly stable, but at supracompetitive levels.

h.    *Methimazole*

1188.    Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares. Methimazole was among the drugs listed.

1189.    Par was a competitor with Heritage on Methimazole. Neal O'Mara (Par) was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole and communicated with a counterpart at Par about a price increase for Methimazole.

*i.      Metronidazole*

1190.   At all relevant times, G&W, Heritage, Impax, Sandoz, Teva, and Valeant dominated the market for Metronidazole. Heritage entered the market for Metronidazole in May 2013.

1191.   G&W, Sandoz, and Teva conspired to increase the price of Metronidazole Cream. Throughout the period, G&W, Sandoz, and Teva had ample opportunity to discuss and coordinate pricing of Metronidazole Cream at various trade association and industry events including (i) the August 30-21, 2010 NACDS Pharmacy and Technology Conference in San Diego, California; (ii) the August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston, Mass. (iii) the April 24-27, 2012 NACDS Annual Meeting; (iv) the February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) the December 3, 2014 NACDS Foundation and Reception Dinner in New York, N.Y.; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

1192.   G&W, Impax, Sandoz, and Teva conspired to increase the price of Metronidazole jelly. The Metronidazole jelly price increase occurred shortly after trade association meetings where representatives from G&W, Impax, Sandoz, and Teva were in attendance, such as: (i) April -May 2011 NACDS Annual Meeting; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; and (iv) August 2012 NACDS Pharmacy and Technology Conference.

1193.   Sandoz and Teva conspired to increase the price of Metronidazole lotion. The Metronidazole lotion price increase occurred shortly after trade association meetings where representatives from Sandoz and Teva were in attendance such as: (i) August 30-31, 2010 NACDS Pharmacy and Technology Conference in San Diego; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; (iv) February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) December 3, 2014 NACDS Foundation

and Reception Dinner in New York; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

1194.   Sandoz and Valeant conspired to increase the price of Metronidazole vaginal. Valeant manufactures a brand metronidazole drug under the name MetroGel vaginal.

1195.   The Metronidazole vaginal price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance such as: (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

1196.   Notably, the Metronidazole vaginal price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs. At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014. Such price increase is a well-known business strategy of Valeant.[40] Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

*j.*     *Nimodipine*

*The Heritage/Sun Agreement*

1197.   As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market.  Heritage saw Teva's departure as an opportunity to raise prices.

1198.   In June 2012, Malek (Heritage) asked Sather (Heritage) to contact Caraco to discuss raising the price of Nimodipine.

---

[40] *See* Sanders and Cummings Press Release (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").

1199.    Sather (Heritage) subsequently exchanged numerous text messages and participated

in calls with her Caraco contact throughout June 2012. On June 28, 2012, in an e-mail titled

"Caraco", Sather (Heritage) wrote:

> [Knoblauch (Sun)] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market. She was not so much help on the pricing discussion- because she does nothave muhc control over it. All pricing goes through [Sachdeva (Sun)] and [Sachdeva (Sun)] sets is. I do not know [Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been set. I reiterated that we would like to see $ go up and we would be fair.

1200.    Malek (Heritage) responded: "Thanks for the info. Not sure what this means 'his

only concern was that they get their fair share of the market.' They are getting their fair share of the

market at a price they don't need to go to is what I wanted to communicate to them."

1201.    In her e-mail response, Sather (Heritage) agreed:

> That is exactly how I stated it to [Knoblauch (Sun)] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key item for them. I said it is big for us and with only two players it should command more $. I'd like to see if [Knoblauch (Sun)] can communicate back to [Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when it gets closer to the close of the RPF) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

1202.    The same day Sather (Heritage) sent an analysis of the upcoming Cardinal RFP to

Malek (Heritage) and others at Heritage. The notes section regarding Nimodipine reflected that

Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high

price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and

still retain the Cardinal business.

1203.    Heritage and Caraco were both able to significantly raise prices to other customers,

including Humana, as a result of this agreement.

1204.   On July 20, 2012, Fleming (Heritage) circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by Sather (Heritage). In an e-mail exchange that same day, Sather (Heritage) and Malek (Heritage) discussed raising prices:

> Sather (Heritage): "My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?

> Malek (Heritage): "I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's."

> Sather (Heritage): "I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we could still lowball the Nimo a little later if necessary."

> Malek (Heritage): "If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line."

> Sather (Heritage): "If I don't continue the conversations now (and at NACDS) and if I lowball right of the gate on the RFP, I think we close the door for a long time."

> Malek (Heritage): "Ok, lets give it a shot. So we will increase the price, you should tell them that so they can do the same without any comp."

1205.   That same day, Sather (Heritage) spoke to Knoblauch (Sun). During this and other communications in the succeeding weeks, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

1206.   When Malek (Heritage) learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

1207.    Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek (Heritage) responded "Great feedback, time for next increase!" He later reiterated "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

1208.    On May 23, 2013, Sather (Heritage) again spoke with Knoblauch (Sun), who indicated that Caraco may be returning to the market for Nimodipine in June or July. Sather (Heritage) immediately reported this news to Malek (Heritage): "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful. And there's a small rumor they may not come back with it. A reminder was provided about our recent changes on that item."

1209.    This resulted in the following e-mail exchange between the two:

Malek (Heritage): OK...Where did you hear this from!!

Sather (Heritage): Vendor/friend [Knoblauch (Sun)]

Malek (Heritage): Are they raising theirs?

Sather (Heritage): They are not yet but admit it would be nice to

Malek (Heritage): Well we would follow in one second……

Sather (Heritage): I did say that!

Malek (Heritage): hahahahahahaha

1210.    During the next year, Caraco did not return to the market. Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

*The Heritage/Ascend Agreement*

1211.    When the FDA approved Ascend's Nimodipine generic in early April 2014, Malek (Heritage) immediately reached out to Ascend's Executive Vice President of Sales and Marketing,

John Dillaway, through LinkedIn, asking if Dillaway (Ascend) had "time to catch up tomorrow afternoon or Thursday morning." Dillaway (Ascend) responded "I would like to catch up."

1212.   On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase. A large majority of the price increases were to be achieved through collusive efforts. During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek (Heritage), Heritage noted that Ascend was going to launch Nimodipine. Malek (Heritage) took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

1213.   Malek (Heritage) took this responsibility to communicate with Ascend because he already had a relationship with Dillaway (Ascend). The pair had previously met in February 2013. Malek (Heritage) had also been communicating frequently with Dillaway (Ascend) through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

1214.   Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014, Malek (Heritage) called Dillaway (Ascend) and the two spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

1215.   On May 9, 2014 Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek (Heritage) and Dillaway (Ascend), Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to the "new entrant into market" Ascend.

1216.   In June 2014, Malek (Heritage) sought to continue his conversations with Dillaway (Ascend) regarding Nimodipine. He e-mailed Dillaway (Ascend) on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway (Ascend) suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

1217.   At the end of June, Heritage implemented the price increase. Heritage raised the price of Nimodipine to at least twelve customers.

1218.   Malek (Heritage) e-mailed Dillaway (Ascend) on October 29, 2014, again asking to "catch up." The two spoke by phone for ten minutes the next day. On November 4, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of communicating specifics over e-mail, Malek (Heritage) and Dillaway (Ascend) made plans to have lunch together when Malek (Heritage) returned from India.

1219.   Two weeks later, on November 18, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) stating "[Dillaway (Ascend)], [j]ust sent you a text. Fresh back from India. Wanted to pick up discussions. Let me know fi you can chat." On November 25, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) again asking if Dillaway (Ascend) "had a few minutes to connect."

1220.   On January 22, 2015, Malek (Heritage) asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse. Malek (Heritage) stressed that this inquiry should be kept confidential.

1221.   R.S. (Heritage) reached someone as Ascend. By January 24, 2015, Malek (Heritage) was able to inform his sales team that Ascend had Nimodipine in its warehouse.

1222.   By May 1, 2015, Ascend had fully launched Nimodipine. Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

1223.    Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

### k.    Paromomycin

1224.    Heritage and Sun, through its division Caraco, dominated the Paromomycin market at all relevant times.

1225.    In April 2014, Heritage had approximately 65% of the market. Sun had approximately 35% market share.

1226.    On April 22, 2014, Heritage's representative spoke to a Sun counterpart for 45 minutes. Shortly thereafter, the Heritage representative notified her superiors via e-mail that Caraco was on board with price increases, to which a superior responded, "No e-mails please."

1227.    On May 8, 2014 a Heritage employee e-mailed Malek (Heritage), who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

1228.    Heritage held another internal pricing call on May 9, 2014. Paromomycin was on the list for a price increase.

1229.    On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility. The employee immediately relayed the information to Malek who responded "Need price increase to go immediately. Jack it up."

1230.    On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase. By July 9, 2014, Heritage successfully increased prices for over a dozen nationwide customers.

1231.    Sun continued to sell the drug through January 2015, maintaining a 40% market share. Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

*l.      Zoledronic Acid*

1232.    At all relevant times, Dr. Reddy's and Heritage dominated the marketed for Zoledronic Acid. Humana purchased Zoledronic Acid directly from both Dr. Reddy's and Heritage.

1233.    Zoledronic Acid was marketed singularly by the brand manufacturer, Novartis, until the spring of 2013, when it came off patent. It was sold in two formulations: a 4 mg and a 5mg, both injectables. Heritage initially sought only to launch the 5mg formulation.

1234.    In early 2013, Heritage received FDA approval to market Zoledronic Acid in the United States. Heritage began communicating with potential competitors before then to avoid price competition and to carve up market share.

1235.    On January 21, 2013, Malek (Heritage) e-mailed O'Mara (Heritage) directing him to reach out to Dr. Reddy's, the only other competitor Malek (Heritage) believed would be marketing Zoledronic Acid. Malek (Heritage) wrote:

> Would like you to have a call with [Austin (Dr. Reddy's)] on Zoledronic.
>
> Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need to lock in our strategy.

1236.    In a follow-up communication to O'Mara (Heritage) the next day, Malek (Heritage) outlined what O'Mara (Heritage) should ask Austin (Dr. Reddy's):

> OK. Here are the questions if you would.
>
> Are they going to be there day one (March 4)

Have they heard of any others there say [sic] one?

Are they launching the 4mg (Zometa) at risk?

Have they heard of anyone else launching the 4mg at risk?

What's their market share goal?

1237.   Communications between the two companies continued in March 2013 in preparation for Heritage' market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

1238.   On March 1, O'Mara (Heritage) emailed Malek (Heritage) informing him that he had left Austin (Dr. Reddy's) a message "to have him call me back." He added, "Did not leave anything that would incriminate me—very generic." O'Mara (Heritage) and Austin (Dr. Reddy's) then spoke for almost eight (8) minutes on March 4, 2013.

1239.   The March 6 communication arose from Malek's (Heritage) concern that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he had hoped. Malek (Heritage) emailed O'Mara (Heritage) asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?" O'Mara's (Heritage") response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

1240.   On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon." The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

1241.   On April 19, 2013, Malek (Heritage) instructed his sales team not to put any collusive discussions on Zoledronic Acid or other drugs in writing to ensure the conspiracy remained hidden:

"Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

1242.   Heritage and Dr. Reddy's continued to police their market allocation agreement. For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers. When Malek (Heritage) learned of this, he emailed M.E. (Heritage), "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. (Heritage) replied. "He told me that he was going to speak to their injectable people and let them know that they should chill."

1243.   For most of 2013 and 2014, the market for Zoledronic Acid remained stable with Dr. Reddy's maintaining roughly 60 percent share to Heritage's 40 percent share for the 5mg formulation.

### 4.    Lupin

1244.   In Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking of +2. When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1245.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Patel and Berthold spoke at least seventy-six (76) times by phone. Green, while still at Teva, also had a very strong relationship with Berthold. As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1246.   As discussed more fully above and in Humana's Second Amended Complaint, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs: Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets and Pravastatin.

Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

1247.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin oral suspension. As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin oral suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1248.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

### 5.    Par

1249.   In Patel's initial May 2013 quality competitor ranking list, Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1250.   Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S. (Teva) had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1251.   Similarly, Rekenthaler (Teva) had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently throughout 2013 and 2014. From the

beginning of 2013 through May 2014, Rekenthaler spoke to M.B. (Par) at least thirty-two (32) times by phone.

1252.   Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets. Patel forwarded the e-mail to T.S. with three question marks: "???" T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday. Just received call back with more information."

1253.   The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol HCL) to Rekenthaler, saying "[n]eed to make a decision quickly." One minute after receiving that e-mail, Rekenthaler called M.B. (Par) and the two spoke for eighteen (18) minutes. Shortly after hanging up the phone with M.B., Rekenthaler sent another e-mail to Patel, stating: "[h]old off on this until I get back with you." Rekenthaler spoke to M.B. again later that afternoon for three (3) minutes.

1254.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

1255.   As discussed more fully above, Teva continued to conspire with Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

### 6.  Greenstone

1256.   Greenstone was not a highly-ranked competitor when Patel first created the quality competitor ranking list in May 2013. Patel had, at that time, given Greenstone a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

1257.   One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with R.H., a national account executive at Greenstone.  Patel and R.H. were former co-workers at ABC and had a longstanding relationship. From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and R.H. communicated by phone or text at least sixty-six (66) times. Patel also spoke to R.H.'s supervisor, Nailor, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

1258.   Patel and R.H. (Greenstone) spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 the day that Greenstone sent notices to customers of its price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone.

1259.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

### 7.    Amneal

1260.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1261.   One of the reasons why Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Rekenthaler (Teva) had a strong relationship with S.R.(2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well. Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.)

1262.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2). As discussed above, Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1263.   Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct. In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Patel that Amneal will concede one customer – Econdisc ("E") – so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



1264.   On the day of this message exchange, Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

### 8.    Rising

1265.   In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1266.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

REDACTED – PUBLIC VERSION

1267.   Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for Diflunisal tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1268.   On April 4, 2014, Teva increased the price on Diflunisal tablets by as much as 182%, as well as Hydroxyzine Pamoate by as much as 165%. In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

1269.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing matched Teva's WAC price increase from April 2014.

1270.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 (Rising) led Patel to increase Rising's quality competitor ranking in May 2014.

### 9. Breckenridge

1271.    In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1272.    Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1273.    For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate and Cyproheptadine HCL tablets. In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

1274.    On April 4, 2014, Teva followed the Breckenridge price increases on Estradiol/Norethindrone Acetate tablets increasing the WAC pricing by over 100% and Cyproheptadine HCL tablets increasing the WAC pricing by over 90%, to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Estradiol/Norethindrone Acetate by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

1275.    As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes. Similarly, Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide

**REDACTED – PUBLIC VERSION**

a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1276.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 10.   Glenmark

1277.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Glenmark, for example, declined slightly in the rankings. In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3. When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1278.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message one hundred and twenty-one (121) times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above and in Humana's Second Amended Complaint, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole tablets, Ranitidine HCL, Moexipril HCL, Moexipril HCL/HCTZ and Pravastatin.

1279.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged forty-four (44) phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Patel exchanged thirty-six (36) calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Patel continued to coordinate with J.C. and Brown

throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol and Gabapentin tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 11. Camber

1280.   When Patel first created the quality of competitor rankings in early May 2013, she gave Camber a ranking of -2. When Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

1281.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1282.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1283.   One of those drugs was Raloxifene HCL tablets.

1284.   Teva had begun marketing Raloxifene HCL in March of that year. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well but had not yet entered by September 2014.

1285.   The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin. As discussed more fully above, Teva, Lupin, and Aurobindo agreed to divide up the generic Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

1286.   As the anticipated product launches for Raloxifene HCL approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a

senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

1287.    Teva's discussions with Actavis escalated over the coming week. On September 10, Rekenthaler exchanged two calls with Falkin (Actavis) lasting fifteen (15) minutes and one (1) minute, respectively. On September 11, the men talked for ten (10) more minutes. On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

1288.    The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the affirmative. Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer, Econdisc.

1289.    Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1290.    On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes. The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls ever between the two competitors. As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene HCL.

1291.    On September 24, Patel discussed a Raloxifene HCL allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc. She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and

conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating: "Camber indicated that they are targeting Econdisc and a small retailer … and then they would be 'done.'"

1292.    As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer. At 9:07am that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler planned to discuss the matter with Camber:

From:    Nisha Patel02
Sent:    Wed 9/24/2014 9:07 AM (GMT-05:00)
To:      ████
Cc:      Dave Rekenthaler; ██████████████████████████████████████████
Bcc:
Subject: Re: Econdisc Raloxifene Intel

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone

1293.    Indeed, at 9:28am that morning, Rekenthaler called Ostaficiuk and the two spoke for two (2) minutes. They spoke two more times that day, including one call that lasted eight (8) minutes.

1294.    Some of these calls also related to Camber's entry into the market for Lamivudine/Zidovudine. Teva and Lupin were already in the market for Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

1295.   On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the Lamivudine/Zidovudine communications.

1296.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene HCL market, and aimed with the information Rekenthaler had gathered from Camber's President, K.G. concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Rekenthaler and Ostaficiuk spoke again twice that day.

1297.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene HCL product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1298.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene HCL. Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1299.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene HCL or Lamivudine/Zidovudine. As a result of this communication, on Monday September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
|---|---|
| **From:** | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| **on behalf of** | Kon Ostaficiuk |
| **Sent:** | 9/29/2014 5:27:43 PM |
| **To:** | [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=███████████████ █████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=██████ |
| **CC:** | ███████[/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=████ |
| **Subject:** | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

1300.   A.R., a senior sales executive at Camber, replied: "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer." A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war…"

1301.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business. J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: "I thought they were done after securing Econdisc?" Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating: "You're positive they sent them an offer?"

1302.   J.P. of Teva "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer. After further discussion with the customer, Teva staff learned that it was a

misunderstanding. Camber never actually made the offer but had instead complied with its agreement with Teva.

1303.    The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene HCL. A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding of the rules of the conspiracy, she pointed out: "**Fair share only applies when there is not supply constraints.**" Ostaficiuk responded optimistically, but cautiously: "Good luck guys but go fishing and gather information before we commit . . .."

## X.    HUMANA'S PURCHASES AND ANTITRUST INJURY

1304.    During the relevant time period, HPI purchased over $229 million worth of the Subject Drugs directly.  Additionally, during the relevant time period, Humana purchased over $4.46 billion worth of the Subject Drugs indirectly.

1305.    Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for each of the Subject Drugs listed above. As an example, the chart below indicates, Humana's contractual price with Teva for Bumetanide increased by 1,136% (.5 mg 100), 1,036% (1 mg 1000), and 1,576% (2 mg 1000) between April 2011 and May 2014:



1306.   As another example, the chart below indicates, Humana's contractual price with Taro for Carbamazepine XR increased by 313% (200 mg 100) and 308% (400 mg 100) between May 2012 and May 2015:



1307.   As the chart below indicates, Humana's contractual price with Teva for Desmopressin Acetate tablets increased by 75% between May 2014 and October 2014:



1308.   As the chart below indicates, Humana's contractual price with Teva for Diclofenac Potassium tablets increased by 176% between May 2013 and May 2015:



REDACTED – PUBLIC VERSION

1309.    As a final example, the chart below indicates, Humana's contractual purchase price with Taro for Warfarin Sodium increased by 148% (4 mg 1000, 5 mg 1000, 1 mg 1000, 2.5 mg 1000, and 2 mg 1000) and 222% (3 mg 1000) between April 2011 and May 2015.



1310.    The Subject Drugs' prices have been substantially higher than the prices that Humana would have paid for the Subject Drugs but for Defendants' collusion.

1311.    Consequently, Humana has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

1312.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Humana has sustained, and continues to sustain, significant losses in the form of artificially

inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

1313.    Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Humana.

1314.    Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Humana has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XI.    INTERSTATE TRADE AND COMMERCE

1315.    Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

1316.    Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

1317.    Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

1318.    Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

1319.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Humana and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

1320.   Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XII.   TOLLING AND FRAUDULENT CONCEALMENT

1321.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

1322.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

1323.   Among other things, as alleged in the State AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the State AG Complaint No. 2, which is incorporated by reference.

1324.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the

existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

1325.   Humana acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Humana did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before the filing of this Complaint, nor was Humana aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

## XIII.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

1326.   Discovery is necessary to determine the full scope of Defendants' conspiracy, including years, products, and participants. Plaintiff reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XIV.   CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1327.   Humana incorporates by reference the preceding allegations.

