### 28.    Lidocaine HCL

2245.    During the relevant time period, Fougera, Taro, and non-defendant Hi-Tech were the primary manufacturers of Lidocaine HCL 5% ointment.

2246.    The market for Lidocaine HCL 5% ointment was mature and at all relevant times had multiple manufacturers.

2247.    The prices of Lidocaine HCL 5% ointment were relatively low and stable for years.

2248.    In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment. At that time, Fougera was the sole generic manufacturer in the market and had a dominant share of the market. In order to cede share to Hi-Tech—as required by the fair share agreement—Sandoz needed to raise prices to maintain (or even augment) its dollar sales notwithstanding the loss of volume.

2249.    On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss ██████████ ██████████ referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time.

2250.    The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four minutes. The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone (according to the available phone records). During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

2251.    Fougera held its internal strategy meeting on November 28, 2011. A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B.. The calls lasted one minute each.

REDACTED – PUBLIC VERSION

2252.   Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

2253.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently. On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation. That call lasted one minute. An hour later, Kaczmarek called CW-6 back and they spoke for six minutes. Further, on March 7, 2013, E.B. called CW-6 and they spoke for five minutes. CW-6 called E.B. back a few minutes later. The call lasted one minute. During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

2254.   One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

2255.   After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant. For example, on March 22, 2012, ABC e-mailed Fougera to advise that it had received an offer for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he directed that CW-3 ███████ to the new player.

2256.   Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine Ointment. CW-6 suggested that Fougera ███████ ████████████████████████████ to which Kaczmarek replied: ████████

2257.   On May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. K.K. forwarded Wal-Mart's request to Kaczmarek, asking how he should respond.

REDACTED – PUBLIC VERSION

2258.    First thing the next morning, Kaczmarek called CW-6 and they spoke for ten minutes. A few hours later, Kaczmarek called CW-6 again and they spoke for three minutes. Immediately upon hanging up, CW-6 called E.B. of Hi-Tech. The call lasted one minute. A half hour later, CW-6 called E.B. again. The call lasted one minute. That same morning, Kaczmarek responded to K.K.'s e-mail stating, ████████████████████████████████████████ ███████

2259.    Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34% market share, and advised that Fougera was ████████████████████████ A Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech. Therefore, Kaczmarek recommended that Fougera ████████████████████████████████ █████ The next day, on May 19, 2012, CW-6 called E.B., speaking for four minutes – likely letting him know that Fougera was now done conceding customers to the new entrant.

2260.    One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine Ointment market. At that time, Sandoz (which by that point had acquired Fougera) had approximately 56% market share and Hi-Tech had 42%.

2261.    On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an internal e-mail, welcoming Aprahamian to the team and listing potential topics for a Monday call. One of those topics was █████████████████████████

2262.    Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several calls, including a call on March 19, 2013 lasting sixteen minutes and a call on March 21, 2013 lasting twelve minutes.

2263.    Later in the day on March 21, 2013, after Aprahamian's conversations with CW-3, J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine Ointment usage numbers

REDACTED – PUBLIC VERSION

by competitor at various customers and stating: ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████    The next day, on March 22, 2013, Aprahamian called CW-3 again. CW-3

returned the call and the two competitors spoke for seventeen minutes.

2264.    During these calls in March 2013, Aprahamian informed CW-3 that Taro would be

re-entering the Lidocaine Ointment market. CW-3, in turn, provided Aprahamian with non-public

price points that Sandoz was charging to its customers for the product.

2265.    Armed with this competitively sensitive information, on or about March 23, 2013,

Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing. Over the

next two weeks, Aprahamian and CW-3 exchanged numerous calls during which they discussed,

among other things, the allocation of customers to the new entrant, Taro. These calls are listed in

the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

2266.    Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3

had a difficult time obtaining that guidance from Kellum. Aprahamian told CW-3 that Taro would

be taking two customers from Sandoz – CW-3 understood that to mean that Taro planned to take

one wholesaler and one retailer.

REDACTED – PUBLIC VERSION

2267.    On April 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail asking, ██████████████████████████████████████████ CW-3 responded: ████████████████████████████████████████ ████████████████████████ J.R. replied by asking Kellum, ████████████ Kellum answered by providing his understanding of the conversations between CW-3 and Taro: ██ ████████████████████████████████████████████████ ████████ Later that day, J.R. sent another e-mail to others at Sandoz stating: ██████████ ██████████████████████

2268.    On April 8, 2013, Taro held a Sales and Marketing conference call. According to the meeting minutes, Perfetto reported the following: ████████████████████████████ The next day, on April 9, 2013, CW-3 called Aprahamian and they spoke for seven minutes.

2269.    On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one lasting eighteen minutes and another lasting nine minutes. Later that day, Aprahamian sent an internal e-mail attaching a ██████████████████████ The Summary detailed that, consistent with fair share principles, Taro's ████████ was ████████ and they had achieved ██████ share. For pricing, Taro matched ████████████████████████ ████████████████████████████████

2270.    The next day, on April 16, 2013, CW-3 called Aprahamian. Aprahamian returned the call and the two competitors spoke for eleven minutes. At the same time, J.J. of Taro called E.B., a senior Hi-Tech sales and marketing executive, and they spoke for eight minutes. Throughout the rest of April, CW-3 and Aprahamian would exchange at least ten more phone calls.

2271.    In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May 2013 for various products. With respect to Lidocaine Ointment, Taro noted that it did not bid at Omnicare because ███████████████

2272.    By January 2014, Sandoz held a ████████████████ which included a presentation on █████████████████████████ The presentation contained a slide titled, ████████████████ which included Taro, and identified the Lidocaine Ointment launch as a key launch for Taro. Sandoz described Taro's ████████████ ███████████████████████



2273.    Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment. For example, in March 2014 Sandoz created a list of products to target at Wal-Mart in 2014. With regard to Lidocaine Ointment, CW-3 responded that Sandoz had ████████████████████████████████ ████████████████████████████████████████████ ████████████

### 29.    Metformin ER

2274.    During the relevant time period, Actavis, Amneal, Lupin, Sun, and Teva dominated the market for Metformin ER tablets.

2275.    The market for Metformin ER was mature and at all relevant times had multiple manufacturers.

2276.    For years, the prices for Metformin ER were relatively low, stable, and declining. In the summer of 2015, Actavis and Lupin began to impose large price increases. Lupin increased prices more than 300% and Actavis increased prices about 250%.

REDACTED – PUBLIC VERSION

2277.    Between August 2015 and January 2016, Amneal, Sun, and Teva also each supported Actavis' and Lupin's price increase by following it themselves and by refraining from adding market share beyond each Defendant's "fair share" of the market.

2278.    Price data show steep and parallel price increases beginning in June 2015 by Actavis, Amneal, Sun, Lupin, and Teva for Metformin ER tables.

2279.    Senior sales executives from each Defendant were in active contact with each other during the period in which they implemented the price increase, both by telephone and at trade shows and industry events.

2280.    For example, and as detailed in the phone records tables depicted throughout this Complaint, between July 2015 and February 2016, David Berthold of Lupin was in frequent contact with S.R. and S.R. (both of Amneal); and with Mark Falkin and T.G. of Actavis. Berthold communicated by telephone with Actavis's T.G., in June, July, and October 2015, and again in May, June, and July of 2016. Similarly, during this same time period, Ara Aprahamian (on behalf of Taro's corporate parent, Sun) was in frequent contact with S.R. (Amneal); Rick Rogerson, Mark Falkin, and M.D. of Actavis; and Nisha Patel of Teva.

### 30.    Methadone HCL

2281.    During the relevant time period, West-Ward and non-defendant Mallinckrodt were the primary manufacturers of Methadone HCL tablets.

2282.    The market for Methadone HCL tablets was mature and at all relevant times had multiple manufacturers.

2283.    For years, the prices for Methadone HCL tablets were relatively low and stable. Before the summer of 2014, West-Ward and Mallinckrodt sold Methadone HCL tablets for less than ███ per pill. However, in June 2014, West-Ward and Mallinckrodt significantly increased their WAC prices by approximately 200%.

REDACTED – PUBLIC VERSION

2284.   Pricing data show steep and parallel price increases beginning in June 2014 by West-Ward and Mallinckrodt on Methadone HCL tablets.

2285.   Throughout this period, West-Ward and Mallinckrodt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and their fair share agreement.

2286.   For example, D.S., West-Ward's Senior Director and Head of Sales, and K.K., Mallinckrodt's National Account Director, both attended a February 2014 ECRM event at the Omni Amelia Island Plantation Resort in Amelia Island, Florida. They spoke by phone on May 15, 2014, and attended the August 2014 NACDS Total Store Expo in Boston. Upon information and belief, K.K. and D.S. agreed that West-Ward would lead the price increase and Mallinckrodt would follow it.

2287.   Approximately one month after the NACDS meeting, West-Ward announced WAC price increases for Methadone HCL tablets. A few weeks later, Mallinckrodt matched West-Ward's WAC prices.

### 31.   Methylphenidate

2288.   During the relevant time period, Actavis, Sandoz, non-defendant Mallinckrodt, Sun, Impax (through a predecessor entity Corepharma), and Par were the primary manufacturers of Methylphenidate.

2289.   The market for Methylphenidate tablets was mature and at all relevant times had multiple manufacturers.

2290.   For years, the prices of Methylphenidate tablets were relatively low and stable.

2291.   As of November 2012, there were three competitors in the Methylphenidate IR market – Mallinckrodt with 43% share, Watson (Actavis) with 37%, and Sandoz with 16%. For

REDACTED – PUBLIC VERSION

Methylphenidate ER, there were only two competitors – Mallinckrodt with 54% share and Sandoz with 16%.

2292.    On February 13, 2013, L.J., a Sandoz sales executive, sent an internal e-mail stating that he had heard that Mallinckrodt was experiencing supply issues on Methylphenidate. Further, L.J. requested the following:



2293.    A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s email to his sales team, including to CW-3, asking

2294.    That same day, on February 13, 2013, CW-3 called K.K., a senior Mallinckrodt sales executive, and they spoke for sixteen (16) minutes. Immediately upon hanging up, CW-3 called Defendant Aprahamian, then a sales executive at Actavis, and they spoke for sixteen (16) We need to get customer intel on the following important questions: 1) When will Mallinckrodt be back in the market for Methylphenidate SR and IR? Previously we heard June 2013. 2) What caused Mallinckrodt to leave the market? 3) Specifically on Methylphenidate IR, where Watson is also present, will Watson be able to take some of Mallinckrodt's share? minutes. A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned. That call lasted ten (10) minutes.

2295.    Later that day, CW-3 also sent the following e-mail conveying the information he had obtained from his competitors:

REDACTED – PUBLIC VERSION



2296.    As was his customary practice, CW-3 stated that the sources of his information were

his ▮▮▮▮▮▮ to keep out of writing the fact that he obtained the information directly from his

competitors – Mallinckrodt and Actavis (Watson). But CW-3's superiors were aware that the

information was coming directly from Mallinckrodt and Actavis, not a customer.

2297.    Having confirmed Mallinckrodt's supply issues – and the fact that the market share

leader would be out of the market for a period of time – Sandoz immediately set to work on

implementing a price increase on Methylphenidate.

2298.    Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price

increase analysis for Methylphenidate to send to the Pricing Committee for approval. In the analysis,

Sandoz noted that Mallinckrodt had a ▮▮▮▮▮▮▮▮ and recommended increasing price

by 340% on Methylphenidate IR and 125% on Methylphenidate ER. Sandoz estimated that these

increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

2299.   On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with Defendant Kaczmarek, then a senior executive at Mallinckrodt. Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts. During these conversations, CW-3 took the following contemporaneous notes in his Notebook:



2300.   Further, in the days leading up to the Sandoz price increase on Methylphenidate, CW-3 exchanged at least twenty-three (23) calls and text messages with Kaczmarek and K.K. These communications are listed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:02 | 0:00:00 |
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:35 | 0:03:14 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 12:50:02 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:08 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:40 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 16:50:58 | 0:00:00 |
| 3/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 17:27:43 | 0:01:02 |
| 3/6/2013 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (Mallinckrodt) | 6:53:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Outgoing | CW-3 (Sandoz) | 8:06:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:20:00 | 0:03:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:23:00 | 0:02:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 17:46:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:09 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:43 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:10:26 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:07 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:55 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:12:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:15:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:17:06 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:18:30 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:20:17 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:21:08 | 0:00:00 |

2301.   During this same time period, CW-3 was also in frequent contact with Defendant

Aprahamian at Actavis, as detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 15:49:40 | 0:00:23 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:04:00 |

2302.   After this series of communications with both Mallinckrodt and Actavis, on March 8,

2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR

between 293% and 449%, depending on the formulation, and on Methylphenidate ER by 125%.

2303.   Three days later, on March 11, 2013, Aprahamian of Actavis called Defendant

Perfetto, at that point a senior executive at Taro, and they spoke for fifty-four (54) minutes. The two

REDACTED – PUBLIC VERSION

competitors would exchange two more calls that day lasting one (1) minute and three (3) minutes. Immediately upon hanging up with Perfetto, Aprahamian called CW-3 of Sandoz. The call lasted one (1) minute. A few minutes later, Aprahamian called CW-3 again and they spoke for five (5) minutes.

2304.    The next day, on March 12, 2013, Perfetto e-mailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, regarding Methylphenidate stating:



2305.    Perfetto's reference to "Mutual" was to one of Taro's sister companies, which was also a subsidiary of Sun. When G.S. of Sun expressed some confusion over what product Perfetto was referring to, he sent the following e-mail to clarify:



REDACTED – PUBLIC VERSION

2306.    G.S. responded that Methylphenidate was a ████████████ for Sun and the company was working as quickly as possible to bring it to market.

2307.    Between March 13 and April 2, 2013, CW-3 of Sandoz and Defendant Kaczmarek exchanged at least twenty-nine (29) text messages. During that same time period, CW-3 was also communicating frequently with his contact at Actavis, Aprahamian, who was also in the process of transitioning to a position at Taro (his first day at Taro was March 18, 2013, but he continued to speak frequently with Actavis colleagues after his departure). Those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:42:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:07:00 | 0:16:00 |
| 3/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:28:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 14:44:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:33:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:34:00 | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:31:00 | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 12:36:00 | 0:18:00 |
| 3/25/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:26:00 | 0:01:00 |

2308.    During his calls with Aprahamian on April 2, 2013, CW-3 took the following contemporaneous notes in his Notebook regarding Methylphenidate:



2309.    Notably, as of April 2, 2013, Actavis had not yet published increased WAC pricing for Methylphenidate IR and would not do so for another several weeks.

REDACTED – PUBLIC VERSION

2310.    Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Sandoz, Mallinckrodt, Actavis, Sun, and Taro were all in attendance. These included senior executives -- D.P. of Sandoz, Defendant Kaczmarek of Mallinckrodt, G.S. of Sun, and Defendant Perfetto and J.K. of Taro.

2311.    The day after the NACDS annual meeting had concluded, on April 24, 2013, Actavis published increased WAC pricing for Methylphenidate IR that matched Sandoz's WAC pricing. Two days later, on April 26, 2013, Sun entered the Methylphenidate IR market and matched its competitors' WAC pricing. And, one week later, on May 1, 2013, Mallinckrodt reentered the market and matched competitor WAC pricing on both formulations. That same day, Kaczmarek sent a text message to CW-3 of Sandoz.

2312.    The day after Mallinckrodt announced that its supply disruption had been resolved, K.K. – a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former colleague from Sandoz. Upon information and belief, the purpose of this call was to determine which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

2313.    And that is just what happened. In August 2013, CW-2 and Armando Kellum – both of Sandoz – acknowledged conceding a large customer ███████████████████████ ███████████████ upon reentry into the market.

2314.    In late 2014, Sun's market share was well below what it determined would be its fair share of 17% in what was then a five-manufacturer market. S.K. and G.S. of Sun then coordinated with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

2315.    In 2014 and 2015, Impax and Par entered the Methylphenidate market. Rather than offer lower prices to win market share, both entered at the same inflated prices of Sandoz, Sun, Mallinckrodt, and Actavis. Impax announced identical list prices to the incumbent manufacturers,

REDACTED – PUBLIC VERSION

and although Par announced lower list prices, both Impax and Par NSP prices closely tracked the inflated prices of the other manufacturers.

2316.   Consistent with the overarching fair share agreement, Impax and Par communicated with the existing manufacturers to arrange for the seamless transfer of a "fair share" of the market without disrupting the price. For example, J.M., Sun's Manager of National Accounts, spoke with G.B. and K.O. – both senior sales executives at Par – to coordinate Par's entry into the market and arrange for Par to receive fair share in mid-2015.

### 32.   Methylprednisolone

2317.   During the relevant time period, Sandoz, Par, Greenstone, Breckenridge, and Cadista were the primary manufacturers of Methylprednisolone.

2318.   The market for Methylprednisolone 4 mg tablets was mature and at all relevant times had multiple manufacturers.

2319.   For years, the prices of Methylprednisolone were relatively low and stable. In early 2011, Methylprednisolone cost just a few cents per tablet. For example, Cadista sold packages of 21 4 mg tablets for 85 cents each. Between March and June 2011, however, Defendants colluded to implement a massive price increase.

2320.   When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices. Although the supply disruption—which in any event did not impact all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

2321.   Cadista and Sandoz both raised their prices by more than 2000%. For example, the same 21 tablet package that Cadista sold for 85 cents in March cost more than $19.00 by June. Sandoz concurrently imposed the same price increase as Cadista. Although Par and Breckenridge did not announce identical WAC prices, they followed the actual (NSP) prices of the others.

2322.    Qualitest – which was obligated by contractual price protections to maintain its current prices for large customers – complied with the fair share agreement by declining to supply Cadista's and Sandoz's customers. As Qualitest's contractual price obligations for Methylprednisolone phased out, Qualitest also raised its prices in accordance with Sandoz and Cadista.

2323.    Between October 2011 and October 2012, Greenstone and Breckenridge entered the market for Methylprednisolone. Consistent with the fair share agreement, Greenstone and Breckenridge communicated with the other Defendants and confirmed their intentions to enter the market at the elevated price. For example, in September 2011, D.N., the Director of Sales at Breckenridge, exchanged text messages with G.B., Par's Vice President of National Accounts, both before (August 14) and after (November 14) Breckenridge's entry.

2324.    Similarly, as Greenstone entered the market and ramped up from the spring to the fall of 2012, R.H., a Director of National Accounts at Greenstone, communicated by telephone with M.S., Breckenridge Vice President of Sales, in February and again in November.

2325.    In return, Cadista, Qualitest, and Sandoz conceded market share to the new entrants so that they could receive their "fair share."

2326.    In response to this price increase, customers pushed back on the Defendants to lower their pricing on Methylprednisolone. For example, Walgreens – who was supplied by Cadista – solicited Sandoz to submit a bid in December 2012. Upon learning that Walgreens was soliciting bids, Richard Tremonte, the Vice President of Sales & Marketing at Sandoz, instructed his sales associate that ███████████████████████████████████████████████████ ███████████████████████████████████████████ Of course, the ██████ was the collusion between the competitors that led to the price increase in the first place, which Tremonte was unwilling to put in writing. Tremonte confirmed this instruction with Armando Kellum of Sandoz.

2327.    Walgreens continued to seek a lower price on Methylprednisolone in 2013. In September 2013, Kellum of Sandoz intervened again to prevent a sales associate from bidding on the large account, which still belonged to Cadista. Upon learning that a sales executive was working on a bid for Walgreens for Methylprednisolone, Kellum instructed Dave Picard: ███████████ ████████████████████████████████████████████████████████████ ██████████ Upon learning of Kellum's concern, the sales associate then confirmed to Kellum that he would ████████████████████████████████ which was a lie. Kellum then pushed harder, admonishing his subordinate: ████████████████████████

2328.    Qualitest and Endo also openly acknowledged in a 2013 internal quarterly business review prepared in July 2013, that they had ████████████████████████████████ ██████████ which had resulted in a $600,000 credit above what Qualitest and Endo had budgeted to sell for Methylprednisolone in the second quarter, notwithstanding the loss of some accounts.

2329.    In September 2013, S.G. of Sandoz wrote to Walgreens about the possibility of picking up additional market share. Kellum quickly followed up with S.G., asking ███████████ ████████████████████████████ S.G. responded, ██████████████████ ██████████████████████████ Kellum admonished, consistent with the fair share agreement between Sandoz and Cadista (and the other manufacturers), ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████ S.G. confirmed to Kellum that Sandoz will ███████ ██████████

2330.    As a result of these collusive communications and each Defendants' adherence to the fair share agreement, the price increase on Methylprednisolone stuck, and Defendants have been able to sell the drug at supracompetitive levels ever since. Indeed, in August 2012, roughly a year

after the initial Methylprednisolone price increase, Kellum of Sandoz conducted an analysis to determine how likely its price increases were to ▮▮▮ He determined that, of the 54 products for which Sandoz had increased prices between 2010 and July 2012, the price increases had failed on only two occasions – a success rate of better than 96%.

### 33.   Naproxen Sodium

2331.   During the relevant time period, Glenmark and Amneal were the primary manufacturers of Naproxen Sodium tablets.

2332.   The market for Naproxen Sodium tablets was mature and at all relevant times had multiple manufacturers.

2333.   For years, the prices for Naproxen Sodium tablets were relatively low and stable. Prior to 2015, Naproxen Sodium cost pennies per tablet. However, in March 2015, Amneal and Glenmark imposed abrupt and substantial price increases of more than 1000%.

2334.   Price data show steep and parallel price increases beginning in January 2015 by Glenmark and Amneal for Naproxen Sodium tables.

2335.   Amneal and Glenmark communicated directly with each other in furtherance of the conspiracy. For example, Jim Brown of Glenmark (the VP of Sales) and Stephen Rutledge of Amneal (the Senior Director of Sales) frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015 – including before and after their respective price increases – which allowed the companies to increase prices and maintain the fair share rules.

2336.   As a result of this collusion, Defendants charged supracompetitive pricing on Naproxen Sodium to Plaintiffs and others in the United States.

### 34.   Oxycodone Acetaminophen

2337.   During the relevant timeframe, Actavis, Alvogen, Amneal, Aurobindo, non-defendant Mallinckrodt, Mayne, and Par were the primary manufacturers of Oxycodone Acetaminophen.

2338.   The market for Oxycodone Acetaminophen, sometimes abbreviated "Oxy/Apap,"was mature and at all relevant times had multiple manufacturers.

2339.   During the time period relevant to this Complaint, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, and Par dominated the market for Oxycodone Acetaminophen. Given the large number of competitors that entered the market for the drug between 2011 and 2015, pricing for Oxycodone Acetaminophen should have fallen substantially over time. Instead, the opposite occurred. For example, by December 2013, Mallinckrodt, Actavis, Alvogen, Amneal and Par all sold 100-tablet bottles of 10/325 mg pills that had cost roughly $18 per bottle throughout 2011 and 2012 for more than $80.

2340.   In the summer of 2013, market prices increased greatly. In the space of less than two months, Mallinckrodt, Alvogen, Amneal, and Actavis more than doubled their NSP prices. Around the same time, Aurobindo and Par re-entered the market. Rather than offer lower prices to win market share, they each entered at even higher prices than had been imposed by Mallinckrodt, Alvogen, Amneal, and Actavis.

2341.   Despite these price increases, each manufacturer's share of the market remained relatively stable, as contemplated by the fair share agreement.

2342.   Pricing data show steep and parallel price increases beginning in August 2013 by Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par for Oxycodone Acetaminophen.

2343.   Throughout this period, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Oxycodone Acetaminophen and their fair share agreement.

2344.   Although the Defendants did not increase prices on the drug until late 2013, Defendants ensured that the fair share agreement applied as new competitors entered the market. For example, Alvogen received approval to launch Oxy/Apap in July 2012. Upon learning that Alvogen was entering the market for Oxy/Apap, Dr. Reddy's – which did not manufacture the drug – reached out to W.H., Alvogen's EVP of US Commercial Sales, to congratulate him on the approval. W.H. responded that Alvogen's entry ████████████████████████████████ ████████████████████████████████ In other words, Hill confirmed to a Defendant that did not manufacture the drug that Alvogen was complying with the overarching agreement by not seeking any more than its "fair share" of the market.

2345.   Between July and December 2013, Defendants coordinated to more than quadruple their prices on Oxy/Apap. Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Qualitest quickly followed. Upon information and belief, the campaign to increase prices on the drug was spearheaded by Actavis and Mallinckrodt. Between July 2013 and December 2013, Marc Falkin of Actavis spoke with W.H., Alvogen's EVP of US Commercial Sales; S.R., VP of Sales at Amneal; R.C., the CEO of Aurobindo; and Walt Kaczmarek, Vice President and General Manager at Mallinckrodt. W.H. (Alvogen) and S.R. (Amneal) also coordinated with Aurobindo and Actavis, respectively, during this timeframe. Additionally, Falkin spoke with C.P. of Qualitest at least 10 times between May 2 and May 19, 2014.

2346.   On November 19, 2013, Qualitest received an inquiry from Econdisc to bid for Oxycodone Acetaminophen. Upon learning that the RFP was requested due to a price increase from the incumbent supplier. Qualitest and Endo declined to bid for this business based on its

commitment to the fair share rules. Further, although sales executives from Qualitest participated in the collusion, this was done on Endo's behalf, as it was Endo that held the ANDA for the drug. And following the acquisition of Par by Endo in May 2015, sales executives from Par began to sell Oxycodone Acetaminophen on behalf of Endo as well, adhering to the collusive pricing set before the acquisition, and continuing to abide by the fair share rules.

2347.   As a Teva sales executive reported internally in a November 26, 2013 e-mail to T.C., K.G., Rekenthaler, Patel, and others, ██████████████████████████████████ ████████████████████████████████████████████ This information proved accurate, as Actavis followed Mallinckrodt's price increase just a few days later. Notably, T.C. of Teva had spoken with W.P. of Qualitest a number of times in the weeks prior to this exchange. Although Teva did not manufacture Oxycodone Acetaminophen, it did manufacture Codeine/Acetaminophen, which is prescribed for similar uses. Reflecting the overarching nature of the conspiracy, Teva therefore communicated with competitors about drugs that it did not manufacture, because it did make drugs that could be substituted those drugs.

2348.   Between September and December 2013—when Oxycodone prices were increasing—Actavis's Falkin communicated by telephone with Par (multiple calls in September with J.H., Par Regional VP of Sales), Alvogen (multiple calls in October and November with B.H., Alvogen EVP of Sales), Amneal (voice and text in October with S.R., Amneal VP of Sales) and Aurobindo (communications in November and December with R.C., Aurobindo CEO).

2349.   While Falkin was communicating with the rest of the manufacturers, A.S., Actavis VP of Sales, and A.B., Senior VP of Sales and Marketing at Actavis, were communicating with W.K., VP and General Manager at Mallinckrodt, between September and December 2013. Actavis's A.B. also had multiple telephone communications during this period with S.R., Senior Director of Sales Finance at Amneal.

2350.    Alvogen's B.H. also communicated with Aurobindo's J.K., Director of National Accounts, in December 2013 and January 2014.

2351.    Mayne entered the market for Oxycodone Acetaminophen in late 2014. In planning for the launch, Stefan Cross, Mayne's President, encouraged his sales team to engage in ███ ██████████████████████ with competitors to determine which customers Mayne should target to receive its "fair share." Indeed, upon entry, Mayne received its "fair share" as the eighth entrant into the market without any disruption to price, in accordance with the overarching conspiracy.

2352.    As a result of these collusive communications, Defendants have been able to maintain Oxy/Apap at supracompetitive levels since July 2012.

### 35.    Permethrin

2353.    During the relevant time period, Actavis, Perrigo, and Mylan were the primary manufacturers of Permethrin cream.

2354.    The market for Permethrin cream was mature and at all relevant times had multiple manufacturers.

2355.    Prior to 2010, Perrigo and Actavis sold Permethrin cream for pennies per dose. However, beginning in May 2010, senior executives from Actavis and Perrigo began coordinating to increase prices substantially. On May 27, 2010, M.D. of Actavis (the Director of National Accounts) spoke by phone with T.P. of Perrigo (the Director of National Accounts). Upon information and belief, the two executives reached an agreement to double their WAC prices for Permethrin by July 2010.

2356.    After successfully doubling their prices, M.D. (Mylan) and T.P. (Perrigo) began speaking again in August 2011 to discuss another price increase. The two spoke twice on August 5, and at least four times on August 8, 2011. Upon information and belief, these conversations resulted

REDACTED – PUBLIC VERSION

in an agreement that each company would increase their prices on Permethrin by at least an additional 200% (on top of the 2010 price increase).

2357.    In early 2013, Perrigo and Actavis learned that Mylan would be entering the market. As a result, M.D. (Mylan) and T.P. (Perrigo) spoke again on March 12, 14, and 18 to coordinate yet another price increase of approximately 100%, which Perrigo led by increasing its WAC prices on March 13. M.D. and T.P. then spoke again on April 11, in order to confirm their third successful price increase on Permethrin, which Actavis announced on April 25.

2358.    In June 2013, Mylan entered the market for Permethrin. Even though prices were more than 1000% higher than they had been in 2010, Mylan entered the market at higher prices than either Actavis or Perrigo, and announcing identical WAC prices. Pursuant to the fair share rules, Perrigo and Actavis conceded market share to Mylan.

2359.    To coordinate Mylan's entry and determine which customers Actavis and Perrigo would concede, Jim Nesta of Mylan and T.P. of Perrigo called each other nine times between August 27 and August 28, 2013. Nesta and T.P. then spoke again on November 15, 2013. T.P. also acted as the intermediary between Nesta and M.D. (Mylan), as he continued to speak with M.D. regularly about the Permethrin market, including multiple calls on August 21, August 23rd, September 6th, September 9th, and September 10th and once on September 11th, 2013.

2360.    As a result of this coordination between the three companies, Mylan, Actavis, and Perrigo were able to implement the fair share rules and maintain supracompetitive pricing on Permethrin cream that they sold to Plaintiffs and others in the United States.

2361.    For example, on May 27, 2010—around when Actavis and Perrigo first raised NSP prices—M.D., Actavis's Director of National Accounts spoke by telephone with T.P., Perrigo's Director of National Accounts for nearly 10 minutes.

2362.   The two spoke again the following summer. In late July 2011, Actavis announced a WAC price increase. Shortly thereafter, the Perrigo Director of National Accounts and the Actavis Director of National Accounts spoke for three minutes on August 3. Two days later, Perrigo announced an identical WAC price. That day, the Perrigo Director called the Actavis Director and appears to have left a message. A few days later, on August 8, they finally connected and spoke for nearly 9 minutes.

2363.   This conduct repeated in 2013. This time,. The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes. They spoke again for nearly 25 minutes on April 12., Actavis announced WAC prices identical to those of Perrigo.

2364.   Before Mylan entered the market in late 2013, Mylan's Nesta and Perrigo's T.P. (Director of National Accounts) communicated. On August 27, the two executives exchanged messages but finally connected on the 28th and spoke for 10 minutes. They spoke again on November 15. Perrigo's Director of National Accounts again spoke to M.D., Director of National Accounts at Actavis on August 21, 23 and September 11, 2013.