1328.   Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Heritage Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Fosinopril HCTZ
> Glipizide-Metformin

>Glyburide
>Glyburide-Metformin
>Hydralazine HCL
>Meprobamate
>Methimazole
>Metronidazole
>Nimodipine
>Paromomycin
>Zoledronic Acid

1329.   Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

1330.   The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Heritage Drugs.

1331.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

>a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

>b.   Humana was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

>c.   Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

1332.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

1333.   As a direct and proximate result of Heritage's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Heritage Drugs than it would

REDACTED – PUBLIC VERSION

have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1334.   Heritage is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1335.   There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1336.   Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1337.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Heritage Drugs, or by assignment from its other subsidiaries that directly purchased the Heritage Drugs during the relevant period.

## COUNT TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Heritage and All Other Defendants Under Joint and Several Liability)**

1338.   Humana incorporates by reference the preceding allegations.

1339.   Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Heritage Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1340.   Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

1341.   The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Heritage Drugs.

1342.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

1343.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

1344.   As a direct and proximate result of Heritage's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Heritage Drugs than it would have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1345.   There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1346.   Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1347.   Heritage's conduct violated the following state antitrust or competition practices laws:

REDACTED – PUBLIC VERSION

a.  Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.  Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

### COUNT THREE

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1348.   Humana incorporates by reference the preceding allegations.

1349.   Heritage engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Heritage's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Heritage Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1350.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Heritage Drugs, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced Heritage Drugs should have been available, and would have been available, absent Heritage's illegal conduct.

1351.   By engaging in the foregoing conduct, Heritage engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

    p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

    q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1352.   Humana incorporates by reference the preceding allegations.

1353.   Heritage has benefitted from artificial prices in the sale of the Heritage Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1354.   Heritage's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Heritage Drugs by Humana.

1355.   Humana has conferred upon Heritage an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1356.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Heritage Drugs.

REDACTED – PUBLIC VERSION

1357.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Heritage Drugs, as it is not liable and would not compensate Humana for the impact of Heritage's unlawful conduct.

1358.   The economic benefit of overcharges derived by Heritage through charging supracompetitive and artificially inflated prices for the Heritage Drugs is a direct and proximate result of Heritage's unlawful conduct.

1359.   The economic benefits derived by Heritage rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Heritage.

1360.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Heritage to be permitted to retain any of the overcharges for the Heritage Drugs derived from Heritage's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1361.   Heritage is aware of and appreciates the benefits bestowed upon them by Humana.

1362.   Heritage should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1363.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Heritage traceable to Humana.

## COUNT FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1364.   Humana incorporates by reference the preceding allegations.

1365.    Heritage knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Heritage Drugs. Heritage injured Humana through this conduct.

1366.    But for Heritage's scheme to inflate the price of the Heritage Drugs, Humana would have purchased lower-priced Heritage Drugs.

1367.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Heritage Drugs than it would have paid absent Heritage's continuing anticompetitive conduct.

1368.    Humana has purchased substantial amounts of the Heritage Drugs during the relevant period.

1369.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Heritage's conduct violates Sections 1 and 2 of the Sherman Act.

1370.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Heritage's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SIX

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

#### (As to Teva and All Other Defendants Under Joint and Several Liability)

1371.    Humana incorporates by reference the preceding allegations.

1372.    Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Teva Drugs"). This conspiracy was *per se* unlawful price-fixing.

REDACTED – PUBLIC VERSION

Adapalene
Amiloride HCL/HCTZ
Amoxicillin/Clavulanate
Amphetamine/Dextroamphetamine ER & IR
Azithromycin
Bethanechol Chloride
Budesonide
Bumetanide
Buspirone HCL
Cabergoline
Capecitabine
Carbamazepine
Cefdinir
Cefprozil
Celecoxib
Cephalexin
Cimetidine
Ciprofloxacin HCL
Clarithromycin ER
Clemastine Fumarate
Clonidine TTS
Clotrimazole
Cyproheptadine HCL
Desmopressin Acetate
Desogestrel/Ethinyl Estradiol (Kariva)
Dexmethylphenidate HCL ER
Dextroamphetamine Sulfate ER
Diclofenac Potassium
Dicloxacillin Sodium
Diflunisal
Diltiazem HCL
Disopyramide Phosphate
Doxazosin Mesylate
Drospirenone and Ethinyl Estradiol (Ocella)
Enalapril Maleate
Entecavir
Epitol
Estazolam
Estradiol
Estradiol/Norethindrone Acetate (Mimvey)
Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
Ethinyl Estradiol/Norethindrone (Balziva)
Ethosuximide
Etodolac
Fenofibrate
Fluconazole
Fluoxetine HCL
Flurbiprofen

REDACTED – PUBLIC VERSION

Flutamide
Fluvastatin Sodium
Gabapentin
Glimepiride
Glipizide-Metformin
Glyburide
Glyburide-Metformin
Griseofulvin
Hydroxyurea
Hydroxyzine Pamoate
Irbesartan
Isoniazid
Ketoconazole
Ketoprofen
Ketorolac Tromethamine
Labetalol HCL
Lamivudine/Zidovudine (Combivir)
Loperamide HCL
Medroxyprogesterone
Methotrexate
Metronidazole
Moexipril HCL
Moexipril HCL/HCTZ
Nabumetone
Nadolol
Niacin ER
Nitrofurantoin MAC
Norethindrone Acetate
Nortriptyline HCL
Omega-3-Acid Ethyl Esters
Oxaprozin
Oxybutynin Chloride
Paricalcitol
Penicillin VK
Pentoxifylline
Piroxicam
Prazosin HCL
Prochlorperazine
Raloxifene HCL
Ranitidine HCL
Tamoxifen Citrate
Temozolomide
Tobramycin
Tolmetin Sodium
Tolterodine
Topiramate Sprinkle
Warfarin Sodium

1373.    Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Teva Drugs throughout the United States.

1374.    The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Teva Drugs.

1375.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

        b.    Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

        c.    Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

1376.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

1377.    As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1378.    Teva is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1379.    There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1380.    Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1381.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Teva Drugs, or by assignment from its other subsidiaries that directly purchased the Teva Drugs during the relevant period.

## COUNT SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Teva and All Other Defendants Under Joint and Several Liability)**

1382.    Humana incorporates by reference the preceding allegations.

1383.    Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Teva Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1384.    Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teva Drugs throughout the United States.

1385.    The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teva Drugs.

1386.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

1387.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

1388.   As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1389.   There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1390.   Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1391.   Teva's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1392.   Humana incorporates by reference the preceding allegations.

1393.   Teva engaged in unfair competition or unfair, unconscionable, deceptive, or
fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a
direct and proximate result of Teva's anticompetitive, deceptive, unfair, unconscionable, and
fraudulent conduct, Humana was deprived of the opportunity to purchase the Teva Drugs at prices
restrained by competition and forced to pay artificially inflated prices.

1394.   There was and is a gross disparity between the price that Humana paid and continues
to pay for the Teva Drugs, including by assignment from its subsidiaries, and the value received,
given that more cheaply priced Teva Drugs should have been available, and would have been
available, absent Teva's illegal conduct.

1395.   By engaging in the foregoing conduct, Teva engaged in unfair competition or
deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West

Virginia.

## COUNT NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1396.   Humana incorporates by reference the preceding allegations.

1397.   Teva has benefitted from artificial prices in the sale of the Teva Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1398.   Teva's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teva Drugs by Humana.

1399.   Humana has conferred upon Teva an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1400.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teva Drugs.

1401.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teva Drugs, as it is not liable and would not compensate Humana for the impact of Teva's unlawful conduct.

1402.   The economic benefit of overcharges derived by Teva through charging supracompetitive and artificially inflated prices for the Teva Drugs is a direct and proximate result of Teva's unlawful conduct.

1403.   The economic benefits derived by Teva rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teva.

1404.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teva to be permitted to retain any of the overcharges for the Teva Drugs derived from Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1405.   Teva is aware of and appreciates the benefits bestowed upon them by Humana.

1406.   Teva should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1407.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teva traceable to Humana.

## COUNT TEN

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Teva and All Other Defendants Under Joint and Several Liability)**

1408.   Humana incorporates by reference the preceding allegations.

1409.   Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teva Drugs. Teva injured Humana through this conduct.

1410.   But for Teva's scheme to inflate the price of the Teva Drugs, Humana would have purchased lower-priced Teva Drugs.

1411.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teva Drugs than it would have paid absent Teva's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

1412.    Humana has purchased substantial amounts of the Teva Drugs during the relevant period.

1413.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teva's conduct violates Sections 1 and 2 of the Sherman Act.

1414.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teva's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT ELEVEN

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1415.    Humana incorporates by reference the preceding allegations.

1416.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Actavis Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine ER & IR
> Budesonide
> Buspirone HCL
> Celecoxib
> Ciprofloxacin HCL
> Clarithromycin ER
> Clonidine TTS
> Desmopressin Acetate
> Dextroamphetamine Sulfate ER
> Disopyramide Phosphate
> Drospirenone and Ethinyl Estradiol (Ocella)
> Estazolam
> Estradiol
> Flutamide
> Glyburide-Metformin
> Griseofulvin

          Hydroxyzine Pamoate
          Nabumetone
          Nortriptyline HCL
          Tamoxifen Citrate
          Topiramate Sprinkle

1417.   Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

1418.   The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Actavis Drugs.

1419.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

1420.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

1421.   As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1422.    Actavis is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1423.    There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1424.    Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1425.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Actavis Drugs, or by assignment from its other subsidiaries that directly purchased the Actavis Drugs during the relevant period.

### COUNT TWELVE

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1426.    Humana incorporates by reference the preceding allegations.

1427.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Actavis Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1428.    Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

1429.    The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Actavis Drugs.

1430.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

1431.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

1432.   As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1433.   There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1434.   Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1435.   Actavis's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of
     Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in
     Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North
     Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT THIRTEEN

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1436.   Humana incorporates by reference the preceding allegations.

1437.   Actavis engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Actavis's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Actavis Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1438.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Actavis Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Actavis Drugs should have been available, and would have been available, absent Actavis's illegal conduct.

1439.   By engaging in the foregoing conduct, Actavis engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
     Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FOURTEEN

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1440.   Humana incorporates by reference the preceding allegations.

1441.   Actavis has benefitted from artificial prices in the sale of the Actavis Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1442.   Actavis's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Actavis Drugs by Humana.

1443.   Humana has conferred upon Actavis an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1444.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Actavis Drugs.

1445.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Actavis Drugs, as it is not liable and would not compensate Humana for the impact of Actavis's unlawful conduct.

1446.   The economic benefit of overcharges derived by Actavis through charging supracompetitive and artificially inflated prices for the Actavis Drugs is a direct and proximate result of Actavis's unlawful conduct.

1447.   The economic benefits derived by Actavis rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Actavis.

1448.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Actavis to be permitted to retain any of the overcharges for the Actavis Drugs derived from Actavis's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1449.   Actavis is aware of and appreciates the benefits bestowed upon them by Humana.

1450.   Actavis should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1451.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Actavis traceable to Humana.

## COUNT FIFTEEN

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Actavis and All Other Defendants Under Joint and Several Liability)**

1452.   Humana incorporates by reference the preceding allegations.

1453.   Actavis knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Actavis Drugs. Actavis injured Humana through this conduct.

1454.   But for Actavis's scheme to inflate the price of the Actavis Drugs, Humana would have purchased lower-priced Actavis Drugs.

1455.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Actavis Drugs than it would have paid absent Actavis's continuing anticompetitive conduct.

1456.   Humana has purchased substantial amounts of the Actavis Drugs during the relevant period.

1457.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Actavis's conduct violates Sections 1 and 2 of the Sherman Act.

1458.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SIXTEEN

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1459.   Humana incorporates by reference the preceding allegations.

1460.   Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Amneal Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Bethanechol Chloride
> Norethindrone Acetate
> Ranitidine HCL

1461.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

1462.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Amneal Drugs.

1463.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

1464.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

1465.    As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1466.    Amneal is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1467.    There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1468.    Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1469.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Amneal Drugs, or by assignment from its other subsidiaries that directly purchased the Amneal Drugs during the relevant period.

## COUNT SEVENTEEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1470.    Humana incorporates by reference the preceding allegations.

1471.    Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Amneal Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1472.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

1473.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Amneal Drugs.

1474.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

1475.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

1476.   As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1477.   There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1478.   Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1479.   Amneal's conduct violated the following state antitrust or competition practices laws:

a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT EIGHTEEN

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1480.  Humana incorporates by reference the preceding allegations.

1481.  Amneal engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amneal's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Amneal Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1482.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Amneal Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Amneal Drugs should have been available, and would have been available, absent Amneal's illegal conduct.

1483.  By engaging in the foregoing conduct, Amneal engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
    Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
    purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
    Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT NINETEEN

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1484.   Humana incorporates by reference the preceding allegations.

1485.   Amneal has benefitted from artificial prices in the sale of the Amneal Drugs resulting
from the unlawful and inequitable acts alleged in this Complaint.

1486.   Amneal's financial benefit resulting from its unlawful and inequitable acts are
traceable to overpayments for the Amneal Drugs by Humana.

1487.   Humana has conferred upon Amneal an economic benefit, profits from unlawful
overcharges, to the economic detriment of Humana.

1488.   It would be futile for Humana to seek a remedy from any party with whom it has
privity of contract for its indirect purchases of the Amneal Drugs.

1489.   It would be futile for Humana to seek to exhaust any remedy against the immediate
intermediary in the chain of distribution from which it purchased the Amneal Drugs, as it is not
liable and would not compensate Humana for the impact of Amneal's unlawful conduct.

1490.   The economic benefit of overcharges derived by Amneal through charging
supracompetitive and artificially inflated prices for the Amneal Drugs is a direct and proximate result
of Amneal's unlawful conduct.

REDACTED – PUBLIC VERSION

1491.    The economic benefits derived by Amneal rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Amneal.

1492.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amneal to be permitted to retain any of the overcharges for the Amneal Drugs derived from Amneal's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1493.    Amneal is aware of and appreciates the benefits bestowed upon them by Humana.

1494.    Amneal should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1495.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Amneal traceable to Humana.

## COUNT TWENTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1496.    Humana incorporates by reference the preceding allegations.

1497.    Amneal knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Amneal Drugs. Amneal injured Humana through this conduct.

1498.    But for Amneal's scheme to inflate the price of the Amneal Drugs, Humana would have purchased lower-priced Amneal Drugs.

REDACTED – PUBLIC VERSION

1499.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Amneal Drugs than it would have paid absent Amneal's continuing anticompetitive conduct.

1500.    Humana has purchased substantial amounts of the Amneal Drugs during the relevant period.

1501.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amneal's conduct violates Sections 1 and 2 of the Sherman Act.

1502.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amneal's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT TWENTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1503.    Humana incorporates by reference the preceding allegations.

1504.    Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Apotex Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Carbamazepine
> Doxazosin Mesylate
> Epitol Tablets
> Pentoxifylline

1505.    Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

1506.   The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Apotex Drugs.

1507.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

1508.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

1509.   As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1510.   Apotex is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1511.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

1512.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1513.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Apotex Drugs, or by assignment from its other subsidiaries that directly purchased the Apotex Drugs during the relevant period.

## COUNT TWENTY-TWO

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1514.   Humana incorporates by reference the preceding allegations.

1515.   Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Apotex Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1516.   Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

1517.   The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Apotex Drugs.

1518.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

1519.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

1520.   As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1521.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1522.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1523.   Apotex's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

REDACTED – PUBLIC VERSION

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT TWENTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1524. Humana incorporates by reference the preceding allegations.

1525. Apotex engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Apotex's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Apotex Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1526. There was and is a gross disparity between the price that Humana paid and continues to pay for the Apotex Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Apotex Drugs should have been available, and would have been available, absent Apotex's illegal conduct.

1527. By engaging in the foregoing conduct, Apotex engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
Virginia.

## COUNT TWENTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1528.    Humana incorporates by reference the preceding allegations.

1529.    Apotex has benefitted from artificial prices in the sale of the Apotex Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1530.    Apotex's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Apotex Drugs by Humana.

1531.    Humana has conferred upon Apotex an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1532.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Apotex Drugs.

1533.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Apotex Drugs, as it is not liable and would not compensate Humana for the impact of Apotex's unlawful conduct.

1534.    The economic benefit of overcharges derived by Apotex through charging supracompetitive and artificially inflated prices for the Apotex Drugs is a direct and proximate result of Apotex's unlawful conduct.

1535.    The economic benefits derived by Apotex rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Apotex.

1536.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Apotex to be permitted to retain any of the overcharges for the Apotex Drugs derived

REDACTED – PUBLIC VERSION

from Apotex's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1537.   Apotex is aware of and appreciates the benefits bestowed upon them by Humana.

1538.   Apotex should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1539.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Apotex traceable to Humana.

## COUNT TWENTY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1540.   Humana incorporates by reference the preceding allegations.

1541.   Apotex knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Apotex Drugs. Apotex injured Humana through this conduct.

1542.   But for Apotex's scheme to inflate the price of the Apotex Drugs, Humana would have purchased lower-priced Apotex Drugs.

1543.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Apotex Drugs than it would have paid absent Apotex's continuing anticompetitive conduct.

1544.   Humana has purchased substantial amounts of the Apotex Drugs during the relevant period.

1545.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Apotex's conduct violates Sections 1 and 2 of the Sherman Act.

1546.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Apotex's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT TWENTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1547.    Humana incorporates by reference the preceding allegations.

1548.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Ascend Drug"). This conspiracy was *per se* unlawful price-fixing.

Nimodipine

1549.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Ascend Drug throughout the United States.

1550.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Ascend Drug.

1551.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drug;

385

b.   Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drug in the United States market; and

c.   Competition in establishing the prices paid for the Ascend Drug was unlawfully restrained, suppressed, or eliminated.

1552.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drug until the market achieves a steady state.

1553.   As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drug than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1554.   Ascend is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1555.   There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1556.   Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1557.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Ascend Drug, or by assignment from its other subsidiaries that directly purchased the Ascend Drug during the relevant period.

## COUNT TWENTY-SEVEN

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1558.    Humana incorporates by reference the preceding allegations.

1559.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Ascend Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

1560.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Ascend Drug throughout the United States.

1561.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Ascend Drug.

1562.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drug;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drug in the United States market; and

      c.    Competition in establishing the prices paid for the Ascend Drug was unlawfully restrained, suppressed, or eliminated.

1563.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drug until the market achieves a steady state.

1564.  As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drug than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1565.  There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1566.  Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1567.  Ascend's conduct violated the following state antitrust or competition practices laws:

> a.  Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.
>
> b.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.
>
> c.  Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.
>
> d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.
>
> e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.
>
> f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.
>
> g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.
>
> h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.
>
> i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.
>
> j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.
>
> k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.
>
> l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT TWENTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1568.   Humana incorporates by reference the preceding allegations.

1569.   Ascend engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ascend's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Ascend Drug at prices restrained by competition and forced to pay artificially inflated prices.

1570.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Ascend Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Ascend Drug should have been available, and would have been available, absent Ascend's illegal conduct.

1571.   By engaging in the foregoing conduct, Ascend engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT TWENTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1572.    Humana incorporates by reference the preceding allegations.

1573.    Ascend has benefitted from artificial prices in the sale of the Ascend Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

1574.    Ascend's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Ascend Drug by Humana.

1575.    Humana has conferred upon Ascend an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1576.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Ascend Drug.

1577.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Ascend Drug, as it is not liable and would not compensate Humana for the impact of Ascend's unlawful conduct.

1578.    The economic benefit of overcharges derived by Ascend through charging supracompetitive and artificially inflated prices for the Ascend Drug is a direct and proximate result of Ascend's unlawful conduct.

1579.    The economic benefits derived by Ascend rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Ascend.

1580.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ascend to be permitted to retain any of the overcharges for the Ascend Drug derived

REDACTED – PUBLIC VERSION

from Ascend's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1581.   Ascend is aware of and appreciates the benefits bestowed upon them by Humana.

1582.   Ascend should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1583.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Ascend traceable to Humana.

## COUNT THIRTY

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1584.   Humana incorporates by reference the preceding allegations.

1585.   Ascend knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Ascend Drug. Ascend injured Humana through this conduct.