### 36.   Perphenazine

2365.   During the relevant time period, Qualitest/Par and Sandoz were the primary manufacturers of Perphenazine.

2366.   The market for Perphenazine was mature and at all relevant times had multiple manufacturers.

2367.   In 2007 and 2008, Par and Sandoz sold Perphenazine tablets for less than ███ per unit. However, Qualitest left the market in 2009 due to a disruption in supply, and Sandoz dramatically increased prices. When Qualitest re-entered in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it matched Sandoz's increased price.

REDACTED – PUBLIC VERSION

2368.   The market shares of Qualitest and Sandoz are wholly reflective of each company's adherence to the fair share rules. As of May 2010, Qualitest had less than 14% market share, compared to Sandoz's 86.1% share of the market. Over the next year, Sandoz conceded approximately 20% market share to Qualitest, and by May 2011, Qualitest's share was more than 33% compared to 66% for Sandoz. But during this time, despite the fact that Qualitest increased its market share from 13% to 33%, prices charged by both companies remained virtually unchanged.

2369.   Indeed, between May 2011 and May 2014, the respective market shares of Qualitest and Sandoz remained essentially fixed, with Par supply roughly one third of the market, and Sandoz supplying the remaining two thirds. As a result of their adherence to the fair share rules, the companies were able to increase prices twice (once in 2011 and again in 2013), and as a result, their average prices roughly doubles from the supracompetitive pricing establishing by Sandoz in 2009. And although executives from Qualitest and Sandoz did communicate regarding their pricing during this time, their adherence to the fair share rules rendered the price increases virtually self-executing. Because each company knew that the other was committed to the conspiracy, the communications about pricing were essentially a formality.

2370.   In mid-2014, the companies reallocated share to be more consistent with fair share rules, and Sandoz conceded additional share to Qualitest so that the two companies had market share close to 50%. Following this reallocation, Sandoz and Qualitest maintained market share within a few percentage points of 50% until at least the end of 2016.

### 37.   Pentoxifylline

2371.   Pentoxifylline, also known by the brand names Pentopak, Pentoxil, and TRENtal, is a medication used to reduce leg pain caused by poor blood circulation.

2372.   During the relevant time frame, Defendants Teva, Mylan, Apotex and Valeant were the primary manufacturers of Pentoxifylline.

2373.   The market for Pentoxifylline was mature and at all relevant times had multiple manufacturers.

2374.   In 2008 and 2009, Teva, Mylan and Apotex NSP unit prices for Pentoxifylline tablets were approximately ███████   Beginning at least as early as August 2009, these Defendants agreed to impose significant price increases.

2375.   When Apotex exited the market in late 2009, Mylan and Teva took the opportunity to raise prices significantly. NSP prices more than doubled. Consistent with their Fair Share agreement, Teva and Mylan achieved nearly an equal split of dollar sales during 2010 and most of 2011.

2376.   In October 2011, Apotex re-joined the market. Instead of competing for customers by lowering prices, as would be expected in a competitive generic market, the addition of another manufacturer had the opposite effect; all three manufactures increased prices. By early 2012, Pentoxifylline effective prices had nearly tripled over 2008 levels and remain elevated today.

2377.   The pattern repeated in October 2014 when Valeant entered the market. Teva, Mylan, and Apotex had led a price increase but Valeant was able to coordinate with these companies – through Purcell, Saharyan, and others – to obtain its fair share because the relationships existed between Valeant and the other conspirators to implement the fair share rules. Rather than offer lower prices to win customers, Valeant matched the market pricing of Teva, Mylan and Apotex.

2378.   Throughout this period, Teva, Mylan, Apotex and Valeant met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pentoxifylline and their fair share agreement.

2379.   For example, during 2010 and 2011, when Teva and Mylan imposed price increases and split the market for Pentoxifylline, the contacts between the two manufacturers were extensive. For example, Teva's Rekenthaler was communicating by phone with Mylan employees at least as

early as April 2010. Rekenthaler communicated with J.K., Mylan Vice President and Executive

Director of Sales in April and May 2010. Rekenthaler also communicated frequently with Jim Nesta,

Muylan Vice President of National Accounts, from 2012 until Rekenthaler left Teva in the spring of

2015.

2380. Rekenthaler was not the only employee to cultivate relationships with Mylan. R.C., a

Teva Vice President of Sales, was, until he left Teva to become the CEO of Aurobindo, in contact

with B.P., Mylan's Senior Vice President of National Accounts, as well as Nesta.

2381. Similarly, in 2014 when Teva wanted to increase its prices for Pentoxifylline, it

reached out to coordinate with Mylan and Apotex in the days and weeks leading up to the increase.

For example, Teva's Rekenthaler spoke to J.H., a Senior Vice President and General Manager at

Apotex, on March 20 for four (4) minutes and March 25, 2013 for two (2) minutes. Then, on the day

that Teva imposed price increases, April 4, 2014, Rekenthaler spoke to Nesta of Mylan for six (6)

minutes. A week after Teva increased its price – on April 11, 2014 – Rekenthaler followed-up with

the SVP at Apotex and the two spoke again for five (5) minutes. During these calls, Rekenthaler

gathered Apotex's pricing plans and conveyed them to his Teva colleague, Nisha Patel.

### 38.   Phenytoin Sodium

2382. During the relevant time period, Mylan, Taro, Amneal, and Sun were the primary

manufacturers of Phenytoin Sodium capsules.

2383. The market for Phenytoin Sodium capsules was mature and at all relevant times had

multiple manufacturers.

2384. For years, the prices for Phenytoin Sodium capsules were relatively low and

declining. Mylan, which had a dominant share of the market going back to at least January 2008,

kept its NSP prices high, but as a result of its higher prices, Mylan saw its market share erode. Sun,

Taro, and Amneal gained market share in the Phenytoin Sodium market. But once shares began to equalize into fair shares, these Defendants were ready to coordinate a price increase.

2385.   In 2014, Mylan, Taro, Amneal, and Sun decided to re-align prices at a much higher level. Price data show steep and parallel price increases beginning in March 2014 by Mylan, Taro, Amneal, and Sun for Phenytoin Sodium capsules.

2386.   Within the space of a few months, Mylan, Taro and Amneal announced price increases that brought their WAC prices to identical levels. The increases ranged from a little less than 200% to more than 300%, but all ended up at the same price.

2387.   Sun did not change its WAC price, but it did dramatically increase the prices it charged its customers. Sun's Phenytoin Sodium NSP prices increased approximately 300% between March 2014 and March 2015, alongside the prices of Taro and Amneal, and ending up higher than Mylan's prices.

2388.   In early April 2014, Taro began formulating its list of products for the June 2014 Increases. On April 3, 2014, Aprahamian exchanged an e-mail with A.S., a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, 2014, Taro had added the product to its price increase list.

2389.   Three days later, on April 10, 2014, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two minutes and ten minutes, respectively. Notably, the competitors would not speak again by phone until June 4, 2014, one day after Taro increased its pricing on Phenytoin Sodium.

2390.   On April 16, 2014, Walgreens – an Amneal customer – e-mailed Taro asking for a bid on Phenytoin Sodium. After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: ███████████████████████

██████ On April 24, 2014, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product.

2391.    Sun also indicated knowledge of the coordinated price increase. On April 21, 2014, W.F., Sun Senior Manager of National Accounts, informed a colleague: "No price increase yet on Phenytoin but I have heard one might be coming." Earlier that day, G.S., President of Sun, communicated by telephone with Taro's M.P., Chief Commercial Officer. The two communicated by telephone again later that month, and in May, June, July, August and September 2014.

2392.    Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona. Key representatives from Taro, Mylan, Amneal, and Sun all attended the conference. The attendees included Aprahamian and Perfetto of Taro, Jim Nesta of Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

2393.    While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed. Indeed, between April 27 and April 29, Nesta of Mylan and S.R. of Amneal exchanged at least twenty-two phone calls and text messages. Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an e-mail to an administrative clerk at Taro, asking, ███████████████████████████████████████████████

2394.    One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium. In the report, Mylan noted that it could supply in July 2014 and identified the product as █████ ████████████████ Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

REDACTED – PUBLIC VERSION

2395.    In the days leading up to the generation of the P&C Report, Nesta and M.A., a sales executive at Mylan, both communicated multiple times with S.R. of Amneal. These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

2396.    Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its competitor, Amneal.

2397.    As detailed above, on June 2, 2014 Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium. That same day, S.R. of Amneal called both M.A. and Nesta several times. Over the next several days, all three competitors would exchange a number of calls. These are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

2398.   On July 2, 2014, S.K., a sales executive at Sun, sent an internal e-mail advising G.S., a senior executive at Sun, and others, that Amneal had raised pricing on Phenytoin Sodium. However, Amneal would not publish its increased WAC pricing until several months later – on September 1, 2014.

2399.   In the days leading up to July 2, Taro, Mylan, and Amneal continued to communicate. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

REDACTED – PUBLIC VERSION

2400.    On July 10, 2014, Wal-Mart e-mailed Mylan requesting a bid on Phenytoin Sodium because its incumbent supplier had increased its pricing. That same day, M.A. of Mylan called Aprahamian. The call lasted seven minutes. First thing the next morning, on July 11, 2014, Aprahamian called S.R. of Amneal. S.R. returned the call a few minutes later and they spoke for three minutes. Later that day, Courtney Wilson, a pricing executive at Mylan, sent an internal e-mail regarding the Wal-Mart opportunity stating: █████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ (emphasis in original).

2401.    On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium. Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210% to match market pricing.

2402.    On July 31, 2014, Wal-Mart was still looking for a supplier for Phenytoin Sodium and reached out to Taro asking for a bid. E.G., a Taro sales executive, forwarded the request along internally, asking ████████████████ Although it was confirmed that Taro could, in fact, supply the customer, A.L., a Taro pricing executive, advised that E.G. respond to the Wal-Mart request as follows: █████████████████████████████████████████████████████ ████████████████████████████ To that, Aprahamian replied to Likvornik separately stating – ██████████████████████.

2403.    One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing. Leading up to the increase, Mylan's Nesta was in touch with A.L., Amneal's Director of Pricing, in June, August and September 2014.

2404.    These Defendants continued to abide by the fair share agreement well after the price increases became effective. For example, in July 2015, Taro chose not to bid on Phenytoin Sodium

Capsules for a customer "due to Taro having enough market share." In August 2015, Taro again declined an opportunity because "we have our share."

### 39.   Pilocarpine HCL

2405.   During the relevant time period, Lannett, Actavis, and Impax were the primary manufacturers of Pilocarpine HCL tablets.

2406.   The market for Pilocarpine HCL tablets was mature and at all relevant times had multiple manufacturers.

2407.   Prior to 2014, Pilocarpine tablets cost pennies per dose. However, when Impax claimed to suffer a brief disruption in supply in late 2013, Lannett and Actavis conspired to increase prices by approximately 200% in March 2014. When Impax re-entered the market in the fall of 2015, it matched or exceeded the prices offered by Actavis and Lannett, but was still able to recover its fair share of the market (because Actavis and Lannett conceded this share back to Impax pursuant to the fair share rules).

2408.   Senior sales executives from Actavis, Lannett and Impax communicated directly with each other in furtherance of the conspiracy. For example, Falkin of Actavis spoke with K.S. of Lannett on November 10th, 22nd and 25th, and December 12th and 13th of 2013, while the two companies were determining what to do in response to Impax's claimed supply disruption. They spoke again on January 17, 2014, twice on February 20th and once on February 27th, just weeks before the two companies imposed their price increases. Likewise, Falkin and M.G. of Impax spoke on November 11, 2013. K.S. of Lannett and D.D. of Impax also spoke once January 15, 2014. Upon information and belief, during these calls, Defendants promised to follow Lannett's price increase and to abide by the fair share rules upon Impax's reentry into the market.

2409.   Pricing data show steep and parallel price increases beginning in January 2014 by Lannett and Actavis for Pilocarpine HCL tables, with Impax joining the price increases when it re-entered the market.

2410.   Throughout this period, Lannett, Actavis, and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pilocarpine HCL and their fair share agreement.

2411.   As a result of this coordination, Defendants were able to charge supracompetitive prices on Pilocarpine HCL to Plaintiffs and others in the United States.

### 40.   Potassium Chloride

2412.   During the relevant time period, Upsher-Smith, Sandoz, Actavis, Zydus, and Mylan were the primary manufacturers of Potassium Chloride 8 MEQ, 10 MEQ and 20 MEQ tablets.

2413.   The market for Potassium Chloride tablets was mature and at all relevant times had multiple manufacturers.

2414.   For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz, and Actavis were the dominant suppliers in the market in the early years. Upsher-Smith manufactured tablets and marketed and sold them under the brand name KlorCon. Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

2415.   In the summer of 2010, Upsher-Smith, Sandoz, and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately six weeks, all three manufacturers tripled their WAC prices. Their NSP prices quadrupled.  For example, bottles of 100 tablets of 8 MEQ dosage strength that sold for less than $7.00 at the end of July 2010 increased to more than $42.00 by mid-August.

2416.   Upon information and belief, this price increase was agreed upon during telephone calls between K.K., the Director of Contracts and Pricing at Sandoz, and D.Z., the Senior National Accounts Manager at Upsher-Smith, who spoke several times in August 2010, including before and after price increase. Additionally, representatives of each of the three companies met at trade shows and other industry events throughout Summer 2010.

2417.   In June 2011, Zydus entered the market. Rather than offer better prices to win market share, Zydus entered at the high prices of Upsher-Smith, Sandoz, and Actavis. Prior to Zydus' entry, Kristy Ronco – the company's Associate Vice President of National Accounts – communicated frequently with CW-4 of Sandoz. The purpose of these communications was to determine which accounts Zydus would add in order for the company to receive its "fair share" of the market. In exchange for Zydus' support of the supracompetitive conspiracy pricing for Potassium Chloride, Actavis, Sandoz, and Upsher-Smith each conceded market share to Zydus.

2418.   As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

2419.   In late 2014, Mylan also entered the market for Potassium Chloride. Consistent with the fair share agreement, Jim Nesta of Mylan reached out to Marc Falkin of Actavis in September 2014 to coordinate Mylan's receipt of its "fair share" of the market. Like Zydus, Mylan agreed to support the pricing as already fixed by Actavis, Sandoz, and Upsher-Smith, and in return, the existing manufacturers of Potassium Chloride conceded market share to Mylan.

2420.   Internal Upsher-Smith documents prepared in late 2014 confirmed that the fair share agreement was followed by all competitors, noting that ████████████████████████████ ████████████ and that ██████████████████████████████ The document also

advocated for another price increase, noting – wholly consistent with the overarching fair share agreement – that Upsher-Smith could ███████████████████████ in part because ████████████████████████████████████████████ and in part because ██████████ ██████████████████████████████████████████████████████████████████████.

2421.   Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus, and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and their fair share agreement.

2422.   For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated numerous times by telephone both before and after the August WAC price increases by Sandoz and Upsher-Smith.

2423.   During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by telephone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

2424.   In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Nesta spoke to Falkin at Actavis twice on September 23, 2014. They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market, it did so at elevated prices consistent with the fair share and price-fixing agreement.

2425.   As a result of these collusive communications, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride tablets and capsules since August 2010.

### 41.   Prednisone

2426.   During the relevant time period, Actavis, Cadista, Qualitest/Par, and West-Ward were the primary manufacturers of Prednisone tablets.

2427.   The market for Prednisone was mature and at all relevant times had multiple manufacturers.

2428.   Prior to 2013, Prednisone tablets cost pennies per pill. However, beginning in February of 2013, Actavis, Cadista, Qualitest, Roxane, and West-Ward colluded to raise their prices by approximately 200%. In January 2013, a marketing manager at Actavis inquired about the possibility of increasing prices on Prednisone. At the time, Cadista had exited the market temporarily, and Actavis knew from its regular communications with West-Ward that its supply was limited.

2429.   In early March 2013, Qualitest submitted revised pricing to Rite Aid for Prednisone knowing that it would be rejected, which allowed Qualitest to concede the account to Roxane in accordance with the fair share rules, and in return, Roxane agreed to support the upcoming price increase (which it did).

2430.   Between April and June, Actavis, Roxane, and Qualitest each increased their prices on Prednisone by approximately 200%. Additionally, West-Ward was able to cure its supply issues and followed the price increase as well during this same timeframe. And when Cadista reentered the market in August, it followed the higher pricing as well. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G, VP of Sales and Marketing at West-Ward.  In accordance with the fair share rules, Actavis, Qualitest, and Roxane allowed West-Ward and Cadista to receive their fair share of the market.

2431.   Senior sales executives continued to communicate to implement this agreement. For example, shortly after joining Actavis in July 2013, Mark Falkin began communicating with M.D. of Cadista (the VP of Sales) to coordinate Cadista's reentry into the market. Falkin also spoke regularly with C.P. of Qualitest beginning in September 2013. Additionally, Mark Falkin of Actavis spoke with L.M. of Qualitest twice on May 2, 2014.

2432.    Furthermore, throughout this period, Actavis, Cadista, Par, and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prednisone tablets and their fair share agreement.

2433.

2434.    D.S., who began as Head of Sales at West-Ward in January 2014 after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West-Ward. D.S. communicated by telephone with K.O. throughout 2014. They communicated in January, February, April, May, June, July, October, November, and December of that year. Prices for Prednisone remained high throughout this time.

2435.    J.H., Par Regional VP of Sales at Par, began communicating with Falkin shortly after Falkin joined Actavis. The two communicated by telephone in September 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August, and October.

2436.    As a result of this coordination, Defendants were able to charge supracompetitive prices for Prednisone to Plaintiffs and others in the United States.

### 42.    Prednisolone Acetate

2437.    During the relevant timeframe, Sandoz and Greenstone (under the Pacific Pharma label) were the primary manufacturers of Prednisolone Acetate.

2438.    The market for Prednisolone Acetate was mature and at all relevant times had multiple manufacturers.

2439.    For years, the prices for Prednisolone Acetate ophthalmic suspension were relatively low and stable. Between July and November 2013, however, Sandoz and Greenstone coordinated large price increases. WAC prices for Prednisolone Acetate jumped more than 500% and to identical levels. NSP prices jumped a similar amount.

REDACTED – PUBLIC VERSION

2440.   Senior sales executives from Sandoz and Greenstone communicated directly with each other in furtherance of the conspiracy. As noted with respect to Clindamycin, Latanoprost, and Eplerenone, Kellum of Sandoz was in frequent contact with R.H. and Jill Nailor of Greenstone during this time period, and other executives from both companies also communicated in furtherance of the conspiracy. Indeed, between 2011 and 2014, there were at least 360 communications between senior sales executives of the two companies in furtherance of the conspiracy.

2441.   During this period, Sandoz and Greenstone market shares remained stable owing to their fair share agreement, to which they closely adhered during the relevant period. Sandoz consistently had more than its fair share of the market. As the first generic entrant in what was essentially a two-player market, Sandoz was arguably entitled to 60% share under the conspiracy's rules. However, Sandoz consistently maintained market share above this threshold, and as such, it was cautious not to bid for any new business on the drug. For example, on January 22, 2014, OptiSource approached Sandoz to see if it was interested in supplying OptiSource members with Prednisolone Acetate. Sandoz's Kellum relayed to his colleagues, ███████████████████████████ ██████████████████████████████████ Kellum further advised, ████████████ ██████████████████████████████████ D.H. at Sandoz agreed with this strategy, and C.B. indicated that he would communicate to OptiSource that █████████████ ██████████████████ Sandoz's Kellum also encouraged his colleagues to walk away from competing for what was presented as a █████████████████████ to provide Prednisolone Acetate because prices had gone up and were already stabilized.

2442.   Pricing data show steep and parallel price increases beginning in July 2013 by Sandoz and Greenstone on Prednisolone Acetate.

REDACTED – PUBLIC VERSION

2443.   Throughout this period, Sandoz and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Prednisolone Acetate and their fair share agreement.

2444.   For example, representatives from Greenstone and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada on August 10-13, 2013. Less than two weeks later, Sandoz announced a large WAC price increase, which Greenstone promptly followed.

### 43.   Prochlorperazine Maleate Suppositories

2445.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine Maleate Suppositories. Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine Maleate Suppositories similarly and maintained a virtually even split of the market.

2446.   In mid-January 2013, Perrigo hired Boothe as an executive. On January 25, 2013, Orlofski called Boothe for the first time ever, according to the available phone records.

2447.   A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

2448.   The next business day, on Monday, March 4, 2013, Orlofski met with Vogel- Baylor in his office at 1:00 p.m. Later that same day, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to run sales reports on Prochlorperazine Maleate Suppositories  in anticipation of a price increase. M.S. provided the requested information to Vogel-Baylor on March 5, 2013.

2449.   On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine Maleate Suppositories. Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

2450.    On March 19, 2013, G&W implemented the 200% increase. That same day, Orlofski

called Boothe. The two competitors would exchange two more phone calls later that day, including

one call lasting six (6) minutes. These were the first calls exchanged between Orlofksi and Boothe

since their lunch on March 1, 2013, according to the available phone records. Orlofski and Boothe

would exchange one text message and one more phone call in March 2013 and would not

communicate by phone again until August 30, 2013, according to the available phone records.

2451.    On April 11, 2013, Perrigo announced it would also be increasing its WAC price for

Prochlorperazine Maleate Suppositories  by 200% from $34.85 to $104.55. However, Perrigo waited

to notify its customers of the specific changes to its contract pricing until after attending the

NACDS 2013 annual meeting.

2452.    The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in

Palm Beach, Florida between April 20 and April 23, 2013. Boothe, Orlofksi, and Vogel-Baylor

attended the conference and had many opportunities to meet in person to discuss the

Prochlorperazine Maleate Suppositories increases at various programming and social events.

2453.    For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together

with W.S., a representative of Pfizer. That same evening, Boothe and Orlofski also attended a wine

tasting hosted by Upsher-Smith. Also on Sunday, Vogel-Baylor told a potential GPO customer that

G&W would need to understand who its incumbent supplier was for Prochlorperazine Maleate

Suppositories, among other drugs, before participating in a bid for new business.

2454.    Over the next several days, Perrigo sent out price increase notices to its customers

for Prochlorperazine Maleate Suppositories specifying its new contract pricing.

2455.    On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed C.M., a sales

executive at G&W, asking for a bid on Prochlorperazine Maleate Suppositories. C.M. declined to bid

on the new business, responding:



2456.   Although G&W turned away this business, a few months later it would take the customer back in retaliation against Perrigo for taking its Target business through McKesson's One Stop program. After trading these accounts, the competitors fell back in line with the agreement. By the fall of 2013, the Prochlorperazine Maleate Suppositories market was again virtually evenly split between Perrigo and G&W.

### 44.   Prochlorperazine Maleate Tablets

2457.   As detailed further above in Section IX.B.12., in August 2014, Patel and Rekenthaler of Teva led price increases on a number of drugs, including Prochlorperazine tablets.

2458.   In order to coordinate the price increase with Mylan, Cadista, and Sandoz, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11. Nesta, in turn, communicated with M.D., a senior sales executive at Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

2459.   Further, Sandoz has admitted in its deferred prosecution agreement that, during this time period, it was "conspiring with [Teva] to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States." This collusion extended to Prochlorperazine tablets.

45.     **Spironolactone HCTZ**

2460.   During the relevant time period, Mylan, Sun, and Greenstone were the primary manufacturers of Spironolactone HCTZ.

2461.   The market for Spironolactone HCTZ tablets was mature and at all relevant times had multiple manufacturers.

2462.   After years of relatively low and stable pricing, in early 2013 the prices of Spironolactone HCTZ radically increased. Within approximately one month, Mylan, Sun, and Greenstone each announced WAC price increases of approximately 400%. Their NSP prices also skyrocketed as customers were forced to pay much higher price.

2463.   A little more than a year later, in the summer of 2014, all three manufacturers again raised prices. Almost simultaneously, Mylan, Sun, and Greenstone imposed NSP price increases of approximately 50%.

2464.   Pricing data show steep and parallel price increases beginning in January 2013 for Spironolactone HCTZ by Mylan, Sun, and Greenstone.

2465.   Greenstone, Mylan, and Sun and communicated directly with each other in furtherance of the conspiracy. As noted elsewhere in this Complaint, Jim Nesta of Mylan was in constant contact with Jill Nailor and R.H. of Greenstone throughout the conspiracy, including during the periods that Defendants were implementing their price increases on Spironolactone HCTZ. For example, R.H. and Nesta spoke at least 12 times between February 2013 and April 2013. Nailor and R.H. were likewise in frequent contact with Aprahamian, Perfetto, and CW-1 of Sun's subsidiary, Taro. Additionally, ███████ of Mylan spoke with Chris Urbanski of Sun/Taro for twenty-five minutes on March 17, 2014 and for five minutes on March 18th. M.A. of Mylan and Aprahamian of Taro (and on behalf of Sun) spoke several times during this period: on March 18,

REDACTED – PUBLIC VERSION

2014, on June 4th, twice on June 6th, once on June 9th, at least three times on July 2nd and for seven minutes on July 10th.

2466.   Also throughout this period, Mylan, Sun, and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Spironolactone HCTZ tablets and their fair share agreement.

2467.   For example, Mylan, Sun, and Greenstone all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. During this time, all three manufacturers announced WAC price increases of more than 400%.

### 46.    Triamcinolone Acetonide

2468.   During the relevant time period, Sandoz, Perrigo, Taro, Par, and Ascend were the primary manufacturers of Triamcinolone Acetonide cream, Sandoz, Perrigo, and Taro were the primary manufacturers of Triamcinolone Acetonide ointment, and Rising and Taro were the primary manufacturers of Triamcinolone Acetonide paste.

2469.   The markets for Triamcinolone Acetonide cream and ointment were mature and at all relevant times had multiple manufacturers.

2470.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment. They took advantage of their already ongoing collusive relationship to raise prices on both products. On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment. CW-3, a sales executive at Fougera, later described these price increases as a ██████. On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

REDACTED – PUBLIC VERSION

2471.    In the days leading up to, and surrounding these increases, CW-6 and T.P. (Perrigo)

exchanged at least eight calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

2472.    After the price increases, both companies adhered to their understanding not to

poach the other's customers or improperly take advantage of the price increase by seeking additional

market share.

2473.    For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an

opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase.

CW-3 of Fougera e-mailed Kaczmarek, his supervisor, stating, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

2474.    That same day, Kaczmarek called CW-6. The call lasted two minutes. CW-6 then

called T.P. and they spoke for three minutes. CW-6 hung up with T.P., called Kaczmarek back, and

they spoke for five minutes. Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail,

with a copy to CW-6. Confident that the agreement with Perrigo was strong, Kaczmarek stated,

████████████████████████████████████████   At the same time, T.P. called his

supervisor, Wesolowski, and they spoke for five minutes.

2475.    The following week, on August 3 and 6, K.O. of Par spoke twice with a sales

executive from Taro calling from the company's main line. Between October 2010 and March 2011,

K.O. spoke at least 10 times with D.S. of Taro, and also exchanged calls with Taro's main company line during this period as well (which makes it impossible to determine from phone records whether she was speaking with D.S. or someone else from Taro). Upon information and belief, K.O. communicated to D.S. that Par was following the price increase on Triamcinolone Acetate as well, and that Par would also follow the fair share rules and not poach market share from the other manufacturers.

2476.   Specifically in the cream market, Fougera, Perrigo, and Par approximately tripled their prices in the second half of 2010 to bring them in line with those of Taro. In early 2011, Taro then proceeded to more than double its prices. Although Taro's prices were much higher than Fougera, Perrigo, and Par, it was nonetheless able to maintain a relatively stable share of the market, consistent with their fair share agreement. As Taro noted in an internal document in 2012, ██████ ███████████████████████

2477.   Specifically in the ointment market, Fougera and Perrigo imposed significant price increases between June and September 2010.  Their prices more than tripled and remained at supracompetetive levels thereafter. When Taro re-launched its ointment in June 2011, rather than offer lower prices to win customers, it entered the market at even higher prices than Fougera and Perrigo, thus entering without disturbing the already high prices.

2478.   Pricing data for Triamcinolone Acetonide cream and ointment show the parallel and inflated pricing by Fougera, Perrigo, Taro, Par, and Ascend.

2479.   Throughout this period, Fougera, Perrigo, Taro, Par, and Ascend met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Triamcinolone Acetonide cream and ointment and their fair share agreement.

2480.   For example, in the summer of 2010, Fougera and Perrigo raised prices for Triamcinolone Acetonide cream significantly to match those of Taro. Par, which also increased its

prices, did not raise them to the same level as the others. A series of communications between Par and Taro followed, after which Par raised its prices to the same level as the others. On August 3 and 6, 2010, K.O., a Vice President of National Accounts at Par, received two calls from the Taro offices. On October 11, 2010, the same Par VP had a brief call with D.S., Assistant Vice President of National Accounts at Taro. The Par VP received another call from Taro's offices on December 10 and had calls with D.S. (the Taro AVP of National Accounts) on January 24, 25 and February 22, 2011, and also received a text message on March 18 from the Taro executive. On April 5, 2011, the Par VP received yet another call from the Taro offices. Shortly thereafter, Par's cream prices steeply increased to the same heights as Taro, Fougera, and Perrigo. When Taro raised its cream prices even higher in June 2011, the Taro and Par executives spoke again for approximately 6 minutes on June 28, 2011.

2481.    The Taro AVP was also communicating with Perrigo, and had telephone calls with A.F., a National Account Director at Perrigo, on January 24 and February 10, 2011.

2482.    During this period, the same AVP at Taro also was communicating with Fougera. As Taro was entering the ointment market in June 2011, D.S. (Taro AVP) received a call from D.L., a Director of National Accounts at Fougera. They spoke for approximately 3 minutes. Taro entered the ointment market at prices even higher than the already inflated prices imposed by Fougera and Perrigo. The two spoke again on July 6, 2011.

2483.    In May 2012, Ascend entered the cream market. Less than a week before, on April 26, G.W., Ascend's Vice President of National Accounts, spoke twice on the telephone with G.B., Vice President of National Accounts at Par. When Ascend did enter the market days later, it did so at the inflated prices that Par, Perrigo, Fougera, and Taro already had imposed. Shortly after Ascend entered the market, its VP of National Accounts spoke to D.S., the AVP at Taro (on July 11, 19 and

20). The Taro AVP also was in touch with his contacts at Par (July 12) and Sandoz (June 11, 15 and August 17).

2484.   As of October 2013, non-defendant Rising and Taro were the two competitors in the market for Triamcinolone Acetonide paste and each maintained approximately 50% market share.