1586.   But for Ascend's scheme to inflate the price of the Ascend Drug, Humana would have purchased lower-priced Ascend Drug.

1587.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Ascend Drug than it would have paid absent Ascend's continuing anticompetitive conduct.

1588.   Humana has purchased substantial amounts of the Ascend Drug during the relevant period.

1589.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ascend's conduct violates Sections 1 and 2 of the Sherman Act.

1590.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ascend's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT THIRTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1591.    Humana incorporates by reference the preceding allegations.

1592.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Aurobindo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine IR
> Fosinopril HCTZ
> Glyburide
> Glyburide-Metformin
> Lamivudine/Zidovudine (Combivir)
> Penicillin VK

1593.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

1594.    The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Aurobindo Drugs.

1595.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

c. Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

1596.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

1597.   As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1598.   Aurobindo is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1599.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1600.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1601.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Aurobindo Drugs, or by assignment from its other subsidiaries that directly purchased the Aurobindo Drugs during the relevant period.

## COUNT THIRTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1602.    Humana incorporates by reference the preceding allegations.

1603.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Aurobindo Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1604.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

1605.    The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Aurobindo Drugs.

1606.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

1607.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

1608.   As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1609.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1610.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1611.   Aurobindo's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

      k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

      l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT THIRTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1612.   Humana incorporates by reference the preceding allegations.

1613.   Aurobindo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Aurobindo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Aurobindo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1614.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Aurobindo Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Aurobindo Drugs should have been available, and would have been available, absent Aurobindo's illegal conduct.

1615.   By engaging in the foregoing conduct, Aurobindo engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

      a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

      b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

      c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

      e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

      g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

      h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT THIRTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Aurobindo and All Other Defendants Under Joint and Several Liability)**

1616.   Humana incorporates by reference the preceding allegations.

1617.   Aurobindo has benefitted from artificial prices in the sale of the Aurobindo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1618.   Aurobindo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Aurobindo Drugs by Humana.

1619.   Humana has conferred upon Aurobindo an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1620.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Aurobindo Drugs.

1621.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Aurobindo Drugs, as it is not liable and would not compensate Humana for the impact of Aurobindo's unlawful conduct.

1622.   The economic benefit of overcharges derived by Aurobindo through charging supracompetitive and artificially inflated prices for the Aurobindo Drugs is a direct and proximate result of Aurobindo's unlawful conduct.

1623.   The economic benefits derived by Aurobindo rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Aurobindo.

1624.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Aurobindo to be permitted to retain any of the overcharges for the Aurobindo Drugs

derived from Aurobindo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1625.    Aurobindo is aware of and appreciates the benefits bestowed upon them by Humana.

1626.    Aurobindo should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1627.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Aurobindo traceable to Humana.

## COUNT THIRTY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1628.    Humana incorporates by reference the preceding allegations.

1629.    Aurobindo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Aurobindo Drugs. Aurobindo injured Humana through this conduct.

1630.    But for Aurobindo's scheme to inflate the price of the Aurobindo Drugs, Humana would have purchased lower-priced Aurobindo Drugs.

1631.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Aurobindo Drugs than it would have paid absent Aurobindo's continuing anticompetitive conduct.

1632.    Humana has purchased substantial amounts of the Aurobindo Drugs during the relevant period.

REDACTED – PUBLIC VERSION

1633.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Aurobindo's conduct violates Sections 1 and 2 of the Sherman Act.

1634.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Aurobindo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT THIRTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

1635.    Humana incorporates by reference the preceding allegations.

1636.    Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Breckenridge Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cyproheptadine HCL
> Estradiol/Norethindrone Acetate (Mimvey)

1637.    Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

1638.    The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Breckenridge Drugs.

1639.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and

c. Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

1640. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

1641. As a direct and proximate result of Breckenridge's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1642. Breckenridge is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1643. There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1644. Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1645. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Breckenridge Drugs, or by assignment from its other subsidiaries that directly purchased the Breckenridge Drugs during the relevant period.

## COUNT THIRTY-SEVEN

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

**(As to Breckenridge and All Other Defendants Under Joint and Several Liability)**

1646.    Humana incorporates by reference the preceding allegations.

1647.    Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Breckenridge Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1648.    Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

1649.    The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Breckenridge Drugs.

1650.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

1651.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

1652.   As a direct and proximate result of Breckenridge's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1653.   There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1654.   Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1655.   Breckenridge's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

      k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

      l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT THIRTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

1656.   Humana incorporates by reference the preceding allegations.

1657.   Breckenridge engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Breckenridge's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Breckenridge Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1658.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Breckenridge Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Breckenridge Drugs should have been available, and would have been available, absent Breckenridge's illegal conduct.

1659.   By engaging in the foregoing conduct, Breckenridge engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

  a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

  b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

  c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

  e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

  f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

  g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

  h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT THIRTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

1660.   Humana incorporates by reference the preceding allegations.

1661.   Breckenridge has benefitted from artificial prices in the sale of the Breckenridge Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1662.   Breckenridge's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Breckenridge Drugs by Humana.

1663.   Humana has conferred upon Breckenridge an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1664.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Breckenridge Drugs.

1665.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Breckenridge Drugs, as it is not liable and would not compensate Humana for the impact of Breckenridge's unlawful conduct.

1666.   The economic benefit of overcharges derived by Breckenridge through charging supracompetitive and artificially inflated prices for the Breckenridge Drugs is a direct and proximate result of Breckenridge's unlawful conduct.

1667.   The economic benefits derived by Breckenridge rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Breckenridge.

1668.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Breckenridge to be permitted to retain any of the overcharges for the Breckenridge

Drugs derived from Breckenridge's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1669.   Breckenridge is aware of and appreciates the benefits bestowed upon them by Humana.

1670.   Breckenridge should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1671.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Breckenridge traceable to Humana.

## COUNT FORTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

1672.   Humana incorporates by reference the preceding allegations.

1673.   Breckenridge knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Breckenridge Drugs. Breckenridge injured Humana through this conduct.

1674.   But for Breckenridge's scheme to inflate the price of the Breckenridge Drugs, Humana would have purchased lower-priced Breckenridge Drugs.

1675.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Breckenridge Drugs than it would have paid absent Breckenridge's continuing anticompetitive conduct.

1676.   Humana has purchased substantial amounts of the Breckenridge Drugs during the relevant period.

1677.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Breckenridge's conduct violates Sections 1 and 2 of the Sherman Act.

1678.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Breckenridge's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT FORTY-ONE**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**(As to Camber and All Other Defendants Under Joint and Several Liability)**

1679.    Humana incorporates by reference the preceding allegations.

1680.    Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Camber Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Lamivudine/Zidovudine (Combivir)
> Raloxifene HCL

1681.    Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Camber Drugs throughout the United States.

1682.    The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Camber Drugs.

1683.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Camber Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

1684.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

1685.   As a direct and proximate result of Camber's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1686.   Camber is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1687.   There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1688.   Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1689.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Camber Drugs, or by assignment from its other subsidiaries that directly purchased the Camber Drugs during the relevant period.

## COUNT FORTY-TWO

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Camber and All Other Defendants Under Joint and Several Liability)

1690.   Humana incorporates by reference the preceding allegations.

1691.   Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Camber Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1692.   Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Camber Drugs throughout the United States.

1693.   The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Camber Drugs.

1694.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Camber Drugs;

  b.   Humana was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

  c.   Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

1695.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

1696.    As a direct and proximate result of Camber's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1697.    There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1698.    Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1699.    Camber's conduct violated the following state antitrust or competition practices laws:

a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT FORTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Camber and All Other Defendants Under Joint and Several Liability)

1700.   Humana incorporates by reference the preceding allegations.

1701.   Camber engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Camber's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Camber Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1702.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Camber Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Camber Drugs should have been available, and would have been available, absent Camber's illegal conduct.

1703.   By engaging in the foregoing conduct, Camber engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FORTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Camber and All Other Defendants Under Joint and Several Liability)

1704.   Humana incorporates by reference the preceding allegations.

1705.   Camber has benefitted from artificial prices in the sale of the Camber Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1706.   Camber's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Camber Drugs by Humana.

1707.   Humana has conferred upon Camber an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1708.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Camber Drugs.

1709.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Camber Drugs, as it is not liable and would not compensate Humana for the impact of Camber's unlawful conduct.

1710.   The economic benefit of overcharges derived by Camber through charging supracompetitive and artificially inflated prices for the Camber Drugs is a direct and proximate result of Camber's unlawful conduct.

1711.   The economic benefits derived by Camber rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Camber.

1712.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Camber to be permitted to retain any of the overcharges for the Camber Drugs derived

from Camber's unfair and unconscionable methods, acts, and trade practices alleged in this

Complaint.

1713.   Camber is aware of and appreciates the benefits bestowed upon them by Humana.

1714.   Camber should be compelled to disgorge in a common fund for the benefit of

Humana all unlawful or inequitable proceeds it received.

1715.   A constructive trust should be imposed upon all unlawful or inequitable sums

received by Camber traceable to Humana.

## COUNT FORTY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Camber and All Other Defendants Under Joint and Several Liability)

1716.   Humana incorporates by reference the preceding allegations.

1717.   Camber knowingly, intentionally, and cooperatively engaged in an anticompetitive

scheme designed to artificially inflate prices of the Camber Drugs. Camber injured Humana through

this conduct.

1718.   But for Camber's scheme to inflate the price of the Camber Drugs, Humana would

have purchased lower-priced Camber Drugs.

1719.   Humana has suffered harm, and will continue to suffer harm in the future, as a result

of paying higher prices for the Camber Drugs than it would have paid absent Camber's continuing

anticompetitive conduct.

1720.   Humana has purchased substantial amounts of the Camber Drugs during the

relevant period.

1721.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and

28 U.S.C. § 2201(a) ruling that Camber's conduct violates Sections 1 and 2 of the Sherman Act.

1722.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Camber's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT FORTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

1723.    Humana incorporates by reference the preceding allegations.

1724.    Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Citron Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Fosinopril HCTZ
> Glyburide

1725.    Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Citron Drugs throughout the United States.

1726.    The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Citron Drugs.

1727.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of

the Citron Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Citron Drugs was unlawfully

restrained, suppressed, or eliminated.

1728.   Even after free and open competition begins, Humana will continue to pay

supracompetitive prices for the Citron Drugs until the market achieves a steady state.

1729.   As a direct and proximate result of Citron's unlawful conduct, Humana has been

injured in its business and property in that it has paid more for the Citron Drugs than it would have

paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently

unknown and will be determined after discovery and upon proof at trial.

1730.   Citron is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the

injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as

alleged herein.

1731.   There is no legitimate, non-pretextual, pro-competitive business justification for

Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable

justification, the conspiracy is broader than necessary to achieve such purpose.

1732.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat

of antitrust injury.

1733.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15,

for HPI's direct purchases of the Citron Drugs, or by assignment from its other subsidiaries that

directly purchased the Citron Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT FORTY-SEVEN

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Citron and All Other Defendants Under Joint and Several Liability)

1734.    Humana incorporates by reference the preceding allegations.

1735.    Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Citron Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1736.    Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Citron Drugs throughout the United States.

1737.    The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Citron Drugs.

1738.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Citron Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Citron Drugs was unlawfully restrained, suppressed, or eliminated.

1739.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Citron Drugs until the market achieves a steady state.

1740.   As a direct and proximate result of Citron's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Citron Drugs than it would have paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1741.   There is no legitimate, non-pretextual, pro-competitive business justification for Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1742.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1743.   Citron's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT FORTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Citron and All Other Defendants Under Joint and Several Liability)

1744.   Humana incorporates by reference the preceding allegations.

1745.   Citron engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Citron's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Citron Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1746.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Citron Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Citron Drugs should have been available, and would have been available, absent Citron's illegal conduct.

1747.   By engaging in the foregoing conduct, Citron engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FORTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Citron and All Other Defendants Under Joint and Several Liability)

1748.   Humana incorporates by reference the preceding allegations.

1749.   Citron has benefitted from artificial prices in the sale of the Citron Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1750.   Citron's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Citron Drugs by Humana.

1751.   Humana has conferred upon Citron an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1752.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Citron Drugs.

1753.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Citron Drugs, as it is not liable and would not compensate Humana for the impact of Citron's unlawful conduct.

1754.   The economic benefit of overcharges derived by Citron through charging supracompetitive and artificially inflated prices for the Citron Drugs is a direct and proximate result of Citron's unlawful conduct.

1755.   The economic benefits derived by Citron rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Citron.

1756.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Citron to be permitted to retain any of the overcharges for the Citron Drugs derived

REDACTED – PUBLIC VERSION

from Citron's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1757.   Citron is aware of and appreciates the benefits bestowed upon them by Humana.

1758.   Citron should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1759.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Citron traceable to Humana.

## COUNT FIFTY

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

1760.   Humana incorporates by reference the preceding allegations.

1761.   Citron knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Citron Drugs. Citron injured Humana through this conduct.

1762.   But for Citron's scheme to inflate the price of the Citron Drugs, Humana would have purchased lower-priced Citron Drugs.

1763.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Citron Drugs than it would have paid absent Citron's continuing anticompetitive conduct.

1764.   Humana has purchased substantial amounts of the Citron Drugs during the relevant period.

1765.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Citron's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1766.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Citron's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT FIFTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

1767.    Humana incorporates by reference the preceding allegations.

1768.    Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Dr. Reddy's Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Ciprofloxacin HCL
> Glimepiride
> Meprobamate
> Oxaprozin
> Paricalcitol
> Tizanidine
> Zoledronic Acid

1769.    Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

1770.    The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Dr. Reddy's Drugs.

1771.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

1772.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

1773.    As a direct and proximate result of Dr. Reddy's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1774.    Dr. Reddy's is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1775.    There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1776.    Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

1777.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Dr. Reddy's Drugs, or by assignment from its other subsidiaries that directly purchased the Dr. Reddy's Drugs during the relevant period.

## COUNT FIFTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

1778.    Humana incorporates by reference the preceding allegations.

1779.    Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Dr. Reddy's Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1780.    Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

1781.    The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Dr. Reddy's Drugs.

1782.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

> b.    Humana was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

> c.    Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

1783.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

1784.    As a direct and proximate result of Dr. Reddy's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1785.    There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1786.    Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1787.    Dr. Reddy's conduct violated the following state antitrust or competition practices laws:

      a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT FIFTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

1788.   Humana incorporates by reference the preceding allegations.

1789.   Dr. Reddy's engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Dr. Reddy's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Dr. Reddy's Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1790.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Dr. Reddy's Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Dr. Reddy's Drugs should have been available, and would have been available, absent Dr. Reddy's illegal conduct.

1791.   By engaging in the foregoing conduct, Dr. Reddy's engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FIFTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)**

1792.   Humana incorporates by reference the preceding allegations.

1793.   Dr. Reddy's has benefitted from artificial prices in the sale of the Dr. Reddy's Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1794.   Dr. Reddy's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Dr. Reddy's Drugs by Humana.

1795.   Humana has conferred upon Dr. Reddy's an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1796.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Dr. Reddy's Drugs.

1797.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Dr. Reddy's Drugs, as it is not liable and would not compensate Humana for the impact of Dr. Reddy's unlawful conduct.

1798.   The economic benefit of overcharges derived by Dr. Reddy's through charging supracompetitive and artificially inflated prices for the Dr. Reddy's Drugs is a direct and proximate result of Dr. Reddy's unlawful conduct.

1799.   The economic benefits derived by Dr. Reddy's rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Dr. Reddy's.

1800.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Dr. Reddy's to be permitted to retain any of the overcharges for the Dr. Reddy's Drugs

derived from Dr. Reddy's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1801.   Dr. Reddy's is aware of and appreciates the benefits bestowed upon them by Humana.

1802.   Dr. Reddy's should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1803.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Dr. Reddy's traceable to Humana.

## COUNT FIFTY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

1804.   Humana incorporates by reference the preceding allegations.

1805.   Dr. Reddy's knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Dr. Reddy's Drugs. Dr. Reddy's injured Humana through this conduct.

1806.   But for Dr. Reddy's scheme to inflate the price of the Dr. Reddy's Drugs, Humana would have purchased lower-priced Dr. Reddy's Drugs.

1807.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Dr. Reddy's Drugs than it would have paid absent Dr. Reddy's continuing anticompetitive conduct.

1808.   Humana has purchased substantial amounts of the Dr. Reddy's Drugs during the relevant period.

REDACTED – PUBLIC VERSION

1809.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Dr. Reddy's conduct violates Sections 1 and 2 of the Sherman Act.

1810.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Dr. Reddy's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT FIFTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1811.   Humana incorporates by reference the preceding allegations.

1812.   G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "G&W Drug"). This conspiracy was *per se* unlawful price-fixing.

Metronidazole

1813.   G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the G&W Drug throughout the United States.

1814.   The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the G&W Drug.

1815.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drug;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the G&W Drug in the United States market; and

    c.   Competition in establishing the prices paid for the G&W Drug was unlawfully restrained, suppressed, or eliminated.

1816.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drug until the market achieves a steady state.

1817.   As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drug than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1818.   G&W is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1819.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1820.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1821.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the G&W Drug, or by assignment from its other subsidiaries that directly purchased the G&W Drug during the relevant period.

## COUNT FIFTY-SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to G&W and All Other Defendants Under Joint and Several Liability)**

1822.    Humana incorporates by reference the preceding allegations.

1823.    G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the G&W Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

1824.    G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the G&W Drug throughout the United States.

1825.    The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the G&W Drug.

1826.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drug;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the G&W Drug in the United States market; and

      c.    Competition in establishing the prices paid for the G&W Drug was unlawfully restrained, suppressed, or eliminated.

1827.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drug until the market achieves a steady state.

REDACTED – PUBLIC VERSION

1828.   As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drug than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1829.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1830.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1831.   G&W's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT FIFTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1832.   Humana incorporates by reference the preceding allegations.

1833.   G&W engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of G&W's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the G&W Drug at prices restrained by competition and forced to pay artificially inflated prices.

1834.   There was and is a gross disparity between the price that Humana paid and continues to pay for the G&W Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced G&W Drug should have been available, and would have been available, absent G&W's illegal conduct.

1835.   By engaging in the foregoing conduct, G&W engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

  a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

  b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

  c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

  e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

  f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

  g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

  h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT FIFTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1836.   Humana incorporates by reference the preceding allegations.

1837.   G&W has benefitted from artificial prices in the sale of the G&W Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

1838.   G&W's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the G&W Drug by Humana.

1839.   Humana has conferred upon G&W an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1840.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the G&W Drug.

1841.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the G&W Drug, as it is not liable and would not compensate Humana for the impact of G&W's unlawful conduct.

1842.   The economic benefit of overcharges derived by G&W through charging supracompetitive and artificially inflated prices for the G&W Drug is a direct and proximate result of G&W's unlawful conduct.

1843.   The economic benefits derived by G&W rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting G&W.

1844.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for G&W to be permitted to retain any of the overcharges for the G&W Drug derived

REDACTED – PUBLIC VERSION

from G&W's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1845.    G&W is aware of and appreciates the benefits bestowed upon them by Humana.

1846.    G&W should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1847.    A constructive trust should be imposed upon all unlawful or inequitable sums received by G&W traceable to Humana.

## COUNT SIXTY

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1848.    Humana incorporates by reference the preceding allegations.

1849.    G&W knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the G&W Drug. G&W injured Humana through this conduct.

1850.    But for G&W's scheme to inflate the price of the G&W Drug, Humana would have purchased lower-priced G&W Drug.

1851.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the G&W Drug than it would have paid absent G&W's continuing anticompetitive conduct.

1852.    Humana has purchased substantial amounts of the G&W Drug during the relevant period.

1853.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that G&W's conduct violates Sections 1 and 2 of the Sherman Act.

1854.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by G&W's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SIXTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1855.    Humana incorporates by reference the preceding allegations.

1856.    Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Glenmark Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Desogestrel/Ethinyl Estradiol (Kariva)
> Fluconazole
> Fosinopril HCTZ
> Gabapentin
> Moexipril HCL
> Moexipril HCL/HCTZ
> Nabumetone
> Norethindrone Acetate
> Ranitidine HCL

1857.    Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

1858.    The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Glenmark Drugs.

REDACTED – PUBLIC VERSION

1859.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

        b.    Humana was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

        c.    Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

1860.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

1861.    As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1862.    Glenmark is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1863.    There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1864.    Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

1865.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15,

for HPI's direct purchases of the Glenmark Drugs, or by assignment from its other subsidiaries that

directly purchased the Glenmark Drugs during the relevant period.