2485.   <u>Paste</u>. In October 2013, Rising was considering implementing a price increase on Triamcinolone Acetonide paste. Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase. These calls are detailed in the chart below. CW-2 felt internal pressure to make money on the product and wanted assurance from D.S. that Taro would follow before Rising raised prices.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/27/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 13:32:00 | 0:02:00 |
| 9/30/2013 | Voice | CW-2 (Rising) | Incoming | D.S. (Taro) | 5:41:00 | 0:04:00 |
| 10/11/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 12:09:00 | 0:02:00 |
| 10/14/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 9:31:00 | 0:04:00 |

2486.   Two days after the final call detailed above, on October 16, 2013, Rising increased its WAC pricing for Triamcinolone Acetonide paste by 25%. Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

2487.   Prior to implementing the increase, Aprahamian of Taro described in an internal e-mail that Taro was ███████ its prices ███████████████████ and noted that the risk of losing business was ████ Indeed, the risk was ████ because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

47.   **Timolol Maleate**

2488.   During the relevant time period, Valeant and Sandoz were the primary manufacturers of Timolol Maleate.

2489.   The market for Timolol Maleate was mature and at all relevant times had multiple manufacturers.

2490.   For years, the prices for Timolol Maleate ophthalmic gel forming solution were relatively low and stable.

2491.   On internal spreadsheets, Sandoz kept track of their market share for Timolol Maleate versus what they viewed as their fair share of that market, and – consistent with the fair share rules – declined to compete for business that would have resulted in Sandoz getting more than its fair share. For example, in May 2013 Sandoz decided not to bid for one of Valeant's accounts because ██████████████████████ Similarly, following the successful price increase, a Sandoz executive advised CW-1 and CW-3 that Sandoz should continue to refrain from bidding on Valeant accounts because ██████████████████████████████

2492.   Not long afterward, beginning in November 2013, Sandoz and Valeant coordinated to increase their prices on Timolol Maleate. Valeant first initiated a modest WAC price increase of approximately 25% in November 2013. In January 2014, Sandoz responded with a WAC increase of more than 200%. One month later, Valeant raised its prices again, matching Sandoz's price increase. WAC prices more than tripled, as did NSP prices. Even as prices increased, market share remained roughly split between the companies.

2493.   Valeant and Sandoz communicated directly with each other in furtherance of the conspiracy. For example, both companies sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida. Sandoz had raised its list (WAC) prices before the conference, and Bausch announced the second portion of its price increases in March.

2494.   Throughout this period, Valeant and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and their fair share agreement.

2495.   For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its WAC prices shortly before the conference. Valeant announced its own WAC price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

### 48.   Triamterene HCTZ

2496.   During the relevant time period, Actavis, Mylan, Sandoz, and Apotex were the primary manufacturers of Triamterene HCTZ tablets and Mylan, Sandoz, and Lannett were the primary manufacturers of Triamterene HCTZ capsules.

2497.   In late 2011, Mylan led price increases on both capsules and tablets, and Sandoz and Actavis followed shortly thereafter. Mylan's price increases were between 100% and 300%, depending on the strength and formulation. Throughout this time period, CW-1 of Sandoz was in constant contact with Edgar Escoto, Mylan's Director of National Accounts. Indeed, the two spoke hundreds of times in 2011 and 2012. Additionally, Armando Kellum of Sandoz spoke with Rick Rogerson of Actavis on May 5, 2011, July 28, 2011, and September 28, 2011, and M.W. of Mylan spoke with J.R. (Sandoz's Executive Director of Marketing) in November 2011. As a result of this coordination, each of the three companies announced their price increases on the formulations of Triamterene HCTZ that each manufactured by November 2011.

2498.   Prior to 2012, neither Apotex nor Lannett manufactured Triamterene HCTZ. However, in a familiar pattern, both entered the market in early 2012 after the existing manufacturers imposed large price increases. However each company received its fair share of the

market after the incumbent suppliers followed the fair share rules, and both Apotex (on tablets) and Lannett (on capsules) were able to enter the market at prices that were higher than the existing market prices.

2499.   Additionally, to determine which tablet customers it should bid on, M.B. of Actavis spoke with T.K. (a National Account Manager at Apotex) on March 8 and March 16, 2012.

2500.   Similarly, J.K. (Mylan's VP of Sales) coordinated with K.S. (Lannett's VP of Sales) on April 19, 20, and 23, to determine which customers Lannett should bid on to get its fair share of the capsules market.

### E.   Involvement of Distributors in the Overarching Conspiracy.

### 1.   Introduction

2501.   Certain major drug distributors (namely ABC,[52] Cardinal,[53] McKesson,[54] Morris & Dickson,[55] and Walgreens / WBAD,[56]collectively the "Distributors") were used by Defendants to

---

[52] AmerisourceBergen Drug Corporation ("ABC") is a Delaware corporation with a principal place of business in Chesterbrook, Pennsylvania. On January 3, 2018, ABC acquired H.D. Smith, LLC ("H.D. Smith"). Formerly known as H.D. Smith Wholesale Drug Co., H.D. Smith, was a Delaware corporation and limited liability company with a principal place of business in Springfield, Illinois. At the time of its acquisition, it was the largest wholesaler of drugs to independent pharmacies in the United States. Unless addressed individually, ABC and H.D. Smith are collectively referred to as ABC.

[53] Cardinal Health, Inc. ("Cardinal") is an Ohio Corporation with a principal place of business in Dublin, Ohio. On July 6, 2015, Cardinal acquired The Harvard Drug Group, LLC ("Harvard"). Unless addressed individually, Cardinal Health and Harvard are collectively referred to as "Cardinal." At all times relevant to the Complaint, Cardinal distributed one or more of the Subject Drugs in this District and throughout the United States.

[54] McKesson Corp. ("McKesson") is a Delaware corporation with a principal place of business in Irving. Texas.

[55] Morris & Dickson Co., LLC ("Morris & Dickson") is a Louisiana limited liability company with a principal place of business in Shreveport, Louisiana.

[56] Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with a principal place of business in Deerfield, Illinois. Walgreens Boots Alliance Development GmbH ("WBAD") is WBA's drug purchasing arm. It is incorporated in Switzerland, with a principal place of business in Bern, Switzerland. It was formed in 2012 as a joint venture between Alliance Boots and Walgreens Co. and

prevent price erosion by "stabilizing" and "settling" the market and to facilitate, if not encourage, coordinated price increases. These Distributors are drug wholesalers that purchase from the Defendants.

2502.    The Distributors and the Defendants agreed with one another that the industry operated on a fair share basis in order to control prices.

a.    On April 23, 2012, Lannett told Cardinal that  Lannett hoped to reach its Lannett added that the strategy might be hampered by

b.    In September 2013, a WBA generics buyer agreed with Dr. Reddy's Senior Director of National Accounts that it was inappropriate for Apotex to continue to seek share for a certain drug because Apotex already had more than 70% share in a two-player market.

2503.    "Fair share" was consistently used as a conspiratorial term of art in the discussions between the Distributors and the Defendants.

a.    On November 3, 2014, Dr. Reddy's executives discussed a ▮▮▮▮▮▮ of fair share in a 6-player market. The Senior Director and Head of National Accounts noted that they had spoken with multiple distributors and had highlighted fair share as a reason to do business with Dr. Reddy's.

---

later became a subsidiary of WBA. Since 2013, WBAD has negotiated and purchased generic drugs on behalf of ABC and WBA under the terms of an agreement that extends until 2026. Unless addressed individually, WBA and WBAD are collectively referred to as "Walgreens." In more recent communications relevant to the price-fixing conspiracy, conspirators refer to "WBAD." In sections of this complaint describing the earlier days of the conspiracy (circa 2011), conspirators refer to "Walgreens," "WAG" or "Wags," WBA and WBAD had not yet been formed and WAG was the stock ticker of the business formerly known as Walgreens.

    b.   On July 10, 2014, WBAD asked Taro for a call to discuss a Mylan price increase and noted that Taro was ██████████████████████████ Because Walgreens so frequently involved itself in market allocation schemes, Heritage noted that Walgreens ████████████████████████ and that ███████████████ ████████████████

    c.   In January 2015, a WBAD category manager told Teva that Teva was entitled to additional business because Teva was ████████████████████████████████ ████████ because he understood the term of art and the associated rules.

    d.   In October 2015, Teva told Cardinal that it was ████████████████ of an opioid addiction treatment and ████████████████████

    e.   In April 2016, Taro sent offers to McKesson along with a note that the Taro salespeople were still looking for their fair share of the market for that particular drug.

2504.   Discussions and decisions based on fair share were effective because the Distributors and the Defendants alike collectively understood the meaning of the term and its rules. The Defendants knew that the Distributors required no further explanation in order to carry out Defendants' common goals.

2505.   The Distributors often requested from the Defendants a summary of the current fair share arrangement. On more than one occasion, Teva's emails to distributors included spreadsheet attachments showing each manufacturer's current accounts and the corresponding market share so that distributors would understand the balance of share of that drug, handle bids in accordance with the fair share arrangement, and pass updates to other manufacturers about the intentions of their competitors.

2506.   The Distributors went beyond the normal course of business in their communications with their suppliers, the Defendants. A distributor must necessarily discuss its own purchases with its suppliers, the manufacturers. But the Distributors did more: they were an instrumentality in anticompetitive communications that affected the market as a whole.

2507.   The reason for the Distributors' involvement in the conspiracy was that they—like the Defendants—benefit from higher prices for generic drugs. The Distributors and Defendants called, texted, emailed, messaged through cellular telephone applications, and met with one another regarding their common interest in higher prices marketwide. For example, in May 2012, at a widely-attended trade show organized by H.D. Smith, manufacturers and wholesaler distributors discussed price increases for topical creams and ointments. Over email, a Fougera national accounts executive reported ███████████████████████████████████████████████████ ██████████████████████████████████ because they can pass along the increase and ████████████ ████████████████████

2508.   For example, McKesson's SEC 10-K filing from 2014 confirms that it benefits from higher prices and may lose profits when the manufacturer-level price increases decrease in frequency or decrease in magnitude:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices. For these manufacturers, a reduction in the frequency and magnitude of price increases, as well as restrictions in the amount of inventory available to us, could have a material adverse impact on our gross profit margin.

2509.   ABC also admits that it has reason to benefit from higher prices in its 2014 10-K, and in filings in subsequent years.

> [ABC's] gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected. In addition, generic pharmaceuticals are also subject to price deflation. If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.

2510.    From 2013 to 2016—the key years during which the market allocation and price increase schemes took full effect—the revenue of Cardinal, ABC, and McKesson increased by 20%, 67%, and 55%, respectively.

2511.    In another example of a distributor's desire to pay higher prices, when Heritage listed injections of the bone cancer drug Zoledronic Acid for sale at around $500, the oncology supply division of ABC told Heritage that the distributor ███████████████████████

2512.    Indeed, the Distributors encouraged the Defendants to increase prices. For example, in spring 2014, Harvard called Heritage and ██████████████ how much Heritage should increase its prices given competing bids of competitors. Harvard and Heritage reviewed 24 drugs and Harvard suggested that Heritage should raise prices on 19 of the 24. The price increases ranged from 10% to 40% higher than Heritage's price at the time. Internal Heritage emails confirm that both sides were pleased with the mutual effort to raise prices.

2513.    Cardinal had several discussions with Sandoz concerning a way to adjust contracts to make it easier for manufacturers like Sandoz to increase prices. At the time, Cardinal knew it should conceal such efforts. Sandoz reported Cardinal's stance as follows:



2514.    Ultimately, because of Cardinal's fears that the plan might become public, the plan was canceled at that time. But Cardinal did agree that it was a ████████████████ and

ultimately Sandoz took other steps with Cardinal █████████████████████████████

██████ In June 2013, Sandoz noted that it had also made similar arrangements with McKesson.

2515.   Likewise, in April 2014 Morris & Dickson sought an across-the-board increase in the

list price of Oxycodone. According to one of her documents, Sun's ████████ was left with the

impression that Morris & Dickson preferred a price increase after she discussed it with two

individuals from that company, including during an in-person meeting at the ECRM trade

conference. Morris & Dickson later wrote to clarify that it was interested in a price increase only so

long as it was ████████████ meaning all the distributors would pay higher prices.

2516.   The following sections provide further examples of each of the Distributors roles in

the conspiracy generally, and then illustrate these roles with respect to specific drugs.

## 2.     ABC

2517.   Sandoz employee notes from a 2015 trade association meeting list ████████████ as

the first criterion of ABC's philosophy on pricing. And a Mylan internal presentation identified ABC

as a distributor that followed the ████████ model.

2518.   Many of the most active conspirators identified in this Complaint worked for ABC at

some point in their careers. Nisha Patel, whose computer files and dozens of acts of price-fixing are

the main corpus of evidence for this complaint, began her pharmaceutical career at ABC. ████

████ arranged fair share deals as a Senior Vice President at ABC before he became a CEO at

Zydus. He is presently a CEO at Dr. Reddy's.

2519.   In March 2013, ABC and Walgreens-Boots Alliance entered into a long-term

agreement (now extended until 2026) to collaborate on the purchase of drugs, including all

purchases from the Defendants. In practice, this meant that distributors who had formerly worked

separately to allocate fair share and facilitate price increases among the Defendants were now

officially working together. ABC and WBAD employees often joined one another's email threads

and discussed allocations and price increases with the Defendants as a group. For example, when

Teva was gathering intelligence about whether a lesser-known competitor would be ███████ after a

certain account, Teva's Senior Director of Sales and Trade relations said she would ████████████

██████████████████████████ the three men who were among the WBAD and ABC

executives that repeatedly were involved in the fair share conspiracy.

2520.   By 2017, WBAD ABC controlled a combined 26% of the volume of all generic

drugs purchased in the United States.

        a.    **Buprenorphine**

2521.   In March 2016, Teva and Sun communicated through ABC to coordinate Sun's entry

into the Buprenorphine market. On March 15, 2016, Teva's Senior Director of National Sales

emailed ABC's Director of Global Generic Sourcing with a request that ABC broker the market

allocation: ███████████████████████████████████████

████████████████████████████████████ The ABC Director

responded, ████████████████████████ and the Teva executive thanked her ███

███████ The next day, ABC wrote:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

2522.   By March 22, 2016, ABC had communicated with Sun on behalf of Teva so that the

two could calibrate their share targets. An ABC executive wrote to Teva that she ████████████

████████████ The details included were that Sun's ██████████████████████ and

that Sun was █████████████████ wrote T.C. on behalf of Teva. Sun then minimized

bidding on Teva accounts but, where it did do so, Teva knew that Sun's goals were limited and Teva

could concede the account without fear of further loss of business. Sun knew it could bid at a higher

price and still win or retain the business because Teva would not defend every account.

REDACTED – PUBLIC VERSION

b. **Dextroamphetamine Amphetamine IR**

2523. In the first quarter of 2014, Actavis, Aurobindo, and Teva allocated the market for Dextroamphetamine Amphetamine IR through ABC.

2524. By March 18, 2014, ABC had communicated with Aurobindo about this drug and then communicated to Teva that Aurobindo wanted only a 10% share of the market. ABC knew that Teva would be able to maintain more accounts at higher prices once it was informed about Aurobindo's intention not to compete for share. That same day, Rekenthaler of Teva had a thirty-minute telephone call with a senior executive at Aurobindo in which they discussed the allocation for Dextroamphetamine Amphetamine IR.

2525. ABC's communications enabled Teva to make fair share arrangements to divide the market with a third manufacturer, Actavis. On March 17, 2014, Patel of Teva had multiple calls with Rogerson of Actavis and Rekenthaler spoke with Falkin, also of Actavis. Rekenthaler and Falkin spoke again seven times on March 20, 2014 to discuss allocation of the market for Dextroamphetamine Amphetamine IR.

2526. On April 16, 2014, Teva learned of a challenger at one of its accounts but not its identity. Patel informed her superiors that the challenger was Actavis and recommended that Teva concede the account to Actavis. At 1:43pm, she communicated to another colleague that the decision had been made to concede. She then called Rogerson at Actavis at 1:55pm to tell him that Teva would play fair.

c. **Loperamide**

2527. Mylan and Teva coordinated a price increase on Loperamide through ABC. On June 16, 2014, ABC's Dave Vietri pointed out to Teva that Mylan had raised its prices on Loperamide in April, but that Teva had failed to follow the price increase. ABC had spoken with Mylan regarding the price increases and wanted Teva to raise the price, too.

2528.   Teva did in fact plan to follow Mylan's increase, and planned to have ABC tell Mylan this. Patel of Teva had discussed the future price increase with ABC at a recent HDMA conference. Teva understood that Mylan would keep the price high only so long as it expected Teva to play fair and follow with its own increase. Conversely, ███████████████████████████ ██████████████ Patel also knew that ABC executives wanted to see higher prices from the manufacturers in order to ████████████ She noted that ABC would █████████ ██████████ to quickly increase the price of Loperamide. But Patel was irked that Teva was the secondary (i.e., backup) supplier and that Teva was being asked to increase its price without being offered the primary slot. She wanted Mylan and ABC to ████████ before announcing that Teva would increase its price.

2529.   Because Teva did in fact plan to support Mylan's increase and had been in discussions with ABC regarding a coordinated increase, the other members of the Teva team considered this unacceptable. On a separate email thread excluding Patel, a Teva Senior Director wrote that Patel was ██████████ for letting ABC and Mylan ████ A Teva Director of National Accounts agreed that it was ██████████████████████ for Teva to delay the price increase and the response to ABC. They described her unwillingness to immediately play fair as ████ and discussed whether Patel should be reported to superiors. Teva followed through with its price increase on August 28, 2014

### d.   Modafinil

2530.   On May 22, 2014, Teva learned that a new market entrant—a co-conspirator manufacturer not named as a defendant in this complaint—had challenged Teva's share of Modafinil sales at ABC. Internally, Teva employees wondered whether the ███████ action was to concede because they were unfamiliar with this competitor. They decided to discuss the competitor's intentions with ABC. During a call the following day, two individuals from ABC

informed Teva that the new entrant would not compete for any further Modafinil share if it could

win the ABC business. Patel of Teva, who had worked at ABC the previous year, remarked that this

competitor would ▮▮▮▮▮▮ if it won the ABC business.

2531.    The Teva team then analyzed its market share and found that Teva had recently

dropped from 18.5.% to 13% share, which Teva considered far too low in a five-player market

(although its annualized gross profit for the drug had only dropped from $19.9 million to $17.8

million). Par and Mylan had higher share, and the fair share rules dictated that the bigger players

should be first to cede share. Thus, Teva decided to communicate back via ABC that the competitor

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

2532.    Ultimately, ABC convinced Teva to give up the account for the benefit of the

market. A few months later, on September 22, 2014, an individual at Teva could not remember why

Teva had conceded and guessed it was perhaps related to a supply problem. ABC wrote to remind

Teva that it was in fact an arranged concession:



(ellipses in original). Teva's Senior Director of Sales and Trade Relations responded that she would

▮▮▮▮▮▮▮▮▮▮ from ABC over the phone.

2533.    The reference to the ▮▮▮▮▮▮▮ refers to a method used by the conspirators to

allocate share without competition. Instead of listing all the drugs in a catalog and then collecting

bids from the manufacturers, the Distributors—including Cardinal, McKesson, ABC, and WBAD—

began to request "wish lists" from the Defendants.

2534.    Bidding resulted in lower prices when incumbents were offered a chance to counterbid (a "right of first refusal" or "ROFR"). The goal of wish lists was to allow the Defendants to signal to one another that they wanted win or keep certain accounts for certain drugs without forcing them to actually bid against one another. At the same time, the items left off the wish list allowed the Distributors to identify for the Defendants the products of which their competitors had expressed little interest in selling.

2535.    The next day, after ABC reminded Teva that Modafinil was part of the ████ ████ D.V. (ABC) called Teva. A Teva employee took notes of the call. ABC admitted the purpose of the wish list and said that ABC would review the wish lists from seven of the major manufacturers and would ██████████████████████████████████████████████████ ██████████████████████████████████████

2536.    WBAD was also involved with ABC's anticompetitive use of wish lists. WBAD's executives were clear that their goal was to pre-arrange which products would be primarily sold by which Defendant so that, once any bidding occurred, each Defendant would be secure in knowing it could win the business without having to put forth an aggressive price. ███████████████ ██████████████████████████████ wrote WBAD's F.H. Harris to Dr. Reddy's. He then requested that Dr. Reddy's provide a wish list of items that Dr. Reddy's would pursue if competition could be minimized or eliminated. ██████████████████████████ ██████████████████████████████████████████████████ ██████

e.    **Pioglitazone Metformin HCL IR Tablets**

2537.    Prior to February 2013, Mylan and Teva were the only competitors in the market for Pioglitazone Metformin. As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned

the right to market the authorized generic. During that period, Mylan and Teva split the market equally with Teva controlling 48% share and Mylan controlling 52%.

2538.    Mylan and Teva's 180-day exclusivity period expired on February 13, 2013 and Aurobindo and Torrent Pharmaceuticals entered the market on that date. Although Sandoz also planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16, 2013.

2539.    In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market. On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

2540.    For example, in the week leading up to Aurobindo's entry on February 13, 2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan. At the same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one calls with sales executives Kevin Green and T.S. These calls are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

2541.   Illustrating the substance of these calls, on February 12, 2013, T.S. spoke to Grauso at Aurobindo for forty-five minutes. Shortly after that call, T.S. sent an internal e-mail stating, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Cardinal was a Mylan customer.

2542.   At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen calls with Nesta of Mylan. These calls are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

2543. Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Kellum and CW-2. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

2544. On February 7, 2013, the same day that Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed ██████ ████████████ on Pioglitazone Metformin.

2545. The new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin. For example, CW-3 of Sandoz and CW-6 of Aurobindo exchanged at least six calls between February 13 and February 19, 2013. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

2546.   During their calls on February 19, 2013, CW-6 and CW-3 discussed specific customers and price points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal as a customer. CW-3's contemporaneous notes are pictured below:



2547.   By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

2548.   Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo, Sandoz and Torrent attended, including A.T. and Grauso from Aurobindo, C.B. and Kellum from Sandoz, and K.G., Vice President of Sales from Torrent.

2549.   On February 28, 2013, Kellum sent an internal e-mail to other Sandoz executives regarding the ███████████████████████ With respect to Pioglitazone Metformin, after

convening with the other manufacturers in Texas, Kellum was confident that the market would be ███████████████████████████████ owing to the fact that ███████████████████████ ████████████████████████████████████████████████████████

Kellum used typical euphemisms for conspiratorial conduct: ████████ meant that Aurobindo and Torrent could be expected not to compete on price, but instead to abide by the Fair Share agreement; ████████ meant that Sandoz would be sure to coordinate directly with the other manufacturers so as not to disrupt the market pricing.

2550.   Kellum kept his word, and Sandoz did its ████████ before launching in April. C.B. (Sandoz) communicated by phone with A.T. (Aurobindo) multiple times during that month. The two discussed in detail pricing and customers for Pioglitazone Metformin.

2551.   Sandoz also did its ████████ with Teva that month. Green (Teva) communicated by phone multiple times in April 2013 with P.K. (Sandoz).

2552.   A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin. The next day, CW-1, a Sandoz senior pricing executive, emailed the sales team stating: ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Six minutes later, CW-1 e-mailed CW-3 individually, asking him to ████████████ ████████████████

2553.   That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two minutes and six minutes. The next day, on April 18, 2013, the two competitors spoke again for ten minutes. During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS. CW-3's contemporaneous notes from that call are pictured below:

REDACTED – PUBLIC VERSION



2554.    At the same time, Sandoz was speaking with Teva. On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four minutes and one call lasting eight minutes.

2555.    Later in the evening on April 19, 2013, CW-1 e-mailed Kellum and others at Sandoz regarding Pioglitazone Metformin stating, ███████████████████████████████ ████████████████████████████████████████ Others at Sandoz agreed, and Sandoz submitted an offer to ABC on April 22, 2013.

2556.    On April 23, 2013, ABC contacted Teva executives Green and Rekenthaler. ABC's message was that Sandoz had entered the market for Pioglitazone Metformin IR and wanted Teva, the biggest player, to give Sandoz the ABC business. ABC made clear that Teva's decision on whether to concede to Sandoz would affect the overall competition in the Pioglitazone Metformin IR market because Sandoz would not compete further. ABC wrote to Teva ████████████



2557.   Within minutes, Green emailed his Teva team ███████████████████████ ███████████ Teva Senior Director replied, ██████████████████ and noted that Teva had maintained most of its accounts. Green agreed that there was no sense in maintaining the business. In accordance with fair share, Teva conceded the account to Sandoz.

2558.   Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, its internal tracking database, that ██████████████████████ ███████████████████████ and stated the reason for the concession was ████████ ███████████ That same day, ABC awarded the business to Sandoz.

2559.   Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors.

2560.   A week later, a Sandoz employee who did not have a pricing or sales role wondered whether Sandoz might pursue Rite Aid's business for Pioglitazone-Metformin IR. A Sandoz Associate Director of Pricing said it was an interesting proposition ████ he wrote, ███████████ ██████████ He knew Sandoz had just told Teva, via ABC, that Sandoz would be ███████████ ███████████ meaning it would no longer compete with Teva for share.

2561.   Sandoz's entry prompted even more communication between the competitors. Between May 8 and May 20, Nesta of Mylan spoke with CW-4 of Sandoz three times and with Green of Teva more than 20 times. Additionally, Grauso of Aurobindo spoke with K.G. of Torrent on May 16, 2013.  In addition to Green (Teva), Grauso (Aurobindo) communicated by phone directly with Nisha Patel at Teva in the second half of 2013.

2562.   Through this coordination, Teva and Mylan conceded significant market share of Pioglitazone Metformin to Sandoz, Taro, Aurobindo, and Torrent, and in return, the new entrants

agreed to support the supracompetitive pricing and not compete for market share in excess of their fair share.

### 3.   Cardinal

2563.   Cardinal communicated pricing and other confidential details among the Defendants. For example, on January 20, 2014, Teva submitted a bid to Cardinal and added a note requesting that Cardinal relay a message to Perrigo:  Eight days later, over the telephone, Cardinal agreed that it would ████████████████████████ Cardinal informed Perrigo that Teva would compete no further if allowed to take the Cardinal account, but, on this occasion, Perrigo wanted to keep Cardinal's business.

2564.   Cardinal's generic drug buyers were in constant contact with the Defendants and were aware of the rules of the scheme to concede share among the Defendants. Cardinal knew that the goal was to reach fair share. For example, on May 11, 2012, Teva's Senior Director of National Sales told an executive at Cardinal about a change in plans for the HIV/AIDS drug Combivir. Teva had made plans to supply Cardinal but had won more than its fair share of business, thereby violating its understandings with competitors Lupin and Aurobindo. Teva apologized for the confusion and wrote that, because Teva had won too much other business—more than its fair share—Teva would ████████████████ to its competitors. Cardinal's executive replied that he understood and then asked Teva for a favor.

2565.   Cardinal executives told the Defendants that Cardinal wanted to prevent price erosion by maintaining current customer allocations. For example, in December 2012, a Cardinal executive in charge of generic drug purchasing explained to Teva on a telephone call why he wanted to keep the current market allocation fixed—doing otherwise by allowing Teva to take share from Sun would ███████████ as Sun would seek share elsewhere by lowering its prices.

2566.    Cardinal's involvement in the overarching conspiracy continued even after the creation of Red Oak Sourcing in 2014. Red Oak is a joint venture between Cardinal and CVS Health that is, according to its website, ███████████████████████████████████████████ ███████ Red Oak employees negotiate on behalf of both Cardinal and CVS Health. Some of the same employees who were involved in the overarching conspiracy while at Cardinal accepted new positions at Red Oak and continued to be involved with price-fixing among the Defendants, except that they were now responsible for an even larger share of the market.

2567.    The Red Oak executives often requested that the Defendants provide charts showing the current allocation of market share. These overviews were requested so that Red Oak could more knowledgeably engage with the Defendants on fair share. For example, on multiple occasions, including at the end of April 2015 and in mid-August 2015, Red Oak requested that Teva provide comparative market share charts showing which customers had been allocated to which manufacturers. Teva replied in an email titled ███████████████ making clear that it was Red Oak that sought the information. The spreadsheets contained a breakdown of the current market share of each manufacturer for the requested drugs.

a.    **Imiquimod**

2568.    On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream. At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

2569.    Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream. That same day, D.K., a senior Fougera executive, sent the following e-mail to Kaczmarek, also a senior Fougera executive:

REDACTED – PUBLIC VERSION



2570.    Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera,

and they spoke for nearly four minutes. CW-6 hung up and immediately called T.P., a sales executive

at Perrigo, and they spoke for nearly nine minutes. When CW-6 hung up with T.P., he promptly

called Kaczmarek back. That call lasted less than one minute.

2571.    It is rare that the entry of a generic competitor would cause prices to actually increase

– but it did so in this case. Three days later, on Friday, April 16, 2010, in advance of Perrigo's entry

into the market, Fougera increased its WAC pricing for Imiquimod Cream. That same day, CW-6

called T.P. The call lasted more than two minutes. Immediately after hanging up, CW-6 called his

supervisor, Kaczmarek, and they ultimately spoke for more than six minutes. Immediately after

hanging up with Kaczmarek, CW-6 called T.P. back. The call lasted one minute.

2572.    The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating

that ███████████████████████████████████████████████████████████

As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

That same day, John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly

six minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of

Fougera, with each of them concurrently reporting the results of those communications to their

superiors, Wesolowski and Kaczmarek. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

2573.    The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida. Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and Wesolowski and S.K., senior executives from Perrigo.

2574.    Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference. On April 26, 2010, T.P. and CW-6 spoke by phone for seven minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four minutes.

2575.    Similarly, on April 27, 2010, D.K. e-mailed Kaczmarek while they were still at the NACDS meeting, stating that he needed █████████████████████████████████████████ ███████████████████████████████████████████████████████████████

2576.    On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's. That same day, D.K. e-mailed Fougera executives with an update regarding his conversations at the NACDS meeting. With respect to Imiquimod Cream, D.K. stated, ███████████████████████████████████████ ██████████████████ D.K. explained that Fougera gave up McKesson and ABC to Perrigo because ███████████████████████████████████████████████████ He also noted that he was pleased that Perrigo has ██████████████████████████████████████

616

REDACTED – PUBLIC VERSION

██████ CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business. Kaczmarek explained that ███████████████ CW-3 replied: ██████████
████████████

2577.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded Boesch that it was inevitable that Perrigo would take some of the market. D.K. also explained: ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████ D.K. stated that Perrigo's share would likely settle in the range of 30-40% ██████████████████████████████████████████████████
██████████████████████

2578.   Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten of its Imiquimod customers to Perrigo.

2579.   On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod Cream, which included a statement that ██████████████████████████
While reviewing the presentation, Boesch challenged D.K. about the statement, asking ██████
██████████████████████████████████████████████████████
D.K. assured Boesch that ██████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████

617

2580.    The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six minutes, likely to confirm (again) the agreement in place between the two competitors.

2581.    Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream. Previously, Perrigo had been selling the AG through a license with a branded manufacturer. That same day, CW-6 called T.P. That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two minutes.

2582.    On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled ████████████████████████ during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is ████████████████████████████████████ Later that year, in November 2010, CW-6 also noted in his monthly recap that ████████████████████ in the Imiquimod market.

2583.    Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market. For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four minutes. Later that day, CW-6 e-mailed Kaczmarek and D.K. regarding Imiquimod Cream that ██████████████████████████████ D.K. responded, ██ ████████████████

2584.    Although Fougera was fortunate that Glenmark had no near-term plans to enter the Imiquimod Cream market, another competitor – Sandoz – did receive FDA approval on February 28, 2011 to launch the product. That same day, CW-6 of Fougera and T.P. of Perrigo exchanged at least five calls, including two calls lasting two minutes each.

2585.    On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod. CW-3 promptly

REDACTED – PUBLIC VERSION

forwarded the e-mail to Kaczmarek. That same day, CW-6 called T.P. and they spoke for more than three minutes.

2586.   When Sandoz entered the market, it did so seamlessly – initially taking comparable share from the existing competitors Fougera and Perrigo.

2587.   For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer. In total, the customers accounted for approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

2588.   On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz. The next day, on March 4, 2011, Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, ████████████████████████████ ████████████████████████████████████████ Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four minutes. A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five minutes.