## COUNT SIXTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Glenmark and All Other Defendants Under Joint and Several Liability)**

1866.    Humana incorporates by reference the preceding allegations.

1867.    Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive

agreements designed to drive up the cost of the Glenmark Drugs in the United States. This

conspiracy was *per se* unlawful price-fixing.

1868.    Glenmark has committed at least one overt act to further the conspiracy alleged in

this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on

commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

1869.    The conspiracy realized its intended effect; Glenmark has benefited, and continues

to benefit, from its anticompetitive agreements which has artificially inflated the prices of the

Glenmark Drugs.

1870.    The contract, combination, or conspiracy had the following direct, substantial, and

reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or
>
> stabilized prices at supracompetitive levels for the Glenmark Drugs;
>
> b.    Humana was deprived of the benefits of free and open competition in the sale of
>
> the Glenmark Drugs in the United States market; and
>
> c.    Competition in establishing the prices paid for the Glenmark Drugs was
>
> unlawfully restrained, suppressed, or eliminated.

1871.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

1872.   As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1873.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1874.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1875.   Glenmark's conduct violated the following state antitrust or competition practices laws:

     a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

     b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

     d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

     e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

     g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

     i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

     j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT SIXTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1876.   Humana incorporates by reference the preceding allegations.

1877.   Glenmark engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Glenmark's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Glenmark Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1878.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Glenmark Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Glenmark Drugs should have been available, and would have been available, absent Glenmark's illegal conduct.

1879.   By engaging in the foregoing conduct, Glenmark engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT SIXTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1880.    Humana incorporates by reference the preceding allegations.

1881.    Glenmark has benefitted from artificial prices in the sale of the Glenmark Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1882.    Glenmark's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Glenmark Drugs by Humana.

1883.    Humana has conferred upon Glenmark an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1884.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Glenmark Drugs.

1885.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Glenmark Drugs, as it is not liable and would not compensate Humana for the impact of Glenmark's unlawful conduct.

1886.    The economic benefit of overcharges derived by Glenmark through charging supracompetitive and artificially inflated prices for the Glenmark Drugs is a direct and proximate result of Glenmark's unlawful conduct.

1887.    The economic benefits derived by Glenmark rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Glenmark.

1888.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Glenmark to be permitted to retain any of the overcharges for the Glenmark Drugs

derived from Glenmark's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1889.    Glenmark is aware of and appreciates the benefits bestowed upon them by Humana.

1890.    Glenmark should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1891.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Glenmark traceable to Humana.

## COUNT SIXTY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1892.    Humana incorporates by reference the preceding allegations.

1893.    Glenmark knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Glenmark Drugs. Glenmark injured Humana through this conduct.

1894.    But for Glenmark's scheme to inflate the price of the Glenmark Drugs, Humana would have purchased lower-priced Glenmark Drugs.

1895.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Glenmark Drugs than it would have paid absent Glenmark's continuing anticompetitive conduct.

1896.    Humana has purchased substantial amounts of the Glenmark Drugs during the relevant period.

1897.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Glenmark's conduct violates Sections 1 and 2 of the Sherman Act.

1898.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Glenmark's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SIXTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1899.    Humana incorporates by reference the preceding allegations.

1900.    Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Impax Drug"). This conspiracy was *per se* unlawful price-fixing.

Metronidazole

1901.    Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Impax Drug throughout the United States.

1902.    The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Impax Drug.

1903.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drug;

> b. Humana was deprived of the benefits of free and open competition in the sale of the Impax Drug in the United States market; and
>
> c. Competition in establishing the prices paid for the Impax Drug was unlawfully restrained, suppressed, or eliminated.

1904. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drug until the market achieves a steady state.

1905. As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drug than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1906. Impax is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1907. There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1908. Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1909. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Impax Drug, or by assignment from its other subsidiaries that directly purchased the Impax Drug during the relevant period.

## COUNT SIXTY-SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Impax and All Other Defendants Under Joint and Several Liability)**

1910.    Humana incorporates by reference the preceding allegations.

1911.    Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Impax Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

1912.    Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Impax Drug throughout the United States.

1913.    The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Impax Drug.

1914.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drug;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Impax Drug in the United States market; and

    c.    Competition in establishing the prices paid for the Impax Drug was unlawfully restrained, suppressed, or eliminated.

1915.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drug until the market achieves a steady state.

1916.    As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drug than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1917.    There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1918.    Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1919.    Impax's conduct violated the following state antitrust or competition practices laws:

    a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT SIXTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1920.   Humana incorporates by reference the preceding allegations.

1921.   Impax engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Impax's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Impax Drug at prices restrained by competition and forced to pay artificially inflated prices.

1922.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Impax Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Impax Drug should have been available, and would have been available, absent Impax's illegal conduct.

1923.   By engaging in the foregoing conduct, Impax engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

      a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

      b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

      c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

      g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

      h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT SIXTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1924.   Humana incorporates by reference the preceding allegations.

1925.   Impax has benefitted from artificial prices in the sale of the Impax Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

1926.   Impax's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Impax Drug by Humana.

1927.   Humana has conferred upon Impax an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1928.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Impax Drug.

1929.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Impax Drug, as it is not liable and would not compensate Humana for the impact of Impax's unlawful conduct.

1930.   The economic benefit of overcharges derived by Impax through charging supracompetitive and artificially inflated prices for the Impax Drug is a direct and proximate result of Impax's unlawful conduct.

1931.   The economic benefits derived by Impax rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Impax.

1932.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Impax to be permitted to retain any of the overcharges for the Impax Drug derived

REDACTED – PUBLIC VERSION

from Impax's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1933.   Impax is aware of and appreciates the benefits bestowed upon them by Humana.

1934.   Impax should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1935.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Impax traceable to Humana.

## COUNT SEVENTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Impax and All Other Defendants Under Joint and Several Liability)**

1936.   Humana incorporates by reference the preceding allegations.

1937.   Impax knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Impax Drug. Impax injured Humana through this conduct.

1938.   But for Impax's scheme to inflate the price of the Impax Drug, Humana would have purchased lower-priced Impax Drug.

1939.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Impax Drug than it would have paid absent Impax's continuing anticompetitive conduct.

1940.   Humana has purchased substantial amounts of the Impax Drug during the relevant period.

1941.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Impax's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1942.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Impax's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SEVENTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1943.    Humana incorporates by reference the preceding allegations.

1944.    Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Lupin Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefdinir
> Cefprozil
> Cephalexin
> Drospirenone and Ethinyl Estradiol (Ocella)
> Ethinyl Estradiol/Norethindrone (Balziva)
> Fenofibrate
> Irbesartan
> Lamivudine/Zidovudine (Combivir)
> Niacin ER

1945.    Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

1946.    The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Lupin Drugs.

1947.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

1948.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

1949.    As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1950.    Lupin is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1951.    There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1952.    Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

1953.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15,

for HPI's direct purchases of the Lupin Drugs, or by assignment from its other subsidiaries that

directly purchased the Lupin Drugs during the relevant period.

## COUNT SEVENTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Lupin and All Other Defendants Under Joint and Several Liability)**

1954.    Humana incorporates by reference the preceding allegations.

1955.    Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive

agreements designed to drive up the cost of the Lupin Drugs in the United States. This conspiracy

was *per se* unlawful price-fixing.

1956.    Lupin has committed at least one overt act to further the conspiracy alleged in this

Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on commerce by

raising and fixing prices of the Lupin Drugs throughout the United States.

1957.    The conspiracy realized its intended effect; Lupin has benefited, and continues to

benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lupin

Drugs.

1958.    The contract, combination, or conspiracy had the following direct, substantial, and

reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or

           stabilized prices at supracompetitive levels for the Lupin Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of

           the Lupin Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Lupin Drugs was unlawfully

           restrained, suppressed, or eliminated.

1959.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

1960.   As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1961.   There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1962.   Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1963.   Lupin's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT SEVENTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1964.   Humana incorporates by reference the preceding allegations.

1965.   Lupin engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lupin's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Lupin Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1966.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Lupin Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Lupin Drugs should have been available, and would have been available, absent Lupin's illegal conduct.

1967.   By engaging in the foregoing conduct, Lupin engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT SEVENTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1968.   Humana incorporates by reference the preceding allegations.

1969.   Lupin has benefitted from artificial prices in the sale of the Lupin Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1970.   Lupin's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lupin Drugs by Humana.

1971.   Humana has conferred upon Lupin an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1972.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lupin Drugs.

1973.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lupin Drugs, as it is not liable and would not compensate Humana for the impact of Lupin's unlawful conduct.

1974.   The economic benefit of overcharges derived by Lupin through charging supracompetitive and artificially inflated prices for the Lupin Drugs is a direct and proximate result of Lupin's unlawful conduct.

1975.   The economic benefits derived by Lupin rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lupin.

1976.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lupin to be permitted to retain any of the overcharges for the Lupin Drugs derived from Lupin's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1977.   Lupin is aware of and appreciates the benefits bestowed upon them by Humana.

1978.   Lupin should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1979.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lupin traceable to Humana.

## COUNT SEVENTY-FIVE

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Lupin and All Other Defendants Under Joint and Several Liability)**

1980.   Humana incorporates by reference the preceding allegations.

1981.   Lupin knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lupin Drugs. Lupin injured Humana through this conduct.

1982.   But for Lupin's scheme to inflate the price of the Lupin Drugs, Humana would have purchased lower-priced Lupin Drugs.

1983.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lupin Drugs than it would have paid absent Lupin's continuing anticompetitive conduct.

1984.   Humana has purchased substantial amounts of the Lupin Drugs during the relevant period.

1985.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lupin's conduct violates Sections 1 and 2 of the Sherman Act.

1986.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Lupin's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT SEVENTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1987.   Humana incorporates by reference the preceding allegations.

1988.   Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Mylan Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Albuterol Sulfate
> Amiloride HCL/HCTZ
> Budesonide
> Buspirone HCL
> Capecitabine
> Cimetidine
> Clonidine TTS
> Diclofenac Potassium
> Diltiazem HCL
> Doxazosin Mesylate
> Enalapril Maleate
> Estradiol
> Fenofibrate
> Fluoxetine HCL
> Flurbiprofen
> Fluvastatin Sodium
> Glipizide-Metformin
> Haloperidol
> Ketoconazole
> Ketoprofen
> Ketorolac Tromethamine
> Loperamide HCL
> Methotrexate
> Nadolol
> Nitrofurantoin MAC
> Pentoxifylline
> Prazosin HCL
> Prochlorperazine

> Tamoxifen Citrate
> Tizanidine
> Tolmetin Sodium
> Tolterodine
> Trifluoperazine HCL
> Valsartan HCTZ

1989.   Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

1990.   The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Mylan Drugs.

1991.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;
>
> b.   Humana was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and
>
> c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

1992.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

1993.   As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1994.   Mylan is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1995.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1996.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1997.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Mylan Drugs, or by assignment from its other subsidiaries that directly purchased the Mylan Drugs during the relevant period.

## COUNT SEVENTY-SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Mylan and All Other Defendants Under Joint and Several Liability)**

1998.   Humana incorporates by reference the preceding allegations.

1999.   Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Mylan Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2000.   Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

2001.   The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mylan Drugs.

2002.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

2003.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

2004.   As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2005.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2006.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2007.   Mylan's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

REDACTED – PUBLIC VERSION

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT SEVENTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

2008.   Humana incorporates by reference the preceding allegations.

2009.   Mylan engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mylan's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Mylan Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2010.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Mylan Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Mylan Drugs should have been available, and would have been available, absent Mylan's illegal conduct.

2011.   By engaging in the foregoing conduct, Mylan engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT SEVENTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

2012.   Humana incorporates by reference the preceding allegations.

2013.   Mylan has benefitted from artificial prices in the sale of the Mylan Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2014.   Mylan's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mylan Drugs by Humana.

2015.   Humana has conferred upon Mylan an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2016.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mylan Drugs.

2017.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mylan Drugs, as it is not liable and would not compensate Humana for the impact of Mylan's unlawful conduct.

REDACTED – PUBLIC VERSION

2018.   The economic benefit of overcharges derived by Mylan through charging supracompetitive and artificially inflated prices for the Mylan Drugs is a direct and proximate result of Mylan's unlawful conduct.

2019.   The economic benefits derived by Mylan rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mylan.

2020.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mylan to be permitted to retain any of the overcharges for the Mylan Drugs derived from Mylan's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2021.   Mylan is aware of and appreciates the benefits bestowed upon them by Humana.

2022.   Mylan should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2023.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mylan traceable to Humana.

## COUNT EIGHTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Mylan and All Other Defendants Under Joint and Several Liability)

2024.   Humana incorporates by reference the preceding allegations.

2025.   Mylan knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mylan Drugs. Mylan injured Humana through this conduct.

REDACTED – PUBLIC VERSION

2026.    But for Mylan's scheme to inflate the price of the Mylan Drugs, Humana would have purchased lower-priced Mylan Drugs.

2027.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mylan Drugs than it would have paid absent Mylan's continuing anticompetitive conduct.

2028.    Humana has purchased substantial amounts of the Mylan Drugs during the relevant period.

2029.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mylan's conduct violates Sections 1 and 2 of the Sherman Act.

2030.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mylan's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT EIGHTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Par and All Other Defendants Under Joint and Several Liability)

2031.    Humana incorporates by reference the preceding allegations.

2032.    Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Par Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Budesonide
> Entecavir
> Fluoxetine HCL
> Flutamide
> Hydroxyurea
> Labetalol HCL

Methimazole
Omega-3-Acid Ethyl Esters

2033.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Par Drugs throughout the United States.

2034.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Par Drugs.

2035.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

2036.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

2037.   As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2038.   Par is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

2039.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2040.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2041.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Par Drugs, or by assignment from its other subsidiaries that directly purchased the Par Drugs during the relevant period.

## COUNT EIGHTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Par and All Other Defendants Under Joint and Several Liability)**

2042.   Humana incorporates by reference the preceding allegations.

2043.   Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Par Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2044.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Par Drugs throughout the United States.

2045.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Par Drugs.

2046.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

2047.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

2048.   As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2049.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2050.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2051.   Par's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT EIGHTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

2052.   Humana incorporates by reference the preceding allegations.

2053.   Par engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent
acts or practices in violation of the state consumer protection statutes listed below. As a direct and
proximate result of Par's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct,
Humana was deprived of the opportunity to purchase the Par Drugs at prices restrained by
competition and forced to pay artificially inflated prices.

2054.   There was and is a gross disparity between the price that Humana paid and continues
to pay for the Par Drugs, including by assignment from its subsidiaries, and the value received, given
that more cheaply priced Par Drugs should have been available, and would have been available,
absent Par's illegal conduct.

2055.   By engaging in the foregoing conduct, Par engaged in unfair competition or
deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

REDACTED – PUBLIC VERSION

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West

Virginia.

## COUNT EIGHTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

2056.   Humana incorporates by reference the preceding allegations.

2057.   Par has benefitted from artificial prices in the sale of the Par Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2058.   Par's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Par Drugs by Humana.

2059.   Humana has conferred upon Par an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2060.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Par Drugs.

2061.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Par Drugs, as it is not liable and would not compensate Humana for the impact of Par's unlawful conduct.

2062.   The economic benefit of overcharges derived by Par through charging supracompetitive and artificially inflated prices for the Par Drugs is a direct and proximate result of Par's unlawful conduct.

REDACTED – PUBLIC VERSION

2063.    The economic benefits derived by Par rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Par.

2064.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Par to be permitted to retain any of the overcharges for the Par Drugs derived from Par's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2065.    Par is aware of and appreciates the benefits bestowed upon them by Humana.

2066.    Par should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2067.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Par traceable to Humana.

## COUNT EIGHTY-FIVE

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Par and All Other Defendants Under Joint and Several Liability)

2068.    Humana incorporates by reference the preceding allegations.

2069.    Par knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Par Drugs. Par injured Humana through this conduct.

2070.    But for Par's scheme to inflate the price of the Par Drugs, Humana would have purchased lower-priced Par Drugs.

2071.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Par Drugs than it would have paid absent Par's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

2072.    Humana has purchased substantial amounts of the Par Drugs during the relevant period.

2073.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Par's conduct violates Sections 1 and 2 of the Sherman Act.

2074.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Par's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT EIGHTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2075.    Humana incorporates by reference the preceding allegations.

2076.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sandoz Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amoxicillin/Clavulanate
> Bumetanide
> Cefdinir
> Cefprozil
> Clemastine Fumarate
> Dexmethylphenidate HCL ER
> Diclofenac Potassium
> Dicloxacillin Sodium
> Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
> Etodolac
> Fosinopril HCTZ
> Haloperidol
> Isoniazid
> Hydroxyzine Pamoate
> Ketoconazole
> Labetalol HCL

        Metronidazole
        Nabumetone
        Nadolol
        Penicillin VK
        Prochlorperazine
        Ranitidine HCL
        Temozolomide
        Tizanidine
        Tobramycin
        Trifluoperazine HCL
        Valsartan HCTZ

2077.   Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

2078.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sandoz Drugs.

2079.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

        b.   Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

        c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

2080.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

2081.   As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have

REDACTED – PUBLIC VERSION

paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2082.    Sandoz is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2083.    There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2084.    Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2085.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Sandoz Drugs, or by assignment from its other subsidiaries that directly purchased the Sandoz Drugs during the relevant period.

## COUNT EIGHTY-SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2086.    Humana incorporates by reference the preceding allegations.

2087.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sandoz Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2088.    Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

2089.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sandoz Drugs.

2090.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

2091.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

2092.   As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2093.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2094.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2095.   Sandoz's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT EIGHTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2096.   Humana incorporates by reference the preceding allegations.

2097.   Sandoz engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sandoz's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sandoz Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2098.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Sandoz Drugs, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced Sandoz Drugs should have been available, and would have been available, absent Sandoz's illegal conduct.

2099.   By engaging in the foregoing conduct, Sandoz engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT I

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2100.   Humana incorporates by reference the preceding allegations.

2101.   Sandoz has benefitted from artificial prices in the sale of the Sandoz Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2102.   Sandoz's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sandoz Drugs by Humana.

2103.   Humana has conferred upon Sandoz an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2104.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sandoz Drugs.

2105.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sandoz Drugs, as it is not liable and would not compensate Humana for the impact of Sandoz's unlawful conduct.

2106.    The economic benefit of overcharges derived by Sandoz through charging supracompetitive and artificially inflated prices for the Sandoz Drugs is a direct and proximate result of Sandoz's unlawful conduct.

2107.    The economic benefits derived by Sandoz rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sandoz.

2108.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sandoz to be permitted to retain any of the overcharges for the Sandoz Drugs derived from Sandoz's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2109.    Sandoz is aware of and appreciates the benefits bestowed upon them by Humana.

2110.    Sandoz should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2111.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Sandoz traceable to Humana.

## COUNT NINETY

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2112.    Humana incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

2113.   Sandoz knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sandoz Drugs. Sandoz injured Humana through this conduct.

2114.   But for Sandoz's scheme to inflate the price of the Sandoz Drugs, Humana would have purchased lower-priced Sandoz Drugs.

2115.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sandoz Drugs than it would have paid absent Sandoz's continuing anticompetitive conduct.

2116.   Humana has purchased substantial amounts of the Sandoz Drugs during the relevant period.

2117.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sandoz's conduct violates Sections 1 and 2 of the Sherman Act.

2118.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sandoz's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT NINETY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sun and All Other Defendants Under Joint and Several Liability)

2119.   Humana incorporates by reference the preceding allegations.

2120.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sun Drugs"). This conspiracy was *per se* unlawful price-fixing.

Albuterol Sulfate
Nimodipine
Paromomycin

2121.    Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sun Drugs throughout the United States.

2122.    The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sun Drugs.

2123.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

2124.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

2125.    As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2126.    Sun is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2127.    There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2128.    Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2129.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its direct purchases of its purchases of the Sun Drugs, or by assignment from its other subsidiaries that directly purchased the Sun Drugs during the relevant period.

**COUNT NINETY-TWO**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT
OF TRADE UNDER STATE LAWS**

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

2130.    Humana incorporates by reference the preceding allegations.

2131.    Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sun Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2132.    Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sun Drugs throughout the United States.