2589.   Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida. These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

2590.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four minutes. Later that day, Kellum – CW-4's boss sent an internal e-mail from ECRM stating that he had ██████ Taro may be entering the Imiquimod Cream market. Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011. The call lasted one minute. By March 9, 2011, Sandoz had acquired approximately

13% of the Imiquimod Cream market and Kellum recommended that they ███████████ ████████████████████████████████████████ referred to a group of direct purchasers including Plaintiff HEB, Ahold, Schnucks, and Giant Eagle. These were all Perrigo customers, and Sandoz intended to obtain their Imiquimod business ███████████████████████████ ████████████████████████████████████ Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that ████████████████████████████████████████ ████████████████████████████████████████████

Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

2591.   On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward, explaining that ██████████ ████████████████████████████████████████████████ ████████████████████████████

2592.   A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream. Taro immediately began coordinating its entry with competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve minutes. Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they spoke for five minutes. The next day, on April 19, 2011, D.S. called CW-4 again. The call lasted one minute.

2593.   On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval for Imiquimod Cream but advised that Taro would not formally launch until June. D.S. also told CW-4 that Taro had already received a pre-commitment from Econdisc, a large GPO customer, and now would only go after smaller customers. CW-4 understood that D.S. shared this information with her so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller customers, it was only to obtain its fair share of the market. CW-4 also understood that Sandoz

REDACTED – PUBLIC VERSION

should not compete for the Econdisc business, and in return, Taro ███████████████

████████████████████████████████

2594.    Perrigo and Fougera were also simultaneously coordinating how they would react to

Taro's entry. For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives that

Taro had received FDA approval to market Imiquimod Cream and asked, ████████████████

████████ This set off a flurry of communications that same day between CW-6 of Fougera and

T.P. of Perrigo, who were both concurrently reporting to, and taking direction from, their

supervisors, Kaczmarek and Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

2595.    Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and

called H.M., a sales executive at Taro. The two men spoke for eight minutes. Upon hanging up, CW-

6 called Kaczmarek. The call lasted one minute. First thing the next morning, CW-6 sent a text

message to T.P. of Perrigo.

2596.    By early July 2011, Taro was finally starting to enter the Imiquimod Cream market.

On July 5, 2011, T.P. reached out to CW-6 of Fougera. The call lasted only two minutes, but it set

off another rush of communications among the three competitors – Perrigo, Fougera, and Taro – to

make sure they were on the same page regarding Taro's entry. These calls, which all occurred within

the span of approximately fifteen minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

2597.   At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz. On July 7, 2011, D.S. of Taro called CW-4 of Sandoz. The call lasted two minutes. CW-4 returned the call and they spoke for sixteen minutes. A few hours later, CW-4 called D.S. and they spoke for another four minutes.

2598.   On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine minutes. As soon as CW-6 hung up he called his boss, Kaczmarek, and the two spoke for five minutes. Later that day, Kaczmarek e-mailed the Fougera sales team stating, ███████████

██████████████████████████████████████████████

2599.   On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

2600.   The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business. That same day, CW-6 of Fougera called T.P. of Perrigo. The call lasted one minute. T.P. returned the call and they spoke for six minutes.

2601.   On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not

support any more customers. CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed along competitive intelligence to the effect that Taro ███████████████████████████████████████████████████████████████

2602.   On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would not identify which competitor made the offer. Thereafter, CW-6 spoke several times with T.P. (Perrigo) and H.M. (Taro), in an effort to discover which competitor made the offer. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

1518. During those calls, CW-6 was able to confirm that Taro had in fact made the offer. Later that day, CW-6 sent the e-mailed Kaczmarek that Hannaford received a competitive offer on Imiquimod, but would not tell him ██████████████████████ Despite not getting this info from the customer, CW-6 reported ██████████████████████ CW-5 responded again that he thought they should ██████████████████ Kaczmarek ultimately agreed with this assessment, and Fougera conceded the account to Taro.

2603.   The goal of these communications between the various competitors on Imiquimod Cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors. The results were highly successful.

2604.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an e-mail to other senior Fougera executives regarding Imiquimod Cream stating, ████████████

REDACTED – PUBLIC VERSION

███████████████████████████████████████████████████████████

████████████████████████████████████

2605.    Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market. As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations. Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

2606.    After this series of calls, on September 30, 2011, Kaczmarek e-mailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod Cream at Wal-Mart, a Fougera customer. Kaczmarek explained that ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ Kaczmarek reluctantly recommended that

Fougera give up Wal-Mart's business and ████████████████████████ Kaczmarek noted

that, if Fougera defended Wal-Mart's business, Taro would likely just go after other customers at

lower and lower prices ███████████████████ On the other hand, if Fougera gave up Wal-

Mart, Taro would hopefully ████████████████████████████████████████████

████████████████████ D.K. agreed with Kaczmarek's recommendation and Fougera

ultimately ceded the business to Taro in order to keep the market stable.

2607.   On February 7, 2014, a Cardinal executive called Teva and said he had explained to

Perrigo that Teva was ███████████████████ and would be done with competition but had

been unsuccessful in persuading certain people at Perrigo to play fair on this drug (Imiquimod

cream). Teva employees were frustrated that the Perrigo employee in charge had either missed the

signal or had decided not to play fair on this drug. They were ████████████████████████████

██████████████████████

### 4.   H.D. Smith

2608.   H.D. Smith was a pharmaceutical distributor that sold to dispensers of prescription

drugs including independent pharmacies and hospitals, reimbursement for which are in most cases

provided by payors such as Plaintiff. H.D. Smith was wholly acquired by ABC in January 2018.

2609.   Because the individuals responsible for arranging supply contracts for H.D. Smith

were in constant contact with the Defendants, they understood that, according to the rules of fair

share, Defendants agreed to act ███████████ by conceding share to new entrants and refusing to

steal share when another competitor increased prices. For example, on multiple occasions in the

spring and summer of 2015, Teva told H.D. Smith that Teva would not lower prices and would

concede business to other manufacturers ████████████████████████

2610.   H.D. Smith's employees were aware of the fair share rules and the pricing

consequences of not following them. For example, on March 4, 2014, Dr. Reddy's complained to

REDACTED – PUBLIC VERSION

H.D. Smith that another manufacturer not named in this complaint was not playing fair:



H.D. Smith replied that it would have ▮▮▮ to give Dr. Reddy's its ▮▮▮ but lamented that the competitor continued to lower the prices for this specific drug and left H.D. Smith with no choice. A few days later, on March 7, 2014, Dr. Reddy's reiterated the message for H.D. Smith to relay to other manufacturers. ▮▮▮

2611.   As illustrated below, H.D. Smith was involved in the fair share conspiracy and facilitated supracompetitive prices for generic drugs.

### a.   Acyclovir

2612.   In November 2014, Heritage and Zydus allocated the market for Acyclovir through H.D. Smith.

2613.   On November 10, 2014 when Zydus had recently entered the market for Acyclovir, Heritage's Associate Director for Pricing and Contracts recommended that Heritage ▮▮▮ from certain accounts where Zydus sought share. Vice President of Marketing Operations L.S. disagreed that the fair share rules required Heritage to give up business at H.D. Smith:



2614.   The Heritage team wanted to retain the H.D. Smith business and thought it was fair to do so but did not want Zydus to consider them irrational for refusing to give up share. A.S. of Heritage then agreed with H.D. Smith's D.M. that Mando would remind Zydus not to target Heritage because they had a common goal in keeping prices elevated across the market. A.S. was the Heritage contact person for H.D. Smith.  On November 10, 2014, L.S. recommended to A.S.:



2615.   L.S. knew that his colleague A.S. would ▮▮▮▮▮▮▮▮▮ to send a message to Zydus via D.M. at H.D. Smith because L.S. was the former Director of Generic Pharmaceuticals Business Development at H.D. Smith. He had worked closely with D.M. A.S. replied ▮▮▮▮ and specifically confirmed that she would ▮▮▮▮▮▮▮▮

2616.   At an in-person meeting on November 17, 2014, A.S. communicated ▮▮▮▮▮▮ to H.D. Smith so that Zydus would know Heritage was already below its fair share and that Zydus needed to target ▮▮▮▮▮ in order to avoid price erosion.

2617.   In an internal Heritage email on November 19, 2014 L.S. mentioned the price stability rationale behind the discussions with H.D. Smith: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ L.S. added that ▮▮▮ would follow up with ▮▮▮▮▮ from H.D. Smith ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

b.   **Valganciclovir**

2618.   On September 21, 2015, Dr. Reddy's, Camber, and Aurobindo allocated the market for Valganciclovir through H.D. Smith. H.D. Smith asked Dr. Reddy's for a new price for Valganciclovir due to a competing bid from Camber, a new entrant in the market. Dr. Reddy's decided to concede the H.D. Smith account to Camber. Conceding accounts to new entrants is one of the key principles of the Defendants' overarching fair share agreement. Dr. Reddy's Director of

Marketing C.W. wrote: ███████████████████████████████████████

Dr. Reddy's Senior Director & Head of National Accounts V.B. added:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

2619.   H.D. Smith had told the Dr. Reddy's team that the bid from Camber would be around ████ They then learned from H.D. Smith that the price being offered by Camber was twice as high as they had expected. V.B. (Dr. Reddy's) wrote: ████████████████████████
████████████████████████████████████████████████████████
████████████████

2620.   On September 22, 2015, K.N. (Dr. Reddy's Senior Director of National Accounts) emailed D.M. (H.D. Smith) to make clear that the reason for the concession was to avoid competition between manufacturers: ██████████████████████ K.N. wrote to D.M.: ████
████████████████████████████████████████████████████████
██████████████████████████

2621.   The next day, September 23, 2015, K.N. asked her Dr. Reddy's colleagues to reconsider the decision to walk away. If H.D. Smith could not buy Valganciclovir from Dr. Reddy's, it would fall short of the purchase points needed to qualify for a Dr. Reddy's loyalty program, and ████ felt that that would hurt her sales relationship with H.D. Smith.

2622.   The Dr. Reddy's team changed its mind and decided to keep the H.D. Smith business, but they worried that refusing to concede to Camber would disrupt the overarching fair share agreement. Camber would see Dr. Reddy's defending its current contracts and would be inclined to ████████████████ thereby eroding price, to the detriment of all.

2623.   K.N. then asked D.M. at H.D. Smith to tell the competition directly: ███████
████████████████████████████████████████   In this context, ████████████ is meant to indicate that the price is the 'right' price and should be maintained. ████ knew that both H.D. Smith and Camber would understand this meaning of the term ████████████ and Camber would then know to keep prices around $1200 rather than lowering them to $600 to obtain share.

2624.   D.M. agreed to pass the price-fixing message to Camber so long as H.D. Smith could keep the contract at the $1200-level price plus the loyalty points: ████████████████ she wrote. K.N. replied █████ and then wrote to her team at Dr. Reddy's: ████████████ ████████████████████████████████████

2625.   Dr. Reddy's Senior Director & Head of National Accounts V.B. wanted to double-check that H.D. Smith would get the message through to Camber. He asked K.N.: ████████ ████████████████████████████

2626.   That evening, D.M. and K.N. met for drinks at K.N.'s home before dining together at a restaurant at the W Hotel in Hoboken. K.N. confirmed once again that the new entrant was Camber, and that H.D. Smith would be willing to serve as a price-fixing liaison. K.N. replied to V.B. at 6:13 pm: ████████████████████████████████ ████████████████████████

2627.   H.D. Smith remained in contact a few days later as Aurobindo entered the market. On September 28, 2015, K.N. wrote: ████████████████████████████ ████████████████████████████████████████ ████████████   As a result of the H.D Smith's involvement in this scheme, Camber, Dr. Reddy's, and Aurobindo were able to maintain high prices for Valganciclovir.

REDACTED – PUBLIC VERSION

### 5.    Harvard

2628.    Harvard is a formerly independent drug distributor that was wholly acquired by Cardinal in 2016. Both before and after the acquisition, multiple Harvard employees were involved in the overarching fair share scheme. The acquisition did not disrupt the channels of collusive communication between the Defendants. At a meeting in 2016, ABC told Sandoz that Cardinal's acquisition of Harvard would serve to keep the number of players in the market stable and ████

████████████

2629.    Generic drug manufacturers have two main ways of making sales to distributors such as Harvard. The simplest is when a customer requests a ██████████ or ██████████ of a specific number of units. The manufacturer responds with a price—which is often the WAC price or very close to it—and if the customer accepts, the drugs are shipped. The second and far more prevalent means of selling generic drugs is through ongoing supply contracts, typically renegotiated at least once a year. The customer sends a request for proposal ("RFP") either for a single drug or for a list of drugs and receives bids from the manufacturers. Incumbent manufacturers are usually given a chance to counterbid the lowest bid, and the process may involve multiple rounds of bidding. The manufacturer with the lowest net price typically wins the bid and sometimes the runner-up is also awarded a ████████ contract, to be used as a backup or for a certain percentage of purchases. Until the next RFP or renegotiation, the customer can place orders for drugs and pay the RFP contract price rather than the published list price.

2630.    During rounds of RFP bidding for multiple generic drugs at other distributors, Harvard passed messages between the Defendants so that they could ██████ one another's pricing. For example, at least one Harvard employee used a private email account to send RFP details to the private email accounts of individuals at two or more of the Defendants. The use of private emails

was designed to avoid detection because the conspirators knew that exchanging confidential details during RFPs was not an acceptable business practice.

a. **Eplerenone**

2631.    During the relevant time frame, Sandoz and Greenstone were the primary manufacturers of Eplerenone.

2632.    While Greenstone was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

2633.    Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed. Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Nailor of Greenstone called Kellum and left a message. They traded voicemails until they were able to speak the next day for nearly fifteen minutes.

2634.    Greenstone planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz – and both increases ultimately became effective on June 2, 2014.

2635.    Shortly before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six second voicemail.

2636.    Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share. Sandoz began preparing to follow Greenstone's Eplerenone price increase in early July 2014. However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until it made more financial sense and Sandoz would be able to limit any contractual penalties that would arise as a result of the increase.

2637.   Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014. Sandoz increased its pricing by as much as 270% to certain customers. During the time period after Greenstone's price increase and before Sandoz could follow, the two competitors continued to coordinate by phone, including a number of calls between Kellum and R.H. of Greenstone in August 2014. Shortly after the Sandoz price increase became effective, on October 15, 2014, Kellum and Nailor of Greenstone also communicated briefly.

2638.   In 2015, Greenstone also allocated the market for Eplerenone with Upsher-Smith, who purchased the drug from Sandoz.

2639.   Upsher-Smith and Greenstone communicated through Harvard to allow Upsher-Smith to reach fair share without targeting Sandoz's customers.

2640.   On or about May 7, 2015, Upsher-Smith's Senior National Account Manager communicated with Harvard's Director of Sourcing/Supplier Relations to send the message that Greenstone needed to concede share to Upsher-Smith. Upsher-Smith had also sent a nearly identical message via Morris & Dickson about a week earlier, on April 28, 2015: ███████████████ ████████████████████████████████████████

2641.   Harvard's Director of Sourcing/Supplier relations or another individual at Harvard passed the message to Greenstone. By May 12, 2015, Harvard confirmed to Upsher-Smith that Greenstone would concede the business to Upsher-Smith, as requested, consistent with the rules of the fair share understanding.

2642.   A few weeks later, at an HDMA trade association meeting on June 6, 2015, Sandoz representatives told Harvard representatives that Sandoz greatly appreciated Harvard's work in passing confidential competitive information between the manufacturers ████████████

REDACTED – PUBLIC VERSION

### b.  Metoprolol Succinate ER

2643.   By January 2014, Dr. Reddy's, Actavis, and Par had secured an agreement to maintain or increase the price of Metoprolol Succinate ER through two Harvard employees. Contemporaneous notes taken by a member of the Par sales team state that:



2644.   By the time these notes were circulated in January 2014, Harvard had confirmed with each of the manufacturers (Dr. Reddy's, Actavis, and Par) that each would follow a price increase by its competitors. Later in 2014, Harvard once again confirmed and then individually reiterated to Dr. Reddy's, Actavis, and Par that they were all mutually willing to █████████ any increase.

### 6.  McKesson

2645.   McKesson shared the view that low-priced market entrants were irresponsible and that to offer low prices for a drug was to 'trash the market.' On trip to India in 2014, McKesson executives noted to former Heritage President and admitted conspirator Malek that another competitor had ████████ the market for Zoledronic Acid 4mg injections with too low a price and, as a result, the competitor had been punished by other industry participants and never picked up significant share.

2646.   The Defendants were aware that the key generics buyers at McKesson understood the fair share system, particularly because of McKesson's extensive involvement in multiple levels of the pharmaceutical supply chain. For example, in certain circumstances, McKesson is a direct competitor of the Defendants because it bid on contracts to supply large retailers such as Target. On one such occasion, Teva conceded the account to McKesson in accordance with the fair share

agreement. McKesson also owns and operates a generic drug manufacturer known as Northstar, and sold drugs including Pravastatin.

2647.   McKesson knew to provide the Defendants the information they needed in order to avoid competition. For example, on August 10, 2015 a Perrigo employee wrote to McKesson:

███████████████████████████████████████████████████████████████████

███████████████████████████

2648.   The email contained nothing more than that message and the numerical code for three product sizes of hydrocortisone cream, but another individual at McKesson understood what she needed to do in order to further Perrigo's desire not to compete with G&W. She asked a subordinate to determine the ██████████████ and upon receiving the answer, told Perrigo that a bid at McKesson would not disrupt much of G&W's business.

### a.   Amikacin

2649.   In the summer of 2014, when a customer requested that Heritage reduce its price on Amikacin, Heritage said that it was aware that Teva's price was slightly lower but that it did not wish to reduce its prices in to gain market share. The Heritage team decided they were █████████ at the current price ████████████████████████████████

███████████████████████████████████

2650.   On October 10, 2014, Heritage's ███████ reported that he had had positive conversations with an individual at McKesson who was willing to coordinate with other manufacturers to help Heritage gain share for Amikacin. This person apparently believed it was inappropriate to provide Heritage with precise prices but ██████ noted that █████████████

██████████████████████████

2651.   Despite her supposed unwillingness to discuss prices, what the individual at McKesson was in fact willing to do was to communicate Heritage's intent to compete for only a

limited fair share so that Heritage would not face competition upon Teva's right of first refusal. By October 14, 2014, ███████ reported that McKesson would help arrange the fair share conspiracy by communicating with Teva:



2652.   McKesson successfully passed the message to Teva. With assurances that Heritage would act responsibly in a two-player market. Heritage and Teva were then careful not to compete.

2653.   By a year later, October 1, 2015, Teva had raised both its list prices and its contract prices for both the 500mg/2mL and 1g/4mL dosage forms of Amikacin by over 50%. Heritage's ██████████████ said she had █████████████████████████ that Teva would also increase its contract prices and would therefore ████████████████ Upon learning of the confirmation of the price increase Heritage's VP of Marketing Operations wrote that it was █████████████ and ██████████ responded: ████████████████████████████████ (Ellipsis in original.)

2654.   When contacted by customers looking to avoid high prices, Heritage supported Teva's price increase by refusing to lower prices. Heritage wrote that it ████████████████████ ███████████████████████ because ████████████████████████████

### b.   Lamotrigine ER

2655.   At a sales and marketing meeting held in April 2013, the Dr. Reddy's sales team arrived with certain unspecified competitor intelligence regarding Lamotrigine ER.

2656.   In June 2013, the Dr. Reddy's team was planning to enter the market for Lamotrigine ER in either in July or August. The only other competitors at the time were Par and Wockhardt, although the latter had supply problems.

2657.   On June 17, 2013 a member of the Dr. Reddy's sales team wrote an internal email about a customer that wanted a bid on Lamotrigine ER. She advised that they should ████████████

█████████████████████████████████████ If Par was unwilling to concede the

business, an aggressive offer would only have the result of driving down prices. Thus, it was

important for Dr. Reddy's to know which accounts Par would defend or concede.

2658.   The same day, Dr. Reddy's Director of National Accounts told colleagues that he

had spoken to McKesson and confirmed that McKesson was still with Par and added that ████

█████████████████████████████████ Senior Director ████████ told his

colleagues that ABC had communicated to him that Par wanted to keep the ABC account.

2659.   McKesson then communicated with Dr. Reddy's and Par to arrange a market

allocation between the two manufacturers. Dr. Reddy's remained concerned that Par might mistake

Dr. Reddy's attempts to seek only a limited part of the Lamotrigine ER market for a move to take

unfair share. That would then risk that Par would lower prices to retain the account, and this could

disrupt the market and drive prices lower. Dr. Reddy's Senior Director for Prescription Marketing

wrote: ████████████████████████████████████████

█████████████████████████████

2660.   Dr. Reddy's Director of National Accounts replied with assurances that he had ████

████████ to Par through McKesson, an account that Par did not want to concede. He also said he

would meet with McKesson's Senior Director of Generic Product Management in person to discuss

the rationale of McKesson's decisions concerning Par and Dr. Reddy's. This was the same

McKesson executive who would later be involved in the allocation of the market for Capecitabine

between Teva and Dr. Reddy's in 2014. That same day, June 26, 2013, Dr. Reddy's had knowledge

Par would be willing to ████████ from another major account.

2661.   In October 2015, Dr. Reddy's and a manufacturer not named as a defendant in this

complaint (Wilshire) allocated fair share for Lamotrigine ER through WBAD.

REDACTED – PUBLIC VERSION

2662.   On October 28, 2015, Dr. Reddy's executives had dinner with WBAD's Director of Generic Pharmaceutical Sourcing. The next morning, he told them he had received a bid for 25% of the Walgreens business from a competitor and encouraged Dr. Reddy's to concede this account in exchange for no further competition from the competitor: ███████████████████████ ████████████████████████████████████████████████████████ █████████████████████

2663.   Dr. Reddy's responded that it believed the competitor ████████████████████ ████████████████ and Reddy's thought that had already been achieved, fair share style, by taking share █████████████████████████ Dr. Reddy's noted that although its ███████████ would be to retain the business because ███████████████████████████ it would ██████████ and its decision would depend on its knowledge of the market share targets of its competitor, and asked WBAD ██████████████████████ Dr. Reddy's added that it would ████████████ WBAD for an update on the competitors' ████████████ ████████

2664.   Dr. Reddy's then directed a national account manager to █████████████████ ██████████████ Reddy's was concerned that the plan had gone awry, because Par was supposed to have conceded all portions of the McKesson business to Wilshire, thereby giving Wilshire its fair share of 20%. But Wilshire had bid only on a portion of the McKesson business, and Dr. Reddy's was ████████████ this happened. Dr. Reddy's later learned that Wilshire intended to bid the remainder and communicated back to McKesson that this was appropriate because Wilshire should be targeting Par and not Dr. Reddy's accounts.

2665.   WBAD continued to be involved in arranging allocation of share through 2016. By this time, Actavis had entered the Lamotrigine ER market. On April 11, 2016, Dr. Reddy's learned of a challenge at WBAD. At this point, Dr. Reddy's was waiting for confirmation that the challenger



was Actavis, because, even though Dr. Reddy's was ███████████ it knew it needed to play fair and ████████████████████████████ in order to confirm for Actavis that it was ████ ████ Dr. Reddy's Senior Director for National Accounts noted that she wanted to speak with WBAD to obtain ████████ and had called and emailed but had not yet received the competitive information she expected from WBAD. Dr. Reddy's Director of Prescription Marketing asked: ████ ████████████████████████████████████████████ ██████████████████████ The Senior Director said she was ███████████████ ████████ from an individual at WBAD. Once again, Dr. Reddy's requested the information because it knew that WBAD would communicate share intentions back and forth between the manufacturers.

### 7. Morris & Dickson

2666.   The Defendants were frank about their adherence to fair share in communications with Morris & Dickson. For example, on March 17, 2015, a Sandoz Director of National Accounts sent an offer to Morris & Dickson seeking additional volume for the drug Diclofenac gel, but wanted to make clear to Morris & Dickson and Sandoz's competitors (in this case, Global, a division of Impax) that this additional share was fair and not an act of competitive aggression. ███████████ ███████████████████████████████████████████ As another example, in September 2014, when a new entrant made an offer to supply Morris & Dickson with Hydralazine, ██████ of Heritage wrote to her contact at Morris & Dickson and explained that, as per an earlier discussion between the two, Heritage would concede the account to the new entrant because ██████████████████████

2667.   As a smaller wholesaler, Morris & Dickson had a strategy of offering competitive intelligence and facilitating fair share in exchange for preferable treatment from the Defendants. For example, on May 14, 2014, E.L. of Morris & Dickson requested a discount on Clonidine-TTS patch

from Teva. Teva's Associate Director of National Accounts wrote to Patel ███████████

██████████████████████████ Patel agreed: ██████████████

██████████████████████████████████████████████

████████████████ However, Patel wanted Teva to concede the Morris & Dickson account

to Actavis rather than offer a price reduction because ███████████████████

██████████████████████████ Patel said, ████████████████

██████████████████████████████ The Teva team was

insistent ████████████████████████████████████████████

███████

 2668. As another example, in May 2014, Sullivan of Lannett met with Morris & Dickson to

obtain confidential information about how other manufacturers would support price increases. In

her notes she remarked that Morris & Dickson ██████████████████████████

█████████████████████████ Later that same week, she had dinner with

two Morris & Dickson employees along with ████ of Heritage.

 2669. Like the other distributors, Morris & Dickson ensured that lines of communication

remained open among the Defendants even when they were reluctant to speak to one another

directly. For example, in March 23, 2015, Morris &Dickson's ██████ learned from a new

contact at Apotex that Apotex did not yet have a launch date for generic Nasonex, which was

contrary to the industry perception that Apotex would launch imminently. The next day Kelley

forwarded that email directly to an individual at Sandoz, who replied ████████

  a. **Eszopiclone**

 2670. Teva, Dr. Reddy's, Mylan, Lupin, Glenmark, Sun, and non-defendant Roxane

launched Eszopiclone on April 15, 2014. In the months leading up to the launch, the various

manufacturers sought to obtain ███████████████ with customers including the Distributors. The

REDACTED – PUBLIC VERSION

Distributors, including Morris & Dickson, helped the Defendants to allocate the market with minimal competition by relaying their intentions regarding share, preferred account targets, and pricing.

2671.    Months before launch, on February 6, 2014, Cardinal reached out to Dr. Reddy's to begin gathering information about the likely allocation plan. Cardinal wrote ███████████ ██████████████████████████████████████████████ ████████████████████████ That evening, a Reddy's executive provided the answer to Cardinal's key question—"█████████████████ and directed a more junior Dr. Reddy's employee to send Cardinal that answer. Cardinal's purpose in asking about Dr. Reddy's market share goals was so that it could discuss Dr. Reddy's market share goals with the other manufacturers seeking pre-commitments.

2672.    Because of the large number of competitors, the Defendants and Roxane were confused about pricing and share intentions, despite their frequent sharing of information. On March 25, 2013, Dr. Reddy's received a voicemail from a customer that explained that new bids were being sent because manufacturers were █████████████ and that Glenmark and Sun/Caraco also sensed that the market had shifted. The Dr. Reddy's team was puzzled by this but knew they could contact ABC and Morris & Dickson to learn about their competitors' intentions.

2673.    On April 2, 2014, ████████ at Morris & Dickson reached out to ████████ at Sun to help avoid price erosion on Eszopiclone. He gave her the pricing proposals that had been sent to Morris & Dickson by four manufacturers. He added that Roxane and another manufacturer were ███████████████████████████████████████████ ████████████████████

### 8.   Walgreens / WBAD

2674.   Walgreens/WBAD is a major drug distributor that operates a chain of over 9,000 pharmacies. WBAD has a long-term agreement to purchase generic drugs together with ABC. The same individuals who were involved in market allocation and price increase schemes for Walgreens continued to do the same after Walgreens formed WBAD, and continued to do so when WBAD combined its drug purchasing efforts with ABC. WBAD executives were equally as responsible for ABC's purchases and involvement in the collusion with the Defendants as those who were official employed by ABC. For example, on April 9, 2015, a Teva executive wrote to WBAD that she had ███████████████████████████████ and then communicated Teva's expectation that ████████████ a portion of the ABC business to Dr. Reddy's, then Reddy's would be ████ competing.

2675.   WBAD executives consistently shuttled between the Defendants so that they would know each other's market share goals and intentions not to compete. The following excerpt from an email regarding the drug Fluconazole, written by Dr. Reddy's Senior Director of National Accounts, is typical of WBAD's involvement in fair share. On a Sunday morning in October 2015 she wrote:



2676.   Walgreens and later WBAD employees were in close contact with the generic drug manufacturers that participated in the fair share conspiracy. For example, in March 2014, WBAD relayed a message from Dr. Reddy's to Teva. Dr. Reddy's wanted Teva to know that it was underbidding Teva's accounts for Moxifloxacin because Dr. Reddy's believed Teva ███████████ ████ at the launch of the product. Dr. Reddy's wanted Teva to know that it was still committed to the overarching agreement, but that here, Dr. Reddy's should be allowed to offer lower prices and take share without further retaliation because Teva had not conceded accounts as it should have.

2677. Two years later, in April 2016, another WBAD executive continued to be involved in anticompetitive activity regarding the same drug. He informed Teva that a new entrant wanted only limited share on Moxifloxacin, implying that Teva should concede, and then, as a reward for playing fair, told Teva ████████████████████████ in the portfolio ████████████████████ ████████████████████

### a.  Disulfiram

2678. In July 2014, Teva and Breckenridge allocated the market for Disulfiram through WBAD. WBAD reached out to T.C. at Teva to inform her that WBAD had received a competitive offer on Disulfiram tablets from Breckenridge (at the time, the only other competitor). In the same email, WBAD passed Breckenridge's market share intentions to Teva: ████████████████ ████████████████

2679. A Teva employee calculated the percentage of total market share represented by WBAD and expressed to colleagues that Breckenridge was ████████████████████ meaning that Breckenridge must have miscalculated, because WBAD's large account would by itself surpass Breckenridge's stated market share goal. Teva subsequently successfully matched the competing bid to maintain the account and looked for other smaller accounts it could cede to Breckenridge.

### b.  Isotretinoin

2680. In March 2013, Teva and Dr. Reddy's allocated the market for Isotretinoin through WBAD and ABC. Dr. Reddy's ████████ reported in an internal email on March 27, 2013:

2681.   Although ███████████ is presently the CEO role at Dr. Reddy's, at the time of the

email he was at ABC. In August 2014, Dr. Reddy's added the drug to its ████████ to WBAD,

asking to be given the ABC business along with other drugs.

2682.   By April 9, 2015, Teva had conceded CVS, Cardinal, and ABC to Dr. Reddy's,

although Teva was internally divided on whether to concede ABC. The Senior Director, for one,

commented ███████████████████████████ and that it was ████████ because

Teva ██████████████████████████ Nevertheless, she was overruled because,

given Teva's earlier concessions, ████████████████ would ████████████ which

was considered fair in what appeared at the time to be a three-player market.

2683.   Teva then discussed that it needed to ████████████ via ABC regarding

Isotretinoin. That afternoon, the Teva Senior Director wrote to WBAD and ABC executives ███

█████████████████████████ and that the Teva team hoped the Dr. Reddy's team

would understand that ████████████████████

### c.      Montelukast Sodium

2684.   On December 20, 2012, Dr. Reddy's and Mylan allocated the market for

Montelukast Sodium through what was then Walgreens. An individual at Walgreens gave Dr.