2133.    The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sun Drugs.

2134.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

  b.   Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

  c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

2135.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

2136.   As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2137.   There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2138.   Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2139.   Sun's conduct violated the following state antitrust or competition practices laws:

  a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

  b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT NINETY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

2140.   Humana incorporates by reference the preceding allegations.

2141.   Sun engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sun's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sun Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2142.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Sun Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Sun Drugs should have been available, and would have been available, absent Sun's illegal conduct.

2143.   By engaging in the foregoing conduct, Sun engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT NINETY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

2144.   Humana incorporates by reference the preceding allegations.

2145.   Sun has benefitted from artificial prices in the sale of the Sun Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2146.   Sun's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sun Drugs by Humana.

2147.   Humana has conferred upon Sun an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2148.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sun Drugs.

2149.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sun Drugs, as it is not liable and would not compensate Humana for the impact of Sun's unlawful conduct.

2150.   The economic benefit of overcharges derived by Sun through charging supracompetitive and artificially inflated prices for the Sun Drugs is a direct and proximate result of Sun's unlawful conduct.

2151.   The economic benefits derived by Sun rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sun.

2152.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sun to be permitted to retain any of the overcharges for the Sun Drugs derived from Sun's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2153.   Sun is aware of and appreciates the benefits bestowed upon them by Humana.

2154.   Sun should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2155.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Sun traceable to Humana.

## COUNT NINETY-FIVE

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sun and All Other Defendants Under Joint and Several Liability)

2156.   Humana incorporates by reference the preceding allegations.

2157.   Sun knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sun Drugs. Sun injured Humana through this conduct.

2158.   But for Sun's scheme to inflate the price of the Sun Drugs, Humana would have purchased lower-priced Sun Drugs.

2159.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sun Drugs than it would have paid absent Sun's continuing anticompetitive conduct.

2160.   Humana has purchased substantial amounts of the Sun Drugs during the relevant period.

2161.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sun's conduct violates Sections 1 and 2 of the Sherman Act.

2162.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sun's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT NINETY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Taro and All Other Defendants Under Joint and Several Liability)

2163.   Humana incorporates by reference the preceding allegations.

2164.   Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Taro Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Carbamazepine
> Clotrimazole
> Enalapril Maleate
> Epitol
> Etodolac
> Ketoconazole
> Nortriptyline HCL
> Warfarin Sodium

2165.    Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Taro Drugs throughout the United States.

2166.    The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Taro Drugs.

2167.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

2168.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

2169.    As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2170.    Taro is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2171.   There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2172.   Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2173.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Taro Drugs, or by assignment from its other subsidiaries that directly purchased the Taro Drugs during the relevant period.

## COUNT NINETY-SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

2174.   Humana incorporates by reference the preceding allegations.

2175.   Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Taro Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2176.   Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Taro Drugs throughout the United States.

2177.   The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Taro Drugs.

2178.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

c. Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

2179. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

2180. As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2181. There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2182. Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2183. Taro's conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT NINETY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

2184.   Humana incorporates by reference the preceding allegations.

2185.   Taro engaged in unfair competition or unfair, unconscionable, deceptive, or

fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

direct and proximate result of Taro's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Humana was deprived of the opportunity to purchase the Taro Drugs at prices

restrained by competition and forced to pay artificially inflated prices.

2186.   There was and is a gross disparity between the price that Humana paid and continues

to pay for the Taro Drugs, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced Taro Drugs should have been available, and would have been

available, absent Taro's illegal conduct.

2187.   By engaging in the foregoing conduct, Taro engaged in unfair competition or

deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT NINETY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

2188.   Humana incorporates by reference the preceding allegations.

2189.   Taro has benefitted from artificial prices in the sale of the Taro Drugs resulting from
the unlawful and inequitable acts alleged in this Complaint.

2190.   Taro's financial benefit resulting from its unlawful and inequitable acts are traceable
to overpayments for the Taro Drugs by Humana.

2191.   Humana has conferred upon Taro an economic benefit, profits from unlawful
overcharges, to the economic detriment of Humana.

2192.   It would be futile for Humana to seek a remedy from any party with whom it has
privity of contract for its indirect purchases of the Taro Drugs.

2193.   It would be futile for Humana to seek to exhaust any remedy against the immediate
intermediary in the chain of distribution from which it purchased the Taro Drugs, as it is not liable
and would not compensate Humana for the impact of Taro's unlawful conduct.

2194.   The economic benefit of overcharges derived by Taro through charging
supracompetitive and artificially inflated prices for the Taro Drugs is a direct and proximate result of
Taro's unlawful conduct.

REDACTED – PUBLIC VERSION

2195.   The economic benefits derived by Taro rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Taro.

2196.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Taro to be permitted to retain any of the overcharges for the Taro Drugs derived from Taro's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2197.   Taro is aware of and appreciates the benefits bestowed upon them by Humana.

2198.   Taro should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2199.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Taro traceable to Humana.

## COUNT ONE HUNDRED

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Taro and All Other Defendants Under Joint and Several Liability)

2200.   Humana incorporates by reference the preceding allegations.

2201.   Taro knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Taro Drugs. Taro injured Humana through this conduct.

2202.   But for Taro's scheme to inflate the price of the Taro Drugs, Humana would have purchased lower-priced Taro Drugs.

2203.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Taro Drugs than it would have paid absent Taro's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

2204.    Humana has purchased substantial amounts of the Taro Drugs during the relevant period.

2205.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Taro's conduct violates Sections 1 and 2 of the Sherman Act.

2206.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Taro's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT ONE HUNDRED ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

2207.    Humana incorporates by reference the preceding allegations.

2208.    Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Upsher-Smith Drug"). This conspiracy was *per se* unlawful price-fixing.

Oxybutynin Chloride

2209.    Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Upsher-Smith Drug throughout the United States.

2210.    The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Upsher-Smith Drug.

2211.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drug;
>
> b.   Humana was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drug in the United States market; and
>
> c.   Competition in establishing the prices paid for the Upsher-Smith Drug was unlawfully restrained, suppressed, or eliminated.

2212.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Upsher-Smith Drug until the market achieves a steady state.

2213.   As a direct and proximate result of Upsher-Smith's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Upsher-Smith Drug than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2214.   Upsher-Smith is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2215.   There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2216.   Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

2217.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Upsher-Smith Drug, or by assignment from its other subsidiaries that directly purchased the Upsher-Smith Drug during the relevant period.

## COUNT ONE HUNDRED TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

2218.   Humana incorporates by reference the preceding allegations.

2219.   Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Upsher-Smith Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2220.   Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Upsher-Smith Drug throughout the United States.

2221.   The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Upsher-Smith Drug.

2222.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drug;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Upsher-Smith Drug was unlawfully restrained, suppressed, or eliminated.

2223.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Upsher-Smith Drug until the market achieves a steady state.

2224.   As a direct and proximate result of Upsher-Smith's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Upsher-Smith Drug than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2225.   There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2226.   Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2227.   Upsher-Smith's conduct violated the following state antitrust or competition practices laws:

     a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

     b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

     d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

     e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

     g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

     i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

     j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT ONE HUNDRED THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

2228.   Humana incorporates by reference the preceding allegations.

2229.   Upsher-Smith engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Upsher-Smith's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Upsher-Smith Drug at prices restrained by competition and forced to pay artificially inflated prices.

2230.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Upsher-Smith Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Upsher-Smith Drug should have been available, and would have been available, absent Upsher-Smith's illegal conduct.

2231.   By engaging in the foregoing conduct, Upsher-Smith engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

## COUNT ONE HUNDRED FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

2232.   Humana incorporates by reference the preceding allegations.

2233.   Upsher-Smith has benefitted from artificial prices in the sale of the Upsher-Smith Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2234.   Upsher-Smith's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Upsher-Smith Drug by Humana.

2235.   Humana has conferred upon Upsher-Smith an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2236.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Upsher-Smith Drug.

2237.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Upsher-Smith Drug, as it is not liable and would not compensate Humana for the impact of Upsher-Smith's unlawful conduct.

2238.   The economic benefit of overcharges derived by Upsher-Smith through charging supracompetitive and artificially inflated prices for the Upsher-Smith Drug is a direct and proximate result of Upsher-Smith's unlawful conduct.

2239.   The economic benefits derived by Upsher-Smith rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Upsher-Smith.

2240.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Upsher-Smith to be permitted to retain any of the overcharges for the Upsher-Smith

REDACTED – PUBLIC VERSION

Drug derived from Upsher-Smith's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2241.   Upsher-Smith is aware of and appreciates the benefits bestowed upon them by Humana.

2242.   Upsher-Smith should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2243.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Upsher-Smith traceable to Humana.

## COUNT ONE HUNDRED FIVE

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

2244.   Humana incorporates by reference the preceding allegations.

2245.   Upsher-Smith knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Upsher-Smith Drug. Upsher-Smith injured Humana through this conduct.

2246.   But for Upsher-Smith's scheme to inflate the price of the Upsher-Smith Drug, Humana would have purchased lower-priced Upsher-Smith Drug.

2247.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Upsher-Smith Drug than it would have paid absent Upsher-Smith's continuing anticompetitive conduct.

2248.   Humana has purchased substantial amounts of the Upsher-Smith Drug during the relevant period.

REDACTED – PUBLIC VERSION

2249.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Upsher-Smith's conduct violates Sections 1 and 2 of the Sherman Act.

2250.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Upsher-Smith's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT ONE HUNDRED SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

2251.    Humana incorporates by reference the preceding allegations.

2252.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Valeant Drug"). This conspiracy was *per se* unlawful price-fixing.

Metronidazole

2253.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Valeant Drug throughout the United States.

2254.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Valeant Drug.

2255.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.  Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drug;

b.  Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drug in the United States market; and

c.  Competition in establishing the prices paid for the Valeant Drug was unlawfully restrained, suppressed, or eliminated.

2256.  Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drug until the market achieves a steady state.

2257.  As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drug than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2258.  Valeant is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2259.  There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2260.  Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2261.  Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Valeant Drug, or by assignment from its other subsidiaries that directly purchased the Valeant Drug during the relevant period.

## COUNT ONE HUNDRED SEVEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

2262.    Humana incorporates by reference the preceding allegations.

2263.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Valeant Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

2264.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Valeant Drug throughout the United States.

2265.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Valeant Drug.

2266.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drug;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drug in the United States market; and

    c.    Competition in establishing the prices paid for the Valeant Drug was unlawfully restrained, suppressed, or eliminated.

2267.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drug until the market achieves a steady state.

REDACTED – PUBLIC VERSION

2268.    As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drug than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2269.    There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2270.    Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2271.    Valeant's conduct violated the following state antitrust or competition practices laws:

    a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT ONE HUNDRED EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

2272.    Humana incorporates by reference the preceding allegations.

2273.    Valeant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Valeant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Valeant Drug at prices restrained by competition and forced to pay artificially inflated prices.

2274.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Valeant Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Valeant Drug should have been available, and would have been available, absent Valeant's illegal conduct.

2275.    By engaging in the foregoing conduct, Valeant engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

      a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

      b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

      c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

      e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

      g.    Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

      h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

## COUNT ONE HUNDRED NINE

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

2276.   Humana incorporates by reference the preceding allegations.

2277.   Valeant has benefitted from artificial prices in the sale of the Valeant Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2278.   Valeant's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Valeant Drug by Humana.

2279.   Humana has conferred upon Valeant an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2280.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Valeant Drug.

2281.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Valeant Drug, as it is not liable and would not compensate Humana for the impact of Valeant's unlawful conduct.

2282.   The economic benefit of overcharges derived by Valeant through charging supracompetitive and artificially inflated prices for the Valeant Drug is a direct and proximate result of Valeant's unlawful conduct.

2283.   The economic benefits derived by Valeant rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Valeant.

2284.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Valeant to be permitted to retain any of the overcharges for the Valeant Drug derived

from Valeant's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2285.    Valeant is aware of and appreciates the benefits bestowed upon them by Humana.

2286.    Valeant should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2287.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Valeant traceable to Humana.

## COUNT ONE HUNDRED TEN

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

2288.    Humana incorporates by reference the preceding allegations.

2289.    Valeant knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Valeant Drug. Valeant injured Humana through this conduct.

2290.    But for Valeant's scheme to inflate the price of the Valeant Drug, Humana would have purchased lower-priced Valeant Drug.

2291.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Valeant Drug than it would have paid absent Valeant's continuing anticompetitive conduct.

2292.    Humana has purchased substantial amounts of the Valeant Drug during the relevant period.

2293.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Valeant's conduct violates Sections 1 and 2 of the Sherman Act.

2294.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Valeant's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT ONE HUNDRED ELEVEN**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

2295.   Humana incorporates by reference the preceding allegations.

2296.   Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Versapharm Drug"). This conspiracy was *per se* unlawful price-fixing.

Ethosuximide

2297.   Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Versapharm Drug throughout the United States.

2298.   The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Versapharm Drug.

2299.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drug;

538

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Versapharm Drug in the United States market; and

    c.   Competition in establishing the prices paid for the Versapharm Drug was unlawfully restrained, suppressed, or eliminated.

2300.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Versapharm Drug until the market achieves a steady state.

2301.   As a direct and proximate result of Versapharm's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Versapharm Drug than it would have paid in the absence of Versapharm's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2302.   Versapharm is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2303.   There is no legitimate, non-pretextual, pro-competitive business justification for Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2304.   Versapharm's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2305.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Versapharm Drug, or by assignment from its other subsidiaries that directly purchased the Versapharm Drug during the relevant period.

## COUNT ONE HUNDRED TWELVE

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

2306.   Humana incorporates by reference the preceding allegations.

2307.   Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Versapharm Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

2308.   Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Versapharm Drug throughout the United States.

2309.   The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Versapharm Drug.

2310.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drug;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Versapharm Drug in the United States market; and

    c.   Competition in establishing the prices paid for the Versapharm Drug was unlawfully restrained, suppressed, or eliminated.

2311.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Versapharm Drug until the market achieves a steady state.

2312.   As a direct and proximate result of Versapharm's unlawful conduct, Humana has

been injured in its business and property in that it has paid more for the Versapharm Drug than it

would have paid in the absence of Versapharm's unlawful conduct. The full amount of such

damages is presently unknown and will be determined after discovery and upon proof at trial.

2313.   There is no legitimate, non-pretextual, pro-competitive business justification for

Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable

justification, the conspiracy is broader than necessary to achieve such purpose.

2314.   Versapharm's unlawful conduct as alleged herein poses a significant and continuing

threat of antitrust injury.

2315.   Versapharm's conduct violated the following state antitrust or competition practices

laws:

 a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

 b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

 c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

 d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

 e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

 f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

 g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

 h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

 i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

 j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

 k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

 l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT II

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

2316.    Humana incorporates by reference the preceding allegations.

2317.    Versapharm engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Versapharm's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Versapharm Drug at prices restrained by competition and forced to pay artificially inflated prices.

2318.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Versapharm Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Versapharm Drug should have been available, and would have been available, absent Versapharm's illegal conduct.

2319.    By engaging in the foregoing conduct, Versapharm engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
          Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.    Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

COUNT III

UNJUST ENRICHMENT UNDER STATE LAW

(As to Versapharm and All Other Defendants Under Joint and Several Liability)

2320.    Humana incorporates by reference the preceding allegations.

2321.    Versapharm has benefitted from artificial prices in the sale of the Versapharm Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2322.    Versapharm's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Versapharm Drug by Humana.

2323.    Humana has conferred upon Versapharm an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2324.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Versapharm Drug.

2325.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Versapharm Drug, as it is not liable and would not compensate Humana for the impact of Versapharm's unlawful conduct.

2326.    The economic benefit of overcharges derived by Versapharm through charging supracompetitive and artificially inflated prices for the Versapharm Drug is a direct and proximate result of Versapharm's unlawful conduct.

2327.    The economic benefits derived by Versapharm rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Versapharm.

2328.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Versapharm to be permitted to retain any of the overcharges for the Versapharm Drug

derived from Versapharm's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2329.   Versapharm is aware of and appreciates the benefits bestowed upon them by Humana.

2330.   Versapharm should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2331.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Versapharm traceable to Humana.

## COUNT ONE HUNDRED FIFTEEN

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

2332.   Humana incorporates by reference the preceding allegations.

2333.   Versapharm knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Versapharm Drug. Versapharm injured Humana through this conduct.

2334.   But for Versapharm's scheme to inflate the price of the Versapharm Drug, Humana would have purchased lower-priced Versapharm Drug.

2335.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Versapharm Drug than it would have paid absent Versapharm's continuing anticompetitive conduct.

2336.   Humana has purchased substantial amounts of the Versapharm Drug during the relevant period.

2337.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Versapharm's conduct violates Sections 1 and 2 of the Sherman Act.

2338.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Versapharm's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT IV

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

2339.    Humana incorporates by reference the preceding allegations.

2340.    Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Wockhardt Drug"). This conspiracy was *per se* unlawful price-fixing.

Enalapril Maleate

2341.    Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Wockhardt Drug throughout the United States.

2342.    The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Wockhardt Drug.

2343.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.  Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drug;

b.  Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drug in the United States market; and

c.  Competition in establishing the prices paid for the Wockhardt Drug was unlawfully restrained, suppressed, or eliminated.

2344.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Wockhardt Drug until the market achieves a steady state.

2345.   As a direct and proximate result of Wockhardt's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Wockhardt Drug than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2346.   Wockhardt is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2347.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2348.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2349.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Wockhardt Drug, or by assignment from its other subsidiaries that directly purchased the Wockhardt Drug during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT ONE HUNDRED SEVENTEEN

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

2350.   Humana incorporates by reference the preceding allegations.

2351.   Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Wockhardt Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

2352.   Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Wockhardt Drug throughout the United States.

2353.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Wockhardt Drug.

2354.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drug;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Wockhardt Drug was unlawfully restrained, suppressed, or eliminated.

2355.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Wockhardt Drug until the market achieves a steady state.

2356.   As a direct and proximate result of Wockhardt's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Wockhardt Drug than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2357.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2358.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2359.   Wockhardt's conduct violated the following state antitrust or competition practices laws:

   a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

   b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

   d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

   g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

   i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

   j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

   k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

   l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT ONE HUNDRED EIGHTEEN

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

2360.   Humana incorporates by reference the preceding allegations.

2361.   Wockhardt engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Wockhardt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Wockhardt Drug at prices restrained by competition and forced to pay artificially inflated prices.

2362.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Wockhardt Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Wockhardt Drug should have been available, and would have been available, absent Wockhardt's illegal conduct.

2363.   By engaging in the foregoing conduct, Wockhardt engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

  a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

  b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

  c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

  e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

  f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

  g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

  h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT ONE HUNDRED NINETEEN

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

2364.   Humana incorporates by reference the preceding allegations.

2365.   Wockhardt has benefitted from artificial prices in the sale of the Wockhardt Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2366.   Wockhardt's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Wockhardt Drug by Humana.

2367.   Humana has conferred upon Wockhardt an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2368.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Wockhardt Drug.

2369.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Wockhardt Drug, as it is not liable and would not compensate Humana for the impact of Wockhardt's unlawful conduct.

2370.   The economic benefit of overcharges derived by Wockhardt through charging supracompetitive and artificially inflated prices for the Wockhardt Drug is a direct and proximate result of Wockhardt's unlawful conduct.

2371.   The economic benefits derived by Wockhardt rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Wockhardt.

2372.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Wockhardt to be permitted to retain any of the overcharges for the Wockhardt Drug

derived from Wockhardt's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2373.   Wockhardt is aware of and appreciates the benefits bestowed upon them by Humana.

2374.   Wockhardt should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2375.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Wockhardt traceable to Humana.

## COUNT ONE HUNDRED TWENTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

2376.   Humana incorporates by reference the preceding allegations.

2377.   Wockhardt knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Wockhardt Drug. Wockhardt injured Humana through this conduct.

2378.   But for Wockhardt's scheme to inflate the price of the Wockhardt Drug, Humana would have purchased lower-priced Wockhardt Drug.

2379.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Wockhardt Drug than it would have paid absent Wockhardt's continuing anticompetitive conduct.

2380.   Humana has purchased substantial amounts of the Wockhardt Drug during the relevant period.

2381.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and

28 U.S.C. § 2201(a) ruling that Wockhardt's conduct violates Sections 1 and 2 of the Sherman Act.

2382.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton

Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Wockhardt's unlawful conduct, and other relief to assure that similar anticompetitive

conduct does not recur.