Reddy's the name of the drug and the message ██████████████████████ In

response, an individual at Dr. Reddy's wrote:



2685.   Having received the signal from Walgreens, Dr. Reddy's did not need to directly

communicate with Mylan regarding this drug to implement a market allocation as per the rules of

the overarching fair share agreement. The Dr. Reddy's team knew from prior discussions and

dealings with Mylan that Mylan would want the Walgreens account, that the fair share agreement meant Dr. Reddy had to ███████████████████ and the estimated share value of Walgreens plus one other account, so Dr. Reddy's could calculate whether Mylan had achieved its fair share.

2686.   Earlier that year, Cardinal had been involved in communications between Dr. Reddy's and the other manufacturer of Montelukast Sodium, Teva, to allocate the market for that drug before Mylan's entry. Internal Teva emails from July 2012 note:



### d.   **Omeprazole Sodium Bicarbonate**

2687.   On August 3, 2016, Dr. Reddy's and Valeant/Oceanside allocated the market and discussed a price increase for Omeprazole Sodium Bicarbonate through WBAD.

2688.   Although they spoke on the telephone, their emails reflect the conversation. Dr. Reddy's V.B. wrote to WBAD:



WBAD replied: ████████████████████████████████

2689.   V.B. then wrote on a separate email to his Dr. Reddy's colleagues: ████████████ ██████████████████████████████████████████ ROS refers to Red Oak Sourcing, indicating that WBAD was willing to discuss what the prices should be for Red Oak Sourcing, which controls the purchasing for Cardinal.

e.       **Progesterone and Vancomycin**

2690.    In late 2012 and early 2013, Akorn and Watson (now Actavis) allocated the market for Progesterone and Vancomycin through an individual at what was then Walgreens (now WBAD), with the explicit goal of preserving pricing in the overall marketplace.

2691.    During the week of February 18, 2013, two Akorn employees—including the Director of Sales, National Accounts—held a call with Walgreens during which they arranged for Walgreens to communicate with Akorn's competitor regarding a fair share arrangement for at least Progesterone and Vancomycin. After the call, ▮▮▮▮▮▮▮▮ to their discussion, Akorn sent bullet points noting the fact that Akorn had significantly less market share than Watson/Actavis and confirming that Walgreens would ask Watson/Actavis to concede one of the drugs to Akorn:



2692.    Walgreens then passed the message to Actavis so Actavis would know Akorn would not compete fully and was seeking only limited share.

2693.    A week later, Walgreens and the Akorn employees scheduled a conference call to discuss the Akorn-Watson allocation arrangement. Akorn sent a reminder email to Walgreens with an admission that Walgreens had also been involved in another fair share deal involving the topical anesthetic drug Lidocaine:



(In 2012, when an unknown manufacturer ▮▮▮▮▮▮▮▮▮▮▮▮ Akorn had given up the Lidocaine business because Walgreens had insisted it would be ▮▮▮▮▮▮▮

These communications involving multiple drugs demonstrate the interdependent nature of the overarching fair share agreement.

2694.    Walgreens transmitted the message to Watson/Actavis. Later, Walgreens told Akorn that Watson/Actavis wanted to keep the product and that Akorn should not make further attempts to compete with Actavis because doing so would only drive the price down to a dollar and would not serve to ███████████████████████ Akorn asked if Walgreens would instead award it Vancomycin without seeking a response price from the incumbent supplier, ██████████████ ████ a fourth drug, Ketorolac 0.4% 5 ml.

2695.    Watson/Actavis was able to keep the business without having to lower its price. Rather than going ██████████ the average price per 125mg capsule of Vancomycin remained above $10.00 for several years and did not drop below $5.00 until after Akorn and Actavis/Watson were sued in this litigation.

f.    **Sumatriptan**

2696.    In June 2016, writing from Bern, Switzerland, a WBAD executive wrote that he needed to discuss Sumatriptan autoinjectors with Dr. Reddy's. The next day, June 28, 2016, Dr. Reddy's Senior Director and Head of National Accounts ████████ spoke with WBAD's Director of Global Generic Pharmaceutical Sourcing to arrange a truce with Teva regarding the Sumatriptan autoinjector. An email from the Reddy's senior director corroborates:



2697.    As on other occasions, WBAD had spoken with Teva about its market share goals, found out which accounts Teva wanted to target or retain to meet those goals, and then relayed that information. In this episode, WBAD specifically did this ████ for Dr. Reddy's because Dr. Reddy's

had helped WBAD with last-minute one-time buys when WBAD had to fill gaps in supply 

 ).

## X.     HUMANA'S PURCHASES AND ANTITRUST INJURY

2698.     During the relevant time period, HPI purchased hundreds of millions of dollars'
worth of the Subject Drugs directly and purchased billions of dollars' worth of the Subject Drugs
indirectly.

2699.     Because of Defendants' illegal conduct, Humana has been compelled to pay
artificially inflated prices for each of the Subject Drugs listed above. As an example, the chart below
indicates, Humana's contractual price with Teva for Bumetanide increased by 1,136% (.5 mg 100),
1,036% (1 mg 1000), and 1,576% (2 mg 1000) between April 2011 and May 2014:



2700.     As another example, the chart below indicates, Humana's contractual price with Taro
for Carbamazepine XR increased by 313% (200 mg 100) and 308% (400 mg 100) between May 2012
and May 2015:



2701.   As the chart below indicates, Humana's contractual price with Teva for Desmopressin Acetate tablets increased by 75% between May 2014 and October 2014:



2702.   As the chart below indicates, Humana's contractual price with Teva for Diclofenac Potassium tablets increased by 176% between May 2013 and May 2015:



2703.   As a final example, the chart below indicates, Humana's contractual purchase price with Taro for Warfarin Sodium increased by 148% (4 mg 1000, 5 mg 1000, 1 mg 1000, 2.5 mg 1000, and 2 mg 1000) and 222% (3 mg 1000) between April 2011 and May 2015.





2704.   The Subject Drugs' prices have been substantially higher than the prices that Humana would have paid for the Subject Drugs but for Defendants' collusion.

2705.   Consequently, Humana has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

2706.   Defendants' unlawful conduct has successfully eliminated competition in the market, and Humana has sustained, and continues to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

2707.   Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Humana.

2708.   Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Humana has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XI.   INTERSTATE TRADE AND COMMERCE

2709.   Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by

Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

2710.   Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

2711.   Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

2712.   Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

2713.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Humana and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

2714.   Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XII.   TOLLING AND FRAUDULENT CONCEALMENT

2715.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

2716.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

2717.   Among other things, as alleged in the State AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the State AG Complaint No. 2, which is incorporated by reference.

2718.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

2719.   Humana acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Humana did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before the filing of this Complaint, nor was Humana aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

REDACTED – PUBLIC VERSION

## XIII.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

2720.   Discovery is necessary to determine the full scope of Defendants' conspiracy, including years, products, and participants. Plaintiff reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XIV.   CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

2721.   Humana incorporates by reference the preceding allegations.

2722.   Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Heritage Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acyclovir
> Amikacin
> Fosinopril HCTZ
> Glipizide-Metformin
> Glyburide
> Glyburide-Metformin
> Hydralazine HCL
> Meprobamate
> Methimazole
> Nimodipine
> Paromomycin
> Zoledronic Acid

2723.   Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

2724.   The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Heritage Drugs.

2725.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

2726.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

2727.   As a direct and proximate result of Heritage's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Heritage Drugs than it would have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2728.   Heritage is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2729.   There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

2730.    Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2731.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Heritage Drugs, or by assignment from its other subsidiaries that directly purchased the Heritage Drugs during the relevant period.

## COUNT II

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

2732.    Humana incorporates by reference the preceding allegations.

2733.    Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Heritage Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2734.    Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

2735.    The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Heritage Drugs.

2736.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

2737.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

2738.   As a direct and proximate result of Heritage's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Heritage Drugs than it would have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2739.   There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2740.   Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2741.   Heritage's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

 i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

 j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

 k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

 l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

 m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

 n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

 o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

 p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

 q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

 r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

 s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

 t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

 u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

 v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

 w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

 x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

 y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

 z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

 aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

 bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

REDACTED – PUBLIC VERSION

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT III

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

2742.  Humana incorporates by reference the preceding allegations.

2743.  Heritage engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Heritage's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Heritage Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2744.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Heritage Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Heritage Drugs should have been available, and would have been available, absent Heritage's illegal conduct.

2745.  By engaging in the foregoing conduct, Heritage engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West

Virginia.

## COUNT IV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

2746.   Humana incorporates by reference the preceding allegations.

2747.   Heritage has benefitted from artificial prices in the sale of the Heritage Drugs

resulting from the unlawful and inequitable acts alleged in this Complaint.

2748.   Heritage's financial benefit resulting from its unlawful and inequitable acts are

traceable to overpayments for the Heritage Drugs by Humana.

2749.   Humana has conferred upon Heritage an economic benefit, profits from unlawful

overcharges, to the economic detriment of Humana.

2750.   It would be futile for Humana to seek a remedy from any party with whom it has

privity of contract for its indirect purchases of the Heritage Drugs.

2751.   It would be futile for Humana to seek to exhaust any remedy against the immediate

intermediary in the chain of distribution from which it purchased the Heritage Drugs, as it is not

liable and would not compensate Humana for the impact of Heritage's unlawful conduct.

2752.   The economic benefit of overcharges derived by Heritage through charging

supracompetitive and artificially inflated prices for the Heritage Drugs is a direct and proximate

result of Heritage's unlawful conduct.

2753.   The economic benefits derived by Heritage rightfully belong to Humana, as it paid

anticompetitive and monopolistic prices during the relevant period, benefiting Heritage.

2754.   It would be inequitable under unjust enrichment principles under the law of the

District of Columbia and the laws of all states and territories in the United States, except Ohio and

REDACTED – PUBLIC VERSION

Indiana, for Heritage to be permitted to retain any of the overcharges for the Heritage Drugs derived from Heritage's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2755.   Heritage is aware of and appreciates the benefits bestowed upon it by Humana.

2756.   Heritage should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2757.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Heritage traceable to Humana.

## COUNT V

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

2758.   Humana incorporates by reference the preceding allegations.

2759.   Heritage knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Heritage Drugs. Heritage injured Humana through this conduct.

2760.   But for Heritage's scheme to inflate the price of the Heritage Drugs, Humana would have purchased lower-priced Heritage Drugs.

2761.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Heritage Drugs than it would have paid absent Heritage's continuing anticompetitive conduct.

2762.   Humana has purchased substantial amounts of the Heritage Drugs during the relevant period.

REDACTED – PUBLIC VERSION

2763.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Heritage's conduct violates Sections 1 and 2 of the Sherman Act.

2764.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Heritage's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT VI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Teva and All Other Defendants Under Joint and Several Liability)

2765.   Humana incorporates by reference the preceding allegations.

2766.   Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Teva Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Amikacin
> Amiloride HCL/HCTZ
> Amoxicillin/Clavulanate
> Amphetamine/Dextroamphetamine ER & IR
> Azithromycin
> Bethanechol Chloride
> Budesonide
> Bumetanide
> Buprenorphine
> Buspirone HCL
> Cabergoline
> Capecitabine
> Carbamazepine
> Cefdinir
> Cefprozil
> Celecoxib
> Cephalexin
> Cimetidine
> Ciprofloxacin HCL

**REDACTED – PUBLIC VERSION**

Clarithromycin ER
Clemastine Fumarate
Clonidine TTS
Clotrimazole
Cyproheptadine HCL
Desmopressin Acetate
Desogestrel/Ethinyl Estradiol (Kariva)
Dexmethylphenidate HCL ER
Dextroamphetamine Sulfate ER
Diclofenac Potassium
Dicloxacillin Sodium
Diflunisal
Diltiazem HCL
Disopyramide Phosphate
Disulfiram
Doxazosin Mesylate
Drospirenone and Ethinyl Estradiol (Ocella)
Enalapril Maleate
Entecavir
Epitol
Estazolam
Estradiol
Estradiol/Norethindrone Acetate (Mimvey)
Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
Ethinyl Estradiol/Norethindrone (Balziva)
Ethosuximide
Etodolac
Fenofibrate
Fluconazole
Fluoxetine HCL
Flurbiprofen
Flutamide
Fluvastatin Sodium
Gabapentin
Glimepiride
Glipizide-Metformin
Glyburide
Glyburide-Metformin
Griseofulvin
Hydralazine
Hydroxyurea
Hydroxyzine Pamoate
Imiquimod
Irbesartan
Isoniazid
Isotretinoin
Ketoconazole
Ketoprofen

Ketorolac Tromethamine
Labetalol HCL
Lamivudine/Zidovudine (Combivir)
Loperamide HCL
Medroxyprogesterone
Metformin ER
Methotrexate
Metronidazole
Modafinil
Moexipril HCL
Moexipril HCL/HCTZ
Montelukast
Nabumetone
Nadolol
Niacin ER
Nitrofurantoin MAC
Norethindrone Acetate
Nortriptyline HCL
Omega-3-Acid Ethyl Esters
Oxaprozin
Oxybutynin Chloride
Paricalcitol
Penicillin VK
Pentoxifylline
Pioglitazone-Metformin
Piroxicam
Prazosin HCL
Prochlorperazine
Raloxifene HCL
Ranitidine HCL
Sotalol HCL
Sumatriptan
Tamoxifen Citrate
Temozolomide
Tobramycin
Tolmetin Sodium
Tolterodine
Topiramate Sprinkle
Warfarin Sodium

2767.   Teva has committed at least one overt act to further the conspiracy alleged in this

Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on interstate

commerce by raising and fixing prices of the Teva Drugs throughout the United States.

663

2768.   The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Teva Drugs.

2769.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

2770.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

2771.   As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2772.   Teva is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2773.   There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

2774.   Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2775.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Teva Drugs, or by assignment from its other subsidiaries that directly purchased the Teva Drugs during the relevant period.

## COUNT VII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Teva and All Other Defendants Under Joint and Several Liability)

2776.   Humana incorporates by reference the preceding allegations.

2777.   Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Teva Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2778.   Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teva Drugs throughout the United States.

2779.   The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teva Drugs.

2780.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

REDACTED – PUBLIC VERSION

    c.   Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

2781.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

2782.   As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2783.   There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2784.   Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2785.   Teva's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT VIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

2786.   Humana incorporates by reference the preceding allegations.

2787.   Teva engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teva's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Teva Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2788.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Teva Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Teva Drugs should have been available, and would have been available, absent Teva's illegal conduct.

2789.   By engaging in the foregoing conduct, Teva engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT IX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

2790.   Humana incorporates by reference the preceding allegations.

2791.   Teva has benefitted from artificial prices in the sale of the Teva Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2792.   Teva's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teva Drugs by Humana.

2793.   Humana has conferred upon Teva an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2794.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teva Drugs.

2795.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teva Drugs, as it is not liable and would not compensate Humana for the impact of Teva's unlawful conduct.

2796.   The economic benefit of overcharges derived by Teva through charging supracompetitive and artificially inflated prices for the Teva Drugs is a direct and proximate result of Teva's unlawful conduct.

2797.   The economic benefits derived by Teva rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teva.

2798.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teva to be permitted to retain any of the overcharges for the Teva Drugs derived from Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2799.   Teva is aware of and appreciates the benefits bestowed upon it by Humana.

2800.   Teva should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2801.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teva traceable to Humana.

## COUNT X

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Teva and All Other Defendants Under Joint and Several Liability)

2802.   Humana incorporates by reference the preceding allegations.

2803.   Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teva Drugs. Teva injured Humana through this conduct.

2804.   But for Teva's scheme to inflate the price of the Teva Drugs, Humana would have purchased lower-priced Teva Drugs.

2805.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teva Drugs than it would have paid absent Teva's continuing anticompetitive conduct.

2806.   Humana has purchased substantial amounts of the Teva Drugs during the relevant period.

2807.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teva's conduct violates Sections 1 and 2 of the Sherman Act.

2808.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

REDACTED – PUBLIC VERSION

caused by Teva's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

2809.   Humana incorporates by reference the preceding allegations.

2810.   Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Actavis Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine ER
> Allopurinol
> Atenolol Chlorthalidone
> Betamethasone Dipropionate
> Betamethasone Dipropionate Augmented
> Betamethasone Dipropionate Clotrimazole
> Betamethasone Valerate
> Budesonide
> Buspirone HCL
> Celecoxib
> Ciclopirox
> Ciprofloxacin HCL
> Clarithromycin ER
> Clindamycin Phosphate
> Clonidine TTS
> Desmopressin Acetate
> Desogestrel/Ethinyl Estradiol (Kariva)
> Dextroamphetamine Sulfate ER
> Disopyramide Phosphate
> Drospirenone and Ethinyl Estradiol (Ocella)
> Estazolam
> Estradiol
> Fluocinonide
> Flutamide
> Glyburide-Metformin
> Griseofulvin
> Hydroxyzine Pamoate
> Labetalol

Metoprolol Succinate
Metformin ER (F)
Methylphenidate
Metronidazole
Nabumetone
Nortriptyline HCL
Oxycodone/Acetaminophen
Permethrin
Pilocarpine HCL
Potassium Chloride
Prednisone
Progesterone
Tamoxifen Citrate
Topiramate Sprinkle
Triamterene HCTZ
Vancomycin HCL

2811.    Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

2812.    The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Actavis Drugs.

2813.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

2814.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

2815.    As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2816.    Actavis is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2817.    There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2818.    Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2819.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Actavis Drugs, or by assignment from its other subsidiaries that directly purchased the Actavis Drugs during the relevant period.

## COUNT XII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

2820.    Humana incorporates by reference the preceding allegations.

2821.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Actavis Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2822.   Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

2823.   The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Actavis Drugs.

2824.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

2825.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

2826.   As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2827.   There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

2828.   Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2829.   Actavis's conduct violated the following state antitrust or competition practices laws:

a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

2830.   Humana incorporates by reference the preceding allegations.

2831.   Actavis engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Actavis's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Actavis Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

2832.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Actavis Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Actavis Drugs should have been available, and would have been available, absent Actavis's illegal conduct.

2833.    By engaging in the foregoing conduct, Actavis engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.    Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

REDACTED – PUBLIC VERSION

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

2834.  Humana incorporates by reference the preceding allegations.

2835.  Actavis has benefitted from artificial prices in the sale of the Actavis Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2836.  Actavis's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Actavis Drugs by Humana.

2837.  Humana has conferred upon Actavis an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2838.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Actavis Drugs.

2839.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Actavis Drugs, as it is not liable and would not compensate Humana for the impact of Actavis's unlawful conduct.

2840.   The economic benefit of overcharges derived by Actavis through charging supracompetitive and artificially inflated prices for the Actavis Drugs is a direct and proximate result of Actavis's unlawful conduct.

2841.   The economic benefits derived by Actavis rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Actavis.

2842.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Actavis to be permitted to retain any of the overcharges for the Actavis Drugs derived from Actavis's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2843.   Actavis is aware of and appreciates the benefits bestowed upon it by Humana.

2844.   Actavis should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2845.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Actavis traceable to Humana.

REDACTED – PUBLIC VERSION

## COUNT XV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

2846. Humana incorporates by reference the preceding allegations.

2847. Actavis knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Actavis Drugs. Actavis injured Humana through this conduct.

2848. But for Actavis's scheme to inflate the price of the Actavis Drugs, Humana would have purchased lower-priced Actavis Drugs.

2849. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Actavis Drugs than it would have paid absent Actavis's continuing anticompetitive conduct.

2850. Humana has purchased substantial amounts of the Actavis Drugs during the relevant period.

2851. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Actavis's conduct violates Sections 1 and 2 of the Sherman Act.

2852. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

2853.    Humana incorporates by reference the preceding allegations.

2854.    Alvogen knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Alvogen Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Labetalol HCL
> Nitrofurantoin MAC
> Oxycodone/ Acetaminophen

2855.    Alvogen has committed at least one overt act to further the conspiracy alleged in this Complaint. Alvogen's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Alvogen Drugs throughout the United States.

2856.    The conspiracy realized its intended effect; Alvogen has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Alvogen Drugs.

2857.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Alvogen Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Alvogen Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Alvogen Drugs was unlawfully restrained, suppressed, or eliminated.

2858.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Alvogen Drugs until the market achieves a steady state.

2859.   As a direct and proximate result of Alvogen's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Alvogen Drugs than it would have paid in the absence of Alvogen's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2860.   Alvogen is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2861.   There is no legitimate, non-pretextual, pro-competitive business justification for Alvogen's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2862.   Alvogen's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2863.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Alvogen Drugs, or by assignment from its other subsidiaries that directly purchased the Alvogen Drug during the relevant period.

## COUNT XVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Alvogen and All Other Defendants Under Joint and Several Liability)**

2864.   Humana incorporates by reference the preceding allegations.

2865.   Alvogen knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Alvogen Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2866.   Alvogen has committed at least one overt act to further the conspiracy alleged in this Complaint. Alvogen's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Alvogen Drugs throughout the United States.

2867.   The conspiracy realized its intended effect; Alvogen has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Alvogen Drugs.

2868.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Alvogen Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Alvogen Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Alvogen Drugs was unlawfully restrained, suppressed, or eliminated.

2869.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Alvogen Drugs until the market achieves a steady state.

2870.   As a direct and proximate result of Alvogen's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Alvogen Drugs than it would have paid in the absence of Alvogen's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2871.   There is no legitimate, non-pretextual, pro-competitive business justification for Alvogen's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2872.   Alvogen's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2873.   Alvogen's conduct violated the following state antitrust or competition practices laws:

   d.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

   e.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   f.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

   g.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

   h.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   i.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

   j.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   k.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

   l.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

   m.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

   n.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

   o.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

   p.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

   q.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

   r.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

   s.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

   t.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

u.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

v.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

w.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

x.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

y.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

z.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

aa.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

bb.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

cc.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

dd.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

ee.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

ff.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

gg.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

hh.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

2874.  Humana incorporates by reference the preceding allegations.

2875.  Alvogen engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Alvogen's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Humana was deprived of the opportunity to purchase the Alvogen Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2876.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Alvogen Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Alvogen Drugs should have been available, and would have been available, absent Alvogen's illegal conduct.

2877.   By engaging in the foregoing conduct, Alvogen engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

2878.   Humana incorporates by reference the preceding allegations.

2879.   Alvogen has benefitted from artificial prices in the sale of the Alvogen Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2880.   Alvogen's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Alvogen Drugs by Humana.

REDACTED – PUBLIC VERSION

2881.   Humana has conferred upon Alvogen an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2882.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Alvogen Drugs.

2883.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Alvogen Drugs, as it is not liable and would not compensate Humana for the impact of Alvogen's unlawful conduct.

2884.   The economic benefit of overcharges derived by Alvogen through charging supracompetitive and artificially inflated prices for the Alvogen Drugs is a direct and proximate result of Alvogen's unlawful conduct.

2885.   The economic benefits derived by Alvogen rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Alvogen.

2886.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Alvogen to be permitted to retain any of the overcharges for the Alvogen Drugs derived from Alvogen's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2887.   Alvogen is aware of and appreciates the benefits bestowed upon it by Humana.

2888.   Alvogen should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2889.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Alvogen traceable to Humana.

REDACTED – PUBLIC VERSION

## COUNT XX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

2890.   Humana incorporates by reference the preceding allegations.

2891.   Alvogen knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Alvogen Drugs. Alvogen injured Humana through this conduct.

2892.   But for Alvogen's scheme to inflate the price of the Alvogen Drugs, Humana would have purchased lower-priced Alvogen Drugs.

2893.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Alvogen Drugs than it would have paid absent Alvogen's continuing anticompetitive conduct.

2894.   Humana has purchased substantial amounts of the Alvogen Drugs during the relevant period.

2895.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Alvogen's conduct violates Sections 1 and 2 of the Sherman Act.

2896.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Alvogen's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

REDACTED – PUBLIC VERSION

2897.    Humana incorporates by reference the preceding allegations.

2898.    Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Amneal Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Bethanechol Chloride
> Metformin ER
> Naproxen Sodium
> Norethindrone Acetate
> Oxycodone/Acetaminophen
> Phenytoin Sodium
> Ranitidine HCL
> Warfarin

2899.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

2900.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Amneal Drugs.

2901.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

   b.    Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

   c.    Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

REDACTED – PUBLIC VERSION

2902.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

2903.   As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2904.   Amneal is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2905.   There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2906.   Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2907.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Amneal Drugs, or by assignment from its other subsidiaries that directly purchased the Amneal Drugs during the relevant period.

## COUNT XXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Amneal and All Other Defendants Under Joint and Several Liability)

2908.   Humana incorporates by reference the preceding allegations.

2909.   Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Amneal Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2910.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

2911.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Amneal Drugs.

2912.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

2913.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

2914.    As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2915.    There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2916.  Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2917.  Amneal's conduct violated the following state antitrust or competition practices laws:

a.  Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.  Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

2918.   Humana incorporates by reference the preceding allegations.

2919.   Amneal engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amneal's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Amneal Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

2920.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Amneal Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Amneal Drugs should have been available, and would have been available, absent Amneal's illegal conduct.

2921.    By engaging in the foregoing conduct, Amneal engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.    Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

REDACTED – PUBLIC VERSION

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

2922.  Humana incorporates by reference the preceding allegations.

2923.  Amneal has benefitted from artificial prices in the sale of the Amneal Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2924.  Amneal's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Amneal Drugs by Humana.

2925.  Humana has conferred upon Amneal an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2926.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Amneal Drugs.

2927.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Amneal Drugs, as it is not liable and would not compensate Humana for the impact of Amneal's unlawful conduct.

2928.    The economic benefit of overcharges derived by Amneal through charging supracompetitive and artificially inflated prices for the Amneal Drugs is a direct and proximate result of Amneal's unlawful conduct.

2929.    The economic benefits derived by Amneal rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Amneal.

2930.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amneal to be permitted to retain any of the overcharges for the Amneal Drugs derived from Amneal's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2931.    Amneal is aware of and appreciates the benefits bestowed upon it by Humana.

2932.    Amneal should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2933.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Amneal traceable to Humana.

REDACTED – PUBLIC VERSION

## COUNT XXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

2934.    Humana incorporates by reference the preceding allegations.

2935.    Amneal knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Amneal Drugs. Amneal injured Humana through this conduct.

2936.    But for Amneal's scheme to inflate the price of the Amneal Drugs, Humana would have purchased lower-priced Amneal Drugs.

2937.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Amneal Drugs than it would have paid absent Amneal's continuing anticompetitive conduct.

2938.    Humana has purchased substantial amounts of the Amneal Drugs during the relevant period.

2939.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amneal's conduct violates Sections 1 and 2 of the Sherman Act.

2940.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amneal's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2941.   Humana incorporates by reference the preceding allegations.

2942.   Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Apotex Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Balsalazide Disodium
> Butorphanol Tartrate
> Carbamazepine
> Doxazosin Mesylate
> Epitol
> Etodolac
> Omega-3-Acid Ethyl Esters
> Oxybutynin Chloride
> Pentoxifylline
> Tizanidine
> Triamterene HCTZ

2943.   Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

2944.   The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Apotex Drugs.

2945.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

2946.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

2947.   As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2948.   Apotex is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2949.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2950.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2951.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Apotex Drugs, or by assignment from its other subsidiaries that directly purchased the Apotex Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT XXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Apotex and All Other Defendants Under Joint and Several Liability)**

2952.   Humana incorporates by reference the preceding allegations.

2953.   Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Apotex Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

2954.   Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

2955.   The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Apotex Drugs.

2956.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

  b.   Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

  c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

2957.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

2958.   As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2959.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2960.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2961.   Apotex's conduct violated the following state antitrust or competition practices laws:

   a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

   b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

   d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

   g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

   i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

   j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

   k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

   l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT XXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2962.   Humana incorporates by reference the preceding allegations.

2963.   Apotex engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Apotex's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Apotex Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2964.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Apotex Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Apotex Drugs should have been available, and would have been available, absent Apotex's illegal conduct.

2965.   By engaging in the foregoing conduct, Apotex engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2966.    Humana incorporates by reference the preceding allegations.

2967.    Apotex has benefitted from artificial prices in the sale of the Apotex Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2968.    Apotex's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Apotex Drugs by Humana.

2969.    Humana has conferred upon Apotex an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

2970.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Apotex Drugs.

2971.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Apotex Drugs, as it is not liable and would not compensate Humana for the impact of Apotex's unlawful conduct.

2972.    The economic benefit of overcharges derived by Apotex through charging supracompetitive and artificially inflated prices for the Apotex Drugs is a direct and proximate result of Apotex's unlawful conduct.

2973.    The economic benefits derived by Apotex rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Apotex.

2974.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Apotex to be permitted to retain any of the overcharges for the Apotex Drugs derived

REDACTED – PUBLIC VERSION

from Apotex's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2975.   Apotex is aware of and appreciates the benefits bestowed upon it by Humana.

2976.   Apotex should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

2977.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Apotex traceable to Humana.

## COUNT XXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2978.   Humana incorporates by reference the preceding allegations.

2979.   Apotex knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Apotex Drugs. Apotex injured Humana through this conduct.

2980.   But for Apotex's scheme to inflate the price of the Apotex Drugs, Humana would have purchased lower-priced Apotex Drugs.

2981.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Apotex Drugs than it would have paid absent Apotex's continuing anticompetitive conduct.

2982.   Humana has purchased substantial amounts of the Apotex Drugs during the relevant period.

2983.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Apotex's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

2984.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Apotex's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

2985.    Humana incorporates by reference the preceding allegations.

2986.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Ascend Drug"). This conspiracy was *per se* unlawful price-fixing.

Nimodipine

2987.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Ascend Drug throughout the United States.

2988.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Ascend Drug.

2989.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drug;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drug in the United States market; and

    c.   Competition in establishing the prices paid for the Ascend Drug was unlawfully restrained, suppressed, or eliminated.

2990.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drug until the market achieves a steady state.

2991.    As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drug than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2992.    Ascend is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

2993.    There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2994.    Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2995.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Ascend Drug, or by assignment from its other subsidiaries that directly purchased the Ascend Drug during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT XXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Ascend and All Other Defendants Under Joint and Several Liability)**

2996.    Humana incorporates by reference the preceding allegations.

2997.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Ascend Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

2998.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Ascend Drug throughout the United States.

2999.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Ascend Drug.

3000.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drug;

b.    Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drug in the United States market; and

c.    Competition in establishing the prices paid for the Ascend Drug was unlawfully restrained, suppressed, or eliminated.

3001.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drug until the market achieves a steady state.

3002.   As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drug than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3003.   There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3004.   Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3005.   Ascend's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT XXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

3006.   Humana incorporates by reference the preceding allegations.

3007.   Ascend engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ascend's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Ascend Drug at prices restrained by competition and forced to pay artificially inflated prices.

3008.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Ascend Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Ascend Drug should have been available, and would have been available, absent Ascend's illegal conduct.

3009.   By engaging in the foregoing conduct, Ascend engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

   a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

   b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

   c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

   g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

   h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

3010.   Humana incorporates by reference the preceding allegations.

3011.   Ascend has benefitted from artificial prices in the sale of the Ascend Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3012.   Ascend's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Ascend Drug by Humana.

3013.   Humana has conferred upon Ascend an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3014.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Ascend Drug.

3015.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Ascend Drug, as it is not liable and would not compensate Humana for the impact of Ascend's unlawful conduct.