## COUNT ONE HUNDRED TWENTY-ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

2383.    Humana incorporates by reference the preceding allegations.

2384.    Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive

agreements designed to drive up the cost of at least the drugs listed below in the United States, in

violation of Section 1 of the Sherman Act (the "Zydus Drugs"). This conspiracy was *per se* unlawful

price-fixing.

> Clarithromycin ER
> Etodolac
> Fenofibrate
> Niacin ER
> Paricalcitol
> Topiramate Sprinkle
> Warfarin Sodium

2385.    Zydus has committed at least one overt act to further the conspiracy alleged in this

Complaint. Zydus's anticompetitive acts had a substantial and foreseeable effect on interstate

commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

2386.    The conspiracy realized its intended effect; Zydus has benefited, and continues to

benefit, from its anticompetitive agreements which have artificially inflated the prices of the Zydus

Drugs.

2387.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

2388.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

2389.   As a direct and proximate result of Zydus's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2390.   Zydus is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2391.   There is no legitimate, non-pretextual, pro-competitive business justification for Zydus's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2392.   Zydus's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2393.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Zydus Drugs, or by assignment from its other subsidiaries that directly purchased the Zydus Drugs during the relevant period.

## COUNT ONE HUNDRED TWENTY-TWO

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

2394.    Humana incorporates by reference the preceding allegations.

2395.    Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Zydus Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2396.    Zydus has committed at least one overt act to further the conspiracy alleged in this Complaint. Zydus's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

2397.    The conspiracy realized its intended effect; Zydus has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Zydus Drugs.

2398.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.  Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

  b.  Humana was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

  c.  Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

2399.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

2400.    As a direct and proximate result of Zydus's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2401.    There is no legitimate, non-pretextual, pro-competitive business justification for Zydus's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2402.    Zydus's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2403.    Zydus's conduct violated the following state antitrust or competition practices laws:

a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT ONE HUNDRED TWENTY-THREE

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

2404.   Humana incorporates by reference the preceding allegations.

2405.   Zydus engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Zydus's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Zydus Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2406.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Zydus Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Zydus Drugs should have been available, and would have been available, absent Zydus's illegal conduct.

2407.   By engaging in the foregoing conduct, Zydus engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

   a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

   b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

   c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
        Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

   g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

   h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT ONE HUNDRED TWENTY-FOUR

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

2408.   Humana incorporates by reference the preceding allegations.

2409.   Zydus has benefitted from artificial prices in the sale of the Zydus Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2410.   Zydus's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Zydus Drugs by Humana.

2411.   Humana has conferred upon Zydus an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2412.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Zydus Drugs.

2413.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Zydus Drugs, as it is not liable and would not compensate Humana for the impact of Zydus's unlawful conduct.

2414.   The economic benefit of overcharges derived by Zydus through charging supracompetitive and artificially inflated prices for the Zydus Drugs is a direct and proximate result of Zydus's unlawful conduct.

2415.   The economic benefits derived by Zydus rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Zydus.

2416.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Zydus to be permitted to retain any of the overcharges for the Zydus Drugs derived

REDACTED – PUBLIC VERSION

from Zydus's unfair and unconscionable methods, acts, and trade practices alleged in this

Complaint.

2417.   Zydus is aware of and appreciates the benefits bestowed upon them by Humana.

2418.   Zydus should be compelled to disgorge in a common fund for the benefit of

Humana all unlawful or inequitable proceeds it received.

2419.   A constructive trust should be imposed upon all unlawful or inequitable sums

received by Zydus traceable to Humana.

## COUNT ONE HUNDRED TWENTY-FIVE

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

2420.   Humana incorporates by reference the preceding allegations.

2421.   Zydus knowingly, intentionally, and cooperatively engaged in an anticompetitive

scheme designed to artificially inflate prices of the Zydus Drugs. Zydus injured Humana through

this conduct.

2422.   But for Zydus's scheme to inflate the price of the Zydus Drugs, Humana would have

purchased lower-priced Zydus Drugs.

2423.   Humana has suffered harm, and will continue to suffer harm in the future, as a result

of paying higher prices for the Zydus Drugs than it would have paid absent Zydus's continuing

anticompetitive conduct.

2424.   Humana has purchased substantial amounts of the Zydus Drugs during the relevant

period.

2425.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and

28 U.S.C. § 2201(a) ruling that Zydus's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

2426.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Zydus's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT ONE HUNDRED TWENTY-SIX

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

### (As to All Defendants)

2427.    Humana incorporates by reference the preceding allegations.

2428.    Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

2429.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing the Subject Drugs prices throughout the United States.

2430.    The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

2431.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

b.    Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

c.      Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

2432.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

2433.   As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2434.   Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

2435.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2436.   Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2437.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic the Subject Drugs, or by assignment from its other subsidiaries that directly purchased generic the Subject Drugs during the relevant periods.

## COUNT ONE HUNDRED TWENTY-SEVEN

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)

### (As to All Defendants)

2438.   Humana incorporates by reference the preceding allegations.

2439.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2440.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

2441.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

2442.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.      Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

        b.      Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

        c.      Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

2443.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

2444.   As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2445.    There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2446.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2447.    Defendants' conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT ONE HUNDRED TWENTY-EIGHT

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

2448.   Humana incorporates by reference the preceding allegations.

2449.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2450.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Subject Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

2451.   By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

       a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

       b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

       c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

       d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

       e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

       f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

       g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

       h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

       i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

       j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

       k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT ONE HUNDRED TWENTY-NINE

## UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

2452.   Humana incorporates by reference the preceding allegations.

2453.    Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2454.    Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Humana.

2455.    Humana has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2456.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

2457.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Humana for the impact of Defendants' unlawful conduct.

2458.    The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

2459.    The economic benefits derived by Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant periods, benefiting Defendants.

2460.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2461.    Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

REDACTED – PUBLIC VERSION

2462.   Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

2463.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Humana.

## COUNT ONE HUNDRED THIRTY

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

**(As to All Defendants)**

2464.   Humana incorporates by reference the preceding allegations.

2465.   Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Humana through this conduct.

2466.   But for Defendants' scheme to inflate the price of the Subject Drugs, Humana would have purchased lower-priced Subject Drugs.

2467.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

2468.   Humana has purchased substantial amounts of the Subject Drugs during the relevant periods.

2469.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

2470.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

REDACTED – PUBLIC VERSION

caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## XV.   DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Defendants, as follows:

A. Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B. judgment against Defendants, jointly and severally, for the damages sustained by Humana, and for awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C. Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

D. Awarding all other legal or equitable relief as the Court deems just and proper.

## XVI.   JURY DEMAND

Humana demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: October 18, 2019

Respectfully submitted:

**LOWEY DANNENBERG, P.C.**

By: _Laura K. Mummert_

Laura K. Mummert, PA ID # 85964
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Tel: 215-399-4770
LMummert@lowey.com

**LOWEY DANNENBERG, P.C.**

Peter D. St. Phillip, PA ID # 70027

574

REDACTED – PUBLIC VERSION

Jennifer Risener
Lee Yun Kim
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
JRisener@lowey.com
LKim@lowey.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**

Todd Schneider
Jason Kim
Kyle Bates
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com

Garrett W. Wotkyns
8501 North Scottsdale Road
Suite 270
Scottsdale, Arizona 85253
Tel. : 480-428-0144
GWotkyns@schneiderwallace.com

*Counsel for Humana Inc.*

**EXHIBIT A**
**TRADE ASSOCIATION MEETINGS - ATTENDEES**


**June 5-8, 2011**
**HDMA Business and Leadership Conference**
**JW Marriott, Desert Ridge, Phoenix, Arizona**

**Apotex:**       Valerie Magerkurth; and Brian Magerkurth (Executive Vice President, Global Supply Operations)

**Fougera:**      Walt Kaczmarek (Senior Vice President, Commercial Operations); and Dave Klaum (Senior Vice President and General Manager)

**Lupin:**        Dave Berthold (Vice President, Sales, U.S. Generics); and Steve Ater (Sales Director).

**Mylan:**        Andrea Morris (Director MPI Commercial Operations); Gary Tighe (National Accounts Director)

**Sandoz:**       Steven Greenstein (Director, Key Customers)

**Upsher-Smith:** Mike Muzetras (Senior National Accounts Manager), David Zitnak (National Accounts Senior Director), Doug Zitnak (National Accounts Senior Director); Mike McBride (VP, Partner Relations); and Brad Leonard (Senior Director, National Accounts)


**October 1-3, 2012**
**GPhA Technical Conference**
**Bethesda, Maryland**

**Actavis:**      Joyce Del Guadio, Executive Director, Regulatory Affairs

**Apotex:**       Bruce Clark, Senior Vice President, Scientific and Regulatory Affairs

**Dr. Reddy's:**  Nick Cappuccino, Vice President and Head of Global Quality

**Impax:**        Marcy Macdonald, Vice President, Regulatory Affairs

**Mylan:**        Marcie McClintic, Vice President and General Counsel

**Perrigo:**      Richard Stec, Vice President, Global and Regulatory Affairs

**Teva:**         Debbie Jaskot, Vice President, U.S. Generic Regulatory Affairs and North American Policy; Jonathan Kafer, Vice President of Sales and Marketing

1

Other Defendants with representative attendees: Akorn, Aurobindo, Breckenridge, Dr. Reddy's Fougera, Glenmark, Heritage, Impax, Lannett, Lupin, Par, Sandoz, Sun, Taro, UDL, and Upsher-Smith.

**February 20-22, 2013**
**GPhA Annual Meeting**
**Orlando, Florida**

**Actavis**:       Sigurdur Olafsson, President

**Mylan**:        Anthony Mauro, President

**Teva**:          Allan Oberman, President and CEO

**Sandoz**:       Don DeGolyer, President

Other Defendants with representative attendees: Akorn, Amneal, Apotex, Breckenridge, Dr. Reddy's, Endo, Glenmark, Heritage, Impax, Lupin, Par, Perrigo, Rising, Sun (through Caraco), Taro, Teligent, VersaPharm, Wockhardt, and Zydus.

**February 24-27, 2013**
**ECRM Retail Pharmacy Generic Pharmaceuticals Conference**
**Sheraton Dallas Hotel in Dallas, Texas**

Defendants with representative attendees: Actavis, Apotex, Aurobindo, Dr. Reddy's, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teligent, West-Ward, and Zydus.

**June 2-5, 2013**
**HDMA 2013 Business and Leadership Conference**
**Orlando, Florida**

**Actavis**:       Andrew Boyer, President and CEO, North America Generics, Marc Falkin, Vice President of Purchasing; Maureen Barrett, Director of National Accounts; Anthony Giannone, National Accounts Director

**Apotex**:       Jeffrey Hampton, Vice President, Commercial Operations; Beth Hamilton, National Sales Director; James Van Lieshout, Vice President, Sales; Jane Williams, Vice President Specialty Generic Sales

**Aurobindo**:    Julie Faria, Senior Manager, Sales Operations and Contact Administration

**Citron**:       Karen Strelau, Vice President, Sales; Laura Short, Associate Vice President, Sales

**Dr. Reddy's:**   Victor Borelli (Vice President and Head, National Accounts, North America Generics); Michael Burton (Director National Accounts, Health Systems); Joshua Hudgens (Director of Purchasing); Patricia Wetzel (Senior Director, National Accounts)

**Glenmark**:   Christopher Bihari, Director National Accounts

**Heritage**:   Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager

**Lannett**:   Kevin Smith, Vice President of Sales; Grace Wilks, Director, Sales and Marketing; Tracy Sullivan, Director of National Accounts; Robert Foley, Marketing Manager; Lauren Carotenuto, National Accounts; and Justin McManus, National Accounts.

**Mylan**:   Janet Bell, National Accounts Director; Joseph Duda, Vice President, North America Sales Operations and Customer Excellence; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Vice President of Sales; Robert O'Neill, Vice President; Sean Reilly, Key Account Manager; John Shane, Director of National Trade Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director; Michael Aigner, Director, National Accounts; John Baranick, Director, Trade Relations; Danielle Barill, Director, Sales Support and Customer Relations; Andrew Dobbs, Manager, Supplier Trade Relations; Richard Isaac, Senior Manager, Strategic Accounts; Christopher Neurohr, Director, National Accounts; Jim Nesta, National Account Manager

**Par**:   Jon Holden, Vice President of Sales; Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National Accounts; Christopher Neurohr, Director, National Accounts; John Bullock, National Accounts Director

**Sandoz**:   Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Executive, Managed Markets

**Sun**:   Scott Littlefield, Trade Director, National Account Director; Daniel Schober, Associate Vice President, Trade Sales; David Moody, CEO, Mutual; David Simoneaux, Marketing Coordinator, Mutual

**Teva**:   Theresa Coward, Senior Director, National Sales; Sal Cuomo, Trade Account Director; Jeffrey Herzfeld, Senior Vice President, Commercial Operations and America Strategy; Jessica Peters, National Accounts Manager; Teri Sherman, National Accounts Director; Christine Baeder, Senior Director Customer Operations; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Marc Falkin, Vice President, Purchasing; Christopher Doerr, Director Trade Relations

**Upsher-Smith**: JoAnn Gaio (Sr. National Account Manager, Trade), Brad Leonard (Senior Director, National Accounts), Mike Muzetras (Senior National Accounts Manager), David Zitnak (National Accounts Senior Director), Doug Zitnak (National Accounts Senior Director); Mike McBride (VP, Partner Relations); and Jim Maahs (Sr. Director, Sales and Marketing).

**VersaPharm:** Steve McCune, Chief Sales and Marketing Officer

**West-Ward**:   Mark Boudreau, Executive Director of National Sales; Paul Kersten, Vice President, Sales and Marketing; Neal Gervais, National Account Director; John Kline, National Account Director; Joseph Ruhmel, National Account Director; Marik Soudreau, Executive Director, National Sales; Steven Snyder, National Account Director

**Zydus**:   Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Phyllis Kidder, Senior Vice President, Global Generics; Kristy Ronco, Associate Vice President, National Accounts

Other Defendants with representative attendees: Amneal, Breckenridge, Endo, Lupin, and Wockhardt.

**June 4-5, 2013**
**GPhA Chemistry, Manufacturing and Controls Workshop**
**Bethesda, Maryland**[1]

**Apotex**:   Kiran Krishnan, Vice President, Regulatory Affairs

**Dr. Reddy's**: Nick Cappuccino, Vice President and Head of Global Quality

**Impax:**   Marcy Macdonald, Vice President Regulatory Affairs

**Perrigo**:   Richard Stec, Vice President Global Regulatory Affairs

**Sandoz**:   Alison Sherwood, Associate Director, Regulatory Affairs

Other Defendants with representative attendees: Actavis, Amneal, Breckenridge, Endo, Fougera, Glenmark, Heritage, Hi-Tech, Impax, Lannett, Morton Grove, Mylan, Par, Rising, Sun, Taro, Teva, UDL, Upsher-Smith VersaPharm, and Zydus.

---

[1] 2013 CMC Workshop Past Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/events/2013-cmc-workshop-past-attendees.

**August 10-13, 2013**
**NACDS 2013 Total Store Expo**
**Sands Expo Convention Center, Las Vegas, Nevada**

**Actavis**:     Michael Baker, Executive Vice President, Trade and Sales Department; Andrew Boyer, President and CEO, North America Generics; Napolean Clark, Vice President of Marketing; Michael Dorsey, Director of National Accounts; Marc Falkin, Vice President of Purchasing; Anthony Giannone, National Accounts Director; Megan Gorman, Senior Marketing Manager; Maureen Meehan, Director of National Accounts; Cindy Stevens, Director of National Accounts; Nancy Baran, Director, Customer Relations; Kathleen Conlon, Director, Contract Administration; Lisa Fiveash, National Account Representative; Rob Hooper, Senior Marketing Manager; Richard Rogerson, Senior Director, New Products; Allan Slavsky, Sales Consultant; Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Development; John Shane, Director, Trade Relations; Michael Dorsey, Director, National Accounts

**Apotex**:     Tom Axner, National Sales Director, Distribution; Tim Berry, National Account Manager; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Sam Boulton, Director, National Accounts; Jeffrey Hampton, Senior Vice President and National Manager, US and Latin America; Niki Hinman Smock, National Account Manager; David Kohler, Vice President and General Manager; Chirag Patel, Marketing Director, National Accounts; Shannon Price, Senior Marketing Director; Bob Simmons, National Accounts Director; Debbie Veira, National Accounts Manager; Pat Walden, Senior Marketing Manager; Corey Anquetil, Director, Strategic Sales National Accounts; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; Tina Kaus, National Accounts Director; James Van Lieshout, Senior Director, Commercial Operations; Pat Walden, Senior Marketing Manager

**Aurobindo**:     Stuart Blake, Director, National Accounts; Robert Cunard, CEO; Patrick Santangelo, Senior Director, Sales; Anthony Thomassey, Director National Accounts

**Citron**:     Vimal Kavuru, CEO

**Dr. Reddy's**:     Chris Costa, Vice President of Sales; Victor Borelli, Vice President and Head, National Accounts, North America Generics; Jinping McCormick, Vice President Rx Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National Accounts; Gary Benedict, Executive Vice President; Umang Vohra, Executive Vice President and Head of North America Generics

**Glenmark**:     Jim Brown, Vice President, Sales; Mitchell Blashinsky, Vice President, Sales and Marketing; Paul Dutra, Executive Vice President; Jessica Cangemi, Director, Sales and Marketing; Jeff Johnson, Director, Sales and Marketing; David Irwin,

Director, Sales; Stephanie Picca, Manager, Sales and Marketing; Terry Coughlin, Executive Vice President and Chief Operating Officer

**Heritage**:     Allen Dunehew, President and CEO; Matt Edelson, Senior Director of Sales; Jeffrey Glazer, CEO; Jason Malek, Senior Vice President; Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager; Gina Gramuglia, Commercial Operations

**Lannett**:     Arthur Bedrosian, President and CEO; William Schreck, Chief Operating Officer; Justin McManus, Director, National Accounts; Kevin Smith, Vice President, Sales and Marketing; Tracy Sullivan, National Accounts Manager; Lauren Carotenuto, National Accounts Representative; Michael Block, Business Development Manager

**Mylan**:     James Nesta, Vice President of Sales; Michael Aigner, Director, National Accounts; Joseph Duda, President; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Vice President; Robert Potter, Senior Vice President, North America and Channel Development; Lance Wyatt, National Accounts Director; Matt Cestra, Senior Director Marketing; Rodney Emerson, Director, Pricing and Contracts; Edgar Escoto, National Accounts Director; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Sean Reilly, Key Account Manager; John Baranick, Director, Trade Relations; Shane Bartolo, Senior Specialist, Sales Administration; Vive Bridges, Senior Director of Global Events; Martin Fletcher, Senior Director, Commercial Business and Purchasing; Ron Graybill, Vice President Managed Markets; Adrienne Helmick, Associate Product Manager, Marketing; Chad Holland, Vice President, Commercial Operations; Heather Paton, Vice President Sales; Bipan Singh, Director, Marketing; Tom Theiss, Director, Trade Relations; Christine Waller, Senior Manager, North America Communications

**Par**:     Jon Holden, Vice President of Sales; Michael Altamuro, Vice President Marketing and Business Analytics; Renee Kenney, Senior Advisor, Generic Sales, Senior Advisor Generic Sales; Karen O'Connor, Vice President, National Accounts; Rick Guillory, Vice President of National Accounts; Gerald Burton, Vice President of National Accounts; Christine Caronna, Director National Accounts; Rich Franchi, Vice President, Sales; Kim Rothofsky, Senior Director, Trade Relations; Scott Littlefield, Trade Director; Brent Bumpas, National Account Director, Trade; Kevin O'Brien, Senior Director Payer Markets; Warren Pefley, Vice President, Sales and Marketing; Charles "Trey" Probst, Vice President; Kelly Bachmeier, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; James Burnett, National Accounts Manager; Walter Busbee, Director National Accounts; Lori Minnihan, Associate Director, Trade Pricing Operations; Spike Pannell, National Account Manager; Sandra Parker, Deputy Compliance Officer; Michael Reiney, Vice President, Purchasing; Jeremy Tatum, Director, Market Insights; Darren Hall, Director, National Accounts