3016.   The economic benefit of overcharges derived by Ascend through charging supracompetitive and artificially inflated prices for the Ascend Drug is a direct and proximate result of Ascend's unlawful conduct.

3017.   The economic benefits derived by Ascend rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Ascend.

3018.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ascend to be permitted to retain any of the overcharges for the Ascend Drug derived

from Ascend's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3019.    Ascend is aware of and appreciates the benefits bestowed upon it by Humana.

3020.    Ascend should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3021.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Ascend traceable to Humana.

## COUNT XXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

3022.    Humana incorporates by reference the preceding allegations.

3023.    Ascend knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Ascend Drug. Ascend injured Humana through this conduct.

3024.    But for Ascend's scheme to inflate the price of the Ascend Drug, Humana would have purchased lower-priced Ascend Drug.

3025.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Ascend Drug than it would have paid absent Ascend's continuing anticompetitive conduct.

3026.    Humana has purchased substantial amounts of the Ascend Drug during the relevant period.

3027.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ascend's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3028.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ascend's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

3029.    Humana incorporates by reference the preceding allegations.

3030.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Aurobindo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine IR
> Cefuroxime Axetil
> Dextroamphetamine Sulfate ER
> Fosinopril HCTZ
> Gabapentin
> Glyburide
> Glyburide-Metformin
> Lamivudine/Zidovudine (Combivir)
> Oxycodone/Acetaminophen
> Penicillin VK
> Pioglitazone HCL

3031.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

3032.   The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Aurobindo Drugs.

3033.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

3034.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

3035.   As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3036.   Aurobindo is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3037.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

3038.    Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3039.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Aurobindo Drugs, or by assignment from its other subsidiaries that directly purchased the Aurobindo Drugs during the relevant period.

## COUNT XXXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

3040.    Humana incorporates by reference the preceding allegations.

3041.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Aurobindo Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3042.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

3043.    The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Aurobindo Drugs.

3044.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

> b.    Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

3045.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

3046.   As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3047.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3048.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3049.   Aurobindo's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

3050. Humana incorporates by reference the preceding allegations.

3051. Aurobindo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Aurobindo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Aurobindo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3052. There was and is a gross disparity between the price that Humana paid and continues to pay for the Aurobindo Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Aurobindo Drugs should have been available, and would have been available, absent Aurobindo's illegal conduct.

3053. By engaging in the foregoing conduct, Aurobindo engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West

Virginia.

**COUNT XXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Aurobindo and All Other Defendants Under Joint and Several Liability)**

3054.    Humana incorporates by reference the preceding allegations.

3055.    Aurobindo has benefitted from artificial prices in the sale of the Aurobindo Drugs

resulting from the unlawful and inequitable acts alleged in this Complaint.

3056.    Aurobindo's financial benefit resulting from its unlawful and inequitable acts are

traceable to overpayments for the Aurobindo Drugs by Humana.

3057.    Humana has conferred upon Aurobindo an economic benefit, profits from unlawful

overcharges, to the economic detriment of Humana.

3058.    It would be futile for Humana to seek a remedy from any party with whom it has

privity of contract for its indirect purchases of the Aurobindo Drugs.

3059.    It would be futile for Humana to seek to exhaust any remedy against the immediate

intermediary in the chain of distribution from which it purchased the Aurobindo Drugs, as it is not

liable and would not compensate Humana for the impact of Aurobindo's unlawful conduct.

3060.    The economic benefit of overcharges derived by Aurobindo through charging

supracompetitive and artificially inflated prices for the Aurobindo Drugs is a direct and proximate

result of Aurobindo's unlawful conduct.

3061.    The economic benefits derived by Aurobindo rightfully belong to Humana, as it paid

anticompetitive and monopolistic prices during the relevant period, benefiting Aurobindo.

3062.    It would be inequitable under unjust enrichment principles under the law of the

District of Columbia and the laws of all states and territories in the United States, except Ohio and

REDACTED – PUBLIC VERSION

Indiana, for Aurobindo to be permitted to retain any of the overcharges for the Aurobindo Drugs derived from Aurobindo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3063.   Aurobindo is aware of and appreciates the benefits bestowed upon it by Humana.

3064.   Aurobindo should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3065.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Aurobindo traceable to Humana.

## COUNT XL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

3066.   Humana incorporates by reference the preceding allegations.

3067.   Aurobindo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Aurobindo Drugs. Aurobindo injured Humana through this conduct.

3068.   But for Aurobindo's scheme to inflate the price of the Aurobindo Drugs, Humana would have purchased lower-priced Aurobindo Drugs.

3069.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Aurobindo Drugs than it would have paid absent Aurobindo's continuing anticompetitive conduct.

3070.   Humana has purchased substantial amounts of the Aurobindo Drugs during the relevant period.

REDACTED – PUBLIC VERSION

3071.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Aurobindo's conduct violates Sections 1 and 2 of the Sherman Act.

3072.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Aurobindo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

3073.    Humana incorporates by reference the preceding allegations.

3074.    Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Breckenridge Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cyproheptadine HCL
> Disulfiram
> Estradiol/Norethindrone Acetate (Mimvey)
> Methylprednisolone

3075.    Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

3076.    The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Breckenridge Drugs.

3077.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

3078.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

3079.   As a direct and proximate result of Breckenridge's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3080.   Breckenridge is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3081.   There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3082.   Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

3083.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Breckenridge Drugs, or by assignment from its other subsidiaries that directly purchased the Breckenridge Drugs during the relevant period.

## COUNT XLII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

3084.    Humana incorporates by reference the preceding allegations.

3085.    Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Breckenridge Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3086.    Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

3087.    The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Breckenridge Drugs.

3088.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;

b.    Humana was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

3089.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

3090.    As a direct and proximate result of Breckenridge's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3091.    There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3092.    Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3093.    Breckenridge's conduct violated the following state antitrust or competition practices laws:

> a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.
>
> b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.
>
> c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.
>
> d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.
>
> e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.
>
> f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.
>
> g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.
>
> h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.
>
> i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.
>
> j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.     W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XLIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

3094.   Humana incorporates by reference the preceding allegations.

3095.   Breckenridge engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Breckenridge's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Breckenridge Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3096.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Breckenridge Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Breckenridge Drugs should have been available, and would have been available, absent Breckenridge's illegal conduct.

3097.   By engaging in the foregoing conduct, Breckenridge engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XLIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

3098.   Humana incorporates by reference the preceding allegations.

3099.   Breckenridge has benefitted from artificial prices in the sale of the Breckenridge Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3100.   Breckenridge's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Breckenridge Drugs by Humana.

3101.   Humana has conferred upon Breckenridge an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3102.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Breckenridge Drugs.

3103.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Breckenridge Drugs, as it is not liable and would not compensate Humana for the impact of Breckenridge's unlawful conduct.

3104.   The economic benefit of overcharges derived by Breckenridge through charging supracompetitive and artificially inflated prices for the Breckenridge Drugs is a direct and proximate result of Breckenridge's unlawful conduct.

3105.   The economic benefits derived by Breckenridge rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Breckenridge.

3106.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Breckenridge to be permitted to retain any of the overcharges for the Breckenridge

Drugs derived from Breckenridge's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3107.   Breckenridge is aware of and appreciates the benefits bestowed upon it by Humana.

3108.   Breckenridge should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3109.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Breckenridge traceable to Humana.

## COUNT XLV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

3110.   Humana incorporates by reference the preceding allegations.

3111.   Breckenridge knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Breckenridge Drugs. Breckenridge injured Humana through this conduct.

3112.   But for Breckenridge's scheme to inflate the price of the Breckenridge Drugs, Humana would have purchased lower-priced Breckenridge Drugs.

3113.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Breckenridge Drugs than it would have paid absent Breckenridge's continuing anticompetitive conduct.

3114.   Humana has purchased substantial amounts of the Breckenridge Drugs during the relevant period.

3115.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Breckenridge's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3116.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Breckenridge's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

3117.   Humana incorporates by reference the preceding allegations.

3118.   Cadista knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Cadista Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Methylprednisolone
> Prednisone
> Prochlorperazine

3119.   Cadista has committed at least one overt act to further the conspiracy alleged in this Complaint. Cadista's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Cadista Drugs throughout the United States.

3120.   The conspiracy realized its intended effect; Cadista has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Cadista Drugs.

3121.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Cadista Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Cadista Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Cadista Drugs was unlawfully restrained, suppressed, or eliminated.

3122.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Cadista Drugs until the market achieves a steady state.

3123.   As a direct and proximate result of Cadista's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Cadista Drugs than it would have paid in the absence of Cadista's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3124.   Cadista is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3125.   There is no legitimate, non-pretextual, pro-competitive business justification for Cadista's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3126.   Cadista's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3127.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Cadista Drugs, or by assignment from its other subsidiaries that directly purchased the Cadista Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT XLVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Cadista and All Other Defendants Under Joint and Several Liability)**

3128.    Humana incorporates by reference the preceding allegations.

3129.    Cadista knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Cadista Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3130.    Cadista has committed at least one overt act to further the conspiracy alleged in this Complaint. Cadista's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Cadista Drugs throughout the United States.

3131.    The conspiracy realized its intended effect; Cadista has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Cadista Drugs.

3132.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Cadista Drugs;
>
> b.    Humana was deprived of the benefits of free and open competition in the sale of the Cadista Drugs in the United States market; and
>
> c.    Competition in establishing the prices paid for the Cadista Drugs was unlawfully restrained, suppressed, or eliminated.

3133.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Cadista Drugs until the market achieves a steady state.

3134. As a direct and proximate result of Cadista's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Cadista Drugs than it would have paid in the absence of Cadista's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3135. There is no legitimate, non-pretextual, pro-competitive business justification for Cadista's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3136. Cadista's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3137. Cadista's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XLVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Cadista and All Other Defendants Under Joint and Several Liability)

3138.   Humana incorporates by reference the preceding allegations.

3139.   Cadista engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Cadista's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Cadista Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3140.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Cadista Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Cadista Drugs should have been available, and would have been available, absent Cadista's illegal conduct.

3141.   By engaging in the foregoing conduct, Cadista engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XLIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

3142.    Humana incorporates by reference the preceding allegations.

3143.    Cadista has benefitted from artificial prices in the sale of the Cadista Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3144.    Cadista's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Cadista Drugs by Humana.

3145.    Humana has conferred upon Cadista an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3146.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Cadista Drugs.

3147.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Cadista Drugs, as it is not liable and would not compensate Humana for the impact of Cadista's unlawful conduct.

3148.    The economic benefit of overcharges derived by Cadista through charging supracompetitive and artificially inflated prices for the Cadista Drugs is a direct and proximate result of Cadista's unlawful conduct.

3149.    The economic benefits derived by Cadista rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Cadista.

3150.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Cadista to be permitted to retain any of the overcharges for the Cadista Drugs derived

REDACTED – PUBLIC VERSION

from Cadista's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3151.    Cadista is aware of and appreciates the benefits bestowed upon it by Humana.

3152.    Cadista should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3153.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Cadista traceable to Humana.

## COUNT L

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

3154.    Humana incorporates by reference the preceding allegations.

3155.    Cadista knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Cadista Drugs. Cadista injured Humana through this conduct.

3156.    But for Cadista's scheme to inflate the price of the Jubilant Cadista Drugs, Humana would have purchased lower-priced Cadista Drugs.

3157.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Cadista Drugs than it would have paid absent Cadista's continuing anticompetitive conduct.

3158.    Humana has purchased substantial amounts of the Cadista Drugs during the relevant period.

3159.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Cadista's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3160.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Cadista's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Camber and All Other Defendants Under Joint and Several Liability)

3161.   Humana incorporates by reference the preceding allegations.

3162.   Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Camber Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Hydralazine
> Lamivudine/Zidovudine (Combivir)
> Raloxifene HCL
> Valganciclovir

3163.   Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Camber Drugs throughout the United States.

3164.   The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Camber Drugs.

3165.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or
>
>     stabilized prices at supracompetitive levels for the Camber Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

3166.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

3167.   As a direct and proximate result of Camber's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3168.   Camber is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3169.   There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3170.   Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3171.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Camber Drugs, or by assignment from its other subsidiaries that directly purchased the Camber Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT LII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Camber and All Other Defendants Under Joint and Several Liability)**

3172.    Humana incorporates by reference the preceding allegations.

3173.    Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Camber Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3174.    Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Camber Drugs throughout the United States.

3175.    The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Camber Drugs.

3176.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Camber Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

3177.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

3178.    As a direct and proximate result of Camber's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3179.    There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3180.    Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3181.    Camber's conduct violated the following state antitrust or competition practices laws:

a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in
       Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to
       purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North
       Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
       Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Camber and All Other Defendants Under Joint and Several Liability)

3182.   Humana incorporates by reference the preceding allegations.

3183.   Camber engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Camber's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Camber Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3184.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Camber Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Camber Drugs should have been available, and would have been available, absent Camber's illegal conduct.

3185.   By engaging in the foregoing conduct, Camber engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT LIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Camber and All Other Defendants Under Joint and Several Liability)

3186.   Humana incorporates by reference the preceding allegations.

3187.   Camber has benefitted from artificial prices in the sale of the Camber Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3188.   Camber's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Camber Drugs by Humana.

3189.   Humana has conferred upon Camber an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3190.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Camber Drugs.

3191.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Camber Drugs, as it is not liable and would not compensate Humana for the impact of Camber's unlawful conduct.

3192.   The economic benefit of overcharges derived by Camber through charging supracompetitive and artificially inflated prices for the Camber Drugs is a direct and proximate result of Camber's unlawful conduct.

3193.   The economic benefits derived by Camber rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Camber.

3194.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Camber to be permitted to retain any of the overcharges for the Camber Drugs derived

REDACTED – PUBLIC VERSION

from Camber's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3195.   Camber is aware of and appreciates the benefits bestowed upon it by Humana.

3196.   Camber should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3197.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Camber traceable to Humana.

**COUNT LV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Camber and All Other Defendants Under Joint and Several Liability)**

3198.   Humana incorporates by reference the preceding allegations.

3199.   Camber knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Camber Drugs. Camber injured Humana through this conduct.

3200.   But for Camber's scheme to inflate the price of the Camber Drugs, Humana would have purchased lower-priced Camber Drugs.

3201.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Camber Drugs than it would have paid absent Camber's continuing anticompetitive conduct.

3202.   Humana has purchased substantial amounts of the Camber Drugs during the relevant period.

3203.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Camber's conduct violates Sections 1 and 2 of the Sherman Act.

3204.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Camber's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

3205.   Humana incorporates by reference the preceding allegations.

3206.   Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Citron Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefuroxime Axetil
> Fluconazole
> Fosinopril HCTZ
> Glyburide
> Glyburide-Metformin

3207.   Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Citron Drugs throughout the United States.

3208.   The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Citron Drugs.

3209.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Citron Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Citron Drugs was unlawfully restrained, suppressed, or eliminated.

3210.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Citron Drugs until the market achieves a steady state.

3211.   As a direct and proximate result of Citron's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Citron Drugs than it would have paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3212.   Citron is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3213.   There is no legitimate, non-pretextual, pro-competitive business justification for Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3214.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3215.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Citron Drugs, or by assignment from its other subsidiaries that directly purchased the Citron Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT LVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Citron and All Other Defendants Under Joint and Several Liability)**

3216.    Humana incorporates by reference the preceding allegations.

3217.    Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Citron Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3218.    Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Citron Drugs throughout the United States.

3219.    The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Citron Drugs.

3220.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

b.    Humana was deprived of the benefits of free and open competition in the sale of the Citron Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Citron Drugs was unlawfully restrained, suppressed, or eliminated.

3221.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Citron Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

3222.   As a direct and proximate result of Citron's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Citron Drugs than it would have paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3223.   There is no legitimate, non-pretextual, pro-competitive business justification for Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3224.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3225.   Citron's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Citron and All Other Defendants Under Joint and Several Liability)

3226.   Humana incorporates by reference the preceding allegations.

3227.   Citron engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Citron's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Citron Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3228.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Citron Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Citron Drugs should have been available, and would have been available, absent Citron's illegal conduct.

3229.   By engaging in the foregoing conduct, Citron engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Citron and All Other Defendants Under Joint and Several Liability)

3230.    Humana incorporates by reference the preceding allegations.

3231.    Citron has benefitted from artificial prices in the sale of the Citron Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3232.    Citron's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Citron Drugs by Humana.

3233.    Humana has conferred upon Citron an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3234.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Citron Drugs.

3235.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Citron Drugs, as it is not liable and would not compensate Humana for the impact of Citron's unlawful conduct.

3236.    The economic benefit of overcharges derived by Citron through charging supracompetitive and artificially inflated prices for the Citron Drugs is a direct and proximate result of Citron's unlawful conduct.

3237.    The economic benefits derived by Citron rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Citron.

3238.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Citron to be permitted to retain any of the overcharges for the Citron Drugs derived

REDACTED – PUBLIC VERSION

from Citron's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3239.   Citron is aware of and appreciates the benefits bestowed upon it by Humana.

3240.   Citron should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3241.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Citron traceable to Humana.

## COUNT LX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

3242.   Humana incorporates by reference the preceding allegations.

3243.   Citron knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Citron Drugs. Citron injured Humana through this conduct.

3244.   But for Citron's scheme to inflate the price of the Citron Drugs, Humana would have purchased lower-priced Citron Drugs.

3245.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Citron Drugs than it would have paid absent Citron's continuing anticompetitive conduct.

3246.   Humana has purchased substantial amounts of the Citron Drugs during the relevant period.

3247.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Citron's conduct violates Sections 1 and 2 of the Sherman Act.

3248.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Citron's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

3249.   Humana incorporates by reference the preceding allegations.

3250.   Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Dr. Reddy's Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Allopurinol
> Ciprofloxacin HCL
> Eszopiclone
> Fluconazole
> Glimepiride
> Isotretinoin
> Lamotrigine ER
> Meprobamate
> Metoprolol Succinate ER
> Montelukast
> Omeprazole-Sodium Bicarbonate
> Oxaprozin
> Paricalcitol
> Ranitidine HCL
> Sumatriptan
> Tizanidine
> Valganciclovir
> Zoledronic Acid

3251.   Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on

interstate commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

3252.   The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Dr. Reddy's Drugs.

3253.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

3254.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

3255.   As a direct and proximate result of Dr. Reddy's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3256.   Dr. Reddy's is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

3257.   There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3258.   Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3259.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Dr. Reddy's Drugs, or by assignment from its other subsidiaries that directly purchased the Dr. Reddy's Drugs during the relevant period.

## COUNT LXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

3260.   Humana incorporates by reference the preceding allegations.

3261.   Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Dr. Reddy's Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3262.   Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

3263.   The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Dr. Reddy's Drugs.

3264.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

Case 2:19-cv-04862-CMR   Document 39-1   Filed 12/15/20   Page 223 of 430

REDACTED – PUBLIC VERSION

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

3265. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

3266. As a direct and proximate result of Dr. Reddy's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3267. There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3268. Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3269. Dr. Reddy's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

3270.   Humana incorporates by reference the preceding allegations.

3271.   Dr. Reddy's engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Dr. Reddy's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Dr. Reddy's Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3272.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Dr. Reddy's Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Dr. Reddy's Drugs should have been available, and would have been available, absent Dr. Reddy's illegal conduct.

3273.   By engaging in the foregoing conduct, Dr. Reddy's engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

  x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

  y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

  z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

  aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXIV

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)**

3274. Humana incorporates by reference the preceding allegations.

3275. Dr. Reddy's has benefitted from artificial prices in the sale of the Dr. Reddy's Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3276. Dr. Reddy's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Dr. Reddy's Drugs by Humana.

3277. Humana has conferred upon Dr. Reddy's an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3278. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Dr. Reddy's Drugs.

3279. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Dr. Reddy's Drugs, as it is not liable and would not compensate Humana for the impact of Dr. Reddy's unlawful conduct.

3280. The economic benefit of overcharges derived by Dr. Reddy's through charging supracompetitive and artificially inflated prices for the Dr. Reddy's Drugs is a direct and proximate result of Dr. Reddy's unlawful conduct.

REDACTED – PUBLIC VERSION

3281.   The economic benefits derived by Dr. Reddy's rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Dr. Reddy's.

3282.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Dr. Reddy's to be permitted to retain any of the overcharges for the Dr. Reddy's Drugs derived from Dr. Reddy's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3283.   Dr. Reddy's is aware of and appreciates the benefits bestowed upon it by Humana.

3284.   Dr. Reddy's should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3285.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Dr. Reddy's traceable to Humana.

## COUNT LXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

3286.   Humana incorporates by reference the preceding allegations.

3287.   Dr. Reddy's knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Dr. Reddy's Drugs. Dr. Reddy's injured Humana through this conduct.

3288.   But for Dr. Reddy's scheme to inflate the price of the Dr. Reddy's Drugs, Humana would have purchased lower-priced Dr. Reddy's Drugs.

REDACTED – PUBLIC VERSION

3289.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Dr. Reddy's Drugs than it would have paid absent Dr. Reddy's continuing anticompetitive conduct.

3290.   Humana has purchased substantial amounts of the Dr. Reddy's Drugs during the relevant period.

3291.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Dr. Reddy's conduct violates Sections 1 and 2 of the Sherman Act.

3292.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Dr. Reddy's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

3293.   Humana incorporates by reference the preceding allegations.

3294.   G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "G&W Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Betamethasone Valerate
> Ciclopirox
> Fluocinolone Acetonide
> Fluocinonide
> Halobetasol Propionate
> Hydrocortisone Valerate
> Metronidazole
> Prochlorperazine Maleate

3295.    G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the G&W Drugs throughout the United States.

3296.    The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the G&W Drugs.

3297.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the G&W Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the G&W Drugs was unlawfully restrained, suppressed, or eliminated.

3298.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drugs until the market achieves a steady state.

3299.    As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drugs than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3300.    G&W is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

3301.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3302.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3303.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the G&W Drugs, or by assignment from its other subsidiaries that directly purchased the G&W Drug during the relevant period.

## COUNT LXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to G&W and All Other Defendants Under Joint and Several Liability)**

3304.   Humana incorporates by reference the preceding allegations.

3305.   G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the G&W Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3306.   G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the G&W Drugs throughout the United States.

3307.   The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the G&W Drugs.

3308.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the G&W Drugs in the United States market; and

c.   Competition in establishing the prices paid for the G&W Drugs was unlawfully restrained, suppressed, or eliminated.

3309.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drugs until the market achieves a steady state.

3310.   As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drugs than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3311.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3312.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3313.   G&W's conduct violated the following state antitrust or competition practices laws:

a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

REDACTED – PUBLIC VERSION

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

3314.   Humana incorporates by reference the preceding allegations.

3315.   G&W engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of G&W's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the G&W Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3316.   There was and is a gross disparity between the price that Humana paid and continues to pay for the G&W Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced G&W Drugs should have been available, and would have been available, absent G&W's illegal conduct.

3317.   By engaging in the foregoing conduct, G&W engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT LXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

3318.   Humana incorporates by reference the preceding allegations.

3319.   G&W has benefitted from artificial prices in the sale of the G&W Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3320.   G&W's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the G&W Drugs by Humana.

3321.   Humana has conferred upon G&W an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3322.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the G&W Drugs.

3323.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the G&W Drugs, as it is not liable and would not compensate Humana for the impact of G&W's unlawful conduct.

3324.   The economic benefit of overcharges derived by G&W through charging supracompetitive and artificially inflated prices for the G&W Drugs is a direct and proximate result of G&W's unlawful conduct.

REDACTED – PUBLIC VERSION

3325.   The economic benefits derived by G&W rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting G&W.

3326.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for G&W to be permitted to retain any of the overcharges for the G&W Drugs derived from G&W's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3327.   G&W is aware of and appreciates the benefits bestowed upon it by Humana.

3328.   G&W should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3329.   A constructive trust should be imposed upon all unlawful or inequitable sums received by G&W traceable to Humana.

## COUNT LXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to G&W and All Other Defendants Under Joint and Several Liability)

3330.   Humana incorporates by reference the preceding allegations.

3331.   G&W knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the G&W Drugs. G&W injured Humana through this conduct.

3332.   But for G&W's scheme to inflate the price of the G&W Drugs, Humana would have purchased lower-priced G&W Drugs.

REDACTED – PUBLIC VERSION

3333.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the G&W Drugs than it would have paid absent G&W's continuing anticompetitive conduct.

3334.    Humana has purchased substantial amounts of the G&W Drugs during the relevant period.

3335.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that G&W's conduct violates Sections 1 and 2 of the Sherman Act.

3336.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by G&W's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

3337.    Humana incorporates by reference the preceding allegations.

3338.    Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Glenmark Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Alclometasone Dipropionate
> Ciclopirox
> Desogestrel/Ethinyl Estradiol (Kariva)
> Fluconazole
> Fluocinonide
> Fosinopril HCTZ
> Gabapentin
> Hydralazine
> Moexipril HCL

REDACTED – PUBLIC VERSION

Moexipril HCL/HCTZ
Nabumetone
Naproxen Sodium
Norethindrone Acetate
Ranitidine HCL

3339.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

3340.   The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Glenmark Drugs.

3341.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

3342.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

3343.   As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3344.   Glenmark is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3345.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3346.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3347.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Glenmark Drugs, or by assignment from its other subsidiaries that directly purchased the Glenmark Drugs during the relevant period.

## COUNT LXXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

3348.   Humana incorporates by reference the preceding allegations.

3349.   Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Glenmark Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3350.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

3351.   The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Glenmark Drugs.

3352.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

3353.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

3354.   As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3355.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3356.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3357.   Glenmark's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

REDACTED – PUBLIC VERSION

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
     Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

3358.   Humana incorporates by reference the preceding allegations.

3359.   Glenmark engaged in unfair competition or unfair, unconscionable, deceptive, or
fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a
direct and proximate result of Glenmark's anticompetitive, deceptive, unfair, unconscionable, and
fraudulent conduct, Humana was deprived of the opportunity to purchase the Glenmark Drugs at
prices restrained by competition and forced to pay artificially inflated prices.

3360.   There was and is a gross disparity between the price that Humana paid and continues
to pay for the Glenmark Drugs, including by assignment from its subsidiaries, and the value
received, given that more cheaply priced Glenmark Drugs should have been available, and would
have been available, absent Glenmark's illegal conduct.

3361.   By engaging in the foregoing conduct, Glenmark engaged in unfair competition or
deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

3362.   Humana incorporates by reference the preceding allegations.

3363.   Glenmark has benefitted from artificial prices in the sale of the Glenmark Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3364.   Glenmark's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Glenmark Drugs by Humana.

3365.   Humana has conferred upon Glenmark an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3366.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Glenmark Drugs.

3367.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Glenmark Drugs, as it is not liable and would not compensate Humana for the impact of Glenmark's unlawful conduct.

REDACTED – PUBLIC VERSION

3368.   The economic benefit of overcharges derived by Glenmark through charging supracompetitive and artificially inflated prices for the Glenmark Drugs is a direct and proximate result of Glenmark's unlawful conduct.

3369.   The economic benefits derived by Glenmark rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Glenmark.

3370.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Glenmark to be permitted to retain any of the overcharges for the Glenmark Drugs derived from Glenmark's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3371.   Glenmark is aware of and appreciates the benefits bestowed upon it by Humana.

3372.   Glenmark should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3373.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Glenmark traceable to Humana.

## COUNT LXXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

3374.   Humana incorporates by reference the preceding allegations.

3375.   Glenmark knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Glenmark Drugs. Glenmark injured Humana through this conduct.

3376.    But for Glenmark's scheme to inflate the price of the Glenmark Drugs, Humana would have purchased lower-priced Glenmark Drugs.

3377.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Glenmark Drugs than it would have paid absent Glenmark's continuing anticompetitive conduct.

3378.    Humana has purchased substantial amounts of the Glenmark Drugs during the relevant period.

3379.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Glenmark's conduct violates Sections 1 and 2 of the Sherman Act.

3380.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Glenmark's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Impax and All Other Defendants Under Joint and Several Liability)

3381.    Humana incorporates by reference the preceding allegations.

3382.    Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Impax Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine ER and IR
> Cyproheptadine HCL
> Dextroamphetamine Sulfate ER
> Metronidazole
> Methylphenidate
> Pilocarpine HCL

3383.    Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Impax Drugs throughout the United States.

3384.    The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Impax Drugs.

3385.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

3386.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

3387.    As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3388.    Impax is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

3389.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3390.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3391.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Impax Drugs, or by assignment from its other subsidiaries that directly purchased the Impax Drugs during the relevant period.

## COUNT LXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Impax and All Other Defendants Under Joint and Several Liability)

3392.   Humana incorporates by reference the preceding allegations.

3393.   Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Impax Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3394.   Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Impax Drugs throughout the United States.

3395.   The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Impax Drugs.

3396.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

3397.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

3398.   As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3399.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3400.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3401.   Impax's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Impax and All Other Defendants Under Joint and Several Liability)

3402.   Humana incorporates by reference the preceding allegations.

3403.   Impax engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Impax's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Impax Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3404.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Impax Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Impax Drugs should have been available, and would have been available, absent Impax's illegal conduct.

3405.   By engaging in the foregoing conduct, Impax engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

REDACTED – PUBLIC VERSION

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

3406.   Humana incorporates by reference the preceding allegations.

3407.   Impax has benefitted from artificial prices in the sale of the Impax Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3408.   Impax's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Impax Drugs by Humana.

3409.   Humana has conferred upon Impax an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3410.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Impax Drugs.

3411.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Impax Drugs, as it is not liable and would not compensate Humana for the impact of Impax's unlawful conduct.

3412.   The economic benefit of overcharges derived by Impax through charging supracompetitive and artificially inflated prices for the Impax Drugs is a direct and proximate result of Impax's unlawful conduct.

REDACTED – PUBLIC VERSION

3413.    The economic benefits derived by Impax rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Impax.

3414.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Impax to be permitted to retain any of the overcharges for the Impax Drugs derived from Impax's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3415.    Impax is aware of and appreciates the benefits bestowed upon it by Humana.

3416.    Impax should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3417.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Impax traceable to Humana.

## COUNT LXXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Impax and All Other Defendants Under Joint and Several Liability)

3418.    Humana incorporates by reference the preceding allegations.

3419.    Impax knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Impax Drugs. Impax injured Humana through this conduct.

3420.    But for Impax's scheme to inflate the price of the Impax Drugs, Humana would have purchased lower-priced Impax Drugs.

REDACTED – PUBLIC VERSION

3421.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Impax Drugs than it would have paid absent Impax's continuing anticompetitive conduct.

3422.    Humana has purchased substantial amounts of the Impax Drugs during the relevant period.

3423.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Impax's conduct violates Sections 1 and 2 of the Sherman Act.

3424.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Impax's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

3425.    Humana incorporates by reference the preceding allegations.

3426.    Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Lannett Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amantadine HCL
> Pilocarpine HCL
> Triamterene HCTZ

3427.    Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

3428.    The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Lannett Drugs.

3429.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

3430.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

3431.    As a direct and proximate result of Lannett's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3432.    Lannett is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3433.    There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

3434.   Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3435.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Lannett Drugs, or by assignment from its other subsidiaries that directly purchased the Lannett Drugs during the relevant period.

## COUNT LXXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

3436.   Humana incorporates by reference the preceding allegations.

3437.   Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Lannett Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3438.   Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

3439.   The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lannett Drugs.

3440.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

> b.   Humana was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

3441.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

3442.   As a direct and proximate result of Lannett's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3443.   There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3444.   Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3445.   Lannett's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

      dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

      ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Lannett and All Other Defendants Under Joint and Several Liability)

3446.   Humana incorporates by reference the preceding allegations.

3447.   Lannett engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lannett's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Lannett Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3448.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Lannett Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Lannett Drugs should have been available, and would have been available, absent Lannett's illegal conduct.