**Perrigo:**      Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Christian Strong, Senior Vice President, Diabetes Care; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Philip Willis, Innovation and Marketing Strategy; Tom Cotter, Vice President, OTC Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwarg, National Account Executive; Pete Haakenstad, National Account Manager; Larry Hudson, Animal Health; H. James Booydegraaff, Associate Director, Marketing; Andy Kjeelberg, Vice President, Consumer Healthcare Sales; John Klingenmeyer, Vice President, Consumer Healthcare Sales; Shelley Kocur, Senior Director, Service and Customer Supply Chains; Elizabeth Lowney, Strategic and Pipeline Plan Manager; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President and General Manager; Kristine Milbocker, Trade Relations Planner; Troy Pelak, Vice President, Consumer Healthcare Sales; Tony Polman, National Account Executive; Neal Wilmore, Vice President Commercial Operations, Animal Health; Michael Yacullo, Vice President, Consumer Healthcare Sales; Tom Zimmerman, Vice President and General Manager

**Sandoz:**      Peter Goldschmidt, President Sandoz US and Head North America; Armando Kellum, Vice President, Sales and Marketing; Paul Krauthauser, Senior Vice President, Sales and Marketing; Della Lubke, National Account Executive; Steven Greenstein, Director, Key Customers; Christopher Bihari, Director, Key Customers; Anuj Hasija, Executive Director, Key Customers

**Sun:**      William Everett, National Trade Account Manager; Wayne Fallis, Director, National Accounts; Steven Goodman, Director Marketing, Generics; Susan Knoblauch, Senior Manager, Sales; GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Grace Shen, Vice President, Marketing; Steven Smith, Senior Director of Sales; Christopher Bihari, Director, Key Customers; Michael Perfetto (Generic Rx and OTC)

**Taro Israel:**      Ara Aprahamian, Vice President, Sales and Marketing; Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic Rx Business;

**Taro USA:**      Sheila Curran, Vice President, Sales Operations; Howard Marcus, Vice President Sales and Marketing; Doug Statler, Senior Director, Head of Sales; Elizabeth Guerrero, Director, Corporate Accounts, Managed Care; Carlton Holmes, Vice President Marketing; Tim Kiernan, Director of Marketing Analytics

**Teva:**      Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer North America Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman,President and CEO Teva Americas Generics; Jennifer Chang, Director, Marketing; Scott Goldy, Director, National Accounts; Christine Baeder, Senior Vice President, Customer and Marketing Operations; Christopher Doerr, Senior Director, Trade Operations;

Kevin Green, Associate Vice President, National Accounts; Jeffrey Herzfeld, Senior Vice President, US Specialty Medicines; Jonathan Kafer, Executive Vice President, Sales and Marketing; Kayla Kelnhofer, National Account Executive; Jennifer King, Director, New Product Marketing; David Marshall, Vice President of Operations; Jerry Moore, Director, State Government Affairs; Teri Sherman, Director National Accounts; Jason Nagel, Associate Director; John Wodarczyk, Director, Customer Relations

**West-Ward:**  Spiro Gavaris, Vice President of Sales and Marketing; Sam Goodman, Marketing Manager; Tareq Darwazeh, National Accounts Senior Manager; Paul Markowitz, Director, National Accounts; Ernesto Cividanes, Manager, Trade Relations

**Zydus:**  Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing; Elizabeth Purcell, Senior Director, Marketing and Portfolio Management; Ganesh Nyak, Chief Operating Officer and Executive Director; Daniel Lukasiewicz, Senior Manager, Marketing Operations; Sharvil Patel, Deputy Managing Director

### September 29 – October 2, 2013
### HDMA 2013 Annual Board and Membership Meeting
### <u>White Sulphur Springs, West Virginia</u>

**Apotex:**  Beth Hamilton, Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales, Retail Division; Jeff Watson, President

**Mylan:**  Joseph Duda, President; Anthony Mauro, Senior Vice President; Robert O'Neill, Vice President, Commercial Operations; Robert Potter, Senior Vice President, North America; Robert Tighe, CFO

**Teva:**  Robert Tighe, Chief Financial Officer, North America; Theresa Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations

### October 28-30, 2013
### GPhA Fall Technical Conference
### <u>North Bethesda, Maryland</u>

**Apotex:**  Kiran Krishnan, Vice President, Regulatory Affairs

**Dr. Reddy's:**  Nick Cappuccino, Vice President and Head of Global Quality

8

**Impax**:         Marcy Macdonald, Vice President Regulatory Affairs

**Mylan**:        Dan Snider, Vice President Morgantown RD, Marcie McClintic, Vice President and Chief of Staff, Carmen Shepard, Senior VP Global Policy and Regulatory

**Perrigo**:      Richard Stec, Vice President, Global Regulatory Affairs

Other Defendants with representative attendees: Actavis, Akorn, Amneal, Breckenridge, Fougera, Glenmark, Heritage, Hi-Tech, Lannett, Lupin, Par, Rising, Sandoz, Sun, Taro, Teligent, Teva, UDL, Upsher-Smith, Versapharm, Wockhardt, and Zydus.

**February 19-21, 2014**
**GPhA Annual Meeting**
**Orlando, Florida**

**Apotex**:      Jeff Watson, President, North America

**Mylan**:       Andrea Miller, Senior Vice President, Head of Global Complex Products Operations; Marcie McClintic Coates, Vice President and Head of Global Regulatory Affairs; Anthony Mauro, President

**Perrigo**:     Douglas Boothe, President of Generics Division; Judy Brown, CFO; Joseph Papa, Chairman and CEO; Richard Stec, VP Global Regulatory Affairs

**Sandoz**:      Carlos Sattler, Vice President, Clinical Development and Medical Affairs

**Taro**:        Ara Aprahamian, VP Sales & Marketing; Kim DiPadova

**Teligent**:    Jason Grenfell-Gardner, President and CEO; Thomas Vandervort, Director Business Development

**Teva**:        Allan Oberman, President and CEO

Other Defendants with representative attendees: Actavis, Breckenridge, Dr. Reddy's, Epic, Heritage, Hi-Tech, Impax, Lupin, Mylan, Par, Sun, Upsher-Smith, Wockhardt, and Zydus.

**February 23-26, 2014**
**ECRM Retail Pharmacy Efficient Program Planning Session**
**Omni Amelia Island Plantation Resort, Amelia Island, Florida**

Defendants with representative attendees: Actavis, Apotex, Citron, Dr. Reddy's, Heritage, Lannett, Par, Perrigo, Sandoz, Sun, Teligent, Taro, West-Ward, and Zydus.

9

**March 9-12, 2014**
**HDMA Distribution Management Conference and Technology Expo**
<u>**Palm Desert, California**</u>[2]

Defendants with representative attendees: Actavis, Mylan, Par, Taro, Teva, and Upsher-Smith.

**April 1, 2014**
**HDMA Sixth Annual CEO Roundtable Fundraiser**
<u>**New York, New York**</u>

**Actavis**:     Andrew Boyer, Senior Vice President, US Generics Sales and Marketing; Napolean Clark, Executive Director, US Generics Marketing; Marc Falkin, Vice President, Marketing, Pricing, and Contracts; Anthony Giannone, Executive Director, Sales; Rick Rogerson, Director, Pricing

**Apotex**:     Beth Hamilton, Director, National Sales; Jeffrey Hampton, Senior Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales; Jeff Watson, President, US and Canada Commercial

**Aurobindo**:     Robert Cunard, CEO; Paul McMahon, Senior Director Commercial Operations

**Citron**:     Vimal Kavuru, CEO; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing

**Mylan**:     Joseph Duda, President; Hal Korman, Executive Vice President and Chief Operating Officer; Anthony Mauro, Senior Vice President, and President of North America; James Nesta, Vice President of Sales; Robert Potter, Senior Vice President, North America National Accounts and Channel Development; Joseph Zenkis, Vice President, North America Sales and Channel Strategy

**Sandoz**:     Anuj Hasija, Executive Director, Key Accounts; Armando Kellum, Vice President, Contracts, Pricing, and Business Analytics; Kirko Kirkov, Executive Director, Key Accounts; Scott Smith, Vice President, Commercial Operations

**Teva**:     Maureen Cavanaugh, Senior Vice President, Sales and Marketing; Christopher Doerr, Director, Trade Operations; Jeffrey Herzfeld, Senior Vice President, US Trade Relations, Specialty Medicines; David Rekenthaler, Vice President Sales

---

[2] 2015 Distribution Management Conference, Previous Attendees, HDMA, Google Cache, https://webcache.googleusercontent.com/search?q=cache:tavttopjP9kJ:https://www.healthcaredistribution.org/events/2015-distribution-management-conference/previous-attendees+&cd=1&hl=en&ct=clnk&gl=us.

**April 26-29, 2014**
**NACDS 2014 Annual Meeting**
**Scottsdale, Arizona**

**Actavis**: Andrew Boyer, President and CEO, North America Generics; Marc Falkin, Vice President of Purchasing; Sigurdur Olafsson, President; Paul Reed, Senior Director of Trade and Sales Development; Robert Stewart, Chief Operating Officer; Paul Bisaro, Board Member; Jean-Guy Goulet, Regional President, Canada Generics; Michael Reed, Executive Director, Trade Relations; John Shane, Director, Trade Relations

**Apotex**: Jeff Watson, President, Global Generics; Sam Boulton, Director of National Accounts; Jeremy Desai, President and CEO; Jeffrey Hampton, Senior Vice President and General Manager, US and Latin America; David Kohler, Vice President and General Manager; Corey Anquetil, Director, Strategic Sales North America; Buddy Bertucci, Vice President, Institutional Sales; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; James Van Lieshout, Sr. Director, Commercial Operations; Peter Hardwick, Senior Vice President, Sales and Marketing, Canada

**Aurobindo**: Robert Cunard, CEO; Paul McMahon, Senior Director Commercial Operations;

**Citron**: Vimal Kavuru, CEO; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing

**Dr. Reddy's**: Chris Costa, Vice President of Sales; Victor Borelli, Vice President and Head, National Accounts, North America Generics; Jinping McCormick, Vice President Rx Marketing, US Generics; Michael Allen, Vice President and Head, Rx Products, North America Generics; Milan Kalawadia, Vice President, OTC Division

**Glenmark**: Jim Brown, Vice President of Sales; James Grauso, Executive Vice President, North America Sales

**Heritage**: Jeffrey Glazer, CEO

**Mylan**: Joseph Duda, President; Anthony Mauro, Chief Commercial Officer; James Nesta, Vice President of Sales; Hal Korman, Executive Vice President and Chief Operating Officer; Robert Potter, Senior Vice President, North America and Channel Development; Rob O'Neill, Head of Sales; John Munson, Vice President Global Accounts Mylan

**Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor, Generic Sales; Scott Littlefield, Trade Director; Brent Bumpas, National Account Director, Trade; Michael Altamuro, Vice President, Marketing and Business Analytics; Antonio Pera, Chief Commercial Officer

11

**Perrigo**:     Doug Boothe, President Generics Division, Impax; Scott Jamison, Executive Vice President and General Manager; Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Andy Kjellberg,Vice President, Consumer Healthcare Sales; Jeff Needham, Executive Vice President and General Manager, Consumer Healthcare; Tony Polman, National Account Executive

**Sandoz**:     Peter Goldschmidt, President Sandoz, US and Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armando Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, Vice President Sales and Marketing; Dave Picard, Vice President, Biosimilars and Injectables; Claude Dupuis, Director of Corporate Accounts Ontario and Western Canada; Jacquelin Gagnon, Vice President, Sales and Marketing, Canada; Michel Rubidoux, President and General Manager, Canada

**Sun**:     GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Steve Smith, Senior Director of Sales; Steven Goodman, Director Marketing, Generics; Michael Perfetto (Generic RX and OTC)

**Taro Israel**:     Ara Aprahamian, Vice President, Sales and Marketing; Michael Perfetto, Chief Commercial Officer

**Taro USA:**     Alex Likvornik, Senior Director, Strategic Pricing and Marketing; Elizabeth Ivey, Vice President, Sales and Marketing

**Teva**:     Maureen Cavanaugh, Senior Vice President and Chief Operating Officer, North America Generics; Allan Oberman, President and CEO Teva Americas Generics; Theresa Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations; Jeffrey Herzfeld, Senior Vice President US Specialty Medicines; David Marshall, Vice President of Operations; Michael Reid, Vice President, Corporate and Retail Sales; Michael Sine, Director, Corporate Account Group; Douglas Sommerville, Senior Vice President and General Manager, Canada

**Zydus**:     Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Scott Goldy, Director, National Account; Kevin Green, Vice President, National Accounts

**May 12-15, 2014**
**MMCAP 2014 National Member Conference**
**Bloomington, Minnesota**

**Actavis:**      Mark Blitman, Executive Director of Sales for Government Markets

**Apotex:**       Bob Simmons, National Account Director

**Lannett**:      Tracy Sullivan, National Account Manager

**Mylan**:        Janet Bell, Director, National Accounts

**Heritage**:     Anne Sather, National Account Manager

**Par**:          Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Jon Holden, Vice President of Sales; Karen O'Connor, Vice President, National Accounts

**Perrigo**:      Pete Hakenstad, National Account Manager

**Teva**:         Nick Gerebi, National Account Manager

**West-Ward**:  Mark Boudreau, Executive Director of National Sales

**June 1-4, 2014**
**HDMA 2014 Business and Leadership Conference**
**JW Marriott Desert Ridge, Phoenix, Arizona**[3]

**Actavis**:      Maureen Barrett, Director of National Accounts; Marc Falkin, Vice President of Purchasing; John Fallon, Director of National Accounts; Anthony Giannone, National Accounts Director; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Richard Rogerson, Executive Director Pricing and Business Analytics

**Apotex**:       Bob Simmons, National Account Director; Jeffrey Hampton, Vice President, Commercial Operations; Beth Hamilton, National Sales Director; Tina Kaus, National Accounts Director; James Van Lieshout, Vice President, Sales; Jane Williams, Vice President Specialty Generic Sales

**Aurobindo:**   Julie Faria, Senior Manager, Sales

---

[3] DMC and Expo, HDA, Previous Attendees,
https://webcache.googleusercontent.com/search?q=cache:tavttopjP9kJ:https://www.healthcaredistribution.org/events
/2015-distribution-management-conference/previous-attendees+&cd=1&hl=en&ct=clnk&gl=us.

13

**Citron:**     Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing

**Dr. Reddy's:** Chris Costa, Vice President of Sales; Mike Allen, Vice President and Head, Rx Generics; Victor Borelli; Senior Director, National Accounts; Joshua Hudgens, Director of Purchasing; Katherine Neeley, Associate Director; Gunjan Patel, Sales Analyst

**Glenmark:**   Christopher Bihari, Director National Accounts

**Heritage:**   Anne Sather, National Account Manager; Neal O'Mara, National Accounts Manager; Jeffrey Glazer, Chairman and CEO; Jason Malek, Senior Vice President, Commercial Operations; Matthew Edelson, Associate Director, National Accounts

**Lannett:**    Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director Sales and Marketing; Justin McManus, Director, National Accounts and Sales; Lauren Carotenuto, National Account Representative

**Mylan:**      Richard Isaac (Senior Manager, Strategic Accounts); Joseph Duda (President); Edgar Escoto (National Accounts Director); James Nesta (Vice President of Sales); Lance Wyatt (National Accounts Director); Michael Aigner (Director, National Accounts); John Baranick (Director of Trade Relations); Joseph Zenkus (Vice President, North America Sales and Channel Strategy); Frank Mullery (Senior Director and Controller); Todd Bebout (Vice President, North America Supply Chain Management); Janet Bell (Director, National Accounts); Steven Krinke (National Account Manager); Robert O'Neill (Head of Sales Generic North America); Sean Reilly (National Account Manager); John Shane (Trade Relations); Erik Williams (Vice President North America Pricing and Contracts)

**Par:**        Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Jon Holden, Vice President of Sales; Karen O'Connor, Vice President, National Accounts; Brent Bumpas, National Account Executive; Lisa Walker, Associate Director; Michael Reiney, Vice President, Sales; Charles "Trey" Propst, Vice President, National Accounts; Warren Pefley, Director, National Accounts

**Sandoz:**     Lisa Badura, Director, National Accounts Sales; Anuj Hasija, Key Account Executive Director; Kirko Kirkov, Key Account Executive Director; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager; James Hendricks, Key Account Executive Director; Della Lubke, Director, National Accounts; David Picard, Vice President, Generic Sales; Christopher Bihari, Director, National Sales; Steve Greenstein, Director, National Accounts

**Sun**:            Daniel Schober, Associate Vice President, Trade Sales; Scott Littlefield, Trade Director, National Account Executive; Steven Smith, Senior Director of Sales; Susan Knoblauch, Senior Manager, Sales

**Taro USA**:   Anand Shah, Associate Director Sales Operations

**Teva**:          Theresa Coward, Senior Director, National Sales; Sal Cuomo, Trade Account Director; Christopher Doerr, Director, Trade Operations; Daniel Driscoll, Vice President Institutional Sales and Marketing; Jeffrey Herzfeld, Senior Vice President; Jeff McClard, Senior Director, National Accounts; Jessica Peters, Director, National Accounts; Teri Sherman, National Accounts Director; Cassie Dunrud, Associate Director; David Rekenthaler, Vice President, Sales, US Generics; Marc Falkin, Vice President, Marketing, Pricing, and Contract Operations; Nisha Patel, Director; Nick Gerebi, Director National Accounts

**Upsher-Smith**: JoAnn Gaio (Senior National Account Manager, Trade); Scott Hussey (Senior Vice President, Global Sales); Jim Maahs (Senior Director); Michael McBride (Associate Vice President, Partner Relations); Mike Muzetras (Senior National Accounts Manager); Doug Zitnak (National Accounts Senior Director)

**West-Ward:** Mark Boudreau, Executive Director of National Sales; Jeff Ruhland, Associate Manager, Supply Chain and Warehouse; Joseph Ruhmel, National Account Director; Steven Snyder, National Account Director

**Zydus**:       Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Maria McManus, Corporate Account Manager; Jodi Weber, Corporate Account Manager; Louis Pastor, Senior Director, Trade Operations

Other Defendants with representative attendees: Amneal, Camber, Breckenridge, Endo, Lupin, Rising, and Wockhardt.

### June 3-4, 2014
### GPhA CMC Workshop
### Bethesda North Marriott Hotel, Bethesda, Maryland

**Apotex**:      Pradeep Sanghvi (Executive Vice President, Global R&D); Kiran Krishnan (Vice President, Regulatory Affairs); Chetan Doshi (Director of Formulation Development, Solid Dose)

**Impax**:       Marcy Macdonald (Vice President, Regulatory Affairs)

**Mylan**:       Dan Snider (Vice President, Morgantown RD)

**Perrigo**:     Richard Stec (Vice President Global Regulatory Affairs)

| **Taro USA:** | Scott Tomsky (Vice President, Generic Regulatory Affairs, North America); Siva Vaithiyalingam (Director, Regulatory Affairs) |

| **Teligent:** | Ann Howard, Senior Regulatory Affairs Associate |

| **Teva:** | Scott Tomsky (Generic Regulatory Affairs, North America); Siva Vaithiyalingam (Director, Regulatory Affairs) |

Other Defendants with representative attendees: Actavis, Dr. Reddy's, Fougera, Glenmark, Heritage, Hi-Tech (subsidiary of Akorn), Lannett, Lupin, Morton Grove (subsidiary of Wockhardt), Par, Sandoz, Sun, Upsher-Smith, and Zydus.