3449.   By engaging in the foregoing conduct, Lannett engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

      a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

      b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

      c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

      e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

3450.   Humana incorporates by reference the preceding allegations.

3451.   Lannett has benefitted from artificial prices in the sale of the Lannett Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3452.   Lannett's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lannett Drugs by Humana.

3453.   Humana has conferred upon Lannett an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3454.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lannett Drugs.

3455.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lannett Drugs, as it is not liable and would not compensate Humana for the impact of Lannett's unlawful conduct.

3456.   The economic benefit of overcharges derived by Lannett through charging supracompetitive and artificially inflated prices for the Lannett Drugs is a direct and proximate result of Lannett's unlawful conduct.

3457.   The economic benefits derived by Lannett rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lannett.

3458.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lannett to be permitted to retain any of the overcharges for the Lannett Drugs derived

REDACTED – PUBLIC VERSION

from Lannett's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3459.   Lannett is aware of and appreciates the benefits bestowed upon it by Humana.

3460.   Lannett should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3461.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lannett traceable to Humana.

## COUNT LXXXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

3462.   Humana incorporates by reference the preceding allegations.

3463.   Lannett knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lannett Drugs. Lannett injured Humana through this conduct.

3464.   But for Lannett's scheme to inflate the price of the Lannett Drugs, Humana would have purchased lower-priced Lannett Drugs.

3465.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lannett Drugs than it would have paid absent Lannett's continuing anticompetitive conduct.

3466.   Humana has purchased substantial amounts of the Lannett Drugs during the relevant period.

3467.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lannett's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3468.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lannett's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

3469.    Humana incorporates by reference the preceding allegations.

3470.    Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Lupin Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefdinir
> Cefprozil
> Cefuroxime Axetil
> Cephalexin
> Drospirenone and Ethinyl Estradiol (Ocella)
> Ethinyl Estradiol/Norethindrone (Balziva)
> Fenofibrate
> Irbesartan
> Lamivudine/Zidovudine (Combivir)
> Metformin ER (F)
> Niacin ER

3471.    Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

3472.    The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Lupin Drugs.

3473.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

3474.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

3475.   As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3476.   Lupin is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3477.   There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3478.   Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

3479.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Lupin Drugs, or by assignment from its other subsidiaries that directly purchased the Lupin Drugs during the relevant period.

## COUNT LXXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

3480.   Humana incorporates by reference the preceding allegations.

3481.   Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Lupin Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3482.   Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

3483.   The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lupin Drugs.

3484.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

3485. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

3486. As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3487. There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3488. Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3489. Lupin's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT LXXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

3490.   Humana incorporates by reference the preceding allegations.

3491.   Lupin engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lupin's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Lupin Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3492.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Lupin Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Lupin Drugs should have been available, and would have been available, absent Lupin's illegal conduct.

3493.   By engaging in the foregoing conduct, Lupin engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

## COUNT LXXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

3494.   Humana incorporates by reference the preceding allegations.

3495.   Lupin has benefitted from artificial prices in the sale of the Lupin Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3496.   Lupin's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lupin Drugs by Humana.

3497.   Humana has conferred upon Lupin an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3498.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lupin Drugs.

3499.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lupin Drugs, as it is not liable and would not compensate Humana for the impact of Lupin's unlawful conduct.

3500.   The economic benefit of overcharges derived by Lupin through charging supracompetitive and artificially inflated prices for the Lupin Drugs is a direct and proximate result of Lupin's unlawful conduct.

3501.   The economic benefits derived by Lupin rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lupin.

3502.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lupin to be permitted to retain any of the overcharges for the Lupin Drugs derived from Lupin's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

REDACTED – PUBLIC VERSION

3503.    Lupin is aware of and appreciates the benefits bestowed upon it by Humana.

3504.    Lupin should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3505.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Lupin traceable to Humana.

## COUNT XC

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

3506.    Humana incorporates by reference the preceding allegations.

3507.    Lupin knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lupin Drugs. Lupin injured Humana through this conduct.

3508.    But for Lupin's scheme to inflate the price of the Lupin Drugs, Humana would have purchased lower-priced Lupin Drugs.

3509.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lupin Drugs than it would have paid absent Lupin's continuing anticompetitive conduct.

3510.    Humana has purchased substantial amounts of the Lupin Drugs during the relevant period.

3511.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lupin's conduct violates Sections 1 and 2 of the Sherman Act.

3512.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

REDACTED – PUBLIC VERSION

caused by Lupin's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XCI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

3513.    Humana incorporates by reference the preceding allegations.

3514.    Mayne knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Mayne Drug"). This conspiracy was *per se* unlawful price-fixing.

Oxycodone/Acetaminophen

3515.    Mayne has committed at least one overt act to further the conspiracy alleged in this Complaint. Mayne's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Mayne Drug throughout the United States.

3516.    The conspiracy realized its intended effect; Mayne has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Mayne Drug.

3517.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mayne Drug;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Mayne Drug in the United States market; and

817

     c.   Competition in establishing the prices paid for the Mayne Drug was unlawfully restrained, suppressed, or eliminated.

3518.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mayne Drug until the market achieves a steady state.

3519.   As a direct and proximate result of Mayne's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mayne Drug than it would have paid in the absence of Mayne's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3520.   Mayne is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3521.   There is no legitimate, non-pretextual, pro-competitive business justification for Mayne's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3522.   Mayne's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3523.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Mayne Drug, or by assignment from its other subsidiaries that directly purchased the Mayne Drug during the relevant period.

## COUNT XCII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Mayne and All Other Defendants Under Joint and Several Liability)**

3524.   Humana incorporates by reference the preceding allegations.

3525.    Mayne knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Mayne Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

3526.    Mayne has committed at least one overt act to further the conspiracy alleged in this Complaint. Mayne's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mayne Drug throughout the United States.

3527.    The conspiracy realized its intended effect; Mayne has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mayne Drug.

3528.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mayne Drug;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Mayne Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Mayne Drug was unlawfully restrained, suppressed, or eliminated.

3529.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mayne Drug until the market achieves a steady state.

3530.    As a direct and proximate result of Mayne's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mayne Drug than it would have paid in the absence of Mayne's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

3531.    There is no legitimate, non-pretextual, pro-competitive business justification for Mayne's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3532.    Mayne's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3533.    Mayne's conduct violated the following state antitrust or competition practices laws:

 a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

 b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

 c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

 d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

 e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

 f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

 g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

 h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

 i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

 j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

 k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

 l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

 m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

 n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

 o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XCIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

3534.   Humana incorporates by reference the preceding allegations.

3535.   Mayne engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

direct and proximate result of Mayne's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Mayne Drug at prices restrained by competition and forced to pay artificially inflated prices.

3536.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Mayne Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Mayne Drug should have been available, and would have been available, absent Mayne's illegal conduct.

3537.   By engaging in the foregoing conduct, Mayne engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

     a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

     b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

     c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

     e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

     g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

     h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

     j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

     k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

     m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

REDACTED – PUBLIC VERSION

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT XCIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

3538.   Humana incorporates by reference the preceding allegations.

3539.   Mayne has benefitted from artificial prices in the sale of the Mayne Drug resulting
from the unlawful and inequitable acts alleged in this Complaint.

3540.   Mayne's financial benefit resulting from its unlawful and inequitable acts are
traceable to overpayments for the Mayne Drug by Humana.

3541.   Humana has conferred upon Mayne an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3542.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mayne Drug.

3543.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mayne Drug, as it is not liable and would not compensate Humana for the impact of Mayne's unlawful conduct.

3544.   The economic benefit of overcharges derived by Mayne through charging supracompetitive and artificially inflated prices for the Mayne Drug is a direct and proximate result of Mayne's unlawful conduct.

3545.   The economic benefits derived by Mayne rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mayne.

3546.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mayne to be permitted to retain any of the overcharges for the Mayne Drug derived from Mayne's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3547.   Mayne is aware of and appreciates the benefits bestowed upon it by Humana.

3548.   Mayne should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3549.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mayne traceable to Humana.

REDACTED – PUBLIC VERSION

## COUNT XCV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

3550.   Humana incorporates by reference the preceding allegations.

3551.   Mayne knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mayne Drug. Mayne injured Humana through this conduct.

3552.   But for Mayne's scheme to inflate the price of the Mayne Drug, Humana would have purchased lower-priced Mayne Drug.

3553.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mayne Drug than it would have paid absent Mayne's continuing anticompetitive conduct.

3554.   Humana has purchased substantial amounts of the Mayne Drug during the relevant period.

3555.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mayne's conduct violates Sections 1 and 2 of the Sherman Act.

3556.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mayne's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XCVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

3557.   Humana incorporates by reference the preceding allegations.

3558.   Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Mylan Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Albuterol Sulfate
> Allopurinol
> Amiloride HCL/HCTZ
> Atenolol Chlorthalidone
> Bromocriptine Mesylate
> Budesonide
> Buspirone HCL
> Butorphanol Tartrate
> Capecitabine
> Captopril
> Cimetidine
> Clonidine TTS
> Diclofenac Potassium
> Diltiazem HCL
> Diphenoxylate Atropine
> Doxazosin Mesylate
> Enalapril Maleate
> Estradiol
> Fenofibrate
> Fluoxetine HCL
> Flurbiprofen
> Fluvastatin Sodium
> Glipizide-Metformin
> Haloperidol
> Ketoconazole
> Ketoprofen
> Ketorolac Tromethamine
> Loperamide HCL
> Methotrexate
> Modafinil
> Montelukast
> Nadolol

Nitrofurantoin MAC
Pentoxifylline
Permethrin
Phenytoin Sodium
Pioglitazone HCL
Piroxicam
Potassium Chloride
Prazosin HCL
Prochlorperazine
Sotalol HCl
Spironolactone HCTZ
Tamoxifen Citrate
Tizanidine
Tolmetin Sodium
Tolterodine
Triamterene HCTZ
Trifluoperazine HCL
Valsartan HCTZ

3559.    Mylan has committed at least one overt act to further the conspiracy alleged in this

Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on interstate

commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

3560.    The conspiracy realized its intended effect; Mylan has benefited, and continues to

benefit, from its anticompetitive agreements which have artificially inflated the prices of the Mylan

Drugs.

3561.    The contract, combination, or conspiracy had the following direct, substantial, and

reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or

          stabilized prices at supracompetitive levels for the Mylan Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of

          the Mylan Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully

          restrained, suppressed, or eliminated.

3562.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

3563.    As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3564.    Mylan is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3565.    There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3566.    Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3567.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Mylan Drugs, or by assignment from its other subsidiaries that directly purchased the Mylan Drugs during the relevant period.

## COUNT XCVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Mylan and All Other Defendants Under Joint and Several Liability)

3568.    Humana incorporates by reference the preceding allegations.

3569.    Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Mylan Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3570.   Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

3571.   The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mylan Drugs.

3572.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

3573.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

3574.   As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3575.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

3576.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3577.   Mylan's conduct violated the following state antitrust or competition practices laws:

a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North

     Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

     Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XCVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

3578.   Humana incorporates by reference the preceding allegations.

3579.   Mylan engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mylan's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Mylan Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

3580.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Mylan Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Mylan Drugs should have been available, and would have been available, absent Mylan's illegal conduct.

3581.   By engaging in the foregoing conduct, Mylan engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XCIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

3582.   Humana incorporates by reference the preceding allegations.

3583.   Mylan has benefitted from artificial prices in the sale of the Mylan Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3584.   Mylan's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mylan Drugs by Humana.

3585.   Humana has conferred upon Mylan an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3586.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mylan Drugs.

3587.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mylan Drugs, as it is not liable and would not compensate Humana for the impact of Mylan's unlawful conduct.

3588.   The economic benefit of overcharges derived by Mylan through charging supracompetitive and artificially inflated prices for the Mylan Drugs is a direct and proximate result of Mylan's unlawful conduct.

3589.   The economic benefits derived by Mylan rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mylan.

3590.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mylan to be permitted to retain any of the overcharges for the Mylan Drugs derived from Mylan's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3591.   Mylan is aware of and appreciates the benefits bestowed upon it by Humana.

3592.   Mylan should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3593.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mylan traceable to Humana.

## COUNT C

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Mylan and All Other Defendants Under Joint and Several Liability)**

3594.   Humana incorporates by reference the preceding allegations.

3595.   Mylan knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mylan Drugs. Mylan injured Humana through this conduct.

3596.   But for Mylan's scheme to inflate the price of the Mylan Drugs, Humana would have purchased lower-priced Mylan Drugs.

3597.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mylan Drugs than it would have paid absent Mylan's continuing anticompetitive conduct.

3598.   Humana has purchased substantial amounts of the Mylan Drugs during the relevant period.

3599.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mylan's conduct violates Sections 1 and 2 of the Sherman Act.

3600.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mylan's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Par and All Other Defendants Under Joint and Several Liability)

3601.    Humana incorporates by reference the preceding allegations.

3602.    Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Par Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Allopurinol
> Budesonide
> Cabergoline
> Cholestyramine
> Dexmethylphenidate HCL ER
> Doxazosin Mesylate
> Entecavir
> Fluoxetine HCL
> Flutamide
> Hydralazine
> Hydroxyurea
> Isosorbide Dinitrate
> Labetalol HCL
> Lamotrigine ER
> Methimazole
> Methotrexate
> Methylphenidate
> Methylprednisolone
> Metoprolol Succinate ER
> Modafinil
> Omega-3-Acid Ethyl Esters
> Oxybutynin Chloride
> Oxycodone/Acetaminophen
> Perphenazine
> Prednisone
> Triamcinolone Acetonide

3603.    Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Par Drugs throughout the United States.

3604.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Par Drugs.

3605.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;
>
> b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and
>
> c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

3606.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

3607.   As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3608.   Par is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3609.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

3610.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3611.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Par Drugs, or by assignment from its other subsidiaries that directly purchased the Par Drugs during the relevant period.

## COUNT CII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Par and All Other Defendants Under Joint and Several Liability)

3612.   Humana incorporates by reference the preceding allegations.

3613.   Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Par Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3614.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Par Drugs throughout the United States.

3615.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Par Drugs.

3616.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

  b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

3617.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

3618.   As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3619.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3620.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3621.   Par's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

3622.   Humana incorporates by reference the preceding allegations.

3623.   Par engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Par's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Par Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3624.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Par Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Par Drugs should have been available, and would have been available, absent Par's illegal conduct.

3625.   By engaging in the foregoing conduct, Par engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

REDACTED – PUBLIC VERSION

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT CIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

3626.    Humana incorporates by reference the preceding allegations.

3627.    Par has benefitted from artificial prices in the sale of the Par Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3628.    Par's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Par Drugs by Humana.

3629.    Humana has conferred upon Par an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3630.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Par Drugs.

3631.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Par Drugs, as it is not liable and would not compensate Humana for the impact of Par's unlawful conduct.

3632.    The economic benefit of overcharges derived by Par through charging supracompetitive and artificially inflated prices for the Par Drugs is a direct and proximate result of Par's unlawful conduct.

3633.    The economic benefits derived by Par rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Par.

3634.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Par to be permitted to retain any of the overcharges for the Par Drugs derived from Par's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3635.    Par is aware of and appreciates the benefits bestowed upon it by Humana.

3636.    Par should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3637.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Par traceable to Humana.

## COUNT CV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Par and All Other Defendants Under Joint and Several Liability)

3638.    Humana incorporates by reference the preceding allegations.

3639.    Par knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Par Drugs. Par injured Humana through this conduct.

3640.    But for Par's scheme to inflate the price of the Par Drugs, Humana would have purchased lower-priced Par Drugs.

3641.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Par Drugs than it would have paid absent Par's continuing anticompetitive conduct.

3642.    Humana has purchased substantial amounts of the Par Drugs during the relevant period.

3643.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Par's conduct violates Sections 1 and 2 of the Sherman Act.

3644.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Par's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

3645.   Humana incorporates by reference the preceding allegations.

3646.   Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Perrigo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Betamethasone Dipropionate
> Betamethasone Dipropionate Augmented
> Bromocriptine Mesylate
> Ciclopirox
> Clindamycin Phosphate
> Fenofibrate
> Fluocinonide
> Halobetasol Propionate
> Hydrocortisone Valerate
> Imiquimod
> Permethrin
> Prochlorperazine Maleate
> Triamcinolone Acetonide

3647.   Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

3648.   The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Perrigo Drugs.

3649.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

3650.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

3651.   As a direct and proximate result of Perrigo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3652.   Perrigo is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3653.   There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3654.   Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

3655.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Perrigo Drugs, or by assignment from its other subsidiaries that directly purchased the Perrigo Drugs during the relevant period.

## COUNT CVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

3656.   Humana incorporates by reference the preceding allegations.

3657.   Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Perrigo Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3658.   Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

3659.   The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Perrigo Drugs.

3660.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

3661.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

3662.   As a direct and proximate result of Perrigo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3663.   There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3664.   Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3665.   Perrigo's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

3666.  Humana incorporates by reference the preceding allegations.

3667.  Perrigo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Perrigo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Perrigo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3668.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Perrigo Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Perrigo Drugs should have been available, and would have been available, absent Perrigo's illegal conduct.

3669.  By engaging in the foregoing conduct, Perrigo engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

3670.   Humana incorporates by reference the preceding allegations.

3671.   Perrigo has benefitted from artificial prices in the sale of the Perrigo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3672.   Perrigo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Perrigo Drugs by Humana.

3673.   Humana has conferred upon Perrigo an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3674.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Perrigo Drugs.

3675.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Perrigo Drugs, as it is not liable and would not compensate Humana for the impact of Perrigo's unlawful conduct.

3676.   The economic benefit of overcharges derived by Perrigo through charging supracompetitive and artificially inflated prices for the Perrigo Drugs is a direct and proximate result of Perrigo's unlawful conduct.

3677.   The economic benefits derived by Perrigo rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Perrigo.

3678.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Perrigo to be permitted to retain any of the overcharges for the Perrigo Drugs derived

REDACTED – PUBLIC VERSION

from Perrigo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3679.   Perrigo is aware of and appreciates the benefits bestowed upon it by Humana.

3680.   Perrigo should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3681.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Perrigo traceable to Humana.

## COUNT CX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

3682.   Humana incorporates by reference the preceding allegations.

3683.   Perrigo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Perrigo Drugs. Perrigo injured Humana through this conduct.

3684.   But for Perrigo's scheme to inflate the price of the Perrigo Drugs, Humana would have purchased lower-priced Perrigo Drugs.

3685.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Perrigo Drugs than it would have paid absent Perrigo's continuing anticompetitive conduct.

3686.   Humana has purchased substantial amounts of the Perrigo Drugs during the relevant period.

3687.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Perrigo's conduct violates Sections 1 and 2 of the Sherman Act.

3688.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Perrigo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

3689.    Humana incorporates by reference the preceding allegations.

3690.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sandoz Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Alclometasone Dipropionate
> Amantadine HCL
> Amoxicillin/Clavulanate
> Amphetamine/Dextroamphetamine IR
> Betamethasone Dipropionate
> Betamethasone Dipropionate Augmented
> Betamethasone Dipropionate Clotrimazole
> Betamethasone Valerate
> Bromocriptine Mesylate
> Budesonide
> Bumetanide
> Carbamazepine
> Cefdinir
> Cefprozil
> Chlorpromazine HCL
> Cholestyramine
> Ciclopirox
> Clemastine Fumarate
> Clotrimazole
> Clindamycin Phosphate
> Dexmethylphenidate HCL ER
> Diclofenac Potassium
> Dicloxacillin Sodium

Eplerenone
Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
Etodolac
Fluocinolone Acetonide
Fluocinonide
Fosinopril HCTZ
Griseofulvin
Halobetasol Propionate
Haloperidol
Hydroxyzine Pamoate
Imiquimod
Isoniazid
Isosorbide Dinitrate
Ketoconazole
Labetalol HCL
Lidocaine HCL
Methylphenidate
Methylprednisolone
Metronidazole
Nabumetone
Nadolol
Oxaprozin
Penicillin VK
Perphenazine
Pioglitazone-Metformin
Potassium Chloride
Prednisolone Acetate
Prochlorperazine
Ranitidine HCL
Temozolomide
Timolol Maleate
Tizanidine
Tobramycin
Triamcinolone Acetonide
Triamterene HCTZ
Trifluoperazine HCL
Valsartan HCTZ

3691.   Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

3692.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sandoz Drugs.

3693.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

3694.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

3695.   As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3696.   Sandoz is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3697.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3698.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3699.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Sandoz Drugs, or by assignment from its other subsidiaries that directly purchased the Sandoz Drugs during the relevant period.

## COUNT CXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

3700.   Humana incorporates by reference the preceding allegations.

3701.   Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sandoz Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3702.   Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

3703.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sandoz Drugs.

3704.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

3705.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

3706.   As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3707.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3708.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3709.   Sandoz's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

3710.   Humana incorporates by reference the preceding allegations.

3711.   Sandoz engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sandoz's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sandoz Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3712.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Sandoz Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Sandoz Drugs should have been available, and would have been available, absent Sandoz's illegal conduct.

3713.   By engaging in the foregoing conduct, Sandoz engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
    purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
    Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

## COUNT CXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

3714.   Humana incorporates by reference the preceding allegations.

3715.   Sandoz has benefitted from artificial prices in the sale of the Sandoz Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3716.   Sandoz's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sandoz Drugs by Humana.

3717.   Humana has conferred upon Sandoz an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3718.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sandoz Drugs.

3719.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sandoz Drugs, as it is not liable and would not compensate Humana for the impact of Sandoz's unlawful conduct.

3720.   The economic benefit of overcharges derived by Sandoz through charging supracompetitive and artificially inflated prices for the Sandoz Drugs is a direct and proximate result of Sandoz's unlawful conduct.

3721.   The economic benefits derived by Sandoz rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sandoz.

3722.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sandoz to be permitted to retain any of the overcharges for the Sandoz Drugs derived

REDACTED – PUBLIC VERSION

from Sandoz's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3723.    Sandoz is aware of and appreciates the benefits bestowed upon it by Humana.

3724.    Sandoz should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3725.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Sandoz traceable to Humana.

## COUNT CXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

3726.    Humana incorporates by reference the preceding allegations.

3727.    Sandoz knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sandoz Drugs. Sandoz injured Humana through this conduct.

3728.    But for Sandoz's scheme to inflate the price of the Sandoz Drugs, Humana would have purchased lower-priced Sandoz Drugs.

3729.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sandoz Drugs than it would have paid absent Sandoz's continuing anticompetitive conduct.

3730.    Humana has purchased substantial amounts of the Sandoz Drugs during the relevant period.

3731.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sandoz's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3732.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sandoz's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Strides and All Other Defendants Under Joint and Several Liability)

3733.    Humana incorporates by reference the preceding allegations.

3734.    Strides knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Stride Drugs"). This conspiracy was *per se* unlawful price-fixing.

### Hydralazine

3735.    Strides has committed at least one overt act to further the conspiracy alleged in this Complaint. Strides anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Strides Drugs throughout the United States.

3736.    The conspiracy realized its intended effect; Strides has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Strides Drugs.

3737.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Strides Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Strides Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Strides Drugs was unlawfully restrained, suppressed, or eliminated.

3738.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Strides Drugs until the market achieves a steady state.

3739.   As a direct and proximate result of Strides' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Strides Drugs than it would have paid in the absence of Strides' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3740.   Strides is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3741.   There is no legitimate, non-pretextual, pro-competitive business justification for Strides' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3742.   Strides' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3743.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Strides Drugs, or by assignment from its other subsidiaries that directly purchased the Strides Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT CXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Strides and All Other Defendants Under Joint and Several Liability)**

3744.   Humana incorporates by reference the preceding allegations.

3745.   Strides knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Strides Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3746.   Strides has committed at least one overt act to further the conspiracy alleged in this Complaint. Strides' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Strides Drugs throughout the United States.

3747.   The conspiracy realized its intended effect; Strides has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Strides Drugs.

3748.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Strides Drugs;
>
> b.   Humana was deprived of the benefits of free and open competition in the sale of the Strides Drugs in the United States market; and
>
> c.   Competition in establishing the prices paid for the Strides Drugs was unlawfully restrained, suppressed, or eliminated.

3749.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Strides Drugs until the market achieves a steady state.

3750.    As a direct and proximate result of Strides' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Strides Drugs than it would have paid in the absence of Strides' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3751.    There is no legitimate, non-pretextual, pro-competitive business justification for Strides' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3752.    Strides' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3753.    Strides' conduct violated the following state antitrust or competition practices laws:

  a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

  b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

  d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

  e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

  f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

  g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

  h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

  i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

  j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

  k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

  l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Strides and All Other Defendants Under Joint and Several Liability)

3754.   Humana incorporates by reference the preceding allegations.

3755.   Strides engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Strides' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Strides Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3756.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Strides Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Strides Drugs should have been available, and would have been available, absent Strides' illegal conduct.

3757.   By engaging in the foregoing conduct, Strides engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT CXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Strides and All Other Defendants Under Joint and Several Liability)

3758.   Humana incorporates by reference the preceding allegations.

3759.   Strides has benefitted from artificial prices in the sale of the Strides Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3760.   Strides' financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Strides Drugs by Humana.

3761.   Humana has conferred upon Strides an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3762.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Strides Drugs.

3763.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Strides Drugs, as it is not liable and would not compensate Humana for the impact of Strides' unlawful conduct.

3764.   The economic benefit of overcharges derived by Strides through charging supracompetitive and artificially inflated prices for the Strides Drugs is a direct and proximate result of Strides' unlawful conduct.

3765.   The economic benefits derived by Strides rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Strides.

3766.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Strides to be permitted to retain any of the overcharges for the Strides Drugs derived from Strides' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

REDACTED – PUBLIC VERSION

3767.   Strides is aware of and appreciates the benefits bestowed upon it by Humana.

3768.   Strides should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3769.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Strides traceable to Humana.

## COUNT CXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Strides and All Other Defendants Under Joint and Several Liability)

3770.   Humana incorporates by reference the preceding allegations.

3771.   Strides knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Strides Drugs. Strides injured Humana through this conduct.

3772.   But for Strides' scheme to inflate the price of the Strides Drugs, Humana would have purchased lower-priced Strides Drugs.

3773.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Strides Drugs than it would have paid absent Strides' continuing anticompetitive conduct.

3774.   Humana has purchased substantial amounts of the Strides Drugs during the relevant period.

3775.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Strides' conduct violates Sections 1 and 2 of the Sherman Act.

3776.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Strides' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sun and All Other Defendants Under Joint and Several Liability)

3777.   Humana incorporates by reference the preceding allegations.

3778.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sun Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Albuterol Sulfate
> Buprenorphine
> Eszopiclone
> Metformin ER
> Methylphenidate
> Nimodipine
> Paromomycin
> Phenytoin Sodium
> Spironolactone HCTZ
> Tizanidine

3779.   Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sun Drugs throughout the United States.

3780.   The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sun Drugs.

3781.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

c. Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

3782.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

3783.    As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3784.    Sun is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3785.    There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3786.    Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3787.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its direct purchases of its purchases of the Sun Drugs, or by assignment from its other subsidiaries that directly purchased the Sun Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT CXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

3788.   Humana incorporates by reference the preceding allegations.

3789.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sun Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3790.   Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sun Drugs throughout the United States.

3791.   The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sun Drugs.

3792.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

3793.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

3794.   As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3795.   There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3796.   Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3797.   Sun's conduct violated the following state antitrust or competition practices laws:

   a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

   b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

   d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

   g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

   i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

   j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

   k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

   l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT CXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

3798.   Humana incorporates by reference the preceding allegations.

3799.   Sun engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sun's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sun Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3800.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Sun Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Sun Drugs should have been available, and would have been available, absent Sun's illegal conduct.

3801.   By engaging in the foregoing conduct, Sun engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

     a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

     b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

     c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

     e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

     g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

     h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

    p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

    q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

    t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

    u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

    v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

    w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

    x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

3802.   Humana incorporates by reference the preceding allegations.

3803.   Sun has benefitted from artificial prices in the sale of the Sun Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3804.   Sun's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sun Drugs by Humana.

3805.   Humana has conferred upon Sun an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3806.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sun Drugs.

3807.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sun Drugs, as it is not liable and would not compensate Humana for the impact of Sun's unlawful conduct.

3808.   The economic benefit of overcharges derived by Sun through charging supracompetitive and artificially inflated prices for the Sun Drugs is a direct and proximate result of Sun's unlawful conduct.

3809.   The economic benefits derived by Sun rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sun.

3810.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sun to be permitted to retain any of the overcharges for the Sun Drugs derived from Sun's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3811.   Sun is aware of and appreciates the benefits bestowed upon it by Humana.

3812.   Sun should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3813.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Sun traceable to Humana.

## COUNT CXXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

3814.   Humana incorporates by reference the preceding allegations.

3815.   Sun knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sun Drugs. Sun injured Humana through this conduct.

3816.   But for Sun's scheme to inflate the price of the Sun Drugs, Humana would have purchased lower-priced Sun Drugs.

3817.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sun Drugs than it would have paid absent Sun's continuing anticompetitive conduct.

3818.   Humana has purchased substantial amounts of the Sun Drugs during the relevant period.

3819.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sun's conduct violates Sections 1 and 2 of the Sherman Act.

3820.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Sun's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Taro and All Other Defendants Under Joint and Several Liability)

3821.   Humana incorporates by reference the preceding allegations.

3822.   Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Taro Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Alclometasone Dipropionate
> Betamethasone Dipropionate
> Betamethasone Dipropionate Augmented
> Betamethasone Dipropionate Clotrimazole
> Betamethasone Valerate
> Carbamazepine
> Ciclopirox
> Clindamycin Phosphate
> Clotrimazole
> Enalapril Maleate
> Epitol
> Etodolac
> Fluocinolone Acetonide
> Fluocinonide
> Halobetasol Propionate
> Hydrocortisone Valerate
> Imiquimod
> Ketoconazole
> Lidocaine HCL
> Metronidazole
> Nortriptyline HCL
> Phenytoin Sodium
> Triamcinolone Acetonide
> Warfarin Sodium

3823.   Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Taro Drugs throughout the United States.

3824.   The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Taro Drugs.

3825.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

  b.   Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

  c.   Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

3826.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

3827.   As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3828.   Taro is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

3829.   There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3830.   Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3831.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Taro Drugs, or by assignment from its other subsidiaries that directly purchased the Taro Drugs during the relevant period.

## COUNT CXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Taro and All Other Defendants Under Joint and Several Liability)

3832.   Humana incorporates by reference the preceding allegations.

3833.   Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Taro Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3834.   Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Taro Drugs throughout the United States.

3835.   The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Taro Drugs.

3836.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

3837.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

3838.   As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3839.   There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3840.   Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3841.   Taro's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

3842.   Humana incorporates by reference the preceding allegations.

3843.   Taro engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Taro's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Taro Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3844.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Taro Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Taro Drugs should have been available, and would have been available, absent Taro's illegal conduct.

3845.   By engaging in the foregoing conduct, Taro engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

3846.   Humana incorporates by reference the preceding allegations.

3847.   Taro has benefitted from artificial prices in the sale of the Taro Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3848.   Taro's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Taro Drugs by Humana.

3849.   Humana has conferred upon Taro an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3850.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Taro Drugs.