**September 16-18, 2014**
**LogiPha Supply Chain Conference**
**Princeton, New Jersey**

| **Actavis**: | Wayne Swanton, Senior Vice President Manufacturing and Supply Chain; Priya Gopal, Associate Director, Strategic Planning |

| **Perrigo**: | Stuart Glickman, Executive Director Global Logistics |

| **Sandoz**: | Davis Mason, Serialization Global Support Lead; Dorris Michele, Director of Supply Chain; Hillel West, Director of Supply Chain |

**September 27 – October 1, 2014**
**HDMA 2014 Annual Board and Membership Meeting**
**Montage, Laguna Beach, California**

| **Actavis**: | Marc Falkin, Vice President, Marketing, Pricing and Contracts; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; |

| **Apotex**: | Beth Hamilton, Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales-Retail Division |

| **Mylan**: | John c. Poulin, Senior Vice President, North America National Accounts, James Nesta, Vice President of Sales |

| **Teva**: | Maureen Cavanaugh, Chief Operating Officer, Teva US Generics; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations |

| **Zydus**: | Marc Kikuchi, Senior Vice President, Global Generic Sourcing |

16

**October 27-29, 2014**
**GPhA Fall Technical Conference**
**Bethesda, Maryland**

**Actavis**:      Michael Kimball, Executive Director, Transdermal Development

**Apotex**:       Kiran Krishnan, Vice President, Regulatory Affairs

**Impax** :       Marcy Macdonald, Vice President Regulatory Affairs

**Mylan**:        Marcie McClintic Coates, Vice President and Head of Global Regulatory Affairs

**Perrigo**:      Richard Stec, Vice President, Global Regulatory Affairs

**Teva**:         Scott Tomsky, Vice President, Generic Regulatory Affairs, North America

Other Defendants with representative attendees: Breckenridge, Dr. Reddy's, Fougera, Glenmark, Heritage, Lannett, Lupin, Par, Sandoz, Sun, Taro, Teligent, Upsher-Smith, UDL, West-Ward, Wockhardt, and Zydus.


**February 9-11, 2015**
**GPhA Annual Meeting**
**Miami Beach, Florida**[4]

**Apotex**:       Jeff Watson (President)

**Mylan:**        Rajiv Malik (President); Deborah Autor (Senior Vice President, Strategic Global Quality & Regulatory Policy)

**Perrigo:**      Joseph Papa (President, Chief Executive Officer, and Chairman); Douglas Boothe (President of Generics Division); Judy Brown (CFO); Ben Needham (Manager Corporate Development); Richard Stec (VP Global Regulatory Affairs)

**Taro:**         Ara Aprahamian (VP Sales & Marketing); Kim DiPadova; Xiaopin Jin

**Teligent:**     Jason Grenfell-Gardner, President and CEO

**Teva:**         Sigurdur Olafsson (President and Chief Executive Officer, Global Generic Medicines Group); Brian Rubenstein (Executive Counsel)

---

[4] 2015 Annual Meeting Past Meeting Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/index.php/events/2015-annual-meeting-past-meeting-attendees.

Other Defendants with representative attendees: Actavis, Akorn, Breckenridge, Dr. Reddy's, Endo, Epic, Glenmark, Heritage, Impax, Lupin, Par, Sandoz, Teligent, Upsher-Smith, West-Ward, Wockhardt, and Zydus.

**February 16-18, 2015**
**HSCA National Pharmacy Forum**
**Marriott Waterside Hotel and Marina, Tampa, Florida**

**Actavis**:     John Fallon, Executive Director of Sales

**Mylan:**       Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Janet Bell, Director of National Accounts; Mark Pittenger, Senior Director of National Accounts; Cam Bivens, Director of National Accounts; Heather Paton, Vice President, Institutional Sales

**Teva:**        John Fallon, Executive Director, Sales; Brad Bradford, Director of National Accounts; Jeff McClard, Senior Director of National Accounts; Nick Gerebi, Director of National Accounts

**West-Ward:**   Neal Gervais, National Account Director; Joseph Schrick, Director, National Accounts; Anthony Massaro, Associate Product Manager; Mark Zampella, Director, National Accounts; Brad Bradford, Director of National Accounts

**February 22-25, 2015**
**ECRM 2015 Retail Pharmacy Efficient Program Planning Session**
**Hilton Beach Golf Resort and Spa, Destin, Florida**[5]

Other Defendants with representative attendees: Akorn, Apotex, Epic, Impax, Lupin, Mayne, Upsher-Smith, Wockhardt, Actavis, Dr. Reddy's, Heritage, Lannett, Par, Perrigo, Sandoz, Taro Israel, Taro USA, Teligent, Teva, West-Ward, and Zydus.

**March 8-11, 2015**
**HDMA Annual Distribution Management Conference and Expo**
**Orlando, Florida**

**Actavis:**     Thomas Napoli (Associate Director, Controlled Substance Compliance); Michael Reed (Director, National Trade Accounts); Paul Reed (Senior Director, Trade Sales and Development – US Brands); Mary Woods (Executive Director, US Order Management)

---

[5] EPPS Attendees: Retail Pharmacy Generic Pharmaceuticals, ECRM, https://ecrm.marketgate.com/Events/Attendees.aspx?s=3610&rt=S

**Apotex**:          Malinda Baumer (Manager, Customer Support)

**Breckenridge:** Stephanie Puckly (Operations & Customer Service Manager)

**Dr. Reddy's:**  Heather Hovis (Transportation & Distribution Manager)

**Mylan:**          Todd Bebout (Head of North America Supply Chain); Mark Gutmann (Senior Director, Global Serialization Program); Michael Marrone (Global Serialization IT Lead); James Matthews (Senior Direcotr, North American Distribution); Robert Teper (Director of Greensboro Distribution Center Operations); Amanda Tolbert (Director, NA Transportation and Import/Export Compliance)

**Par:**          Aladin Alkhwawam (Associate Director, Packaging); John Dec (Senior Manager, Supply Chain/Logistics Systems); Patricia Lipari (Director, Sales Operations); Richard Walton (Executive Director, Supply Chain Operations)

**Taro USA:**   Rick Lewellyn (Senior Manager, Customer Logistics and Returns)

**Teva:**          Christopher Doerr (Senior Director, Trade Operations); Robert Nelid (Associate Director, Customer Operations)

**Upsher-Smith:** Michael McBride (Associate Vice President, Partner Relations)


**April 14, 2015**
**HDMA 2015 Annual CEO Roundtable Fundraiser**
**New York, New York**

**Actavis**:          Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National Accounts; Marc Falkin, Vice President, Marketing, Pricing and Contracts; Anthony Giannone, Executive Director, Sales

**Amneal**:          Tony Hodges, Vice President, Global Logistics; Gina McFarland, Logistics Supervisor; Corey Reece, Manager, Information Technology

**Breckenridge**: Stephanie Puckly, Operations & Customer Service Manager

**Mylan**:          Robert Potter, Senior Vice President, National Accounts and Channel Development; Anthony Mauro, Chief Commercial Officer; Robert Tighe, Head of Mylan Pharmaceuticals and Canada; Chrys Kokino, Head of Global Biologics Commercial; Frank Mullery, Head of Commercial Finance; James Nesta, Vice President Sales; David Workman, Vice President Strategic Pricing

**Par**:          Michael Altamuro, Vice President Marketing and Business Analytics; Jon Holden, Vice President of Sales; Paul Campanelli, CEO; Terry Coughlin, Chief Operating Officer; Steve Mock, Corporate Affairs; Joel Morales, Vice President

Finance; Antonio Pera, Chief Commercial Officer; Brandon Rockwell, Executive Director, Business

**Sandoz**: Anuj Hasija, Executive Director, Key Accounts; Victor Moreire, Director Contracts and Analytics; Ted Slack, Senior Director, US Managed Markets, Robert Spina, Vice President, Pricing

**Teva**: Christine Baeder, Vice President, Customer Operations; Maureen Cavanaugh, Chief Operating Officer; Christopher Doerr, Senior Director, Trade Operations; Jeffrey Herzfeld, Senior Vice President, US Specialty Medicines Trade Relations; Adam Levitt, Senior Vice President, Global Commercial Operations.

### June 7-10, 2015
### HDMA 2015 Business and Leadership Conference
### <u>San Antonio, Texas</u>

**Actavis**: Andrew Boyer (Senior Vice President, Generic Sales and Marketing); Marc Falkin (Senior Vice President, US Generics); Richard Rogerson (Executive Director, Pricing and Business Analytics, Sales Marketing Generics); Anthony Giannone (Executive Director, Sales); Brandon Miller (Executive Director Trade Relations), Michael Reed (Director, National Trade Accounts)

**Apotex**: Jeffrey Hampton (Vice President, Commercial Operations); Beth Hamilton (National Sales Director); James Crenshaw (Director, National Accounts); Erin Organ (Director of Commercial Operations); Debbie Veira (Manager, National Accounts); Sam Boulton (Director National Account); John Crawford (Director National Account); Tina Kaus (Director National Account); Jim Van Lieshout (VP Market Access and Pharm. Strategy)

**Aurobindo**: Julia Faria (Sr. Manager, Sales Operations and Contract Administration); Charles Rath (National Trade Relations Manager)

**Breckenridge**: Scott Cohon (Director of Sales); David Giering (Manager, Marketing & Trade Relations); Philip Goldstein (Director of National Accounts)

**Camber:** Brett Barczak, Director, Corporate Accounts; Peter Romer, Sales Representative

**Citron**: Susan Knoblauch (Director National Accounts); Laura Short (VP Sales); Karen Strelau (EVP Sales & Marketing)

**Dr. Reddy's**: Victor Borelli (Senior Director, National Accounts); Joshua Hudgens (Director of Purchasing); Katherine Neeley (Associate Director); Patricia Wetzel (Senior Director, National Accounts); Jake Austin (Director National Accounts Rx Generics); Sherice Koonce (Director, Rx Pricing)

**Glenmark**:    Christopher Bihari, Director National Accounts

**Heritage**:    Neal O'Mara (National Accounts Manager); Matthew Edelson (Associate Director, National Accounts); Jeff Glazer (CEO & Vice Chairman); Jason Malek (Senior VP Commercial Operations); Anne Sather (Director, National Accounts)

**Impax**:    William Ball, Senior National Sales Manager, Danny Darnell, Senior National Accounts Manager, Todd Engle, VP Sales and Marketing, Michael Grigsby, Senior National Accounts Manager, Italo Pennella, Trade Account Manager, Thomas Sammler, Director Sales Operations, Gary Skalski, Senior Director Sales

**Lannett**:    Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director Sales and Marketing; Breanna Stillman, Sales Analyst

**Lupin**:    David Berthold, VP Sales US Generics, William Chase, Director, Managed Markets & Trade (Brand), Jason Gensburger, Director, Financial Services, Kevin Walker, National Account Manager, and Lauren Walten, Regional Sales Associate

**Mylan**:    Richard Isaac, Senior Manager, Strategic Accounts; John Baranick, Director of Trade Relations; Todd Bebout, Vice President, North America Supply Chain Management; Robert O'Neill, Head of Generic Sales, North America; Janet Bell, Director National Accounts; Sean Reilly, National Account Manager; Erik Williams, VP-NA Pricing; Lance Wyatt, Director, National Accounts

**Par**:    Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Christopher Neurohr, Director, National Accounts; Karen O'Connor, VP National Accounts

**Rising**:    Scott Goerner, Vice President, Sales; Paul Krauthauser, Senior Vice President, Sales and Marketing; Patricia MacBride, Director of National Accounts

**Sandoz**:    Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Key Accounts; Kirko Kirkov, Executive Director, Key Customers; Sean Walsh, Key Account Manager; Kenneth Baker, Director, Managed Markets; Christopher Bihari, Director of National Accounts (Sales); Seth Coombs, Executive Director, Oncology Injectables; Steven Greenstein, Director of National Accounts (Sales); Jason Jones, Director Key Customer; Marco Polizzi, Head, Institutional Sales and Marketing; Arun Varma, Executive Director Marketing

**Sun**:    Christopher Schoen, Vice President, Trade Sales; Scott Littlefield, Trade Director, National Account Executive; Daniel Schober, VP Trade Sales, Steve Smith, Sr. Director Sales

**Teva**:          Theresa Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade Operations; Cassie Dunrud, Associate Director; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Thomas Boyer, Director, National Accounts; Marc Falkin, Vice President, Marketing, Pricing, and Contracts; Christine [Bader or Baeder], Vice President, Commercial Operations; Brad Bradford, Director National Accounts; Nick Gerebi, Director National Accounts; Jeff Herberholt, Senior Manager, Regional Accounts; Jeff McClard, Senior Director National Accounts; Jason Nagel, Associate Director Trade Relations; Michelle Osmian, Director, Customer Operations; Nisha Patel, Director, National Accounts; Jessica Peters, Director National Accounts

**Upsher-Smith**: Joann Gaio, Senior National Account Manager, Trade, Scott Hussey, Senior VP Global Sales, Brad Leonard, Senior Director National Accounts, Michael McBride, Associate VP, Partner Relations, Mike Muzetras, Senior National Accounts Manager, David Zitnak, National Accounts Senior Director-Trade, Doug Zitnak, National Accounts Senior Director- Trade

**West-Ward:**   Mark Boudreau, Executive Director of National Sales; Joseph Ruhmel, National Account Director; Steven Snyder, National Account Director

**Wockhardt**:   Karen Andrus, Director of Sales, Scott Koenig, Vice President Retail Generics

**Zydus**:       Scott Goldy, Director, National Accounts; Marc Kikuchi, Senior Vice President, Global Generics; Maria McManus, Corporate Account Manager; Maria Bianco-Falcone, Senior Director Contracting; Kevin Green, Senior Director of Sales; Louis Pastor, Senior Director Trade Operations; Kristy Ronco, Vice President, Sales; Jodi Weber, Corporate Account Manager

### June 9-10, 2015
### GPhA Meeting
### North Bethesda, Maryland

**Actavis**:     Joyce Ann DelGaudio, Executive Director, Regulatory Affairs

**Apotex**:      Kiran Krishnan, Vice President, Regulatory Affairs

**Impax**:       Marcy Macdonald, Vice President Regulatory Affairs;

**Mylan**:       Bryan Winship, Senior Director, Quality Management, Strategic Global Quality and Regulatory Policy, Daniel Snider, Vice President Research and Development, Timothy Ames, Vice President Global Strategic Regulatory Affairs, Dawn Culp, Vice President Global Regulatory Affairs Policy;

**Perrigo**:     Richard Stec, Vice President, Global Regulatory Affairs; and

22

**Sandoz**:     Nicholas Tantillo, Head, Policy and Regulatory Strategy

**Teva**:        Scott Tomsky, Generic Regulatory Affairs, North America, Siva Vaithiyalingam, Director, Regulatory Affairs

Other Defendants with representative attendees:  Actavis, Citron, Dr. Reddy's, Fougera, Glenmark (through its parent Glenmark Pharmaceuticals Limited), Heritage, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Taro, UDL, Upsher-Smith, West-Ward, Wockhardt, and Zydus.

**September 27-29, 2015**
**HDMA 2015 Annual Board and Membership Meeting**
**<u>Montage, Laguna Beach, California</u>**

**Apotex**:     Beth Hamilton, a. Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales, Retail Division; Steve Giuli, Director, Government Affairs

**Mylan**:      James Nesta, Vice President of Sales; Robert Potter, Senior Vice President, North America National Accounts; Anthony Mauro, Senior Vice President, North America; Robert Tighe, Head of Mylan Pharma.

**Teva**:        Maureen Cavanaugh, Chief Operating Officer, Teva US Generics; Christine Baeder, Senior Director, Customer Operations; Andrew Boyer, Senior Vice President, Generic Sales; Marc Falkin, Vice President, Marketing and Pricing.

**November 2-4, 2015**
**GPhA Fall Technical Meeting**
**<u>North Bethesda, Maryland</u>**

Representatives of at least Defendants Perrigo, Taro, and Teligent attended.

**February 22-24, 2016**
**GPhA Annual Meeting**
**<u>Orlando, Florida</u>**

Representatives of at least Defendants Amneal, Apotex, Impax, Mylan, and Perrigo attended.

23

**March 6-9, 2016**
**HDMA Distribution Management Conference and Expo**
**San Antonio, Texas**

**Apotex:**        Malinda Baumer (Manager, Customer Support)

**Amneal**:        Matt Beals, Customer Liaison and Axway Track and Trace Administer

**Aurobindo:**   David Palew (Director, Commercial Planning & Supply Chain)

**Breckenridge:** Bill Justice (Executive Director – Operations); Stephanie Puckly (Operations & Customer Service Manager)

**Dr. Reddy's:**  Heather Leone (Senior Associate, Transportation & Distribution)

**Impax:**        Robin Bartlett (Senior Director, IT Business Services); Gary Lerner (Supply Integrity SME)

**Glenmark**:    Lauren LaVista (Sr. Analyst Commercial Operations)

**Mylan**:        Jessica Saccoccio (National Account Manager); Joseph Shepherd (Head of N.A. Distribution Regulatory Compliance); Desiree Torek (Director)

**Par:**          Phillip Hulley (VP, Business Processes & Systems); Brian Magerkurth (SVP Supply Operations)

**Perrigo**:      Luma Raha (Global Operations Systems Program Lead); Roger Reimink (VP of Logistics & Supply Planning)

**Teva:**         Christopher Doerr (Senior Director, Trade Operations); Colleen McGinn (Director, DEA Compliance); Joseph Tomkiewicz (Manager DEA Compliance)

**Upsher-Smith:** Will Kopesky (Director of Supply Chain); Brad Leonard (Senior Director, National Accounts); Michael McBride (VP, Partner Relations); Morgan White (Sr. Director, Business Platforms)


**April 11-14, 2016**
**MMCAP 2016 National Member Conference**
**Minneapolis, Minnesota**

**Mylan**:        Mark Pittenger, Senior Director of National Accounts;

**Perrigo**:      Pete Hakenstad, National Account Manager;

**Sandoz**:       Christopher Bihari; Director, Key Customers;

**Teva**:          Nick Gerbi, Director National Accounts; and

**West-Ward**:   Elizabeth Guerrero, Director, National Accounts.


**June 12-15, 2016**
**HDMA 2016 Business and Leadership Conference**
**Colorado Springs, Colorado**

**Apotex**:       Jeffrey Hampton, Vice President, Commercial Operations; Beth Hamilton, National Sales Director; John Crawford, Director, National Accounts; David Rekenthaler, Vice President, Sales; James Van Lieshout, Vice President, Market Access and Trade Relations

**Dr. Reddy's**:  Victor Borelli; Senior Director, National Accounts; Jinping McCormick, Vice President, Sales and Marketing; Cynthia Medalle, Head Sales and Marketing, Generics

**Glenmark**:     Christopher Bihari, Director National Accounts

**Heritage**:     Anne Sather, Director, National Accounts

**Lannett**:      Tracy Sullivan, Director, National Accounts; Breanna Stillman, Sales Analyst; Bili Giannone, National Account Representative

**Mylan**:        Michael Aigner, National Account Director; John Baranick, Director of Trade Relations; Janet Belli, Director, National Accounts; Thomas Boyer, Vice President, Business Development; Priscilla Lanham, Associate Manager

**Par**:          Joe Cappello, Director, National Accounts

**Sandoz:**       Kirko Kirkov, Executive Director, Key Customers; Sean Walsh, Key Account Manager; Joe Hodge, Director, Key Customers; Sanket Shah, Manager, Customer Operations; Jason Jones, Director, Key Customers

**Sun**:          Christopher Schoen, Vice President, Trade Sales; Scott Littlefield, Trade Director, National Account Executive

**Teva**:         Theresa Coward, Senior Director, National Sales; Christine Baeder, Vice President, Commercial Operations; Sal Cuomo, Director, Trade Relations, Brand Pharmaceuticals; Nick Gerber, Director, National Accounts

**West-Ward:**    Joseph Ruhmel, National Account Director; Christopher Bonny, Executive Director, Commercial Business Development; Neal Gervais, Director, National Accounts; John Kline, National Account Director

**Zydus**:      Linda Andrews, Chargeback Operations Manager; Maria McManus, Corporate Account Manager; Kevin Green, Associate Vice President, National Accounts; Louis Pastor, Senior Director Trade Operations; Kristy Ronco, Vice President, Sales

**September 25-28, 2016**
**HDMA 2016 Annual Board and Membership Meeting**
<u>**Sulphur Springs, West Virginia**</u>

**Apotex**:      Steve a. Giuli, Vice President, Government Affairs; David Rekenthaler, Vice President, Sales

**Mylan**:      John Poulin, Senior Vice President, North America National Accounts, James Nesta, Vice President of Sales; Patrick Weaver, Head of Strategic Government Sales; Robert Tighe, Head of Mylan Pharmaceuticals

**Teva**:      Jessica Peters, Director, Trade Relations; Theresa Coward, Senior Director, Sales and Trade Relations

**Zydus**:      Michael Conley, Vice President, Wholesaler Channels

26