3851.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Taro Drugs, as it is not liable and would not compensate Humana for the impact of Taro's unlawful conduct.

3852.   The economic benefit of overcharges derived by Taro through charging supracompetitive and artificially inflated prices for the Taro Drugs is a direct and proximate result of Taro's unlawful conduct.

3853.    The economic benefits derived by Taro rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Taro.

3854.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Taro to be permitted to retain any of the overcharges for the Taro Drugs derived from Taro's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3855.    Taro is aware of and appreciates the benefits bestowed upon it by Humana.

3856.    Taro should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3857.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Taro traceable to Humana.

## COUNT CXXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Taro and All Other Defendants Under Joint and Several Liability)

3858.    Humana incorporates by reference the preceding allegations.

3859.    Taro knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Taro Drugs. Taro injured Humana through this conduct.

3860.    But for Taro's scheme to inflate the price of the Taro Drugs, Humana would have purchased lower-priced Taro Drugs.

3861.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Taro Drugs than it would have paid absent Taro's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

3862.   Humana has purchased substantial amounts of the Taro Drugs during the relevant period.

3863.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Taro's conduct violates Sections 1 and 2 of the Sherman Act.

3864.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Taro's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3865.   Humana incorporates by reference the preceding allegations.

3866.   Teligent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drug listed below in the United States, in violation of Section 1 of the Sherman Act (the "Teligent Drug"). This conspiracy was *per se* unlawful price-fixing.

Fluocinolone Acetonide

3867.   Teligent has committed at least one overt act to further the conspiracy alleged in this Complaint. Teligent's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Teligent Drug throughout the United States.

3868.   The conspiracy realized its intended effect; Teligent has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Teligent Drug.

3869.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teligent Drug;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Teligent Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Teligent Drug was unlawfully restrained, suppressed, or eliminated.

3870.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teligent Drug until the market achieves a steady state.

3871.   As a direct and proximate result of Teligent's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teligent Drug than it would have paid in the absence of Teligent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3872.   Teligent is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3873.   There is no legitimate, non-pretextual, pro-competitive business justification for Teligent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3874.   Teligent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

3875.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Teligent Drug, or by assignment from its other subsidiaries that directly purchased the Teligent Drug during the relevant period.

## COUNT CXXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Teligent and All Other Defendants Under Joint and Several Liability)**

3876.    Humana incorporates by reference the preceding allegations.

3877.    Teligent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Teligent Drug in the United States. This conspiracy was *per se* unlawful price-fixing.

3878.    Teligent has committed at least one overt act to further the conspiracy alleged in this Complaint. Teligent's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teligent Drug throughout the United States.

3879.    The conspiracy realized its intended effect; Teligent has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teligent Drug.

3880.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teligent Drug;

  b.    Humana was deprived of the benefits of free and open competition in the sale of the Teligent Drug in the United States market; and

  c.    Competition in establishing the prices paid for the Teligent Drug was unlawfully restrained, suppressed, or eliminated.

3881.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teligent Drug until the market achieves a steady state.

3882.   As a direct and proximate result of Teligent's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teligent Drug than it would have paid in the absence of Teligent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3883.   There is no legitimate, non-pretextual, pro-competitive business justification for Teligent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3884.   Teligent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3885.   Teligent's conduct violated the following state antitrust or competition practices laws:

     a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

     b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

     d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

     e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

     g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

     i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

     j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3886.   Humana incorporates by reference the preceding allegations.

3887.   Teligent engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teligent's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Teligent Drug at prices restrained by competition and forced to pay artificially inflated prices.

3888.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Teligent Drug, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Teligent Drug should have been available, and would have been available, absent Teligent's illegal conduct.

3889.   By engaging in the foregoing conduct, Teligent engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CXXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3890.   Humana incorporates by reference the preceding allegations.

3891.   Teligent has benefitted from artificial prices in the sale of the Teligent Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3892.   Teligent's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teligent Drug by Humana.

3893.   Humana has conferred upon Teligent an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3894.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teligent Drug.

3895.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teligent Drug, as it is not liable and would not compensate Humana for the impact of Teligent's unlawful conduct.

3896.   The economic benefit of overcharges derived by Teligent through charging supracompetitive and artificially inflated prices for the Teligent Drug is a direct and proximate result of Teligent's unlawful conduct.

3897.   The economic benefits derived by Teligent rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teligent.

3898.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teligent to be permitted to retain any of the overcharges for the Teligent Drug derived

REDACTED – PUBLIC VERSION

from Teligent's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3899.   Teligent is aware of and appreciates the benefits bestowed upon it by Humana.

3900.   Teligent should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3901.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teligent traceable to Humana.

## COUNT CXXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3902.   Humana incorporates by reference the preceding allegations.

3903.   Teligent knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teligent Drug. Teligent injured Humana through this conduct.

3904.   But for Teligent's scheme to inflate the price of the Teligent Drug, Humana would have purchased lower-priced Teligent Drug.

3905.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teligent Drug than it would have paid absent Teligent's continuing anticompetitive conduct.

3906.   Humana has purchased substantial amounts of the Teligent Drug during the relevant period.

3907.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teligent's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3908.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teligent's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Torrent and All Other Defendants Under Joint and Several Liability)

3909.    Humana incorporates by reference the preceding allegations.

3910.    Torrent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Torrent Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Carbamazepine
> Pioglitazone HCL

3911.    Torrent has committed at least one overt act to further the conspiracy alleged in this Complaint. Torrent's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Torrent Drugs throughout the United States.

3912.    The conspiracy realized its intended effect; Torrent has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Torrent Drugs.

3913.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or
          stabilized prices at supracompetitive levels for the Torrent Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the Torrent Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the Torrent Drugs was unlawfully restrained, suppressed, or eliminated.

3914.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Torrent Drugs until the market achieves a steady state.

3915.   As a direct and proximate result of Torrent's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Torrent Drugs than it would have paid in the absence of Torrent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3916.   Torrent is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3917.   There is no legitimate, non-pretextual, pro-competitive business justification for Torrent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3918.   Torrent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3919.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Torrent Drugs, or by assignment from its other subsidiaries that directly purchased the Torrent Drugs during the relevant period.

## COUNT CXXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Torrent and All Other Defendants Under Joint and Several Liability)**

3920.    Humana incorporates by reference the preceding allegations.

3921.    Torrent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Torrent Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3922.    Torrent has committed at least one overt act to further the conspiracy alleged in this Complaint. Torrent's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Torrent Drugs throughout the United States.

3923.    The conspiracy realized its intended effect; Torrent has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Torrent Drugs.

3924.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Torrent Drugs;

   b.    Humana was deprived of the benefits of free and open competition in the sale of the Torrent Drugs in the United States market; and

   c.    Competition in establishing the prices paid for the Torrent Drugs was unlawfully restrained, suppressed, or eliminated.

3925.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Torrent Drugs until the market achieves a steady state.

3926.   As a direct and proximate result of Torrent's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Torrent Drugs than it would have paid in the absence of Torrent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3927.   There is no legitimate, non-pretextual, pro-competitive business justification for Torrent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3928.   Torrent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3929.   Torrent's conduct violated the following state antitrust or competition practices laws:

   a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

   b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

   d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

   e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

   g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

   i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

   j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

   k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

   l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Torrent and All Other Defendants Under Joint and Several Liability)

3930.  Humana incorporates by reference the preceding allegations.

3931.  Torrent engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Torrent's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Torrent Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3932.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Torrent Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Torrent Drugs should have been available, and would have been available, absent Torrent's illegal conduct.

3933.  By engaging in the foregoing conduct, Torrent engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT CXXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Torrent and All Other Defendants Under Joint and Several Liability)

3934.    Humana incorporates by reference the preceding allegations.

3935.    Torrent has benefitted from artificial prices in the sale of the Torrent Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3936.    Torrent's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Torrent Drugs by Humana.

3937.    Humana has conferred upon Torrent an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3938.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Torrent Drugs.

3939.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Torrent Drugs, as it is not liable and would not compensate Humana for the impact of Torrent's unlawful conduct.

3940.    The economic benefit of overcharges derived by Torrent through charging supracompetitive and artificially inflated prices for the Torrent Drugs is a direct and proximate result of Torrent's unlawful conduct.

3941.    The economic benefits derived by Torrent rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Torrent.

3942.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Torrent to be permitted to retain any of the overcharges for the Torrent Drugs derived

REDACTED – PUBLIC VERSION

from Torrent's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3943.   Torrent is aware of and appreciates the benefits bestowed upon it by Humana.

3944.   Torrent should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3945.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Torrent traceable to Humana.

## COUNT CXL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Torrent and All Other Defendants Under Joint and Several Liability)

3946.   Humana incorporates by reference the preceding allegations.

3947.   Torrent knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Torrent Drugs. Torrent injured Humana through this conduct.

3948.   But for Torrent's scheme to inflate the price of the Torrent Drugs, Humana would have purchased lower-priced Torrent Drugs.

3949.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Torrent Drugs than it would have paid absent Torrent's continuing anticompetitive conduct.

3950.   Humana has purchased substantial amounts of the Torrent Drugs during the relevant period.

3951.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Torrent's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

3952.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Torrent's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXLI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3953.    Humana incorporates by reference the preceding allegations.

3954.    Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Upsher-Smith Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amantadine HCL
> Chlorpromazine HCL
> Cholestyramine
> Eplerenone
> Oxybutynin Chloride
> Potassium Chloride

3955.    Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Upsher-Smith Drugs throughout the United States.

3956.    The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Upsher-Smith Drugs.

3957.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

 a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drugs;

 b. Humana was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drugs in the United States market; and

 c. Competition in establishing the prices paid for the Upsher-Smith Drugs was unlawfully restrained, suppressed, or eliminated.

3958. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Upsher-Smith Drugs until the market achieves a steady state.

3959. As a direct and proximate result of Upsher-Smith's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Upsher-Smith Drugs than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3960. Upsher-Smith is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

3961. There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3962. Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3963. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Upsher-Smith Drugs, or by assignment from its other subsidiaries that directly purchased the Upsher-Smith Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT CXLII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)**

3964.    Humana incorporates by reference the preceding allegations.

3965.    Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Upsher-Smith Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3966.    Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Upsher-Smith Drugs throughout the United States.

3967.    The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Upsher-Smith Drugs.

3968.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Upsher-Smith Drugs was unlawfully restrained, suppressed, or eliminated.

3969.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Upsher-Smith Drugs until the market achieves a steady state.

3970.    As a direct and proximate result of Upsher-Smith's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Upsher-Smith Drugs than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3971.    There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3972.    Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3973.    Upsher-Smith's conduct violated the following state antitrust or competition practices laws:

      a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

      k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

      l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXLIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3974.   Humana incorporates by reference the preceding allegations.

3975.   Upsher-Smith engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Upsher-Smith's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Upsher-Smith Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3976.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Upsher-Smith Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Upsher-Smith Drugs should have been available, and would have been available, absent Upsher-Smith's illegal conduct.

3977.   By engaging in the foregoing conduct, Upsher-Smith engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CXLIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3978.   Humana incorporates by reference the preceding allegations.

3979.   Upsher-Smith has benefitted from artificial prices in the sale of the Upsher-Smith Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3980.   Upsher-Smith's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Upsher-Smith Drugs by Humana.

3981.   Humana has conferred upon Upsher-Smith an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

3982.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Upsher-Smith Drugs.

3983.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Upsher-Smith Drugs, as it is not liable and would not compensate Humana for the impact of Upsher-Smith's unlawful conduct.

3984.   The economic benefit of overcharges derived by Upsher-Smith through charging supracompetitive and artificially inflated prices for the Upsher-Smith Drugs is a direct and proximate result of Upsher-Smith's unlawful conduct.

3985.   The economic benefits derived by Upsher-Smith rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Upsher-Smith.

3986.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Upsher-Smith to be permitted to retain any of the overcharges for the Upsher-Smith

REDACTED – PUBLIC VERSION

Drugs derived from Upsher-Smith's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3987.   Upsher-Smith is aware of and appreciates the benefits bestowed upon it by Humana.

3988.   Upsher-Smith should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

3989.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Upsher-Smith traceable to Humana.

## COUNT CXLV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3990.   Humana incorporates by reference the preceding allegations.

3991.   Upsher-Smith knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Upsher-Smith Drugs. Upsher-Smith injured Humana through this conduct.

3992.   But for Upsher-Smith's scheme to inflate the price of the Upsher-Smith Drugs, Humana would have purchased lower-priced Upsher-Smith Drugs.

3993.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Upsher-Smith Drugs than it would have paid absent Upsher-Smith's continuing anticompetitive conduct.

3994.   Humana has purchased substantial amounts of the Upsher-Smith Drugs during the relevant period.

REDACTED – PUBLIC VERSION

3995.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Upsher-Smith's conduct violates Sections 1 and 2 of the Sherman Act.

3996.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Upsher-Smith's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXLVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

3997.    Humana incorporates by reference the preceding allegations.

3998.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Valeant Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Enalapril Maleate
> Fluocinonide
> Metronidazole
> Omeprazole Sodium
> Pentoxifylline
> Timolol Maleate

3999.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Valeant Drugs throughout the United States.

4000.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Valeant Drugs.

4001.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Valeant Drugs was unlawfully restrained, suppressed, or eliminated.

4002.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drugs until the market achieves a steady state.

4003.   As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drugs than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4004.   Valeant is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

4005.   There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4006.   Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

4007.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Valeant Drugs, or by assignment from its other subsidiaries that directly purchased the Valeant Drugs during the relevant period.

## COUNT CXLVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

4008.    Humana incorporates by reference the preceding allegations.

4009.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Valeant Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4010.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Valeant Drugs throughout the United States.

4011.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Valeant Drugs.

4012.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Valeant Drugs was unlawfully restrained, suppressed, or eliminated.

4013.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drugs until the market achieves a steady state.

4014.   As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drugs than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4015.   There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4016.   Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4017.   Valeant's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CXLVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

4018.   Humana incorporates by reference the preceding allegations.

4019.   Valeant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Valeant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Valeant Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4020.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Valeant Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Valeant Drugs should have been available, and would have been available, absent Valeant's illegal conduct.

4021.   By engaging in the foregoing conduct, Valeant engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CXLIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

4022.    Humana incorporates by reference the preceding allegations.

4023.    Valeant has benefitted from artificial prices in the sale of the Valeant Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4024.    Valeant's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Valeant Drugs by Humana.

4025.    Humana has conferred upon Valeant an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4026.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Valeant Drugs.

4027.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Valeant Drugs, as it is not liable and would not compensate Humana for the impact of Valeant's unlawful conduct.

4028.    The economic benefit of overcharges derived by Valeant through charging supracompetitive and artificially inflated prices for the Valeant Drugs is a direct and proximate result of Valeant's unlawful conduct.

4029.    The economic benefits derived by Valeant rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Valeant.

4030.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Valeant to be permitted to retain any of the overcharges for the Valeant Drugs derived

REDACTED – PUBLIC VERSION

from Valeant's unfair and unconscionable methods, acts, and trade practices alleged in this

Complaint.

4031.   Valeant is aware of and appreciates the benefits bestowed upon it by Humana.

4032.   Valeant should be compelled to disgorge in a common fund for the benefit of

Humana all unlawful or inequitable proceeds it received.

4033.   A constructive trust should be imposed upon all unlawful or inequitable sums

received by Valeant traceable to Humana.

## COUNT CL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

4034.   Humana incorporates by reference the preceding allegations.

4035.   Valeant knowingly, intentionally, and cooperatively engaged in an anticompetitive

scheme designed to artificially inflate prices of the Valeant Drugs. Valeant injured Humana through

this conduct.

4036.   But for Valeant's scheme to inflate the price of the Valeant Drugs, Humana would

have purchased lower-priced Valeant Drugs.

4037.   Humana has suffered harm, and will continue to suffer harm in the future, as a result

of paying higher prices for the Valeant Drugs than it would have paid absent Valeant's continuing

anticompetitive conduct.

4038.   Humana has purchased substantial amounts of the Valeant Drugs during the relevant

period.

4039.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and

28 U.S.C. § 2201(a) ruling that Valeant's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

4040.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Valeant's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CLI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

4041.   Humana incorporates by reference the preceding allegations.

4042.   Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Versapharm Drugs"). This conspiracy was *per se* unlawful price-fixing.

Ethosuximide

4043.   Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Versapharm Drugs throughout the United States.

4044.   The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Versapharm Drugs.

4045.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Versapharm Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Versapharm Drugs was unlawfully restrained, suppressed, or eliminated.

4046.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Versapharm Drugs until the market achieves a steady state.

4047.   As a direct and proximate result of Versapharm's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Versapharm Drugs than it would have paid in the absence of Versapharm's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4048.   Versapharm is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

4049.   There is no legitimate, non-pretextual, pro-competitive business justification for Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4050.   Versapharm's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4051.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Versapharm Drugs, or by assignment from its other subsidiaries that directly purchased the Versapharm Drugs during the relevant period.

## COUNT CLII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

4052.   Humana incorporates by reference the preceding allegations.

4053.   Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Versapharm Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4054.   Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Versapharm Drugs throughout the United States.

4055.   The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Versapharm Drugs.

4056.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Versapharm Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Versapharm Drugs was unlawfully restrained, suppressed, or eliminated.

4057.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Versapharm Drugs until the market achieves a steady state.

4058.   As a direct and proximate result of Versapharm's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Versapharm Drugs than it would have paid in the absence of Versapharm's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4059.   There is no legitimate, non-pretextual, pro-competitive business justification for Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4060.   Versapharm's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4061.   Versapharm's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CLIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

4062.   Humana incorporates by reference the preceding allegations.

4063.   Versapharm engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Versapharm's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Versapharm Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4064.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Versapharm Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Versapharm Drugs should have been available, and would have been available, absent Versapharm's illegal conduct.

4065.   By engaging in the foregoing conduct, Versapharm engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

REDACTED – PUBLIC VERSION

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

## COUNT CLIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

4066.    Humana incorporates by reference the preceding allegations.

4067.    Versapharm has benefitted from artificial prices in the sale of the Versapharm Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4068.    Versapharm's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Versapharm Drugs by Humana.

4069.    Humana has conferred upon Versapharm an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4070.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Versapharm Drugs.

4071.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Versapharm Drugs, as it is not liable and would not compensate Humana for the impact of Versapharm's unlawful conduct.

4072.    The economic benefit of overcharges derived by Versapharm through charging supracompetitive and artificially inflated prices for the Versapharm Drugs is a direct and proximate result of Versapharm's unlawful conduct.

4073.    The economic benefits derived by Versapharm rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Versapharm.

4074.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Versapharm to be permitted to retain any of the overcharges for the Versapharm Drugs

derived from Versapharm's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4075.   Versapharm is aware of and appreciates the benefits bestowed upon it by Humana.

4076.   Versapharm should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

4077.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Versapharm traceable to Humana.

## COUNT CLV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

4078.   Humana incorporates by reference the preceding allegations.

4079.   Versapharm knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Versapharm Drugs. Versapharm injured Humana through this conduct.

4080.   But for Versapharm's scheme to inflate the price of the Versapharm Drugs, Humana would have purchased lower-priced Versapharm Drugs.

4081.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Versapharm Drugs than it would have paid absent Versapharm's continuing anticompetitive conduct.

4082.   Humana has purchased substantial amounts of the Versapharm Drugs during the relevant period.

4083.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Versapharm's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

4084.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Versapharm's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CLVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

4085.   Humana incorporates by reference the preceding allegations.

4086.   West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "West-Ward Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Balsalazide Disodium
> Butorphanol Tartrate
> Captopril
> Isosorbide Dinitrate
> Methadone HCL
> Methotrexate
> Prednisone

4087.   West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

4088.   The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the West-Ward Drugs.

4089.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

4090.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

4091.    As a direct and proximate result of West-Ward's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the West-Ward Drugs than it would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4092.    West-Ward is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

4093.    There is no legitimate, non-pretextual, pro-competitive business justification for West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4094.    West-Ward's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

REDACTED – PUBLIC VERSION

4095.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the West-Ward Drugs, or by assignment from its other subsidiaries that directly purchased the West-Ward Drugs during the relevant period.

## COUNT CLVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

4096.    Humana incorporates by reference the preceding allegations.

4097.    West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the West-Ward Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4098.    West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

4099.    The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the West-Ward Drugs.

4100.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

   b.    Humana was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

   c.    Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

4101.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

4102.    As a direct and proximate result of West-Ward's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the West-Ward Drugs than it would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4103.    There is no legitimate, non-pretextual, pro-competitive business justification for West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4104.    West-Ward's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4105.    West-Ward's conduct violated the following state antitrust or competition practices laws:

    a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CLVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

4106.   Humana incorporates by reference the preceding allegations.

4107.   West-Ward engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of West-Ward's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the West-Ward Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4108.   There was and is a gross disparity between the price that Humana paid and continues to pay for the West-Ward Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced West-Ward Drugs should have been available, and would have been available, absent West-Ward's illegal conduct.

4109.   By engaging in the foregoing conduct, West-Ward engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

     a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

     b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

     c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

     e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

     g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT CLIX

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

4110.    Humana incorporates by reference the preceding allegations.

4111.    West-Ward has benefitted from artificial prices in the sale of the West-Ward Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4112.    West-Ward's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the West-Ward Drugs by Humana.

4113.    Humana has conferred upon West-Ward an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4114.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the West-Ward Drugs.

4115.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the West-Ward Drugs, as it is not liable and would not compensate Humana for the impact of West-Ward's unlawful conduct.

4116.    The economic benefit of overcharges derived by West-Ward through charging supracompetitive and artificially inflated prices for the West-Ward Drugs is a direct and proximate result of West-Ward's unlawful conduct.

4117.    The economic benefits derived by West-Ward rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting West-Ward.

4118.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for West-Ward to be permitted to retain any of the overcharges for the West-Ward Drugs

REDACTED – PUBLIC VERSION

derived from West-Ward's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4119.   West-Ward is aware of and appreciates the benefits bestowed upon it by Humana.

4120.   West-Ward should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

4121.   A constructive trust should be imposed upon all unlawful or inequitable sums received by West-Ward traceable to Humana.

## COUNT CLX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

4122.   Humana incorporates by reference the preceding allegations.

4123.   West-Ward knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the West-Ward Drugs. West-Ward injured Humana through this conduct.

4124.   But for West-Ward's scheme to inflate the price of the West-Ward Drugs, Humana would have purchased lower-priced West-Ward Drugs.

4125.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the West-Ward Drugs than it would have paid absent West-Ward's continuing anticompetitive conduct.

4126.   Humana has purchased substantial amounts of the West-Ward Drugs during the relevant period.

4127.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that West-Ward's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

4128.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by West-Ward's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CLXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

4129.   Humana incorporates by reference the preceding allegations.

4130.   Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Wockhardt Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Captopril
> Enalapril Maleate

4131.   Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

4132.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Wockhardt Drugs.

4133.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;

945

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Wockhardt Drugs was unlawfully restrained, suppressed, or eliminated.

4134.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

4135.   As a direct and proximate result of Wockhardt's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Wockhardt Drugs than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4136.   Wockhardt is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

4137.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4138.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4139.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Wockhardt Drugs, or by assignment from its other subsidiaries that directly purchased the Wockhardt Drugs during the relevant period.

REDACTED – PUBLIC VERSION

## COUNT CLXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

4140.   Humana incorporates by reference the preceding allegations.

4141.   Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Wockhardt Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4142.   Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

4143.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Wockhardt Drugs.

4144.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Wockhardt Drugs was unlawfully restrained, suppressed, or eliminated.

4145.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

4146.   As a direct and proximate result of Wockhardt's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Wockhardt Drugs than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4147.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4148.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4149.   Wockhardt's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

      k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

      l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT CLXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

4150.  Humana incorporates by reference the preceding allegations.

4151.  Wockhardt engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Wockhardt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Wockhardt Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4152.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Wockhardt Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Wockhardt Drugs should have been available, and would have been available, absent Wockhardt's illegal conduct.

4153.  By engaging in the foregoing conduct, Wockhardt engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CLXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

4154.   Humana incorporates by reference the preceding allegations.

4155.   Wockhardt has benefitted from artificial prices in the sale of the Wockhardt Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4156.   Wockhardt's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Wockhardt Drugs by Humana.

4157.   Humana has conferred upon Wockhardt an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4158.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Wockhardt Drugs.

4159.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Wockhardt Drugs, as it is not liable and would not compensate Humana for the impact of Wockhardt's unlawful conduct.

4160.   The economic benefit of overcharges derived by Wockhardt through charging supracompetitive and artificially inflated prices for the Wockhardt Drugs is a direct and proximate result of Wockhardt's unlawful conduct.

4161.   The economic benefits derived by Wockhardt rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Wockhardt.

4162.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Wockhardt to be permitted to retain any of the overcharges for the Wockhardt Drugs

**REDACTED – PUBLIC VERSION**

derived from Wockhardt's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4163.   Wockhardt is aware of and appreciates the benefits bestowed upon it by Humana.

4164.   Wockhardt should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

4165.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Wockhardt traceable to Humana.

## COUNT CLXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

4166.   Humana incorporates by reference the preceding allegations.

4167.   Wockhardt knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Wockhardt Drugs. Wockhardt injured Humana through this conduct.

4168.   But for Wockhardt's scheme to inflate the price of the Wockhardt Drugs, Humana would have purchased lower-priced Wockhardt Drugs.

4169.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Wockhardt Drugs than it would have paid absent Wockhardt's continuing anticompetitive conduct.

4170.   Humana has purchased substantial amounts of the Wockhardt Drugs during the relevant period.

4171.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Wockhardt's conduct violates Sections 1 and 2 of the Sherman Act.

4172.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Wockhardt's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CLXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

4173.    Humana incorporates by reference the preceding allegations.

4174.    Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Zydus Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acyclovir
> Clarithromycin ER
> Etodolac
> Fenofibrate
> Haloperidol
> Niacin ER
> Paricalcitol
> Potassium Chloride
> Topiramate Sprinkle
> Warfarin Sodium

4175.    Zydus has committed at least one overt act to further the conspiracy alleged in this Complaint. Zydus's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

4176.    The conspiracy realized its intended effect; Zydus has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Zydus Drugs.

4177.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

        b.    Humana was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

        c.    Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

4178.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

4179.    As a direct and proximate result of Zydus's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4180.    Zydus is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

4181.    There is no legitimate, non-pretextual, pro-competitive business justification for Zydus's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4182.    Zydus's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4183.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Zydus Drugs, or by assignment from its other subsidiaries that directly purchased the Zydus Drugs during the relevant period.

## COUNT CLXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

4184.   Humana incorporates by reference the preceding allegations.

4185.   Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Zydus Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4186.   Zydus has committed at least one overt act to further the conspiracy alleged in this Complaint. Zydus's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

4187.   The conspiracy realized its intended effect; Zydus has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Zydus Drugs.

4188.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

4189.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

4190.   As a direct and proximate result of Zydus's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4191.   There is no legitimate, non-pretextual, pro-competitive business justification for Zydus's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4192.   Zydus's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4193.   Zydus's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT CLXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

4194.    Humana incorporates by reference the preceding allegations.

4195.    Zydus engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Zydus's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Zydus Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4196.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Zydus Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Zydus Drugs should have been available, and would have been available, absent Zydus's illegal conduct.

4197.    By engaging in the foregoing conduct, Zydus engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

     a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

     b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

     c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

     e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

     g.   Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

     h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.    Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.    West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CLXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

4198.   Humana incorporates by reference the preceding allegations.

4199.   Zydus has benefitted from artificial prices in the sale of the Zydus Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4200.   Zydus's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Zydus Drugs by Humana.

4201.   Humana has conferred upon Zydus an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4202.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Zydus Drugs.

4203.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Zydus Drugs, as it is not liable and would not compensate Humana for the impact of Zydus's unlawful conduct.

4204.   The economic benefit of overcharges derived by Zydus through charging supracompetitive and artificially inflated prices for the Zydus Drugs is a direct and proximate result of Zydus's unlawful conduct.

4205.   The economic benefits derived by Zydus rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Zydus.

4206.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Zydus to be permitted to retain any of the overcharges for the Zydus Drugs derived

REDACTED – PUBLIC VERSION

from Zydus's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4207.   Zydus is aware of and appreciates the benefits bestowed upon it by Humana.

4208.   Zydus should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

4209.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Zydus traceable to Humana.

## COUNT CLXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

4210.   Humana incorporates by reference the preceding allegations.

4211.   Zydus knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Zydus Drugs. Zydus injured Humana through this conduct.

4212.   But for Zydus's scheme to inflate the price of the Zydus Drugs, Humana would have purchased lower-priced Zydus Drugs.

4213.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Zydus Drugs than it would have paid absent Zydus's continuing anticompetitive conduct.

4214.   Humana has purchased substantial amounts of the Zydus Drugs during the relevant period.

4215.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Zydus's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

4216.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Zydus's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CLXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

### (As to All Defendants)

4217.   Humana incorporates by reference the preceding allegations.

4218.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

4219.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing the Subject Drugs prices throughout the United States.

4220.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

4221.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

4222.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

4223.   As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4224.   Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

4225.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4226.   Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4227.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic the Subject Drugs, or by assignment from its other subsidiaries that directly purchased generic the Subject Drugs during the relevant periods.

## COUNT CLXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)

### (As to All Defendants)

4228.   Humana incorporates by reference the preceding allegations.

4229.    Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

4230.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

4231.    The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

4232.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

4233.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

4234.    As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4235.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4236.   Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4237.   Defendants' conduct violated the following state antitrust or competition practices laws:

4238.

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

REDACTED – PUBLIC VERSION

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT CLXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

4239.    Humana incorporates by reference the preceding allegations.

4240.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4241.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Subject Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

4242.    By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CLXXIV

## UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

4243.    Humana incorporates by reference the preceding allegations.

4244.    Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4245.    Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Humana.

4246.    Humana has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

4247.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

4248.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Humana for the impact of Defendants' unlawful conduct.

4249.    The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

4250.    The economic benefits derived by Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant periods, benefiting Defendants.

4251.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs

REDACTED – PUBLIC VERSION

derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4252.   Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

4253.   Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

4254.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Humana.

## COUNT CLXXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

#### (As to All Defendants)

4255.   Humana incorporates by reference the preceding allegations.

4256.   Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Humana through this conduct.

4257.   But for Defendants' scheme to inflate the price of the Subject Drugs, Humana would have purchased lower-priced Subject Drugs.

4258.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

4259.   Humana has purchased substantial amounts of the Subject Drugs during the relevant periods.

REDACTED – PUBLIC VERSION

4260.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

4261.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## XV.   DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Defendants, as follows:

A.  Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B.  Entering judgment against Defendants, jointly and severally, for the damages sustained by Humana, and awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.  Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

D.  Awarding all other legal or equitable relief as the Court deems just and proper.

## XVI.   JURY DEMAND

Humana demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).


Dated: December 15, 2020                          Respectfully submitted:

                                                  **LOWEY DANNENBERG, P.C.**


                                                  By:  _Laura K. Mummert_
                                                      Laura K. Mummert, PA ID # 85964
                                                      One Tower Bridge

**REDACTED – PUBLIC VERSION**

100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Tel: 215-399-4770
LMummert@lowey.com

**LOWEY DANNENBERG, P.C.**

Peter D. St. Phillip, PA ID # 70027
Thomas Skelton
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
TSkelton@lowey.com

**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**

Todd Schneider
Jason Kim
Matt Weiler
Kyle Bates
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

*Counsel for Humana Inc.*